**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, | ) | |
| PLAINTIFF, | ) | |
| v. | ) | Cause No. 2:19-cv-64-PPS |
| CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY, | ) | |
| DEFENDANTS. | ) | |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Defendants CITY OF SOUTH BEND ("South Bend") and JUSTIN GORNY ("Officer Gorny"), by and through their respective undersigned counsel, and pursuant to Northern District of Indiana Local Rule 56-1(a)(3), provide the following statement of material facts in support of their Joint Motion for Summary Judgment:

**TABLE OF CONTENTS** **PAGE, PARAGRAPH**


I. The Events of July 20, 2018.

A. The Hot Spot Patrol. .......... 1, ¶1

B. Officer Gorny Responds to Radio Traffic about an Erratic Driver Leaving the Area of the Hot Spot Patrol, and Traveling toward Officer Gorny's Beat. .......... 2, ¶12

C. The Accident. .......... 7, ¶50

II. South Bend Policy and Training on Emergency Vehicle Operations.

A. Academy Training. .......... 8, ¶62

B. South Bend Police Department Policy on Emergency Vehicle Operations. . 9, ¶67

C. South Bend's Field Training Officer Program. .......... 11, ¶72

D. Inservice Training. ........................................................................ 12, ¶79

E. South Bend Police Department Review of Damage to Department Vehicles. ........................................................................ 14, ¶87

F. South Bend Police Officers' Understanding of Department Policy on Emergency Vehicle Operations. ........................................................................ 15, ¶92

III. South Bend Policy and Training on Pursuits.

A. South Bend's Pursuit Policy. ........................................................................ 16, ¶101

B. South Bend Training on Pursuits. ........................................................................ 17, ¶103

C. South Bend Review of Police Pursuits. ........................................................................ 17, ¶106

IV. Officer Gorny's Training on Emergency Vehicle Operations and Pursuits. ... 19, ¶115

## I. THE EVENTS OF JULY 20, 2018.

### A. THE HOT SPOT PATROL.

1. On the morning of July 20, 2018, South Bend Police Department Sergeant Ryan Hiipakka, Officer Zachary Alfrey, Officer James Wagner, Officer Gregory Howard, and Officer Mollie O'Blenis were working a "hot spot" patrol in the Northwest District. ECF #1, ¶¶12-15; Exhibit D at 33:13 – 34:9; Exhibit L at 313:2-13. A "hot spot" patrol involves an increase of police monitoring within that designated area. ECF #1, ¶12.

2. Officer Gorny was not assigned to work the hot spot. Exhibit D at 31:17-22. Officer Gorny was assigned to the Southwest District, otherwise known as "The Lake," that night. ECF #1, ¶25; Exhibit D at 32:18-24; Exhibit L at 313:14-16, 431:8-18.

3. Officer Gorny was assigned to the "X car." Exhibit L at 313:14-16.

4. An X car is expected to assist with traffic stops. Exhibit L at 307:12-18.

5. Officer Alfrey was working in an unmarked, undercover van with Officer Wagner. ECF #1, ¶13; Exhibit A at 8:16-19, 9:8-10; Exhibit D at 33:24 – 34:2; Exhibit G at 16:3-6. They were observing a residence that was believed to be distributing narcotics. Exhibit A at 22:2-25. If they observed someone at the house for a short time and then leave, they would follow that vehicle until a traffic stop could be performed to investigate the possible narcotics offenses. Exhibit A at 22:2-25; Exhibit G at 17:24 – 18:3.

6. Officer O'Blenis and Officer Howard were working in an unmarked car that was equipped with lights and siren. ECF #1, ¶14; Exhibit A at 8:22-9:7; Exhibit D at 34:6-9.

7. Sergeant Hiipakka was working in the hot spot area in a marked patrol car. ECF #1, ¶15; Exhibit A at 8:19-21; Exhibit D at 34:3-5; Exhibit G at 15:25 – 16:2.

8. Officers working the hot spot patrol were using a dedicated channel, Channel 7, to communicate with each other. ECF #1, ¶19.

9. Officer Gorny was monitoring Channel 7. ECF #1, ¶21. It was not inappropriate for Officer Gorny to monitor Channel 7. Exhibit L at 290:7-12.

10. Officers are expected to monitor each other's safety and radio traffic and be available and proactive to intervene when officers need assistance. Exhibit A at 25:17-21.

11. Officers working the hot spot patrol discussed over the radio their belief that someone had "made" them—i.e. identified the undercover van as a police vehicle. Exhibit N, 4:18:50 through 4:27:20, "Merged Radio Traffic (x94) START" at 00:00 through 1:45; Exhibit O, 4:18:50 through 4:27:20.[1]

### B. Officer Gorny Responds to Radio Traffic about an Erratic Driver Leaving the Area of the Hot Spot Patrol, and Traveling toward Officer Gorny's Beat.

12. Officer Alfrey observed a vehicle that was suspected of being involved in a narcotics transaction and left the hot spot in a fairly rapid fashion. Exhibit A at 23:1-12.

13. Officer Alfrey followed the vehicle, and observed it speeding and driving erratically. Exhibit A at 9:11-14, 23:13-16.

14. Officer Alfrey began to broadcast the vehicle's movements over the radio. Exhibit A at 23:13-16; Exhibit N, 4:30:02; Exhibit O, 4:30:02.

15. Officer Alfrey began to broadcast the vehicle's movements over the radio less than three minutes after the radio transmissions about the undercover officers being "made." Exhibit A at 23:13-16; Exhibit N, 4:27:20 through 4:30:02; Exhibit O, 4:27:20 through 4:30:02.

16. Officer Alfrey's goal was to perform a traffic stop. Exhibit A at 9:11-14.

17. Undercover officers rely on marked patrol cars to make traffic stops. Exhibit A at 25:12-16.

[1] The parties have stipulated to the accuracy of the transcript of the radio traffic.

18. Officer Gorny was at the intersection of South Sheridan and West Sample Street, talking with Officer Brandon Myers, when he heard the radio traffic about the reckless driver. ECF #1, ¶29; Exhibit D at 35:11-19.

19. Officer Gorny understood that the undercover officers needed a marked vehicle to initiate the traffic stop. Exhibit D at 35:17-22.

20. Officer Alfrey was following the driver that committed the traffic violation until a marked car could get him pulled over. Exhibit A at 14:14-22.

21. Officer Alfrey was unable to keep up with the vehicle. Exhibit A at 14:23-15:2.

22. The vehicle that Officer Alfrey was following turned southbound, heading toward the Southwest District, Officer Gorny's assigned district. Exhibit D at 41:24 – 42:8; Exhibit L at 290:13-21.

23. Officer Alfrey made the following radio transmissions about the vehicle he was following:

> *We do have a white minivan that's whipping pretty hard back through here, coming down College (unintelligible) Lincolnway and no plate light. And uh they're moving pretty good.*

Exhibit N, 4:30:02; Exhibit O, 4:30:02.

> *We're behind them west on Lincolnway and they blew through a stop sign up here.*

Exhibit N, 4:30:02; Exhibit O, 4:30:22.

> *He's uh south on Brookfield. He's zooming pretty good.*

Exhibit N, 4:30:02; Exhibit O, 4:30:54.

24. Sergeant Hiipakka then radioed that he was at Lincolnway and Bendix. Exhibit N, 4:31:05; Exhibit O, 4:31:05.

25. The intersection of Lincolnway and Bendix is one mile from the intersection of College and Lincolnway. Exhibit Q.

26. Officer Alfrey then radioed:

> *He's uh right on Linden or Orange. Headed towards Olive.*

Exhibit N, 4:31:28; Exhibit O, 4:31:28.

27. Officer Howard radioed that he was at Wilber and Lincolnway. Exhibit N, 4:31:42; Exhibit O, 4:31:42.

28. The intersection of Wilber and Lincolnway is approximately one mile driving distance from the intersection of Linden and Olive. Exhibit R.

29. Officer Alfrey then radioed:

> *OK, we're on Linden coming up to Olive. He's still moving pretty good. He's uh, turning left on Olive. Looks like he's gonna go over the tracks.*

Exhibit N, 4:31:51; Exhibit O, 4:31:51.

30. Officer Alfrey's radio transmissions indicated that the suspect vehicle had come from the area of the hot spot patrol, and that it was traveling toward the southwest region. Exhibit G at 51:15-20, 52:1-9.

31. Officer Gorny radioed:

> *95's not too far away from Olive* [*and*] *Western. What do you need?*

Exhibit D at 41:24 – 42:8; Exhibit N, 4:32:15; Exhibit O, 4:32:15.

32. "95" is Officer Gorny. Exhibit D at 37:2-10.

33. Officer Gorny proceeded north on Sheridan toward Western. ECF #1, ¶38.

34. The intersection of Sheridan and Sample is 1.5 miles driving distance from the intersection of Western and Olive. Exhibit S.

35. Officer Gorny turned right onto Western Avenue and proceeded east on Western. ECF #1, ¶40.

36. Officer Alfrey radioed:

> *OK, we've got a uh white or silver Ford Windstar, looks like. Um, no plate light. He's moving really good. He's getting ready to come over the tracks on Olive. We're behind him in our van.*

Exhibit N, 4:32:22; Exhibit O, 4:32:22.

37. Officer Gorny activated his overhead emergency lights as he proceeded east on Western because the radio traffic was sounding increasingly urgent. Exhibit D at 163:9-19, 181:22 – 182:2. Officer Gorny believed that it was urgent to stop the vehicle. Exhibit D at 77:19 – 78:4, 181:22 – 182:12.

38. When he activated his emergency lights, Officer Gorny did not activate his siren. Exhibit D at 87:22 – 88:1. He made this decision for tactical purposes. Exhibit D at 87:22 – 88:1. He believed that the siren would alert the suspect and put pedestrians at risk. Exhibit D at 88:2-13.

39. Officer Gorny radioed:

> *95's coming up Western towards Olive.*

Exhibit N, 4:32:37; Exhibit O, 4:32:37.

40. Officer Alfrey responded:

> *OK, uh, I'll stay behind him until uh you get him pulled over.*

Exhibit N, 4:32:42; Exhibit O, 4:32:42.

41. Officer Alfrey radioed:

> *OK. He's, uh, passing cars into oncoming traffic. He's, uh, driving in the opposite lane of traffic, coming back over into the correct lane. He's, uh, coming up Olive and Western now.*

Exhibit N, 4:32:53; Exhibit O, 4:32:53.

> *OK, he just blew through Western, uh, on Olive, going up towards the roundabout.*

Exhibit N, 4:33:15; Exhibit O, 4:33:15.

42. Based on the actions of the vehicle Alfrey was following and its erratic and dangerous driving, Alfrey believed that this was more than just a routine traffic stop or traffic violator. Exhibit A at 26:8-15.

43. Alfrey also believed, based on what he observed, that it was important for officers to promptly get that person stopped. Exhibit A at 26:19-22

44. A driver who runs a stop sign could be an indication that they are fleeing from police. Exhibit G at 49:22 – 50:17.

45. Driving at high speed is potentially consistent with someone fleeing. Exhibit G at 50:22 – 51:1.

46. Driving into the opposite lane to pass other vehicles could be another indication that the driver is fleeing. Exhibit G at 51:2-6.

47. While Officer Alfrey was following the vehicle, the driver of the vehicle that Officer Alfrey was following exhibited all of those behaviors. Exhibit G at 51:7-11.

48. Before Sergeant Hiipakka pulled the vehicle over, he did not know anything about the driver, including anything related to his criminal history or whether he possessed anything that might subject him to criminal liability, such as drugs or weapons, so he did not know whether the person was a felon. Exhibit G at 49:1-11.

49. The suspect vehicle's path of travel is shown in Exhibit T.

### C. THE ACCIDENT.

50. As Officer Gorny was driving on Western, he believed that the urgency of stopping the vehicle was increasing as he heard the radio traffic about the erratic driver. Exhibit D at 77:24-78:4, 85:3-17, 181:22 – 183:5; Exhibit L at 449:10-15; *see also* Exhibit O at 4:32:53.

51. Officer Gorny's driving down Western corresponded with the urgency to get to the suspect. Exhibit D at 183:1-9.

52. As Officer Gorny drove down Western, he saw the suspect vehicle go south on Olive Street. Exhibit L at 459:1-8. Officer Gorny attempted to activate his siren after he saw the suspect vehicle go through the intersection of Olive and Western. Exhibit L at 459:1 – 460:19.

53. When Officer Gorny attempted to activate his siren, he accidentally deactivated his emergency lights for a brief second. Exhibit D at 85:3-17; Exhibit L at 460:13-19. As soon as Officer Gorny realized that he had accidentally turned off his emergency lights, he looked down to turn his emergency lights and siren on. Exhibit D at 85:3-17, 88:14-18.

54. As Officer Gorny approached the intersection of Western and Kaley from the west, Erica Flores ("Flores") entered the intersection of Western and Kaley from the south. ECF #1, ¶45.

55. Flores entered the intersection as Officer Gorny was looking down to turn his siren on. Exhibit D at 85:3-17.

56. Officer Gorny saw Flores' vehicle just before the crash occurred. Exhibit D at 61:2-11. When Officer Gorny saw Flores' vehicle, he tried to swerve to avoid hitting it. Exhibit D at 61:2-11. He hit his brakes hard enough for the anti-lock braking system to engage. Exhibit E-45 at 1; Exhibit L at 68:1 – 71:6.

57. Officer Gorny struck Flores' vehicle. ECF #1, ¶46. Flores died as a result of the accident. ECF #1, ¶46.

58. Officer Gorny believed that he was operating his vehicle with due regard and was driving with his car under control. Exhibit D at 183:10-15.

59. Officer Gorny believed that he properly considered environmental factors, in that it was unlikely that pedestrians would have been out at this time and he was observant of his surroundings as he operated his vehicle down Sheridan and Western. Exhibit D at 183:21 – 184:22.

60. Officer Gorny believed that the traffic light at the intersection of Western and Kaley was green for his direction of travel when he entered the intersection. Exhibit D at 75:6-11, 76:13-15.

61. At all times relevant, Officer Gorny was acting under the color of state law and within the scope of his employment with the City of South Bend. ECF #1, ¶10.

## II. South Bend Policy and Training on Emergency Vehicle Operations.[2]

### A. Academy Training.

62. The Indiana Law Enforcement Academy teaches recruits about operating their emergency vehicles safely. Exhibit B at 133:24 – 134:9; Exhibit P (CITY 306-308, 356-517). The Academy teaches recruits about operating their emergency vehicles with due regard. Exhibit A at 28:10-19; Exhibit B at 134:10-15; Exhibit G at 42:3-11; Exhibit P (CITY 364, ¶11; CITY 366, ¶7; CITY 374, 381-89, 1302). The Academy teaches recruits the laws relating to reckless speed and operating their emergency vehicles with due regard. Exhibit B at 31:2-10; Exhibit K at 54:6-14.

63. "Due regard" means driving with proper care and concern for others. Exhibit B at 30:18-21; Exhibit L at 91:23-24.

[2] Unless stated otherwise, the facts in this section are as of July 20, 2018.

64. The Indiana Law Enforcement Academy teaches recruits about how the Constitution relates to law enforcement vehicle operations, and that reckless driving could be seen as a violation of the Fourteenth Amendment. Exhibit G at 40:18 – 42:11, 47:7-20.

65. The Academy teaches recruits about the Fourteenth Amendment "shocks the conscience" standard, and that due process claims are typically brought by innocent third parties who were injured or killed during emergency responses or pursuits. Exhibit B at 144:12 – 146:9; Exhibit B-10B; Exhibit P (CITY 401-406).

66. The Indiana Law Enforcement Academy teaches recruits to clear intersections. Exhibit A at 29:5-7; Exhibit P (CITY 486).

### B. South Bend Police Department Policy on Emergency Vehicle Operations.

67. When the South Bend Police Department adopts a new policy, that policy is provided to its officers, who are required to acknowledge that they reviewed it. Exhibit B at 71:6 – 72:4; Exhibit K at 86:23 – 87:2. South Bend officers are expected to know and comply with departmental policies. Exhibit B at 139:20-25; Exhibit K at 86:15-20. It is a normal practice for law enforcement agencies to require their officers to review and comply with departmental policies. Exhibit H at 97:21 – 98:3.

68. South Bend has a policy on emergency vehicle operations that its officers are required to know. Exhibit B at 56:19-22, 57:16-20; Exhibit P (CITY 1240-43).

69. South Bend Police Department policy 308 Officer Response to Calls provides, "This policy provides officers with guidelines for the safe and appropriate vehicular response to emergency and non-emergency incidents or requests for assistance, whether these are dispatched or self-initiated." Exhibit B-16B, §308.1; Exhibit K at 82:8-15, 83:10-24; Exhibit P (CITY 1240, §308.1). This policy further provides, "Officers responding to non-emergency calls shall proceed

accordingly, unless they are sent or redirected to a higher priority call, and shall obey all traffic laws." Exhibit B-16B, §308.3; Exhibit K at 82:8-15, 83:10-14, 83:25 – 84:7; Exhibit P (CITY 1240, §308.3). This policy further provides,

> Officers responding to an emergency call shall proceed immediately and shall continuously operate the emergency vehicle lighting and siren as required by law (I.C. § 9-21-1-8). Even when operating a vehicle in emergency mode, the law holds officers legally responsible to drive with due regard for the safety of all people.
>
> Members may disable the siren only if the call requires a "silent" response. If running "silent," then the officer must exercise extra caution for motorists and pedestrians. The vehicle emergency lighting shall be operated all times when the siren has been disabled.

Exhibit B-16B, §308.3.1; Exhibit K at 82:8-15, 83:10-14, 84:8-24; Exhibit L at 128:2 – 130:8; Exhibit P (CITY 1240, §308.3.1). This policy further provides,

> Officers responding to an emergency shall proceed immediately as appropriate and shall continuously operate the emergency vehicle lighting and siren as required by law (I.C. § 9-13-2-6(1)(B)).
>
> Responding with emergency lights and siren does not relieve the operator of an emergency vehicle of the duty to continue to drive with due regard for the safety of all persons and property, and does not protect the operator from the consequences of reckless disregard for the safety of others.

Exhibit B-16B, §308.5; Exhibit K at 82:8-15, 83:10-14, 85:3-15; Exhibit P (CITY 1241, §308.5). This policy further provides, "if the emergency equipment on the vehicle should fail to operate, the officer must terminate the emergency response and continue accordingly." Exhibit B-16B, §308.6; Exhibit K at 82:8-15, 83:10-14, 85:16-23; Exhibit P (CITY 1242, §308.6).

70. South Bend's policy requiring the use of lights *and* siren when responding to an emergency, unless circumstances justify a silent response, is more restrictive than Indiana law, which only requires law enforcement officers to use lights *or* siren when responding to an emergency. Exhibit B-16B, §308.3.1; Exhibit K at 82:8-15, 83:10-14, 84:8-24; Exhibit L at 184:21 – 185:6; Exhibit P (CITY 1240, §308.3.1); IC 9-21-1-8(c) ("This section [authorizing emergency

vehicles to disregard traffic laws] applies to an authorized emergency vehicle only when the vehicle is using audible or visual signals as required by law.").

71. South Bend officers understand that they are required to use both their lights and their siren when responding to emergency calls, except in certain circumstances for tactical reasons. Exhibit A at 15:15 – 16:20; Exhibit B at 40:17-42:10, 138:22 – 139:16. South Bend officers understand that, if they are responding without their siren, they are required to use their emergency lights and use extra caution. Exhibit B at 139:7-11; Exhibit G at 54:2-11.

### C. SOUTH BEND'S FIELD TRAINING OFFICER PROGRAM.

72. The South Bend Police Department utilizes a field training officer ("FTO") program for new officers who have completed the Academy. Exhibit A at 30:7-15; Exhibit C at 73:18 – 74:12.

73. The FTO program includes a post-basic training program, which is two-to-three weeks of additional classroom instruction. Exhibit A at 29:13-17, 30:7-15; Exhibit C at 72:8 – 74:12; Exhibit D at 170:21 – 171:4; Exhibit L at 342:14-21; Exhibit M, ¶5. The SBPD post-basic training program includes instruction on operating emergency vehicles with due regard, including in emergency situations. Exhibit A at 29:18 – 30:6; Exhibit L at 104:6 – 105:8, 343:1 – 344:8; Exhibit M, ¶5; Exhibit P (CITY 2689, 2691, 2693). This training includes instruction that Fourteenth Amendment claims may be "brought by innocent third parties injured or killed in emergency runs or pursuit situations by fleeting suspect or by law enforcement vehicle(s)." Exhibit P (CITY 2681). This training includes instruction on what is an emergency. Exhibit P (CITY 2690).

74. In the FTO program, a field training officer is assigned a probationary or new officer; the field training officer rides with the probationary or new officer and gives them hands-on training. Exhibit B at 68:7-14; Exhibit D at 171:8-11. The field training officer gives the new

officer advice, critiques their performance, and grades their performance at the end of every shift. Exhibit D at 171:12-16. If the new officer does something wrong, the field training officer tells them about it. Exhibit D at 171:17-19.

75. The FTO program utilizes written training materials called "Training Briefs," which give topics for the officer and their FTO to talk about and learn various aspects of the job. Exhibit B at 140:25 – 141:11. One of the Training Briefs used by SBPD discusses emergency vehicle operations, and instructs the officer that "You must use due regard for the safety of all citizens when running signal 10, as you can be held responsible for accidents caused by negligence." Exhibit B at 141:6 – 142:3; Exhibit B-20 at 1 (§A.2).

76. "Signal 10" is SBPD's term for running in emergency mode. Exhibit D at 37:11-13; Exhibit J at 24:6-15.

77. One of the Training Briefs used by SBPD instructs the officer that "All employees, on or off duty, using Department vehicles shall exercise good judgment at all times and respect the safety and property of all people." Exhibit P (CITY 872, §A.1).

78. Officers in SBPD's FTO program are instructed on driving with due regard. Exhibit A at 30:11-15; Exhibit B at 52:13 – 53:12, 134:19 – 135:2. Officers in the FTO program are graded on whether they operated their vehicle with due regard. Exhibit A at 30:16-18. Officers in the FTO program are taught to use their lights and siren. Exhibit L at 344:9-13, 345:2-5. Officers in the FTO program are instructed that, if they are not using their emergency equipment, they are required to abide by posted traffic laws. Exhibit B at 53:20 – 54:6.

### D. INSERVICE TRAINING.

79. South Bend officers receive annual state-mandated training on emergency vehicle operations ("EVO"). Exhibit B at 97:2-9, 136:5 – 137:1. During the state-mandated EVO training, officers are instructed about driving with due regard. Exhibit B at 136:5 – 137:1.

80. The South Bend Police Department trains its officers in emergency vehicle operations twice per year, in late spring and in early fall. Exhibit D at 140:4-9; Exhibit E at 85:6-14.

81. The emergency vehicle operations training would generally be held at a track at a Tire Rack facility. Exhibit E at 86:24 – 87:18; Exhibit J at 35:22-25. The track is a racetrack, not cones set up in a parking lot. Exhibit J at 84:7-19. It is between a quarter mile and a half mile in length. Exhibit J at 85:20-25.

82. The South Bend Police Department also has its EVO instructors discuss EVO training at roll calls from time to time. Exhibit E at 85:6-14.

83. South Bend trains its officers about constitutional responsibilities. Exhibit F at 205:14-20; Exhibit K at 54:19 – 55:3, 55:14-25.

84. The South Bend Police Department has a video of classroom EVO training for officers who missed the track training. Exhibit C-101; Exhibit L at 412:6-10.

85. The South Bend Police Department has additional EVO training videos available for officers. Exhibit C at 74:22 – 83:11; Exhibit C-103; Exhibit C-104; Exhibit C-105; Exhibit C-106.

86. The South Bend Police Department utilizes the "Below 100" program as part of its EVO training. Exhibit D at 177:1-17; Exhibit L at 99:8 – 100:16, 102:4-13, 498:21-25; Exhibit P (CITY 2594, 2642, 2662). The goal of the Below 100 program is to bring officer fatalities down to below 100 per year. Exhibit D at 177:1-7; Exhibit L at 99:8 – 100:16; Exhibit P (CITY 2642, 2662). The tenets of the Below 100 program are "Wear your belt," "Wear your vest," "Watch your speed," "WIN—What's important now?" and "Remember: Complacency Kills!" Exhibit D

at 177:8-10; Exhibit D-B; Exhibit L at 99:8 – 100:16, 100:20 – 102:3, 498:21-25; Exhibit P (CITY 2594, 2642).

### E. South Bend Police Department Review of Damage to Department Vehicles.

87. South Bend policy requires its officers to report any damage to a department vehicle. Exhibit B-16B, §703.6; Exhibit K at 83:1-5, 83:10-14; Exhibit P (CITY 1257, §703.3.2 ("Any previously unreported damage … shall be promptly reported to a supervisor and documented as appropriate."); CITY 1262, §703.6); *see also* Exhibit P (CITY 874-75, ¶7).

88. South Bend maintains records of all instances of damage to police vehicles. Exhibit B-16B, §703.6; Exhibit I at 27:17 – 30:7, 60:18-25; Exhibit K at 83:1-5, 83:10-14; Exhibit U.

89. South Bend reviews all instances of damage to police vehicles to determine whether the officer was at fault. Exhibit B-16B, §703.6; Exhibit I at 31:8-11; Exhibit K at 83:1-5, 83:10-14; Exhibit U.

90. South Bend takes corrective action for officers' at-fault accidents. Exhibit I at 60:18-25; Exhibit I-6C. The severity of the corrective action increases with the amount of damage to the department vehicle and the number of at-fault accidents within the preceding 12 months. Exhibit I-6C; Exhibit U.

91. Corrective action for at-fault damage incidents is typically "loss of unit," meaning that the officer loses their take-home car privileges for a specified number of days. Exhibit I at 33:19 – 34:4; Exhibit U. The take-home car privilege is an economic benefit for South Bend's police officers; officers who are able to use a take-home car do not have to drive their own car to and from work. Exhibit I at 34:4-10. "Loss of unit" ranges from 1 day, for minor accidents where the officer has no at-fault accidents within the prior 12 months, to 120 days, for serious accidents where the officer had several at-fault accidents within the prior 12 months. Exhibit I-6C; Exhibit

U. Officers found to be at fault for an accident have also received verbal warnings, written reprimands, and additional training. Exhibit I at 34:11 – 35:9, 36:20 – 37:2; Exhibit U.

### F. South Bend Police Officers' Understanding of Department Policy on Emergency Vehicle Operations.

92. In July 2018, Sergeant Hiipakka understood from his training that he was required to operate his emergency vehicle with due regard for the safety of all persons. Exhibit G at 55:17-21. He understood that he was required to drive his emergency vehicle with due regard for the safety of all persons at all times, including emergency runs. Exhibit G at 55:22 – 56:4.

93. In July 2018, Officer Alfrey understood that he was required to drive with due regard for all persons at all times while driving a police vehicle, including during emergency runs. Exhibit A at 30:19-31:6.[3]

94. No South Bend officer has testified in this action that they did not know that they were required to drive their patrol vehicles with due regard.

95. In July 2018, Sergeant Corey Calvert knew that recklessness may be considered a violation of the Fourteenth Amendment. Exhibit B at 31:15-22. South Bend trains its officers to watch their speed during an emergency call. Exhibit B at 43:19-21.

96. In July 2018, Sergeant Hiipakka understood that he was required to clear intersections when driving in emergency mode. Exhibit G at 56:5-8. He understood that it was particularly important to clear blind intersections. Exhibit G at 56:9-19.

97. A "blind" intersection is an intersection where you cannot see traffic coming from the left or right. Exhibit A at 34:2-7.

[3] Officer Gorny also testified that he knew in July 2018 that he was required to drive with due regard at all times when operating his patrol vehicle. *See* below, ¶125.

98. In July 2018, Officer Alfrey understood that he needed to clear intersections when driving in emergency mode, especially blind intersections. Exhibit A at 31:7-13.[4]

99. No South Bend officer has testified in this action that they did not know that they needed to clear intersections when driving in emergency mode.

100. Officer Gorny had never had trouble with the overhead emergency lights before this incident. Exhibit D at 85:18-23. No South Bend police officer ever mentioned to Officer Gorny that they were uncomfortable with the new switch to active the overhead emergency lights. Exhibit D at 85:24 – 87:21.

## III. South Bend Policy and Training on Pursuits.[5]

### A. South Bend's Pursuit Policy.

101. South Bend has a pursuit policy that all of its officers are required to abide by. Exhibit B at 55:24 – 56:14; Exhibit B-16B (§306); Exhibit P (CITY 1244-48).

102. SBPD's pursuit policy provides that "The decision to initiate pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large." Exhibit P (CITY 1244, §306.3(a)). This policy provides that, in deciding whether to initiate pursuit, the officer will consider road, weather, and environmental conditions; population density; vehicular and pedestrian traffic; the relative performance capabilities of the pursuit and the vehicle being pursued; and the seriousness of the offense. Exhibit P (CITY 1244, §306.3(c)). This policy provides that "[w]hen engaged in pursuit, officers have a legal responsibility to drive with due regard for the safety of all people." Exhibit P (CITY 1245, §306.4(d)). This policy provides that an officer must terminate a vehicle pursuit if the "[r]isks associated with continued

[4] Officer Gorny also testified that he knew in July 2018 that he needed to clear intersections. *See* below, ¶126.
[5] Unless stated otherwise, the facts in this section are as of July 20, 2018.

pursuit are greater than the public safety benefit of making an immediate apprehension." Exhibit P (CITY 1247, §306.8(a)(2)).

### B. SOUTH BEND TRAINING ON PURSUITS.

103. South Bend officers are trained on the pursuit policy during the FTO program. Exhibit B at 58:15 – 59:2, 66:6 – 67:2. South Bend officers are trained on when to initiate and terminate pursuits during the FTO program. Exhibit B at 76:17 – 79:16. If an officer in the FTO program engages in a pursuit, the training officer will discuss that pursuit with the officer they are training, and advise them about things that they could do better or should have done differently during the pursuit. Exhibit B at 135:3 – 136:4.

104. One of the training briefs used in SBPD's FTO program is titled "Vehicle Pursuit." Exhibit B at 142:17-21; Exhibit B-20 at 6; Exhibit P (CITY 850-55). This training brief instructs that "due regard" is "The duty to drive with Due Regard for the safety of all persons. Driving with the safety and welfare of all citizens on the roadway in mind in all circumstances." Exhibit B at 142:25 – 143:4; Exhibit B-20 at 6; Exhibit P (CITY 850). This training brief instructs on the factors that officers should consider when determining whether to initiate or continue a pursuit, including "[t]o drive with utmost Due Regard for the safety of all persons, especially the Public…." Exhibit P (CITY 852-53).

105. South Bend trains its officers to always use both their lights and their siren during a pursuit. Exhibit B at 42:20-24. South Bend trains its officers to watch their speed during a pursuit. Exhibit B at 43:13-18.

### C. SOUTH BEND REVIEW OF POLICE PURSUITS.

106. South Bend's practice is to informally review all pursuits with officers. Exhibit B at 34:18 – 35:13; Exhibit F at 43:13 – 44:2, 288:24 – 289:12; Exhibit P (CITY 1248, §306.10(b)). South Bend's policy and practice is for a supervisor to review the pursuit with the officer on the

same shift if possible, to go over things that they could have done better, things that they did well, and other things to take into consideration. Exhibit B at 137:10 – 138:21; Exhibit F at 43:13 – 44:2, 288:24 – 289:12.

107. South Bend also has a procedure for formal review of all of its pursuits. Exhibit F at 18:5 – 20:8, 286:21 – 287:8; Exhibit M, ¶6; Exhibit P (CITY 1247-48, §306.10).

108. South Bend officers are required to fill out a Vehicle Pursuit Form for every vehicle pursuit that they are involved in, and to provide those forms to internal affairs. Exhibit F at 18:5 – 20:8, 45:1-18; Exhibit M, ¶6; Exhibit P (CITY 1247, §306.10(a)). The internal affairs investigator then enters data into the Department's internal affairs data management system (which is called "IAPro"), gathers the reports, and turns it over to the captain of the South Bend Police Department Office of Risk Management ("ORM"). Exhibit F at 18:5 – 20:8, 27:13 – 28:3, 45:19-22, 281:23 – 284:8. The ORM captain then downloads and reviews the dash camera video. Exhibit F at 18:5 – 20:8, 47:18 – 48:9, 59:14 – 60:6, at 285:25 – 286:7.

109. The South Bend Police Department has a Pursuit Review Committee ("PRC"). Exhibit F at 18:5 – 20:8, at 154:10-12; Exhibit M, ¶7. The PRC is comprised of officers who are emergency vehicle instructors. Exhibit F at 18:5 – 20:8.

110. The captain of ORM acts as a gatekeeper for the PRC. Exhibit M, ¶8. The captain of ORM sends a pursuit to the PRC if there is a possible violation of SBPD policy. Exhibit F at 18:5 – 20:8, 21:10-15, 25:10-16, 29:11-15, 35:24 – 36:5, 53:3-9; Exhibit M, ¶8. If the captain of ORM finds no violation of SBPD policy, he does not send that pursuit to the PRC. Exhibit F at 18:5 – 20:8, 21:16-20, 25:10-16, 29:11-15, 35:8-16, 36:6-10, at 253:21 – 254:24; Exhibit M, ¶8.

111. When a pursuit is sent to the PRC for review, the PRC reviews the dash camera video, evaluates whether the pursuit was within policy, and then fills out a form with its findings. Exhibit F at 18:5 – 20:8, 26:19 – 27:8, 44:15-18, 286:10-15.

112. If the PRC finds a policy violation, the ORM captain notifies that officer's shift captain, and the officer is coached to make sure that the policy violation is corrected. Exhibit F at 37:2 – 39:25, 53:3-19. Other consequences for violating policy during a pursuit could be additional training or forbidding an officer from engaging in pursuits. Exhibit F at 94:18-23.

113. The IAPro database has fields for "Pursuit justified" and "Pursuit within policy." Exhibit F at 82:24 – 83:4, at 282:13-19. If the checkbox is not selected for these fields, these fields default to "no" when the summary for that pursuit is printed. Exhibit F at 82:24 – 86:19, 92:10-14, at 282:25 – 284:5. SBPD was not aware until 2024 that, if the checkbox is not checked, the IAPro printout says "No" for the "Pursuit justified" and "Pursuit within policy" fields. Exhibit F at 284:14-22.

114. It is not SBPD's usual practice to update the "Pursuit justified" and "Pursuit within policy" fields in IAPro if a pursuit is found to be justified and within policy. Exhibit F at 83:21 – 86:19, 87:6-23, 285:4-24. The determination of whether a pursuit was justified and within policy is found in the documents that are scanned and attached to the IAPro file. Exhibit F at 87:6-23, 89:6 – 90:4.

### IV. OFFICER GORNY'S TRAINING ON EMERGENCY VEHICLE OPERATIONS AND PURSUITS.

115. Officer Gorny received training at the police academy on emergency vehicle operations. Exhibit L at 93:18 – 94:18. Officer Gorny was trained at the police academy that he had to drive with due regard for the safety of the public when driving in emergency mode. Exhibit D at 156:7-13, 171:20-24; Exhibit L at 483:11-17; Exhibit P (CITY 306 ("[T]he driver of an

emergency vehicle must show 'due regard for the safety of all persons.'")). Officer Gorny understands "due regard" to mean driving in a manner that you are in control of your vehicle for the safety of the public and for yourself. Exhibit D at 172:13-20.

116. Officer Gorny received track training at the police academy, which included evasive maneuvers, high speeds, braking, and taking corners at high speed. Exhibit D at 176:12-21. Officer Gorny achieved speeds of at least 85 miles per hour during his track training at the police academy. Exhibit D at 176:22-25.

117. Officer Gorny was trained about clearing intersections at the police academy. Exhibit D at 175:19-21. The academy taught him that, when approaching a red light, you need to slow down, come to nearly a complete stop to clear both left and right of your intersection, and proceed with caution. Exhibit D at 175:22 – 176:4.

118. South Bend trained Officer Gorny that he had to use due regard for the safety of the public while driving his patrol car. Exhibit D at 154:5 – 156:10; Exhibit L at 483:18-24. He was trained in the FTO program that he was required to drive with due regard when operating an emergency vehicle. Exhibit D at 172:21 – 174:19; Exhibit D-A; Exhibit P (CITY 548-56, *& esp.* CITY 552; CITY 785-86, §A.2). Officer Gorny was trained that "You must use due regard for the safety of all citizens when running signal 10, as you can be held responsible for accidents caused by negligence." Exhibit D at 172:21 – 175:3; Exhibit D-A, § A.2.

119. During his FTO training, Officer Gorny was commended for driving with due regard during emergency runs. Exhibit L at 47:6 – 48:1; Exhibit P (CITY 919, 923, 998, 1026, 1052, 1061).

120. During his FTO training, Officer Gorny was noted to have engaged in unsafe emergency driving on one occasion; this was noted on the Daily Observation Report form that Officer Gorny signed. See Exhibit P (CITY 910).

121. South Bend trained Officer Gorny on clearing intersections during his FTO program. Exhibit D at 176:5-8.

122. During his FTO program, Officer Gorny was commended for thoroughly clearing intersections during an emergency run when it was raining. Exhibit P (CITY 1026).

123. Officer Gorny received inservice emergency vehicle operations training, which included hands-on training on a closed course. Exhibit D-15 at 2 ("EVO Training" in October 2017, "E.V.O" in April 2017), 3 ("EVO Classroom Version/Video" on December 21, 2016, "Mandatory EVO Training October 2016"), 4 ("SBPD EVO 2016" in April 2016); Exhibit D-19; Exhibit L at 94:6 – 96:13; Exhibit P (CITY 600-603).

124. In December 2016, Officer Gorny satisfied part of his annual EVO training requirement by watching a video of a recorded classroom training session. Exhibit C at 63:22 – 64:2, 86:1-3; Exhibit L at 484:10-22.

125. On July 20, 2018, Officer Gorny knew that he was required to drive with due regard when responding to calls on the midnight shift. Exhibit D at 175:4-10. He understood that he was required to use due regard if he was driving without his lights or siren on. Exhibit D at 175:11-18.

126. On July 20, 2018, Officer Gorny knew that he was required to clear an intersection before proceeding through the intersection against a red light. Exhibit D at 74:15 – 75:6.

127. On July 20, 2018, Officer Gorny understood that he was required to follow all of the South Bend Police Department policies. Exhibit D at 166:7-10.

Respectfully Submitted,

/s/ Joseph W. Smith
Joseph W. Smith
CLARK JOHNSON & KNIGHT, LTD.
233 East 84th Drive, Suite 301
Merrillville, Indiana 46410
Telephone: 219-322-0830
Facsimile: 219-322-0834
Attorneys for CITY OF SOUTH BEND

/s/ *R. Jeffrey Lowe*
R. Jeffrey Lowe, Atty. #21508-22
KIGHTLINGER & GRAY, LLP
Bonterra Building, Suite 200
3620 Blackiston Boulevard
New Albany, IN 47150
jlowe@k-glaw.com

/s/ Matthew S. Clark
Matthew S. Clark
CLARK JOHNSON & KNIGHT, LTD.
233 East 84th Drive, Suite 301
Merrillville, Indiana 46410
Telephone: 219-322-0830
Facsimile: 219-322-0834
Attorneys for CITY OF SOUTH BEND

/s/ John F. Kautzman
John F. Kautzman, #5544-49
RUCKELSHAUS, KAUTZMAN,
BLACKWELL, BEMIS, DUNCAN &
MERCHANT, LLP
135 N. Pennsylvania Street, Suite #1600
Indianapolis, IN 46204
Telephone: (317) 634-4356
Fax: (317) 634-8635
jfk@RKBlegalgroup.com

*Counsel for Defendant,*
*Justin Gorny*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 18th day of August, 2025, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to:

- Stephen J. Phillips sphillips2@phillipslegal.com
- Terrence M. Quinn tquinn@phillipslegal.com
- Kevin C. Smith ksmith@smithsersic.com
- Joseph W. Smith Jsmith@cjklaw.com, shazi@cjklaw.com
- Matthew S. Clark Mclark@cjklaw.com, kstocco@cjklaw.com
- R. Jeffrey Lowe jlowe@k-glaw.com
- John Kautzman jfk@rkblegalgroup.com
- Phillip M. Riley, pmr@rkblegalgroup.com

/s/ Joseph W. Smith
Joseph W. Smith