IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, | ) | |
| Plaintiff, | ) | Case No. 2:19-cv-00064-PPS-JEM |
| -vs- | ) | |
| CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY, | ) | |
| Defendants. | ) | |

VIDEOTAPED DEPOSITION OF
OFFICER ZACHARY ALFREY
October 17, 2024

Videotaped deposition of OFFICER ZACHARY ALFREY, conducted at the location of the Aloft Hotel, 111 North Main Street, South Bend, Indiana, commencing at 11:14 a.m., on the above date, before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter, Certified Realtime Reporter and Notary Public.



Exhibit A

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

PHILLIPS LAW OFFICES
161 North Clark Street, Suite 4925
Chicago, Illinois 60601
312-964-8296
BY: STEPHEN D. PHILLIPS, ESQ.
sphillips@phillipslegal.com
MICHAEL J. PHILLIPS, ESQ.
mphillips@phillipslegal.com
ALEC MESROBIAN, ESQ. (Via Zoom)
amesorbian@phillipslegal.com

ON BEHALF OF DEFENDANT CITY OF SOUTH BEND:

CLARK JOHNSON & KNIGHT, LTD.
233 East 84th Drive, Suite 301
Merrillville, Indiana 46410
219-322-0830
BY: JOSEPH W. SMITH, ESQ.
jsmith@cjklaw.com

ON BEHALF OF DEFENDANT JUSTIN GORNY:

RUCKELSHAUS KAUTZMAN BLACKWELL
BEMIS & DUNCAN, LLP
135 North Pennsylvania Street, Suite 1600
Indianapolis, Indiana 46204
317-634-4356
BY: JOHN F. KAUTZMAN, ESQ. (Via Zoom)
jfk@rkblegalgroup.com

ALSO PRESENT:

MR. ROGER LARSON, Paralegal,
City of South Bend

VIDEOTAPED BY: ANTHONY MICHELETTO

REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

I N D E X


| OFFICER ZACHARY ALFREY | EXAMINATION |
|---|---|
| BY MR. STEPHEN PHILLIPS....... | 5 |
| BY MR. KAUTZMAN............... | 21 |
| BY MR. SMITH.................. | 28 |
| BY MR. STEPHEN PHILLIPS....... | 31 |
| BY MR. KAUTZMAN............... | 35 |
| BY MR. STEPHEN PHILLIPS....... | 38 |


E X H I B I T S


| ALFREY DEPOSITION EXHIBIT | | MARKED FOR ID |
|---|---|---|
| No. 1 | Document, "Transcript of Radio Traffic, July 20, 2018" | 40 |

| EXHIBITS PREVIOUSLY MARKED | | FIRST REFERRED TO |
|---|---|---|
| Exhibit 3 | Video clip | 11 |

THE VIDEOGRAPHER: We are now on the record. My name is Anthony Micheletto. I'm a videographer for Golkow Litigation Services.

Today's date is October 17, 2024. The time is 11:14 a.m. as indicated on the video screen.

This video deposition is being held in South Bend, Indiana in the matter of Soraida Flores vs. City of South Bend.

Our deponent today is Zachary Alfrey.

Will counsel please identify themselves for the video record.

MR. STEPHEN PHILLIPS: Stephen Phillips and Michael Phillips on behalf of the Plaintiffs.

MR. SMITH: Joseph Smith for City of South Bend.

MR. KAUTZMAN: John Kautzman, Justin Gorny.

THE VIDEOGRAPHER: Our Court Reporter today is Corinne Marut. Please swear in the witness.

(WHEREUPON, the witness was duly sworn.)

OFFICE ZACHARY ALFREY,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STEPHEN PHILLIPS:

Q. Good morning, sir.
A. Good morning, sir.
Q. Would you state your name and spell your last name.
A. Yeah. My name is Zachary, Z-a-c-h-a-r-y, last name is Alfrey, A-l-f-r-e-y.
Q. My name is Steve Phillips. We've never met before, have we?
A. No.
Q. I'm going to be asking you a series of questions. The other lawyers may ask you questions as well. Okay?
A. Okay.
Q. Many of my answers will just require a yes or no answer. Fair enough?
A. Yes.
Q. What is your occupation or profession?
A. I'm a police officer with the City of Mishawaka.

Q. How long have you been with Mishawaka?
A. It will be five years this November.
Q. What is your rank?
A. I'm a Patrolman First Class.
Q. Now, you had a meeting and talked to the lawyers for the City of South Bend outside in the hallway before this deposition, right?
A. Um-hmm. Yes.
Q. And you spoke for at least 15 minutes or so?
A. Yes.
Q. You and I have never met and I've never talked to you. Is that accurate?
A. That is correct, yes.
Q. Have you talked to anyone from the City of South Bend since you got the subpoena for deposition in this case?
A. No. Outside of this morning in the hallway, that was the first time.
Q. Have you talked to Sergeant Hiipakka since you received the subpoena for deposition in this case?
A. Yes.
Q. And when did you talk to him?

A. I was away on training. He called me to let me know that a subpoena had been delivered to my mailbox at the police station. He said that he had been in contact with whoever had originally issued the subpoena and taken care of setting up the initial date and time scheduled for the first time we did the deposition. He said that he would take care of setting up the time, the Skype, all that stuff. I believe that was the same day that the subpoena was delivered. I -- I don't know the date.
Q. Okay. That's my question is when did you talk to Sergeant Hiipakka about -- would it be fair to say it was about the time you got the subpoena?
A. I would say within a day of the date of the subpoena was the day that we talked, correct.
Q. Have you talked to Sergeant Hiipakka about his deposition --
A. I have not.
Q. -- in this case?
A. No.
Q. When is the last time you spoke to Officer Gorny?

A. I have not spoke to Officer Gorny. We didn't -- we didn't speak when we were really employed together. I saw him the day of the incident obviously. But even before that incident, probably a few days, if not a few weeks, maybe in passing at the Police Department.

Q. Is it correct that you did not know Mr. Gorny well before this and had only worked with him a few times before this incident?

A. Yes, correct.

Q. Did you review any documents in preparation for this deposition?

A. No.

Q. Do you recall this incident?

A. Yes.

Q. On the night of this occurrence you were in an unmarked undercover van?

A. Yes.

Q. And there was also Sergeant Hiipakka in your group in a marked squad car, right?

A. Yes.

Q. And there was one other undercover vehicle with Officer O'Blenis and Officer -- who was the other officer with her?

A. I believe it was Officer Al Wiegand. I'm not -- I'm not sure, but I believe it was that.
Q. Okay. And they were in a detective car, unmarked, but it did have lights and siren --
A. Yes.
Q. -- available?
A. Yes.
Q. When you saw -- you were in a van with Officer -- was it Wagner?
A. Correct.
Q. When you saw the driver who was speeding and driving erratically, the goal -- would it be fair to say the goal was to perform a traffic stop?
A. Yes.
Q. And would it be fair to say that everybody involved in that contact with that erratic driver considered it to be a traffic stop?
A. Yes.
Q. When Officer Gorny was monitoring the radio, you recall he was monitoring the radio?
A. Yes.
Q. Did you know or expect that Officer Gorny was going to go through 14 intersections in a 30 mile an hour speed zone at

speeds over 90 miles per hour for this traffic stop?

MR. SMITH: Objection to form. You can answer.

BY THE WITNESS:

A. No.

BY MR. STEPHEN PHILLIPS:

Q. Okay. Did you have any idea -- strike that.

Did you request that Officer Gorny go through 14 intersections at over 90 miles an hour with regard to this traffic stop?

A. No.

Q. Did you know that Mr. Gorny, Officer Gorny, was playing music while traveling on Western at the time he collided with Mrs. Flores?

MR. SMITH: Objection to form. Go ahead.

BY THE WITNESS:

A. No.

BY MR. STEPHEN PHILLIPS:

Q. We're going to play a video for you. Okay?

A. Okay.

Q. You will see it on your screen. It's

A. I do not believe so.
Q. Did you play music during the course of high-speed vehicle operations when you worked for the City of South Bend?
A. Yes.
Q. What type of music did you play?
A. Usually just the radio station.
Q. Did -- did the City of South Bend know that's what you were doing?
A. I'm sure that they did. I never had anyone say anything to me about it.
Q. The traffic violator who the three of you were following that morning, when he was finally pulled over -- strike that.
The traffic violator that the three of you were following that morning, when Sergeant Hiipakka turned on his lights, did that traffic violator pull over?
A. I did not make the location of the traffic stop. Due to the restrictions that we had being in the undercover vehicle, we are not able to keep up with that --
Q. Okay. Did you find --
A. -- traffic.

Q. Did you find out later from Sergeant Hiipakka or reading the reports that when Sergeant Hiipakka turned on his lights, the traffic violator pulled over?
A. Yes, he pulled over.
Q. Did you find out later that the driver of the car that got pulled over, the erratic driver, that he said he was late to work?
A. Yes.
Q. And did you find out that Officer O'Blenis and Officer Hiipakka let that driver go without even issuing him a ticket?
A. Yes.
Q. The driver of the car that committed the traffic violation that you were following, you were following him until a marked car could get him pulled over?
A. Correct. To that point, the following was minimal, maybe a block or so. We called out the direction of travel and vehicle description and we weren't able to keep up with that vehicle. So, correct, yes.
Q. You did not have trouble keeping up with that vehicle?

A. No, we were unable to keep up with that vehicle.
Q. Okay. Now, the driver of that vehicle that was doing the erratic driving, did he shoot at anyone or commit a violent act when you saw him?
A. No.
Q. So, the driver of the car, at least from your perspective, you did not consider him a fleeing felon?
A. No.
Q. And, in fact, that driver of that car when you were following was not fleeing. They hadn't even attempted to pull him over yet?
A. Correct.
Q. Were the City of South Bend police officers required to use their lights and siren when responding to emergency calls at high speeds?
A. Yes.
Q. Were the South Bend police officers in an actual pursuit required to run with both lights and siren in a pursuit?
A. It's expected that you run both lights and sirens, but there are certain exceptions where you would turn off your siren depending on the type

of incident that you're responding to. And in some cases there are situations which you may turn your lights off, especially during midnight hours where you may shut that off.

Q. Would that be for tactical reasons to, so to speak, surprise the offender?

A. Yes.

Q. Okay. Let me ask you this, though. In a pursuit, were the South Bend police officers required to run with both lights and siren?

A. Yes.

Q. Did the cultural differences of the midnight or night shift allow City of South Bend police officers to disobey Police Department policies?

A. No.

MR. SMITH: Objection to form. You can answer.

BY THE WITNESS:

A. No.

BY MR. STEPHEN PHILLIPS:

Q. You did not tell or indicate to Mr. Gorny in any fashion that this was a fleeing suspect, did you?

A. No.
Q. Did you tell Mr. Gorny to not use his overhead lights while coming to this scene?
A. No.
Q. Did you tell Mr. Gorny not to use his siren while driving over 90 miles an hour on Western Avenue or at any time?
A. No.
Q. Did you tell Mr. Gorny not to use his lights and siren at any time on the evening of this occurrence?
A. No.
Q. Did you tell Mr. Gorny that this was an emergency or a code 10?
A. No.
Q. Do people live on Sheridan Street?
A. Yes.
Q. And do high-speed vehicle operations put innocent civilians at risk?
MR. SMITH: Objection to form. You can answer.
BY THE WITNESS:
A. Personally I would say no. I think there is a substantial liability with any type of

John, are you there?

MR. KAUTZMAN: Yeah. I'm sorry. I do have a few questions, but I didn't know if Joe wanted to ask anything or not.

MR. SMITH: You go first.

MR. KAUTZMAN: All right.

EXAMINATION

BY MR. KAUTZMAN:

Q. Officer Alfrey, this is John Kautzman, attorney for Justin Gorny. Nice to see you.

I'm not sure if we ever formally met. Probably the only time we would have met would have been at the South Bend Merit Board or Merit Commission hearing regarding Gorny. Does that make sense?

A. Yes, sir.

Q. You recall testifying at that?

A. I do, sir.

Q. Okay. I just have a couple questions I want to follow up on from Mr. Phillips' questions.

The vehicle that you were pursuing that he referred to as a, quote-unquote, "traffic violator," we're talking about that white minivan that you were following. Is that right?

A. Yes.
Q. Okay. And this vehicle, do you recall what first brought your attention to this vehicle? What area were you in? What kind of criminal activity was symbolic of that area? Was that known as a hot spot? Tell us a little background on what alerted you to even potentially think about following this vehicle.
A. We had identified a residence on the northwest side of South Bend that we believed was distributing narcotics. Myself and my partner were set up on that house conducting observation for stop-and-go traffic.
And as vehicles would stop at the house, we would observe occupants that would go up and interact with the house, short-stay traffic, people would go up and converse or have any sort of interaction with someone inside the home for a short period of time and then leave.
With that, we would then follow that vehicle for said time until we could make an attempt to perform a traffic stop on that and confirm if they were or were not doing any narcotics-related behavior at that residence.

Q. Okay. And, so, a given vehicle, the one that we're talking about, did something at or near that residence that alerted you to the possibility of that person being a buyer of narcotics or a dealer of narcotics --
A. Um-hmm.
Q. -- and then left that area in a fairly rapid fashion. Is that right?
MR. STEPHEN PHILLIPS: Objection; form.
BY MR. KAUTZMAN:
Q. Is that correct, sir?
A. Yes.
Q. Okay. And then you are following this vehicle and you are broadcasting the vehicle's movements on the radio. Is that right?
A. Yes.
Q. And Gorny is able to turn into a channel to hear that, those transmissions. Is that right?
A. Yes.
Q. Have you had a chance recently at all to look back at the radio traffic that was being broadcast shortly before the collision that brings us here today?
A. No.

Q. Let me ask you if some of these transmissions by you refresh your recollection on some of this stuff.

Specifically at time stamp 4:30:02, you broadcast that we, quote, "have a white minivan that's whipping pretty hard back through here, coming down College and Lincolnway and no plate light. And uh they're moving pretty good."

Do you recall saying something like that?

A. Yes.

Q. Do you recall saying at 4:30:22, "We're behind them west on Lincolnway and he blew the stop sign up here"? Do you recall seeing that happen?

A. Yes.

Q. Do you recall continuing to broadcast, and I won't go through every transmission, that he is, quote, "zooming pretty good"; that he's a, quote, "fast-moving car"; still quote, "moving pretty good"; and then Gorny says, "What do you need?" And you say, "We've got a white or silver Ford Windstar. No plate light. He's moving really good." Do you recall saying that?

A. Yes.

Q. Do you recall you then saying, quote, "Okay. I'll stay behind him until you get him pulled over"? And you're corresponding with Gorny at that point. Is that right?

A. I -- I would say I am not necessarily corresponding directly with him. It's an open channel with quite a few officers that are on there.

I believe it would be more fair to say we're just directly discussing to all the officers that were on that channel at the time.

Q. Okay. Is it fair to say that officers in an undercover situation like yours rely upon the marked units to make their presence known and to oftentimes intervene in making a traffic stop?

A. Yes.

Q. And is it also fair that officers are to monitor each other's safety and traffic and be available and proactive to intervene when other officers need assistance?

A. Yes.

Q. Do you recall also in that same series of transmissions saying that he's, quote, "passing" -- referring to the vehicle that you were

following -- he's, quote, "passing cars on oncoming traffic. He's driving in the opposite lane of traffic, now coming back over into the correct lane," and that he, quote, "just blew through Western on Olive going up towards a roundabout"?

Do you recall those transmissions?

A. Yes.

Q. Would it be fair to say based on the context of you following this person in the first place and the erratic driving that you saw, frankly, dangerous driving that you saw by this vehicle, that this was more than just a routine traffic stop or traffic violator that you were dealing with?

A. Yes.

MR. STEPHEN PHILLIPS: Objection; form. Move to strike.

BY MR. KAUTZMAN:

Q. And did you think it was important for you or other officers to promptly get this person stopped?

A. Yes.

Q. Now, Mr. Phillips asked you a series of questions about did you tell Gorny to drive at

certain speeds, did you tell him how to drive, did you tell him how to activate or not activate his lights or siren.

That wouldn't be your role to do that in any event, would it be?

A. No.

Q. He was simply responding to what he was hearing on the broadcast and anticipating his need, for lack of a better term, to assist in getting this person stopped, right?

MR. STEPHEN PHILLIPS: Objection; form, state of mind.

BY MR. KAUTZMAN:

Q. Would a reasonable officer in that situation or if you would have been in Gorny's situation and heard those same transmissions I just read to you, would you think it would be important to get that driver stopped?

MR. STEPHEN PHILLIPS: Objection; form.

BY MR. KAUTZMAN:

Q. You can answer that.

A. Yes.

Q. Okay.

MR. KAUTZMAN: That may be all I have. Give

me one moment here.
That's all I have. Thank you.
Joe.
MR. SMITH: Thank you.

EXAMINATION

BY MR. SMITH:
Q. All right. Just introduce myself to you again. My name is Joseph Smith. I'm one of the attorneys for the City of South Bend.
Did you attend the Law Enforcement Academy in Plainfield?
A. Yes.
Q. When did you attend the academy in Plainfield?
A. I would have went in summer of 2017.
Q. Did the Law Enforcement Academy teach you about the concept of due regard as it pertains to the operation of a police vehicle?
A. Yes.
Q. What did the academy teach you about that concept?
A. Without trying to quote anything verbatim or be overly technical, essentially it was even though you're driving maybe in a heightened

condition, we still do our best to adhere to the rules of the road, posted speed limits, while you may be exceeding them, right-of-way, turn signals, stuff like that.

Q. Did the academy teach you to clear intersections?

A. Yes.

Q. When you -- were you already employed by South Bend when you went to the academy or were you employed by South Bend after the academy?

A. No, I was employed before I attended the academy.

Q. All right. After you attended the academy, did you have a post-basic training classroom section with the South Bend Police Department?

A. Yes.

Q. And in that classroom training, did the South Bend Police Department also teach you about this concept of due regard?

A. Yes.

Q. Do you recall what you were taught about the concept of due regard in that post-basic training with South Bend?

A. I would say it was extremely similar to what they taught at the academy. They had very good examples as well as partnering you with I would say a good understanding of the policy or what was to be expected for you while you were out there.
Q. After that classroom training with South Bend Police Department, did you then have a field training officer program?
A. Yes.
Q. During that field training officer or FTO program, was the concept of due regard when operating a police vehicle discussed from time to time?
A. Yes.
Q. In your FTO training were you graded on whether you operated your vehicle with due regard?
A. Yes.
Q. In July of 2018 did you understand from your training that you were required to drive with due regard for all persons?
A. Yes.
Q. In July of 2018 did you understand from your training that you were required to drive with

due regard at all times while driving a police vehicle?
A. Yes.
Q. And that included during emergency runs, correct?
A. Yes.
Q. You understood in July of 2018 that you needed to clear intersections when driving in emergency mode. Is that correct?
A. Yes.
Q. And that's especially true for blind intersections, correct?
A. Yes.
MR. SMITH: That's all I have.
THE WITNESS: Sir.

FURTHER EXAMINATION

BY MR. STEPHEN PHILLIPS:
Q. Officer, the radio transcript, and I just want to clear one thing up, if I may. Maybe it was clear. Maybe I missed it. All right. So, bear with me?
A. Um-hmm.
Q. Gorny said, "95's coming up Western towards Olive."

And then you said -- strike that.
At 4:32:42 you said, "Okay, uh, I'll stay behind him until you get him pulled over."
Do you recall saying that generally?
A. Yeah.
Q. Okay. Just so we're clear, you were not requesting specifically for Gorny to pull him over. You wanted someone listening to that radio transmission to pull him over.
A. Yes.
Q. Is that fair?
Is that fair?
A. Yes.
Q. Okay. So, you didn't specifically request Mr. Gorny to pull over the car?
A. No.
Q. My statement is accurate?
A. Yes.
Q. Okay. Would you agree that it would be reckless to go through a red light at Kaley and Western at over 90 miles an hour without clearing the intersection?
MR. SMITH: Objection to form. Go ahead.
BY THE WITNESS:

A. Yes.
BY MR. STEPHEN PHILLIPS:
Q. Well, you were asked questions about due regard by counsel for the City. Do you recall that?
A. Yes.
Q. So, I want to ask you about that due regard. Fair enough?
A. Yeah.
Q. Okay. Would you agree that it would be reckless to go through the intersection at Western and Kaley at 90 miles an hour without making sure the intersection is clear?
MR. SMITH: Objection to form. Go ahead.
BY THE WITNESS:
A. In that context, yes.
BY MR. STEPHEN PHILLIPS:
Q. And would you agree that it would be reckless to go through the intersection at Kaley and Western at 90 miles an hour particularly because it's a blind intersection?
MR. SMITH: Objection to form. Go ahead.
BY THE WITNESS:
A. Again, in that context, yes.

BY MR. STEPHEN PHILLIPS:
Q. Okay. And a blind intersection, is that an intersection where the vision is obstructed for traffic?
A. I would define a blind intersection as, as I approach, I cannot see oncoming traffic in either of my lateral directions.
Q. And would you agree that that's particularly dangerous to go through a red light at those?
A. Yes.
Q. And officers knew that?
A. Yes.
MR. STEPHEN PHILLIPS: Okay. I think that's all I have. Thank you, sir, very much.
MR. SMITH: John, do you have anything?
MR. KAUTZMAN: I just have a little follow-up on that.
Does anyone have the copy of the transcript?
Joe Smith, do you have a copy of the transcript you can put in front of the witness?
MR. SMITH: I -- give me a moment.
MR. KAUTZMAN: Thanks.

MR. SMITH: I believe I do. Hang on.
MR. KAUTZMAN: Thank you.
MR. SMITH: All right.

FURTHER EXAMINATION

BY MR. KAUTZMAN:

Q. Officer Alfrey, I'm just going to have you look at just about four transmissions that occur starting at about 4:32:15.

And tell me when you get there because I want you to read kind of between 4:32 and 4 -- basically 4:32:15 to 4:32:42. So, 15 to 42.

A. Okay.

Q. Do you see that general area I'm talking about?

A. At 42 -- excuse me. At 4:32:15, I'm there.

Q. Yes.

A. Yes.

Q. Starting there. Okay.

I just want to read these four transmissions in order, and have you read along with me and tell me if this is right.

At 4:32:15 Gorny comes on the radio and says, quote, "95's not too far away from Olive and

I, CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was waived;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor inte , in the outcome of t

___________________________________

CORINNE T. MARUT, Certified Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)