IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, Plaintiff, -v- CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY, Defendants. | Case No. 2:19-cv-00064-PPS-JEM |

The video recorded deposition upon oral examination of COREY CALVERT, a witness produced and sworn before me, Nancy L. Delaney, RMR, CRR, Notary Public in and for the County of St. Joseph, State of Indiana, taken on behalf of the Plaintiff, at the offices of Stewart Richardson & Associates, 1400 East Angela Boulevard, South Bend, Indiana, on Monday, August 19, 2024, at 10:33 a.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800) 869-0873

**Exhibit B**

APPEARANCES

FOR THE PLAINTIFF:

MR. STEPHEN D. PHILLIPS, ESQ.
MR. MICHAEL J. PHILLIPS, ESQ.
MR. TERRENCE M. QUINN, ESQ.
MR. ALEC D. MESROBIAN (via videoconference)
Phillips Law Offices
161 North Clark Street, Suite 4925
Chicago, Illinois 60601

VIA VIDEOCONFERENCE FOR DEFENDANT, JUSTIN GORNY:

MR. R. JEFFREY LOWE, ESQ.
Kightlinger & Gray, LLP
Bonterra Building, Suite 200
3620 Blackiston Boulevard
New Albany, Indiana 47150

- - and - -

MR. JOHN F. KAUTZMAN, ESQ.
Ruckelshaus Kautzman Blackwell Bemis & Duncan, LLP
135 North Pennsylvania Street, Suite 1600
Indianapolis, Indiana 46204

FOR THE DEFENDANT, CITY OF SOUTH BEND:

MR. JOSEPH W. SMITH, ESQ.
Clark, Johnson & Knight, LTD.
233 East 84th Drive, Suite 301
Merrillville, Indiana 46410

- - and - -

MS. KYLIE CONNELL, ESQ.
City of South Bend, Legal Department
227 West Jefferson Boulevard, Suite 1200
South Bend, Indiana 46601

ALSO PRESENT:

MATTHEW SANDELIN, VIDEOGRAPHER

ROGER LARSON (Via Videoconference)

INDEX OF EXAMINATION

| EXAMINATION | PAGE |
|---|---|
| BY MR. S. PHILLIPS | 6 |
| BY MR. SMITH | 133 |
| BY MR. S. PHILLIPS | 144 |

INDEX OF EXHIBITS

| IDENTIFIED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1-A | Matters for Examination | 7 |
| Exhibit 2-A | Document from Safety Training Vehicle Safety Pursue | 99 |
| Exhibit 2-B | Video regarding Exhibit 2-A | 101 |
| Exhibit 3-A | Document from 3975 Pursuits VTS 01_1 | 105 |
| Exhibit 3-B | Document regarding performance-baed training | 106 |
| Exhibit 4 | Document regarding proper training | 107 |
| Exhibit 5-A | Document with quote from training | 108 |
| Exhibit 5-B | Video regarding Exhibit 5-A | 112 |
| Exhibit 5-C | Video of victim impact statement | 126 |
| Exhibit 6-A | Video regarding 60 MPH pursuit limit | 121 |
| Exhibit 7 | Gorny's History of Pursuits over 60 MPH | 122 |
| Exhibit 8-A | Pursuit review committee notes dated June 25, 2015 (CITY 4009-4010) | 48 |

INDEX OF EXHIBITS (Continued)


| IDENTIFIED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8-B | Pursuit review committee notes dated March 17, 2016 (CITY 4820-4821) | 49 |
| Exhibit8-C | Pursuit review committee notes dated July 27, 2016 (CITY 4932-4935) | 50 |
| Exhibit 8-D | Pursuit review committee notes dated August 15, 2018 (CITY 6501) | 50 |
| Exhibit 10-B | Document titled, "Management of Emergency Driving Operational Risks" (CITY 0363-0409) | 144 |
| Exhibit 16-A | Email to Ryan O'Neill from Ken Stuart dated December 21, 2016 with attached email string and roster (CITY 012072-012073) | 23 |
| Exhibit 16-B | Exerpts from South Bend Police Department Policy Manual (CITY 1240-1953) | 24 |
| Exhibit 16-C | Traffic Occupant Protection Strategies (T.O.P.S.) dated March 12, 2008 (CITY 2315-2700) | 26 |
| Exhibit 17 | Vehicle pursuit policy dated August 16, 2017 (CITY 0581-0584) | 69 |
| Exhibit 18 | South Bend Police Department Policy Manual Policy 500 (CITY 2310-2314) | 94 |
| Exhibit 19 | List of FTO information for Corey Calvert beginning February 13, 2018 | 90 |
| Exhibit 20 | Training Brief documents (CITY 1629-1633, 1694-1699) | 140 |

THE VIDEOGRAPHER: Recording. For the record, my name is Matt Sandelin of Video Instanter. I'm the video recording device operator for this deposition. Our business address is 134 North La Salle Street, Suite 1400, Chicago, Illinois, 60602. This deposition is being video recorded pursuant to the Federal Rules of Civil Procedure and all other applicable rules.

This is the deposition of Sergeant Corey Calvert being taken in the matter of Soraida Flores, et al, versus the City of South Bend, et al, case number 2:19-cv-0064-PPS-JEM, in the United States District Court, Northern District of Indiana, Hammond Division. Today's date is August 19, 2024. The time is 10:33 a.m. Eastern Time.

Would the witness please identify yourself for the record by stating your full name, please.

THE WITNESS: Corey Calvert.

THE VIDEOGRAPHER: And would the parties present please introduce themselves for the record by stating their names and who they represent, please.

MR. S. PHILLIPS: Steve Phillips, Michael Phillips, Terrence Quinn on behalf of the plaintiffs.

MR. SMITH: Joseph Smith for the City of South Bend. Present with me in the room is Kylie Connell, assistant City attorney.

MR. LOWE: Jeff Lowe for Justin Gorny.

MR. KAUTZMAN: John Kautzman for Justin Gorny.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness.

COREY CALVERT,

having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. S. PHILLIPS:

Q Would you state your name and spell your last name, please.

A Corey Calvert. C-a-l, v as in Victor, e-r-t.

Q I'm going to be asking you a series of questions. If there's any question you don't understand, will you stop me and let me know before you answer?

A Absolutely.

Q And a lot of my questions will call for a yes or no answer. Okay?

A Okay.

Q You've been designated by the City of South Bend as a 30(b)(6) corporate representative. Are you aware

the middle that I looked at, but again, being able to specifically point those out right now, I'm not sure if I would be able to.
Q Do you know of any police officer who's ever been suspended with regard to excessive speed or improper pursuit or improper emergency call?
A I do not know. I know of officers that have been suspended. Their exact reasoning I am unsure of, no.
Q So going back to my question, do you know of any police officer who's ever been suspended for excessive speed, excessive speed or improper response to an emergency call traffic stop or pursuit?
A No.
Q Do you know of any officer who was ever been trained -- strike that. Do you know of any officer who has received any type of discipline for any motor vehicle incidents or speeding other than their car being taken away?
A Specific officers, no.
Q Do you know of any generally, have you ever --
A The punishment of car being taken away is what I'm confused about. Officers are coached upon their speed when complaints come in.

Q My question to you is that we have looked at certain documents that talk about officers who got involved in traffic accidents and they received some discipline. Are you familiar with that concept with the City?
A I am.
Q Do you know of any officer for the City of South Bend who's ever been disciplined for excessive speed or improper pursuits and received a discipline beyond the car being taken away for personal use?
A I understand now. No, I do not.
Q Since you are the designated representative for the City of South Bend with regard to pursuits, what do you believe is the first and paramount principle of pursuits?
A Driving with due regard, sir.
Q What do you mean by due regard?
A So I've attempted to look up a legal definition. A proper one that I believe to be fit is driving with proper care and concern for others.
Q When did you graduate from the police academy?
A 2011.
Q And which police academy?
A Indiana Law Enforcement Academy in Plainfield,

Indiana.
Q And at the police academy, did they teach you about the laws with regard to due regard and reckless speed?
A They did.
Q At the Indiana police academy, did they teach you about case law, legal case law about your responsibilities as a police officer and what recklessness is?
A They did.
Q At the Indiana police academy, did they teach you about the constitutional violations of the 4th and 14th Amendments?
A They did.
Q And at the Indiana police academy, did they teach you that recklessness was a violation of the 4th and 14th Amendment?
A That specifically, I can't answer.
Q But you know it is now, though; is that fair?
A It could be considered a violation, yes.
Q And you knew that in July of 2018. Right?
A Correct.
Q You agree that training of police officers with regard to high speed operations of police vehicles should be done in a serious manner. Correct?

A Correct.
Q Did you ever talk to Officer Gorny about this incident?
A I did.
Q When did you first talk to Officer Gorny about this incident?
A I'd estimate a few days after.
Q Where was Officer Gorny when you spoke to him?
A I didn't ask his location, sir.
Q You spoke to him on the phone?
A I believe so.
Q And who else was present for this conversation with Officer Gorny a few days after this?
A I have no knowledge of that.
Q How long did you talk to Officer Gorny?
A Briefly.
Q What did he say to you and what did you say to him?
A Just checking on his welfare, sir, nothing case specific.
Q What did Officer Gorny tell you?
A I have no knowledge of that specifically.
Q Have you ever talked to Officer Gorny about this incident?
A Case specific?
Q Yes.

A Specifically to my recollection, no.
Q Have you ever talked to any officer about this specific incident?
A Yes, it's come up.
Q Who did you talk to?
A Specifically, I don't know.
Q When did you talk to people about this Gorny incident?
A After it occurred, sir.
Q How long after?
A Again, specifically, I'm unable to answer that.
Q Do you have any idea?
A I mean, the next day, individuals were talking about it.
Q What did you find out?
A That the incident occurred.
Q Any details?
A There was a fatality crash.
Q Anything else?
A Officer Gorny was involved.
Q Anything else?
A The location.
Q Anything else?
A Specifically, I'm unable to answer accurately right now.

Q Did South Bend prior to July of 2018 have any rule or policy with regard to the maximum speed for emergency call or pursuit?
A I have no knowledge of the maximum speed ever being designated.
Q Did South Bend ever have a maximum speed policy or rule with regard to traffic stops?
A I have no knowledge of any maximum speed.
Q Did anyone ever tell you prior to July of 2018 that South Bend had a policy or rule with regard to the maximum speed of a pursuit or an emergency call or a traffic stop?
A No, sir.
Q Have any of your pursuits ever resulted in discipline against you?
A I have no knowledge of any discipline from my pursuits.
Q Has anyone ever talked to you and criticized any of your pursuits or your emergency call responses?
A My supervisors at the time would review our pursuits as we regularly do now and there would have been talking points.
Q My question to you is did anybody prior to July of 2018 ever criticize any of your pursuits?
A Again, breaking down the pursuits as I just

explained, yes, that would have been -- that would have occurred.

Q So you're meaning that -- when I say criticized, I'm talking about did they tell you bad things that you did or things you should have done differently or did they just go over what happened?

A Yeah, specific things I could have done better or did wrong, I can't recall, but certainly went over the vehicle pursuits in detail.

Q So prior to July of 2018, you yourself had gone over pursuits and what transpired factually with your supervisors. Correct?

A Correct.

Q Any of the supervisors ever tell you that you did something wrong or you should have done something different?

A Again, specifically, I don't know. That would have been on record if that had occurred.

Q Anything jump out at you that you recall?

A I do not.

Q Who were your supervisors prior to July of 2018?

A Several of them. It seems like the main one that I was normally assigned to was Sergeant Dan Moryl.

Q Spell his last name.

A M-o-r-y-l, Daniel.

Q Have you ever spoken to Captain Schweizer about the pursuit review committee?
A That topic, no. He is one that selected me or informed me that I was selected as an EVO instructor, though.
Q First question, did you ever talk to Captain Schweizer about the pursuit review committee?
A I have no knowledge of that occurring, no.
Q Captain Schweizer told you that he wanted you to become an EVO instructor?
A Whether he wanted me to become one or that I was selected after applying. I'm unsure.
Q When did you apply for an EVO instructor?
A I was selected in 2019, I believe April of 2019, approximately.
Q When did you apply for an EVO instructor?
A I answered it that way because I'm unsure of when I applied. I am estimating that it occurred shortly prior to that.
Q So --
A April 2019.
Q It's your best memory that you applied to become an EVO instructor shortly prior to April of 2019?
A Yes.
Q Now, the topics designated for today include the

A It certainly does.
Q One of the main principles of high speed vehicle operation in police cars is that officers should not create unnecessary risk for other motorists or the public. Agreed?
MR. SMITH: Objection to form. Go ahead.
A Can you restate that one?
Q One of the main tenets of pursuits in high speed vehicle operation is that police officers should not create unnecessary risks for other motorists or the public. Agreed?
MR. SMITH: Same objection. Go ahead.
MR. LOWE: Same objection.
A We are tasked with driving with due regard.
Q My question is a bit different.
A Yeah, if you could restate it or rephrase it, please.
Q Sure. You would agree that a police officer when he's in a pursuit or high speed vehicle operation should not create unnecessary risk for other motorists or the public. True?
A Correct.
Q Did you ever supervise Mr. Gorny?
A I did not.
Q Did you ever work with Mr. Gorny?

A I did.
Q How many times?
A Multiple shifts.
Q When you say multiple, was it five or was it 100?
A Again, being specific in this formal proceeding, I was employed since 2011, so I'm unsure when he was hired, but he was assigned to the same shift as me.
Q Were you on midnights in 2018?
A Still am.
Q How many years were you on midnights before July of 2018?
A Since 2011.
Q Were you assigned the same quadrants as Officer Gorny on the night of this occurrence?
A I was not working the night of this occurrence.
Q Were you trained by the City of South Bend to always use your lights and siren when you're in the emergency mode?
A That is an option in emergency mode.
Q My question is were you trained that it's mandatory to use lights and siren when you're in the emergency mode prior to July of 2018?
A It is sometimes mandatory. We are able to use just our lights in some occurrences.
Q The occurrences where you're only allowed to use

your lights in an emergency call prior to July of 2018 would be a bank robbery?

MR. SMITH: I'm -- sorry if you're not done with the question. I just want to object that it is characterizes the witness' testimony.

MR. S. PHILLIPS: Okay.

Q First question, were you trained that you were always supposed to use lights and siren during emergency call prior to July of 2018?

A Again, always is what I want clarification on.

Q Always is always. Always means every time.

A Okay, so not every time.

Q So prior to July of 2018 when you were in the emergency mode?

A Correct.

Q You were not trained that you always -- each time you were in the emergency mode you had to use lights and siren; is that correct?

A Again, correct, in the sense that a silent response is acceptable and still deemed emergency mode.

Q My question is very simple.

A Okay. Can you please make it more simple?

Q Sure. First question, were you trained that when you were in the emergency mode --

A Correct.

Q -- an emergency call, that you always had to use lights and siren? Yes or no.
A No.
Q What exceptions were there to always using lights and siren in the emergency mode prior to July of 2018?
A Some exceptions would be burglary in progress, a hold-up alarm, a known hostage.
Q Any others?
A Those would be the main ones.
Q Any others that you can remember?
A Not right now.
Q With regard to a traffic stop, were you trained that you should always use your lights and siren prior to July of 2018?
A In regards to a traffic stop, lights are only required initially.
Q So a traffic stop is not an emergency. Right?
A Correct.
Q Were you trained in a pursuit that you should always use lights and siren?
A Yes.
Q At all times?
A Yes.
Q Did you ever supervise Mr. Gorny?

A I did not.
Q Did you ever supervise Mr. Gorny's supervisors?
A I did not.
Q Who were your supervisors prior to July of 2018 on the midnight shift?
A Again, Sergeant Dan Moryl, Sergeant Dorian Finley, Sergeant Martin Mullins. Keep going? Sergeant Angela Kline, Officer Tim Lancaster. I'm not sure of his ranking at that time, he has multiple. Officer Steve Noonan, Officer Tony Ross, Officer Paul Daley, Officer Jamil Elwaer. There may be a couple more.
Q During a pursuit, are you trained to watch your speed, prior to July of 2018?
A Correct.
Q And how do you watch your speed during that pursuit?
A Using the speedometer, sir.
Q And were you trained prior to July of 2018 to watch your speed during an emergency call?
A Yes.
Q Prior to July of 2018, what's the maximum speed that you ever went on an emergency call in a city street?
A I'm unable to answer that.

Q What's your best estimate?
A Approximately 70.
Q What was the speed limit on the 70 mile an hour pursuit?
A Whatever the speed limit is on Lincolnway West.
Q What do you believe that -- I mean, you've been here for 11 years. What's the speed limit on Lincolnway West?
A I believe 35.
Q So Lincolnway West, is that a residential, business, what type of neighborhood is that?
A Unsure on the exact classification. I would estimate it to be mixed use. There's businesses and residences.
Q So prior to July of 2018, about 70 miles an hour would have been your maximum speed on a city street; is that right?
A In responding to emergency call, approximately 70 miles per hour.
Q How about a pursuit on city streets, what was your maximum speed prior to July 2018?
A In excess of 100 miles per hour.
Q Where was that?
A Southbound on Main Street.
Q What's the speed limit on Main Street?

these?
A I have no knowledge of what he answered, sir.
MR. S. PHILLIPS: You're going to have to designate somebody else for these.
MR. SMITH: We can talk about that later.
MR. S. PHILLIPS: I agree.
Q Do you know if the pursuit review committee or the police department ever did any research or looked at statistics with regard to pursuits?
A I have no knowledge of that, no.
Q Do you know whether or not the pursuit review committee ever discussed officer discretion versus a strict pursuit review committee -- strike that. Do you know whether or not the pursuit review committee ever discussed a maximum speed limit for pursuits versus officer discretion?
A I have no knowledge of that.
Q You are not here to talk about the training videos. You've never seen those. Right?
A Specifically?
Q You are not here to talk about those?
A I do not believe I am.
MR. S. PHILLIPS: Let's go off the record.
THE VIDEOGRAPHER: Time is 11:46 a.m. We're now going off the record.

(A short recess is taken.)

THE VIDEOGRAPHER: Time is 11:59 a.m. We're now back on the record.

Q We just took a break, Officer?

A We did.

Q And during the break, you found out that you became a field training -- you became a field training officer prior to July of 2018 and we found out that was April of 2018. Right?

A Yes.

Q How did you -- did you train people --

A I'm sorry. February of '18, sir.

Q Okay. So you became certified as a field training officer in February of 2018?

A Correct.

Q What does a field training officer do?

A You're tasked with training newer officers, probationary officers assigned to the South Bend Police Department.

Q Did you prior to July of 2018 have anything to do with emergency vehicle operations training?

A I did.

Q What did you do?

A As an instructor, no, but as an FTO, I was assigned new officers.

Q So there -- prior to July of 2018, there were emergency vehicle operations instructors, you were not one. Correct?
A I was not, sir.
Q But as a field training officer, you did some type of training for police officers. Right?
A Yes.
Q What was the training that you did?
A Teaching newer officers due regard, the requirement to drive with that and then grading their ability to drive in moderate and emergency situations and normal driving.
Q What did you teach the officers prior to July of 2018 about how to drive with due regard?
A That we're required to drive with proper care and concern for others.
Q Did you define that any further?
A I did not have that definition at the time. That's something that I discovered later on.
Q So let's go back to prior to July of 2018. As a field training officer, what did you teach the people with regard to emergency -- the other officers -- strike that. Prior to July of 2018, what did you teach the other officers with regard to emergency vehicle operations?

A Again, due regard is required, I just didn't use that definition. So we are again required to drive with that proper care and concern for others, explaining when the lights and sirens are needed and then we're required to abide by posted traffic laws otherwise.
Q You see the Exhibit 1-A where it says the matters for examination again. Correct?
A I do.
Q The training of City of South Bend police officers on initiation of vehicle pursuits, are you knowledgeable about that with regard to the time period prior to July of 2018?
A I am.
Q And how did you get that knowledge?
A Through the FTO program.
Q And the training of City of Chicago -- strike that, I'm sorry. The training of City of South Bend police officers on initiation of vehicle pursuits, how did the City of South Bend do that? First question.
A Through policy.
Q Which policy specifically?
A Right now, I believe it's titled 306, vehicle pursuits.

Q And that was in effect prior to July of 2018, it just had a different number?
A We had a vehicle pursuit policy in effect, maybe a revision since then, but yes, we had a vehicle pursuit policy.
Q My question is what is -- show me the exact document, the policy that was in place prior to July of 2018 for initiation of vehicle pursuits.
A Show you it?
Q Yes.
A Can I confer to my counsel for that? I have no records with me, sir.
Q Well, you're going to have to get it from him.
MR. SMITH: Can we go off the record while I find that?
THE VIDEOGRAPHER: Time is 12:04 p.m. We're now going off the record.
(A short recess is taken.)
THE VIDEOGRAPHER: Time is 12:15 p.m. We're now back on the record.
Q Officer, we were going over the items for examination today. You recall that. Right?
A I do.
Q And looking at Exhibit 16-B, policy 306, what is this?

A Vehicle pursuit policy for the South Bend Police Department.
Q And this was in effect at the time of this occurrence. Correct?
A That's what I'm told, yes.
Q And had you ever read this policy before this, before July of 2018?
A If it was in effect, I would have read it.
Q Where would you have read it?
A In the policy manual.
Q Were all of the officers in the police department prior to July of 2018 required to abide by this policy 306 for vehicle pursuits?
A Yes. If it was in effect, we would.
Q Now, this vehicle pursuit policy, did that apply to emergency calls or is that separate and apart?
A Officer response to calls is now titled policy 308, I believe.
Q My question to you is policy 306, did that apply to emergency calls at the time of this occurrence?
A I believe we had a separate policy at that time too, sir.
Q So policy 306 did not apply to emergency calls at the time of this occurrence. Correct?
A Correct.

Q Did policy 306 apply to traffic stops at the time of this occurrence?
A It looks specific to vehicle pursuits that could be a result of a traffic stop.
Q My question to you is did policy 306 apply to traffic stops at the time of this occurrence?
A Specifically traffic stops, no, sir.
Q Let's go to the policy for emergency stops at the time of this occurrence. What number was that?
MR. SMITH: Policy for what?
MR. S. PHILLIPS: Emergency calls.
MR. SMITH: You mean officer response to calls?
MR. S. PHILLIPS: Well, whatever.
A 308, I believe.
MR. SMITH: 308 is page 1 of the 12.
Q Policy 308, is that the policy that applied to emergency calls at the time of this occurrence?
A I'm told it is, yes.
Q And were you required to know this?
A Yes.
Q Was there a policy in place for traffic stops at the time of this occurrence?
A I am unsure.
MR. S. PHILLIPS: Let's go back to the items for examination. Well, leave this up, actually.

Q Do you know what type of stop the Chief of Police and Officer Herron referred to Officer Gorny's conduct on the night of this occurrence?
A What --
Q Let me back up.
A I'm sorry.
Q From what you know about Officer Gorny's conduct on the night of this occurrence, was he responding to a traffic stop, an emergency call or was this a pursuit?
MR. LOWE: Object to form.
A I believe a potential traffic stop.
Q And where did you get that information from?
A Specifically, I don't know.
Q What was the training that was given to the police officers prior to July of 2018 with regard to the initiation of pursuits?
A That again is referencing the prior policy 306 and specifically in the initiation of pursuits.
Q How was that given to the officers? Was that given to them through the two hours of EVO they got every year?
A No, through --
Q How was it --
A I'm sorry.

Q How was it given to them?
A Through policy and then through the FTO program.
Q And how many times did Officer Gorny go through the FTO program prior to July 2018?
A I have no knowledge of that.
Q Do you have any idea who took Officer Gorny through the FTO program officer training with regard to emergency calls, traffic stops or pursuits prior to July of 2018?
A I do not. I'm sorry.
Q Did the City of South Bend prior to July of 2018 consider it reckless to go above 60 miles an hour for a traffic stop?
MR. SMITH: Objection to form. You can answer.
A I have no knowledge of max speeds being set or perceptions thereof.
Q Now, you speak on behalf of the City today, so I'm going to ask you some questions. Okay?
A Yes, sir.
Q Do you believe that with regard to a traffic stop a speed above 60 miles an hour is inappropriate and unsafe?
MR. SMITH: Objection to form. Go ahead.
A While attempting to -- can you -- are you able to be more specific?

Q No, an officer is responding to a traffic stop.
A I'm sorry, I didn't catch responding.
Q An officer is responding to a traffic stop. Do you believe that it is unsafe and reckless to go above 60 miles an hour?
MR. SMITH: Objection to form. Go ahead.
A In most situations, yes.
Q And would -- let me ask you this, an officer responding to a traffic stop, do you believe it would be reckless and inappropriate to go 70 miles an hour?
MR. SMITH: Objection to form. Go ahead.
A In most situations, yes.
Q Can you think of any situation for a traffic stop where it would be not reckless?
A Certainly.
Q To go above 70 -- to go above 70 miles an hour for a traffic stop?
A Certainly.
Q What?
A My initial, when I was shot at by that female, that was an initiation of a traffic stop. She failed to yield. There's other situations, traffic stops where officers are requesting additional assistance.

Q Who would that be prior to July of 2018? Who would you talk to about that, Ken Stuart?
A I would.
Q Is Ken Stuart still with the police force?
A He is, sir.
Q What's his title?
A Sergeant.
Q Is he an EVO instructor?
A That I am unsure of as well. I believe he still does hold the designation.
Q Now, July of 2018, Officer Fulnecky was the EVO supervisor; is that correct?
A I have -- prior to '18, sir, I don't know the tiers or the specific amount of instructors, so I don't know her role in the EVO program at that time.
Q Who were the EVO instructors that you're aware of prior to July of 2018?
A Mark Walsh, Cori Bair, Andrew Hines. I've seen Steve Smith referenced. Right now, I can't recall any more. I'm unsure when Lieutenant Rohrscheib became one.
Q Who was the supervisor of the EVO instructors in July of 2018?
A I'm unsure.
Q Did the EVO instructors play any role with regard

to the pursuit reviews, pursuit review committees prior to July 2018?
A I'm unsure.
MR. S. PHILLIPS: Can you put up that Exhibit 1.
Q What did the training of the City of South Bend police officers on initiation of vehicle pursuits prior to July of 2018, what did that consist of? What were the elements of the training?
A The policy being handed or presented to newer officers and then hands-on training through the FTO program.
Q What did the hands-on training consist of?
A Whether I was involved in a vehicle pursuit in those amount of times that I was -- had a probationary officer with me is unknown, but we would have had small talk regarding various scenarios.
Q Was there any formal education of police officers on the initiation of vehicle pursuits prior to July of 2018 or was it just the word of mouth, you being together with someone in a police car?
MR. SMITH: Objection, mischaracterizes testimony. Go ahead.
A And the policy being in place and reiterated by

supervisors and trainers. I know we've went over it before several times.
Q Well, let's start from the beginning.
A Yeah.
Q The training of City of South Bend police officers on initiation of vehicle pursuits was done by the policy being handed to them. Correct?
A Presented, yeah.
Q When you say presented, I'm saying handed to them. Are we talking about the same thing?
A Absolutely, I'm sorry.
Q And the second thing you said, it was done through the field training officers. Right?
A Correct.
Q And was there anything else?
A Specifically, I don't know.
Q Now, the policy being handed to the police officers as part of the training for the initiation of South Bend police officers on initiation of pursuits, that was handed to them when they first joined the force?
A I'm unsure on that timeline. Certainly, during the FTO program, prior to being released on their own.
Q So first question, the training with regard to the new people getting the policy, that was done either

when they first started or it was handed to them when the field training officer trained them. Correct?
A During the FTO program, yes.
Q Now --
A I'm sorry, go ahead.
Q The FTO program as far as the training for initiation of vehicle pursuits, how was that done prior to July of 2018?
A Similar to how we do it today.
Q Which is?
A As an FTO, you're assigned a probationary or new officer. They ride with you during that shift and get the hands-on training.
Q Other than when the new police officer joins the force and is given the policy with regard to initiation of vehicle pursuits, and at that time the -- their field training officer is talking to them about when to initiate a pursuit, is there any other time that officers are trained with regard to initiation of pursuits?
A Through the revisions and the policy. So whenever a policy is revised, we are tasked with acknowledging that policy.
Q Was -- did the -- so let me ask you this, can you

tell us whether or not Officer Gorny received any training with regard to initiation of pursuits other than when he first got on the department?
A And the revisions of the policy, no, I cannot.
Q When were the revisions?
A I believe I was told there was one in 2017.
Q Let's look at that one.
MR. SMITH: That one I'll need to email to you. This is a part of a very large document, so it might be easier if you give me a few minutes to separate it from the document. Can we go off the record.
THE VIDEOGRAPHER: Time is 12:33 p.m. We're now going off the record.
(A short recess is taken.)
THE VIDEOGRAPHER: Time is 12:45 p.m. We're now back on the record.
Q We just took a break. Right?
A We did.
(Exhibit 17 marked.)
Q Look at Exhibit 17, please. This is the revised policy for pursuits. Right?
A Yes.
Q And this policy was put into place because of what?
A I have no knowledge.

Q When this policy came out, how did the City of South Bend make sure that officers were aware of it?
A Notification. I'm unsure what program we used. Currently we use Lexipol.
Q When you say notification to officers, the police officers who are going to engage in pursuits, explain the process. How did they get a copy of this policy?
A Through whatever program we used and I don't know if Captain Schweizer at the time would have been tasked with informing us like we do now. Captain Herron explains when there's revisions that need to be acknowledged and accepted.
Q You said -- were these emailed to the officers or handed to them, paper copies?
A Not pop versions. Certainly, we can print those off on our on, but we used a program similar to what we use now.
Q I don't understand this.
A Yeah.
Q How do the officers see this policy? Tell me the process. This revised pursuit policy for 2017, how do they see it?
A Through a screen and then whatever program we used

at that time.
Q So would they do that at the police department?
A They could.
Q Where else?
A Wherever their mobile laptops were located.
Q How did the City of South Bend make sure that the police officers reviewed this vehicle pursuit policy from 2017?
A I'm unsure how they ensured everyone did that, but we were tasked with signing and acknowledging policies much like we are today.
Q So it's your understanding that when the police officers would -- strike that. It's your understanding and your testimony that when the City revised a policy, they wanted the officers to know about it. The officer had to sign a document saying they reviewed it?
A We do now, so I don't know if that has ever changed. I have no knowledge. I'm not comfortable explaining that timeline, but we did have technology that we were aware of the revisions.
Q My question goes back to July and prior -- strike that. My question is July 2018 and prior, how did the City make sure that each officer reviewed and understood the revised policies with regard to

pursuits?
A It's my recollection that we've always signed and acknowledged that we accepted or acknowledged the revisions.
Q Is there any documents in this case documenting that Officer Gorny did that?
A I believe there are.
Q What document would that be called?
A I'd have to refer to my counsel for that specific title.
Q You don't know?
A I don't know.
Q How about for emergency calls? We talked about that policy prior, what number was that? It's right there. 306, right? Policy 308 was the policy relating to emergency calls. Right?
A Correct.
Q And was that in place in June of 2018?
A I believe it was.
Q And how long had it been in place?
A I have no knowledge of that.
Q Was there a policy with regard to traffic stops in June of 2018 or prior?
A I vaguely remember a specific one referencing that.
Q What was it called?

Q Do you know or have any evidence that when there was a revision of a police pursuit policy related to termination of vehicle pursuits, do you know if the City has any documentation or evidence that police officers actually reviewed that?
A I have no knowledge if they have it. We sign the revisions. I sign the revisions. I can't answer for other officers.
Q The training of City of South Bend police officers on termination of vehicle pursuits would come through policy 306. Right?
A Correct.
Q And any revisions to 306. Right?
A Correct.
Q And anything when -- strike that. And in addition to that, when a revision of the termination of a pursuit -- let me start over again. When the officers are trained with regard to the decision to initiate a pursuit or terminate a pursuit, you said that it's a review of the policy or review of a revised policy and the field training officer talks to them about it. Right?
A Talks about the revision or the policy?
Q The policy.
A Not necessarily.

Q So they may or may not?
A May or may not.
Q So a field training officer, when a new officer starts, may or may not talk about initiation and termination decision making of pursuits. Right?
A My last answer was in terms of the revisions and discussing the current or the revised policy. If they were involved in a pursuit, the field training officer would be able to talk them through that.
Q So let's start over.
A Yeah.
Q You have no knowledge and no evidence that when there was a revision to a pursuit policy, whether or not anybody verbally spoke to the officers about that. Correct?
A Correct.
Q So the conversation about the initiation and termination of pursuits, the ones that you're aware of, those happened when an officer first joined the force and was with his training supervisor. Correct?
A I'm sorry. One more time with that one.
Q Sure. You said that there were conversations with the field training officer about initiation and termination of pursuits when the officer joins the

force. Right?
A There could be. That was a --
Q There may or may not be?
A There may be. If that officer was involved with that specific officer while training them, those conversations would occur.
Q So let's go back to my question.
A Yes.
Q Whether or not a specific officer at the time they joined the force got any discussion about when to initiate a pursuit or terminate a pursuit, that may or may not have happened. Right?
A Correct.
Q It depended on whether or not there was a pursuit with the field training officer present; is that correct?
A Potentially.
Q Anything else?
A So as FTOs or probationary officers, they are assigned a binder that contain briefs and I believe policies at that time, so it could have been discussed regularly with FTOs after all.
Q There was no mandatory requirement that at the time a new officer joined the force, that there was a review or discussion with the field training

officer about initiation of pursuits and termination of pursuits. Agreed?
A To my knowledge, I would agree.
Q And when there was a revision to a pursuit policy about whether or not to initiate a pursuit or terminate a pursuit, there was no mandatory requirement that anybody discuss the policy with them. Correct?
A To my knowledge, that would be correct.
Q Now, the training of City of South Bend police officers on decision making related to initiation of vehicle pursuits, who did that prior to June of 2018?
A FTOs.
Q And the training of City of South Bend police officers on decision making related to termination of vehicle pursuits, who did that, the FTOs?
A Those -- yes, FTOs.
Q Did anybody ever document from the City of South Bend whether or not police officers actually got training on decision making related to initiation and termination of pursuits?
A It could be documented.
Q You say it could be?
A Yes.

Q Do you know if it was?
A For some officers, yes, it is.
Q Why for some officers, but not others?
A So they're -- and we need to maybe possibly clarify, the documentation on the DOR for a field training officer, the daily observation report is what I believe it stands for. Decision making has always been a category that the FTO graded that officer for that particular shift.
So decision making related to vehicle pursuits, it could be applicable there, but it could be decision making for the response to a different type of call and maybe that wasn't assessed during that particular shift. So that's why I say there are some instances where that officer was graded that particular shift and sometimes not.
Q There is no evidence that any police officers were trained specifically on decision making related to termination and initiation of vehicle pursuits; is that correct?
A I have no knowledge of the evidence. Again, the DORs could reflect that information.
Q May or may not?
A May or may not.
Q But certainly, there was no requirement that each

and every police officer for the City of South Bend be trained specifically with regard to the initiation and termination of vehicle pursuits prior to July of 2018?
A The policy is specific on the initiation and termination, so --
Q Other than the policy?
A Okay.
Q Is that fair?
A I have no knowledge of formal training other than that, but yeah, policy is very specific on that.
Q Other than the actual policy that was given to the police officers with regard to the initiation and termination of pursuits prior to June of 2018, there is no evidence that any of the specific police officers were formally trained with regard to initiation and termination of pursuits; is that fair?
A I have no knowledge. Correct, that is fair.
Q Would the same hold true for emergency calls?
A Yes.
Q Would the same hold true for traffic stops?
A In terms of other than the policy?
Q Yes.
A Yes.

that they reviewed a new policy when it came out?
A I do not know.
Q I want to talk a bit about the pursuit initiation.
A Yes.
Q And termination. Okay? And it's your understanding based on your review and your conversations with people that the pursuit review initiation termination and issues related to pursuits are the same now as they were back prior to July of 2018; is that fair?
A Yes.
Q You had watched videos of pursuits and issues related to pursuits as part of your training prior to June 2018?
A Specifically, I remember EVO videos being assigned as a program for officers. Specific content related to those videos, I'm unable to answer to.
Q I understand you may not remember the content.
A Okay.
Q But you did see videos prior to July of 2018 in your EVO instruction; is that fair?
A I know they were assigned. Whether I saw them or not, I got my required training at the track, so if there's a -- I would like to see the training roster with my name on it. I know videos were

assigned as part of the program.
Q Did you have classroom EVO? Strike that, let me say did you have classroom instruction on emergency vehicle operation prior to July of 2018? You did, didn't you or did you not?
A Again, the videos were an option for our officers. I believe that didn't make that mandated training in time, but still within that allotted time to stay certified. What --
Q You're --
A Go ahead, I'm sorry.
Q Here's my question. If it is documented in a training record --
A Yes.
Q That an officer went to a classroom for emergency vehicle operations, did that include watching of videos?
A Sometimes.
Q Did it include instruction from an instructor?
A Yes.
Q So an instructor for emergency vehicle operations would, at a minimum, talk to the officers. Right?
A Correct.
Q And explain things. Right?
A Correct.

Q And may or may not watch a video with them. Fair?
A Fair.
Q Now, officers who teach emergency vehicle operations, it's the position of the City that they have to do it in a meaningful, persuasive and serious manner; is that fair?
MR. SMITH: Objection to form. You can answer.
A That sounds fair.
Q I mean, if you're teaching emergency vehicle operations, you want to make sure that the audience is getting the message, understanding the message and hopefully will abide by the message; is that fair?
A That is fair.
Q Emergency vehicle operations lectures should be taken by the instructors to be serious. Right?
A Correct.
Q And what's said in the emergency vehicle operations discussions can certainly influence the training and retraining and supervision of officers. Fair?
MR. SMITH: Objection to form. Go ahead.
A Correct.
Q What I'm getting at is when an officer is teaching emergency vehicle operations or talking about them to the students, there's no question that that can

Q Okay. Let's take a break here.
A Yes, great.
THE VIDEOGRAPHER: Time is 3:26 p.m. We're now going off the record.
(A short recess is taken.)
THE VIDEOGRAPHER: Time is 3:35 p.m. We're now back on the record.
Q Sir, we just took a break. Right?
A We did.
Q And you had a private conversation with your lawyer during the break. Right?
A I did.
Q You would agree with me that when pursuit policies give officers discretion, there's a higher rate of pursuits. Correct?
MR. SMITH: Objection to form. Go ahead.
A I don't know if -- I don't know.
Q Were you ever taught that when police -- strike that. Were you ever taught that when pursuit policies give the officers discretion, there is a higher rate of pursuits?
A I don't recall being taught that.
Q Does South Bend still have a discretionary pursuit policy?
A Yes.

Q And you're not aware of any training or retraining for officers driving above 60 miles an hour during a traffic stop. True?
A Training or retraining? Please restate the question.
Q Sure. You're not aware of any training or retraining for police officers who are driving above 60 miles an hour during a traffic stop. Correct?
A So after acknowledging that they did this, retraining them, is that the question?
Q Just very simple, during traffic stops --
A Yes.
Q If an officer goes above 60 miles an hour, you're not aware of any training or retraining of those officers. Right?
A For that specific incident, no.
MR. S. PHILLIPS: That's all I have. Thank you.
MR. SMITH: Jeff, anything?
MR. LOWE: No.
EXAMINATION
BY MR. SMITH:
Q I've got a few questions. So first, Sergeant Calvert, I'd like you to describe some of the

training that you've received throughout your career on safe emergency vehicle operations. Was safe emergency vehicle operations a topic of instruction at the law enforcement academy?
A Yes.
Q Do you recall what instruction you received on operating an emergency vehicle safely?
A I believe there's a classroom version, but certainly several hours of hands-on training.
Q Was the concept of due regard taught to you at the academy?
A Absolutely.
Q Do you recall what they taught you about the concept of due regard at the academy?
A That we're required to do that by state statute.
Q Did you receive further training when you joined the South Bend Police Department?
A I did.
Q Did you receive the field training officer training that you discussed earlier?
A I did.
Q Was the concept of due regard a topic that was discussed during your FTO training?
A Certainly.
Q Do you remember what you were taught about the

concept of due regard during your FTO training?
A Again, that it's required by state law and policy.
Q Do you recall if you personally were engaged in any pursuits while you were in the FTO program?
A I do recall one.
Q Do you recall if the field training officer discussed that pursuit with you after it happened?
A He did.
Q Can you -- do you recall what he told you about that pursuit?
A I do not, no.
Q As an FTO yourself, if a officer that you are training gets into a pursuit, do you discuss that pursuit with them after it occurs?
A Yes.
Q What kinds of things might you discuss with that officer about the pursuit?
A Again, the requirement of due regard, the importance of that, the definition that I've discovered with proper care and concern for others and then just taking into consideration the policy as required and then the different factors to take into consideration during a pursuit as well.
Q Is one of the things that you might discuss with that officer things that they should have done

differently during a pursuit?
A Yes.
Q Things that they could do better during a pursuit?
A Yes.
Q As a police officer in the State of Indiana, you are required to have annual training on emergency vehicle operations. Correct?
A Correct.
Q Is the concept of due regard discussed during your annual emergency vehicle operations training?
A It is.
Q What are you told about the concept of due regard during your annual EVO training?
A Again, being required and then that definition for officers to use.
Q And you are an EVO instructor. Correct?
A An EVO instructor, yes.
Q Is the concept of due regard something that you discuss when you are conducting the training of other officers?
A Absolutely.
Q What do you tell them about the concept of due regard?
A It's extremely important, required by state law and statute or statute and policy, state statute and

policy, and again that definition.
Q Do you discuss with them the consequences of not driving with due regard?
A Specifically, I don't know.
Q What are the consequences of not driving with due regard?
A Personal injury or death, obviously civil and criminal proceedings, they could be disciplined through the department, property damage.
Q Do the shift sergeants at the South Bend Police Department have a role in reviewing pursuits with officers?
A We do.
Q What is that role?
A We are tasked with reviewing that pursuit.
MR. S. PHILLIPS: Objection, foundation. What time period?
A It is asked that we review it that same shift.
MR. SMITH: Hang on, let me --
MR. S. PHILLIPS: I think his knowledge is after 2018, that's why I'm asking.
Q Let's talk about during your time as a sergeant.
A Yes.
Q During your time as a sergeant --
MR. S. PHILLIPS: Foundation. What year was

that? I just want to see if you can lay the foundation.
Q What year did you become a sergeant?
A 2021, June of 2021.
Q So during the time as a sergeant, have you had a role in reviewing pursuits with officers?
A I have.
Q What has been that role?
A Again, we're tasked with reviewing it on the same shift if possible, if the video and program uploads correctly and then going over those same things, things that we could have done better, things that they might have done well, other things to take into consideration.
Q Before you became a sergeant, when you would get into a pursuit, did your sergeant do that same kind of thing with you then?
A They did.
Q And that was true during the 2015 to 2018 time frame?
A Yes.
Q Earlier, you discussed a silent response and I want to make sure that your testimony on that was clear, because I wasn't very clear on it. You mentioned that there might be some circumstances where you

don't necessarily have to use the siren; is that right?
A Yes.
Q What are those circumstances?
A Hold-up alarms, burglary in progress, any event involving a possible hostage.
Q If you're -- would you be using your lights?
A Lights and then using extra caution because the siren is not being used.
Q So you're still driving with due regard?
A Absolutely.
Q Now, in the circumstances -- other than what you just discussed where you don't have to use the lights, are lights and sirens required for all emergency runs?
A Yes.
Q You mentioned policies get revised from time to time. Right?
A Yes.
Q Are South Bend police officers expected to know and comply with revised policies?
A Yes.
Q So I didn't read it would not be an excuse if someone was accused of violating a policy?
A Correct.

Q I'm going to put an exhibit up here. We'll call this Exhibit 20. Give me one minute here. You should see a document -- John, we can hear you.

(Exhibit 20 marked.)

So you should be seeing a document entitled training brief at the top emergency vehicle operation. Do you see that?

A I do. Is it possible to maximize on your screen?

MR. S. PHILLIPS: Can we put it on that screen?

A I cannot put it on that screen, no.

Q Now, you mentioned earlier today training briefs that are used with the field training officer program. Does the exhibit that I'm showing you here, for the record this is --

THE VIDEOGRAPHER: I'm sorry. Are you able to mute yourself on the Zoom on your computer? Are you --

A So I think it shows me and John are the only ones unmuted.

THE VIDEOGRAPHER: I'm getting an echo in my --

MR. SMITH: Hang on. Is that better? I had my computer muted, but it unmuted when I plugged in the TV.

THE VIDEOGRAPHER: No problem. Thank you.

Q So you mentioned some training briefs used in the

FTO program. I'm showing you a document that's got page number City 1629. Does this document appear to be a training brief that is used with the City's FTO program?
A It does.
Q And just generally speaking, what is the purpose of those training briefs that are used with the FTO program?
A It gives topics for the FTO and the probationary or new officer to talk about, speak about and then learn various aspects of the job.
Q So this one is titled, "Emergency vehicle operation." Correct?
A Correct.
Q Do you see letter A, it says, "Running signal 10." Do you see that?
A Yes.
Q Under there, number 2, can you read that for us, please.
A "You must use due regard for the safety of all citizens when running signal 10, as you can be held responsible for accidents caused by negligence."
Q And what is signal 10?
A Emergent mode or emergency mode.
Q So the City was training its officers that they

thud use due regard when running in emergency mode. Correct?
A Correct.
MR. SMITH: John, can you mute, please. John can you mute, please.
MR. LOWE: John Kautzman, you need to mute.
MR. KAUTZMAN: I'm sorry.
Q Back to Exhibit 20, page the City 1630. Is there a date identified on this document?
A Yes.
Q So the signatures are dated what date?
A It appears to be 12/25 of 2015.
Q So according to this document, the South Bend -- new South Bend police officers were receiving this training in 2015?
A Yes.
Q I'm showing you another page on Exhibit 20. This is number -- page number City 1694. Can you tell us what this -- what this document purports to be?
A Another training brief, this one titled, "Vehicle pursuit."
Q If you look down about two-thirds of the way down, do you see that it has a definition for due regard?
A I do.
Q Can you read that definition for us, please.

A "The duty to drive with due regard for the safety of all persons. Driving with the safety and welfare of all citizens on the roadway in mind in all circumstances."
Q And then going down to page City 1699, do you see a date that the document was signed?
A I do.
Q What date is that?
A It appears to be February 17th of 2016.
Q So according to this document, South Bend police officers were getting training on due regard with vehicle pursuits in 2016?
A Yes.
Q Showing you now Exhibit 20, page City 1631, does this appear to be another training brief?
A It does.
Q What is the topic of this training brief?
A Unknown risk traffic stop.
Q Looking at page city 1633, is there a date that this document was signed?
A There is.
Q What is that date?
A 12 -- it appears to be 25/2015.
Q So according to this document, police officers, new police officers with the City of South Bend Police

Department were getting this training on unknown risk traffic stops in 2015. Correct?
A Correct.
MR. SMITH: Let me check my notes. I may be done. That's all I have.
MR. S. PHILLIPS: John or Jeff?
MR. LOWE: Nothing, this is Jeff.
MR. KAUTZMAN: Nothing from John.
MR. S. PHILLIPS: Let's go -- hang on a second.
EXAMINATION
BY MR. S. PHILLIPS:
Q Mr. Calvert, you were talking about some of the training that officers receive at the Indiana police academy. Do you recall that?
A Yes.
Q I want to show you some discussion about some of the training. Okay?
A Okay.
MR. S. PHILLIPS: Which exhibit is this?
MR. M. PHILLIPS: 10-B.
(Exhibit 10-B marked.)
Q This is actually from the Indiana training academy for State Police -- for police. Okay?
A State Police?
Q Not State, I misspoke. This is from the Indiana

academy for training of police. Okay?
A Okay.
Q And I want to ask you about -- do you see the -- highlighted, officers are trained with regard to deliberate indifference substantial due process violation?
A I do see that.
Q And you see, "Shock the conscious -- life, liberty or property has been deprived." Right?
A I do see that.
Q And you see that they talk about the 4th and 14th Amendments. Right?
A Correct.
Q That was discussed with you during the course of your training. Right?
A Certainly, the 4th and 14th Amendments I can accurately attest to.
Q Did anybody ever describe to you deliberate indifference?
A At the academy, I don't know. I've heard that term used.
Q But you knew about what deliberate indifference was before 2018. Right?
A I believe so.
Q And do you see highlighted in yellow below it talks

about the 14th Amendment states that, "No state shall deprive any person of life, liberty or property without due process of the law. This claim has typically been brought by innocent third parties that were injured or survivors of killed individuals arising from emergency response or pursuit situations by either a fleeing suspect or law enforcement vehicles." Right?
A I do see that.
Q That was Mrs. Flores in this case. Right?
MR. SMITH: Objection to form. Go ahead.
A It could be argued that.
Q Well, certainly, Mrs. Flores was an innocent third party that was injured, actually she was killed, arising from emergency response or pursuit situations. Right?
MR. SMITH: Objection to form.
A She did lose her life.
Q And you were taught this and you knew this when you went through the academy and before June of 2018. Right?
A I was aware of the 14th amendment, yes.
Q These training briefs that were shown to you -- you can take that down. These training briefs that were shown to you by counsel, there is no evidence

of monitoring police officers to confirm they actually read those training briefs. Right?
MR. SMITH: Objection to form.
A As an FTO, when they sign it, that's how I would accept them understanding and acknowledging that they read it.
Q Well, what you mean by that is that when they -- when you hand them the document?
A Correct.
Q They have to sign that they've received it. Right?
A Correct.
Q But there is no evidence or recording that these officers actually read the material after they received it. Right?
A I don't know of any documentation specific other than that.
Q Other than signing that they received it. Right?
A And I don't even know if that is specific to receiving it or discussing it with your FTO. It didn't specify in the signature.
Q Let's go back to my question.
A Yes.
Q You know of no evidence or documents that the City has that officers who received these training statements reflect that they actually reviewed

STATE OF INDIANA )
)
COUNTY OF ST. JOSEPH )

I, NANCY L. DELANEY, RMR, CRR, a Notary Public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiff; that said deposition was taken at the time and place heretofore mentioned between 10:33 a.m. and 4:01 p.m.;

That said deposition was taken by stenographic means and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

IN WITNESS WHEREOF I have hereunto set my hand

and affixed my notarial seal this 30th day of August, 2024.

NOTARY PUBLIC SEAL INDIANA

Nancy L. Delaney
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0750624
My Commission Expires Aug. 6, 2031

County of St. Joseph
My Commission Expires:
August 6, 2031

Job No. 192718