UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION
Case No. 2:19-cv-00064-JTM-JPK

SORAIDA FLORES, as Personal )
Representative of the )
Estate of ERICA FLORES, )
deceased, )
)
Plaintiff, )
)
-vs- )
)
CITY OF SOUTH BEND, a )
municipal corporation, and )
JUSTIN GORNY, )
)
Defendants. )

The videotaped Zoom deposition upon oral examination of JUSTIN GORNY, a witness produced and sworn before me, Valerie Fillenwarth, RPR, a Notary Public in and for the County of Johnson, State of Indiana, taken on behalf of the Plaintiff via Zoom, on the 29th day of February, 2024, commencing at the hour of 1:00 p.m. EST, pursuant to the Federal Rules of Civil Procedure.

Job No. MDLG6576788



**Exhibit D**

A P P E A R A N C E

FOR THE PLAINTIFF:
Mr. Stephen D. Phillips
Mr. Terrence M. Quinn
Mr. Alec Mesrobian
PHILLIPS LAW OFFICES
161 North Clark Street, Suite 4925
Chicago, Illinois 60601
312.346.4262 (Phone)
sphillips@phillipslegal.com

FOR THE DEFENDANT JUSTIN GORNY:
Mr. R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
Bonterra Building, Suite 200
3620 Blackiston Boulevard
New Albany, Indiana 47150
812.949.2300 (Phone)
jlowe@k-glaw.com
and
Mr. John F. Kautzman
RUCKELSHAUS, KAUTZMAN, BLACKWELL,
BEMIS, DUNCAN & MERCHANT, LLP:
135 North Pennsylvania Street
Suite 1600
Indianapolis, Indiana 46204
317.634.4356 (Phone)
jfk@rkblegalgroup.com

(Continued.)

A P P E A R A N C E

FOR THE DEFENDANT CITY OF SOUTH BEND:

Mr. Joseph Smith
Ms. Margaret Domanski-Sullivan
KNIGHT HOPPE KURNIK & KNIGHT
233 East 84th Street, Suite 301
Merrillville, Indiana 46410
219.322.0830 (Phone)
jsmith@khkklaw.com

and

Ms. Kylie Connell
City of South Bend, Legal Department
County City Building
227 West Jefferson Street, Suite 1200
South Bend, Indiana 46601
574.235.9241 (Phone)
kconnell@southbendin.gov

ALSO PRESENT:

Chris Clee, Videographer
Sarah Curl-Larlson
Julie Wisner

# I N D E X O F E X A M I N A T I O N


| | Page |
|---|---|
| DIRECT EXAMINATION.................... | 6 |
| Questions by Stephen J. Phillips | |
| CROSS-EXAMINATION..................... | 169 |
| Questions by Joseph Smith | |
| CROSS-EXAMINATION..................... | 180 |
| Questions by John Kautzman | |
| REDIRECT EXAMINATION.................. | 186 |
| Questions by Stephen J. Phillips | |


# I N D E X O F E X H I B I T S


| Deposition Exhibit No.: | Page |
|---|---|
| Exh 1 Oath of the Police Department of the City of South Bend, Indiana.......................... | 26 |
| Exh 2 Two-page aerial view map....... | 63 |
| Exh 3 Two-page aerial view map....... | 63 |
| Exh 4 Two-page aerial view map....... | 63 |
| Exh 6 Law Enforcement Dispatch Log: July 20, 2018, Transcription of Radio Traffic..................... | 30 |
| Exh 9 Justin Gorny post-collision dash cam video......................... (Retained by attorney.) | 100 |
| Exh 10 Policy 320, South Bend Police Department, Policy Manual, Standards of Conduct............. | 120 |

(Continued.)

I N D E X O F E X H I B I T S


| Deposition Exhibit No.: | Page |
|---|---|
| Exh 11 Policy 308, South Bend Police Department, Policy Manual, Officer Response to Calls......... | 121 |
| Exh 15 Training History Report........ | 128 |
| Exh 19 Tire Rack, Track Map, 3 pages.. | 143 |
| Exh A Training Brief, Emergency Vehicle Operation......................... (Bates number CITY 0785-0786) | 173 |
| Exh B Below 100 poster.............. | 177 |


(Reporter's Note: Quotation marks are used for clarity and do not necessarily reflect a direct quote.)

THE VIDEOGRAPHER: Good afternoon. We are now on the record. My name is Chris Clee. I'm the videographer for Golkow Litigation Services.

Today's date is February 29, 2024, and the time is 1:03 p.m. Eastern Standard Time.

This video deposition is being held in the matter of Soraida Flores, et al, vs. The City of South Bend. The deponent is Justin Gorny.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely. Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard.

Counsel will be noted on the stenographic record. The court reporter is Valerie Fillenwarth and will now swear in the witness.

JUSTIN GORNY,

having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION,

QUESTIONS BY MR. STEPHEN D. PHILLIPS:

Q. Mr. Gorny, would you please state your full name and spell your last name?
A. Justin David Gorny, G-O-R-N-Y.
MR. PHILLIPS: We're getting a pretty good feedback there. Mr. [sic] Court Reporter, can you correct that?
(Inaudible.)
MR. PHILLIPS: How about now, can you say something, Mr. Gorny, please? Can't hear you at all. Oh, you're muted.
THE WITNESS: (Inaudible.)
THE VIDEOGRAPHER: Do you want to go off?
MR. PHILLIPS: Yeah.
THE VIDEOGRAPHER: All right. Going off the record. The time is 1:04 p.m.
(WHEREUPON, at this time a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 1:06 p.m.
BY MR. PHILLIPS:
Q. Okay. Mr. Gorny, what is your professional address, currently?
A. My residence or work address?
Q. Work.
A. Work, 809 South State Street,

for stopping -- we had a suspicious person call, stop -- stopped that individual. Through investigative, found out that he just committed burglary, I believe.

I had another accommodation for a traffic stop that digging deeper in that traffic stop we found a little over $10,000 I believe in stolen merchandise.

In June of 2022 I was officer of the month on the midnight shift. I believe I took -- I collected 20 guns off the road that month.

Q. Okay.

A. I believe one of those was used in a homicide as well.

(WHEREUPON, Deposition Exhibit 6 was marked for identification.)

BY MR. PHILLIPS:

Q. Okay. I'm going to show you another exhibit. Can you see Exhibit 6 which is a transcript of the radio traffic on the night of this occurrence?

A. Yes, sir. It's only half the exhibit though.

Q. Oh, I'll get you the rest. Okay.

Can you see this?

A. Yes.

Q. Okay. Did you review this radio transcript or the radio call in preparation for this deposition?

A. I reviewed it, yes.

Q. When did you look at it?

A. Why?

Q. No, when.

A. I can't give you a specific time frame.

Q. Okay. You were not part of the hot spot, or the Hippaka team, that morning, correct?

A. I'm sorry, what was the question, sir?

Q. You were not part of the hot spot team that Sergeant Hippaka was running that morning, right?

A. I was not part of the initial five or six, I believe, but everybody was briefed on what was taking place.

Q. Okay. My question is: The Hippaka team was five officers in the northwest part of the city, right?

A. I'm sorry, what was the question, sir?

Q. The Hippaka team was five officers assigned to the northwest part of the city on the night of this occurrence, right?

A. I don't recall it being a specific team. There was a group of individuals.

Q. Okay. You weren't part of the group of individuals that were assigned to Officer Hippaka on the night of this occurrence when this began, correct?

A. Officer Hippaka was my direct supervisor that night.

Q. Okay. You're not answering my question.

A. I must be missing your question, I apologize.

Q. You weren't assigned to the hot spot team in the northwest side of the city that Officer Hippaka was running that evening when this incident started, correct?

A. That specific night I was assigned to the southwest district. I was not the -- in the hot spot area that night.

Q. Can you answer my question, please?

MR. LOWE: Object to form. He did. But go ahead.

BY MR. PHILLIPS:

Q. My question is you were not assigned to the northwest side of the city with the Hippaka team when this incident began, correct?

A. I -- I'm trying to answer your question, sir. Sergeant Hippaka was my immediate supervisor. I was assigned to the southwest side. I do not recall if there was a specific team, quote unquote, team. I know there was a hot spot patrol that night.

Q. Okay. You were not assigned to the northwest part of the city where this incident began, correct?

A. No, sir, I was assigned to the southwest side.

Q. So my statement is correct, right?

MR. LOWE: Object to form. He's asked and answered. But go ahead.

A. I was assigned to the southwest side of town.

BY MR. PHILLIPS:

Q. Officer Alfrey and Officer Wagner were in an unmarked car that was not equipped

with sirens or lights, correct?
A. To my knowledge, yes.
Q. Sergeant Hippaka drove a fully marked police car that night, correct?
A. To my knowledge, yes.
Q. Officers Howard and O'Blenis, they were in an unmarked car that had sirens and lights, correct?
A. Yes, sir.
Q. Okay. The group of five officers in the northwest side of the city during the Public hearing were described as the Hippaka team, were they not?
A. I do not recall.
Q. Okay. Would you -- would you say -- strike that.
Would you agree that the five officers in the northwest part of the city were characterized as the Hippaka team?
A. They -- they were working a hot spot that night. I don't know if -- what you would characterize that other than the hot spot.
Q. Okay. You were not assigned to work that hot spot on the northwest side of the city that night, correct?

A. Correct.
Q. You were listening -- hang on one second. I'll be right back.
The first time that you became aware of a traffic incident that led to this collision was when you were down on Sheridan, correct?
A. Of -- what particular incident are you asking about, sir?
Q. The Flores incident.
A. I don't understand your question.
Q. The first time you became aware of the vehicle that started the Flores incident was when you were sitting on Sheridan --
A. Yes, sir.
Q. -- talking to Officer Myers, correct?
A. Yes, sir.
Q. The traffic stop being made by the Hippaka hot spot team was a routine traffic stop, true?
A. I don't -- Hippaka hot spot team was trying to initiate a traffic stop, needing a marked vehicle.
Q. Okay. My question is the tra- -- the traffic stop that was initiated by the Hippaka hot spot team was a routine traffic stop,

correct?
A. No traffic stop is routine, sir.
Q. Okay. Well, let me ask you this: The Hippaka hot spot team was engaged in a traffic stop of the vehicle that you were trying to get to on the night of this occurrence, correct?
A. Yes, Officer Alfrey was advising for a marked patrol unit to initiate that traffic stop.
Q. Okay. You need to answer my question, please.
A. I apologize. I missed the question, sir.
Q. When this incident began, this was a routine -- strike that.
When this incident began, this was a traffic stop that the Hippaka team was trying to engage in, right?
A. Yes, they were looking to stop that vehicle.
Q. It was a traffic stop, correct?
A. Yes, sir. I believe I answered that.
Q. Okay. What was your identifying language or call sign on the radio that night?

A. I was assigned to Unit 395.
Q. Okay. You were referred to in the transcript as an X car, is that right?
A. Yes, sir.
Q. And what was your call sign or sign for the X car?
A. Unit 395.
Q. Now, that was shortened in some of these transcripts to 95, was it not?
A. Yes, sir.
Q. Okay. An emergency call or emergency run is referred to as a signal 10, correct?
A. Yes.
Q. Okay. No one on the radio referred to this incident, the car that they were attempting to pull over, as a signal 10, correct?
A. I don't think anybody would put signal -- that's not language that would be used.
Q. Okay. My question is no one called out that this that was a signal 10 emergency call on the radio that evening, this traffic stop that the Hippaka team was trying to engage in, correct?

A. Nobody called that out, no, sir.
Q. Okay. What is a pursuit call?
A. A pursuit?
Q. Yeah.
A. It's when a vehicle takes off from an officer that has their lights activated.
Q. Okay. Is there a call sign for that? Is that a signal something?
A. To not my knowledge, no sir.
Q. Okay. What is a pursuit typically referred to during a radio transmission?
A. Vehicle being in pursuit.
Q. And what is an emergency call typically referred to in a radio transmission?
A. I wouldn't say there's any exact verbatim wordage that's used.
Q. Okay. Do -- do officers refer to emergency calls on the radio as an emergency from time to time?
A. There's officer discretion that's used. Certain calls warrant for an emergency run, yes.
Q. Okay. My question is when officers describe an emergency call on the radio, do they, from time to time, call it an emergency

and use that word?

A. Emergency, no.

Q. Okay. Do officers call an emergency call a signal 10 on the radio from time to time?

A. From time to time, yes.

Q. Okay. Anything else that they call an emergency call to let people know it's an emergency call, other than a signal 10?

A. No, officers use discretion based on the information provided. You don't -- every time you turn your lights on you don't say on the radio that you're running light and sirens or have your lights activated.

Q. Okay. My question is: When officers on the radio want to tell people they're engaged in an emergency call, do they use any phrases other than signal 10?

A. Are you asking -- your -- I don't understand your question. Signal 10 is, yes, sir, you would say that your signal 10 would be used, but you don't always have -- I don't -- you don't always get on the radio and tell everybody you're running lights and siren.

Q. Okay. I didn't ask that. All I want

to know is the nomenclature. Do you understand my question?
A. No, sir, I do not.
Q. Okay. A signal 10 is an emergency call?
A. Yes, sir.
Q. We talked about that?
A. Yes, sir.
Q. Is there any reference or nomenclature to describe an emergency call other than a signal 10?
A. Some guys could say that they're running hot, which is jargon for running signal 10.
Q. Okay. Did anybody on that radio transcript say they were running hot that night?
A. I do not believe so. I believe "Step it up" is also a term used that you're running lights and sirens as well.
Q. Okay. Did anybody on that radio call say that they -- use the "phrase step it up"?
A. I do not recall specifically, no.
Q. Okay. So the three phrases that are used on radio calls to designate an emergency

would be a signal 10, step it up, or running hot, correct?
A. Those are common language used, yes.
Q. Okay. Any others?
A. Not to my recollection right now.
Q. Okay. You first contacted the Hippaka hot spot team, according to the transcript, correct?
A. I don't see on the transcript where I did that, but I did contact them, yes.
Q. Okay. Well, did anybody call for you? I mean, you reviewed the transcript, and I'll look it over with you. Okay. Do you see at 4:31:51?
A. Yes, sir.
Q. Okay. That's Officer Alfrey, right?
A. Yes, sir.
Q. Okay. And then 4:32:15 is the first time you spoke, correct?
A. According to this, yes, sir.
Q. Okay. Do you have any reason to believe this transcript is incorrect?
A. Not to my knowledge.
Q. Okay. Looking at 4:32 and 15 seconds, the first time you spoke was when you

said "95's not too far away from Olive and Western. What do you need?", correct?

A. Yes, sir, that's after -- if you go up to the 4:31 after Alfrey said he turned left on Olive, getting ready to go over the tracks, that would be the divider of where northwest is coming into the southwest district, which I was (inaudible).

Q. Mr. Gorny, can you please stick to my question? Would you do that for us?

A. Yes, sir.

MR. LOWE: Object to the statement. He is.

BY MR. PHILLIPS:

Q. Is the first time that your name appears on here when you spoke at 4:32 and 15 seconds as far as the radio transmissions?

A. Yes, sir.

Q. And prior to you speaking on the radio, no one asked you either by your name or by your identification number to get involved in this, correct?

A. Nobody asked me on -- through radio transmission, no.

Q. Okay. Officer Howard indicated on

the radio "We've got lots of units coming from the north," after you contacted the Hippaka team, correct?

A. Where is the transmission that you're referring to, sir?

Q. Do you see at 4:32:48?

A. Yes.

Q. Officer Howard said, "We've got a lot of units coming from the north," correct?

A. Yes, sir. The transmission prior to that, though --

Q. Can we stick to my question? It's just that simple.

A. Yes, sir.

Q. 4:32:48 you agree that Officer Howard said, "All right. We've got a lot of units coming from the north," correct?

A. That's what's stated, yes, sir.

Q. Okay. You weren't coming from the north, correct?

A. No, sir.

Q. Okay. My statement's accurate, agreed?

A. I was not coming from the north, no.

Q. Okay. When you were driving

but --

MR. KAUTZMAN: Did you say "If that's what the black box said"?

THE WITNESS: If that's what the black box said.

BY MR. PHILLIPS:

Q. Yeah. Does that refresh -- if I told you that the black box indicated that prior -- just prior to the time you got to the intersection, your accelerator was at about 68 percent, you were increasing your speed, would that refresh your recollection --

MR. LOWE: Object to form.

Q. -- that you were increasing your speed as you were approaching Kaley?

MR. LOWE: Object to form. You can answer.

A. I don't recall if I was increasing my speed or -- just because the accelerator was pushed doesn't mean that I was attempting to increase.

BY MR. PHILLIPS:

Q. Okay. So -- so you can't tell us whether or not you were increasing your speed as you approached Kaley, is that correct?

A. I do not recall, no, sir.
Q. Okay. It was -- it was too late for you to avoid the collision with Mrs. Flores when you reached the intersection of Kaley, correct?
A. As I reached the intersection of Kaley and entered the intersection, I attempted to -- an object appeared, which would have been Miss Flores' vehicle. I attempted to pull an evasive maneuver, I believe turned left to try to miss her vehicle.
Q. Okay. But it was too late, right?
A. Ultimately an accident happened, yes, sir.
Q. Do you know how fast you were going or have a reasonable estimate how fast you were going in the three seconds prior to the impact with the Flores vehicle?
A. I was made aware of my speed, yes, through the black box. At the time -- at the time of the accident I did not believe I was going those speeds. I felt like I was in control of doing roughly around 70 miles an hour, but I was made aware through the black box that the speeds that were estimated, I

believe, at 90 miles an hour.

Q. Okay. And do you dispute the black box data in the three to five seconds before the impact about your speed or your braking or your accelerator?

A. I don't have any reason to believe -- no.

Q. Okay. You have -- you don't have any reason to disbelieve it?

A. No, I do not.

Q. Okay. When you were on Western traveling eastbound, your overhead lights were not on the entire time, your emergency lights, right?

A. Yes, sir.

Q. Okay. And you did not use your siren at all on either Western or Sheridan on the night of this occurrence, correct?

A. I do not recall using it, no.

Q. Okay.

MR. PHILLIPS: You want a break here, John?

MR. KAUTZMAN: Sure.

MR. PHILLIPS: How about five, is that okay?

Q. You knew, as you were traveling on Western, that people traveling northbound on Kaley would not be able to see your overhead emergency lights if they were not on, right?
A. If my lights weren't on, then nobody would be able to see them, correct.
Q. Now, you knew and you talked about this in the Public hearing, about the concept of clearing an intersection, right?
A. Yes, sir.
Q. You knew that if you were going through a red light at Kaley, you were required to make sure that intersection was clear before you went through the red light, right?
A. If Kaley's light was red, then, yes, it would have sl- -- cleared it.
Q. No, my question is if as you were approaching Kaley and the light was red for Western, you knew it was your responsibility to clear that intersection before going through the red light, correct?
A. I don't understand your question, sir. I -- I -- the light on Kaley -- Western was green. You're saying I knew it was red.
Q. No. My question to you is: If as

you were approaching Kaley, as you're going on eastbound on Western, if the traffic light for you was red, you had a responsibility to clear that intersection before you went through a red light, right?

A. But I -- as I approached that intersection the light was green.

Q. No, I understand that's your position. I get that. But my question's a different question. My question is following up on some talk -- some testimony that you gave about clearing the intersection with a red light, okay?

A. I -- I understand what you're saying.

Q. Okay. So let's -- let's -- when you come to an intersection that there is a red light for you --

A. Yes.

Q. -- and you -- and you want to go through the red light, you've got a responsibility to clear that intersection, right?

A. Yes, if you approach an intersection and the light is red, you have to clear the intersection.

Q. Okay. Clear the intersection is to make sure no one's coming through that intersection when you're coming through on a red light, right?

A. Yes, on a red light, yes.

Q. Okay. And you don't know whether or not Mrs. Flores went through a red light when she was going through the intersection, is that right?

A. I believe I was going through a green light.

Q. Okay. Well, do you know what color the light was for Mrs. Flores when she entered that intersection?

A. I can't speak on that, sir.

Q. Okay. Did you read the city engineer's deposition?

A. I did not.

Q. Okay. Has anyone ever told you that you went through a red light as you approached Kaley?

A. That was the -- in my opinion, the false narrative that was released in the media. But I have never been specifically told that I went through a red light, no.

Q. Okay. Did you ever tell anyone that you went through a red light at Kaley and Western?
A. I do not believe so.
Q. Did you ever tell anybody that the light was red as you were approaching Kaley on the night of this occurrence?
A. I do not recall, no.
Q. Do you deny making that statement? Do you deny telling people that the light was red as you were approaching Kaley and went through the intersection?
A. Sir, still to this day I believe that light was green. I -- I don't recall making that statement.
Q. Okay. A few months prior to this incident you switched cars from a Chevy Impala to a Ford Taurus, right?
A. Yes, sir.
Q. The switches for overhead lights in your new car were in a different locations than they were in your old car, true?
A. Yes, sir.
Q. And it's your position you had trouble finding them on the night of this

occurrence, right?
A. Yes, sir.
Q. Did you receive any training on the new lights or the location of the new lights when you got your new car?
A. I was issued the vehicle and that was -- that was the training I received.
Q. Okay. My question is: Did you receive any training on the location or operation of the new lights when you got the new car?
A. No, sir. I was issued the vehicle and given the keys to that vehicle.
Q. Okay. Did you receive any training whatsoever on the location of the light switches or toggles when you were issued the new vehicle?
A. No, sir.
Q. You were driving on Western that night and you would describe that as a high-stress situation, right?
A. Yes, sir.
Q. Why was this a high-stress situation?
A. During that specific incident, you are not only performing your duties operating

that vehicle but you're also listening to radio traffic, and the radio traffic that I was receiving at that time was increasing the urgency of stopping the vehicle.

Q. Okay. Did you receive any training whatsoever on finding the overhead light switch in a high-stress situation?

A. No, sir.

Q. Do you feel you had inadequate training with regard to the new overhead light switches, emergency light switches, and their location in your police car?

A. Sir, I attended the trainings that I was instructed to do so and I attended those.

Q. Okay. My question to you is: Do you feel that you had inadequate training with regard to the location or use of the new overhead light switches and their location when you were issued the new police car?

MR. KAUTZMAN: To which we object. Calls for a legal conclusion. But you may answer, if you know.

A. Again, sir, I attended the trainings that I was instructed to do so. I was not instructed to attend any trainings on that.

BY MR. PHILLIPS:
Q. Okay. Do you believe that you should have had training with regard to the location or use of the new light switches in your new police car prior to --
MR. SMITH: Objection to form.
Q. -- this?
MR. SMITH: Sorry. Objection to form.
MR. LOWE: Same here. Go ahead.
A. I attended the trainings that South Bend required of me. I'm not a training instructor; I can't speak on that behalf.
BY MR. PHILLIPS:
Q. Okay. Did you ever ask for additional training or any training with regard to the location of the light switches when you got your new police car?
A. No, I was just issued the vehicle.
Q. My question is: Did you ever ask for any additional or any training with regard to the location of the light switches on the new police car?
A. No, sir. I was just issued the vehicle.
Q. Okay. Why didn't you ask for new

you were uncomfortable or that there were significant differences with the new switches in the new police car?

A. There was -- it was noted -- when I switched, I'm sure I made the comments of: This is a lot different than the previous one. The technology was much different.

Q. Who did you tell that to?

A. That would have been -- I was issued through -- I believe Bob was his name, Parks, maybe, is the one that issued the vehicle.

Q. In the two months between the time you got the new police car and the time of this occurrence, did you ever tell anybody, "Hey, I'm uncomfortable. I need some training with regard to these new switches or their location for the emergency lights and siren"?

A. I do not recall having that conversation, if that did happen.

Q. Did anybody ever come to you from the city and say, "Are you comfortable with these new light switches, any issues with the new switches," or words to that effect at any time between when you got the new police car and the time of this occurrence?

A. No, I was never asked about the vehicle or my comfort level.
Q. On the night of this occurrence, is it your testimony you had trouble finding or turning on and off the emergency light bar?
A. Yes, sir.
Q. And when was that?
A. As I was going up Western, I deactivated the light for a brief sec- -- for a brief second. When I realized that I accidentally shut the overhead light off, I immediately turned it back on. As I was coming up to Kaley, with the radio traffic, et cetera, it required the -- emergent, to step it up a little bit more, and that's when I looked down to activate the siren, and the collision occurred.
Q. Prior to the night of this occurrence, did you ever have any difficulty turning on or off the emergency light switch or siren?
A. I do not recall a specific incident, no, sir.
Q. Did any other police officer, to your knowledge, ever indicate to you that they had

problems with the location or the use of the new light switches and siren when the new police cars came in?

A. I do not recall a -- specific conversations. I know there was a talk amongst guys of the upgrades and technology being much different from the Impala to the Taurus.

Q. Okay. But my question to you is: Did any other police officer ever complain to you about the location or the use of the emergency lights and siren toggle switches when the new cars came in?

A. The -- I thought I answered that. The -- the majority of -- like I said, the guys talked about the difference being between the two vehicles, going into a newer vehicle with newer technology. To have specific interactions or specific officer, I couldn't tell you that. I know it was a general knowledge that there was a significant difference between the two vehicles.

Q. Other than the fact that there was a significant difference between the lights switches and the siren switches in the old vehicle versus new vehicle, did any other

police officers complain to you or say they were uncomfortable with the differences?

A. It was -- it was noted between guys in conversation that there is a significant difference. So the comfort level would be much different confirm- -- being a new item. I'm trying to answer your question, sir.

Q. Okay. I understand that guys said there's a difference in the location or use of the toggle switches with the emergency lights and siren in the new cars.

A. Yes, sir.

Q. Right. But my question to you is: Did anyone ever tell you, did any of the other police officers tell you, "Hey, there's a difference here, and I'm uncomfortable with it," or, "I don't like it," the location of the new switches for the emergency light bar and siren when the new police cars came in?

A. I can't recall a specific conversation that would have been had.

Q. Okay. You did not use the siren that night because you thought it would alert the suspect, that is the driver, is that right?

A. I didn't use the siren that night for

tactical purposes, yes.

Q. Okay. In fact, you testified in the Public hearing you did not use your siren because you thought it would alert the suspect and he would travel eastbound and put pedestrians at risk, correct?

A. Yes. For a tactical advantage, yes.

Q. Okay. And you didn't want to alert the suspect and put pedestrians at risk, that was the reason why you didn't activate your siren, right?

A. Yes, sir, for the tactical advantage, yes.

Q. Okay. And it's true that you attempted to turn on your siren before your collision with Mrs. Flores but you hit the wrong button, right?

A. Yes.

Q. Did the City of South Bend ever tell you -- anybody from the city ever tell you it's your responsibility to understand and properly use the light switches and equipment in your car?

A. I do not recall.

Q. Did anyone ever tell you from the

City of South Bend "You are responsible for both knowing how it operates and how to operate the equipment correctly in your car"?

A. I do not recall having that conversation, no.

Q. Okay. Did you receive any training on the siren switch in a high-stress situation from the City of South Bend or the police department?

A. No, sir.

Q. Do you have -- do you feel that you received -- strike that.

Do you feel that you needed training with regard to the siren, the location of the siren with the new car?

MR. LOWE: Object to form. You can answer.

A. I feel that it was different and I was uncomfortable at that time, yes.

BY MR. PHILLIPS:

Q. Okay. But my question is: Do you feel that you needed training with regard to the siren switch in the new car?

MR. LOWE: Object to form. But you can answer.

Q. Okay. Let's look at page -- looks like this is page 4. Anything on here in 2016 related to EVO or -- or -- or driving?

A. I believe the sixth thing down, the SBPD EVO 2016 on 4-5.

Q. What did that consist of?

A. Being early spring, I would assume that would have been as -- at the track as well, similar to the ones we've previously talked about.

Q. 10 minutes or so on the track?

A. Yes, sir.

Q. 50 miles an hour, top speed?

A. Roughly, approximately.

Q. Okay. And, again, no classroom lectures, posters, handouts, worksheets, correct?

A. Not to my knowledge.

Q. Okay. Anything else on page 4?

A. Not that I see.

Q. I'll scroll down to make sure.

A. Okay.

Q. So as far as your driving and your emergency vehicle operations, from the time you started with South Bend until the time of this

occurrence, it consisted of watching the same video once a year, agreed?

A. I believe so, yes.

Q. And 10 minutes or so around the track at the Tire Rack, right?

A. Yes. The -- South Bend did training, I believe, two times a year for EVO; once in the early -- late spring I believe and early fall.

Q. Okay. But what I'm getting at is other than watching the video, the same video in 2016, 2017, and 2018, and the once-a-year going around 10 minutes or so at the track at Tire Rack, you had no additional emergency vehicle training from the City of South Bend, agreed?

A. Sir, in your question you said one time a year. We did training twice a year. Depending on availability, there could have been two times that I would have went to the track verse (phonetic) watching a video.

Q. Oh, okay. All right. So you may have gone to the track twice a year for 10 minutes for those three years that you were at South Bend Police Department, is that what

you're saying?
A. Yes, sir.
Q. Okay. So let me go back again. So your training on emergency vehicle operations for South Bend consisted of once a year watching the same video 2016, 2017, 2018, agreed?
A. Yes, sir.
Q. And the second part was going to the track once or twice a year at Tire Rack and going around the track for about 10 minutes or so, agreed?
A. Approximately, yes, sir.
Q. Okay. Anything else?
A. Not to my knowledge at this time.
Q. Okay. You did not receive any lessons, plans, or materials or handouts at EVO or any other time related to driving, correct?
A. Not to my knowledge.
Q. Okay. Did you ever speak at any of the EVO, or did you ever instruct at any of the EVO, or teach other officers emergency driving or any driving at all?
A. No, sir, that's for the instructors.
Q. Okay. Do you recall who the

BY MR. PHILLIPS:

Q. So my question is: If you had decided not to respond to the radio traffic that night, you think this -- this accident with Mrs. Flores still would have happened? You don't believe that, do you?

A. I don't believe that I can predict the future, sir. Hopefully -- I wish this accident never happened, but I don't believe whether I respond to that or not that an accident doesn't take place. I can't predict the future on that.

Q. You agree that there is a serious risk of harm to drivers and pedestrians by officers driving at high speeds?

MR. KAUTZMAN: Can you restate the question, Steve? I didn't understand the term that you used.

MR. LOWE: You broke up.

MR. PHILLIPS: Oh.

BY MR. PHILLIPS:

Q. You agree that there is a serious and dangerous risk of harm to pedestrians and drivers by officers driving at high speeds, right?

A. I believe there's a serious harm any -- with anybody on the roadway --
Q. Okay.
A. -- not just officers.
Q. Okay. And you were trained that you have to use due regard with the safety of the public and other users of the roadway, the pedestrians, when you are involved in driving a police car, right?
A. Yes, and I believe I was doing so.
Q. Okay. And you were trained and you knew that if you did not use due regard with the safety of the public when you were driving a police car, that you could be held liable for damages, right?
A. I believe I was driving with due regard, yes.
Q. Okay. No, my question is: You knew that if you weren't using due regard for the safety of the public when you were driving your police car, you could be held liable for damages, right?
A. Yes, sir, you're saying I knew that I had to drive with due regard, and that's what I'm trying to tell you is, yes, I believe I was

driving with due regard.

Q. My question to you is: -- it's more -- it's simpler than that, okay? You were -- strike that.

You were trained and you knew that if you did not use due regard for the safety of the public when you were driving a police car, you could be held liable for damage that you cause, right?

A. Yes, sir.

MR. KAUTZMAN: Objection. Calls for legal conclusion on his knowledge of what the law allows him to be liable for.

BY MR. PHILLIPS:

Q. Okay. Yes?

MR. LOWE: You can answer.

A. Yes, you have to drive with due regard.

BY MR. PHILLIPS:

Q. Okay. Is the answer to my question -- okay.

And you knew you could be held liable for damages if you didn't drive with due regard for the safety of the public, right?

MR. KAUTZMAN: Same objection.

A. Yes, sir, I know you need to drive with due regard.

BY MR. PHILLIPS:

Q. Okay. Did you know that you could be held liable for damages -- you did -- strike that.

The City of South Bend told you that you had to drive with due regard for the safety of the public, right?

A. Yes, sir.

Q. And they told you that at the police academy, right?

A. Yes, sir.

Q. And they told you you could be sued for damages if you didn't drive with due regard for the safety of the public, right?

MR. KAUTZMAN: Same objection. Go ahead, if you know.

A. Yes, sir, I'm trying to tell you I understand you need to drive with due regard. I'm agreeing with you, yes.

BY MR. PHILLIPS:

Q. Okay. Why didn't you use your lights and siren on Sheridan?

A. Due to the context of the radio

traffic, at that point in time I do not believe it was an -- emergent just yet.

Q. Okay. But you were driving well over the speed limit on Sheridan, we talked about that, right?

A. Yes, sir.

Q. Why didn't you use your lights or siren on Sheridan when you were driving over the speed limit?

MR. LOWE: Objection, asked and answered. Go ahead.

A. Again, the context, I did not believe was an emergent run at that point in time.

BY MR. PHILLIPS:

Q. Okay. But isn't the -- isn't the reason for lights and siren is to warn the public of the presence of a police officer coming down the street?

A. That's one of the uses, yes.

Q. Okay. Well, why didn't you warn the public with your lights or siren as you were driving north on Sheridan over the speed limit?

A. At that point in time I did not believe it was an emergent run, sir.

Q. Okay. You told me that's an emergent

something, I apologize. I mean the transcript has been breaking up here and there, so if I misheard it, I'm sorry.

MR. KAUTZMAN: Well, then let's do that because you might have misheard. So let's have the court reporter reread his initial answer to this series of questions on the same topic.

THE COURT REPORTER: Well, I don't know exactly what you want, but here's one of the answers.

(WHEREUPON, the requested material was read back by the court reporter.)

MR. PHILLIPS: Okay, that's fair. That's fair.

MR. KAUTZMAN: And can you state what the question was right before that answer, please, ma'am?

THE COURT REPORTER: Yeah. Hold on, I got to go back.

(WHEREUPON, the requested material was read back by the court reporter.)

MR. PHILLIPS: Wait, wait, wait, what's the answer?

(WHEREUPON, the requested material was read back by the court reporter.)

MR. PHILLIPS: Okay, that's fair. I didn't hear that. I apologize. I'm sorry.
MR. KAUTZMAN: Thanks.
MR. PHILLIPS: Yeah. No, I -- you know, this transcript cuts in and out. I didn't hear that so...
MR. KAUTZMAN: Okay.
BY MR. PHILLIPS:
Q. When you were going down Western, did you feel the need to turn on your lights and warn the public sooner than you did?
A. I turned my lights on at Falcon. Based on the context of the radio transmission, I believed that was at that point in time where the vehicle crossed over the tracks into oncoming traffic and was darked out, which obviously means having its headlights off, so that created the more substantial risk to the public and elevated the circumstances.
Q. You said at the Public hearing that you heard that the other vehicle was coming over the center line, and it would be a disaster or could be a disaster. Do you recall that?
A. Yes, sir.

Q. Okay. So when the other vehicle is coming over the center line, a collision could occur that could be a disaster, you agree?

A. Yes. I believe the other context to that question is that they were increasing their speed as well.

Q. Okay. So the other car coming over the center line and increasing its speed, in your opinion, could lead to a disaster, agreed?

A. Yes, without headlights on and all the information that was provided at that point in time, yes, I believe, absolutely.

Q. Okay. Well, you believe that the vehicle that you were coming to intercept had its headlights off?

A. At one point in time Alfrey transmitted over channel 7 that it darked out.

Q. Okay. So the vehicle that is passing cars in the other lane and is picking up speed, and may have inadvertently turned off his lights, or turned off his lights intentionally, could have resulted in a disaster, right?

A. Yes, sir.

Q. Why a disaster? And what do you mean by disaster?

A. I mean --
MR. LOWE: Which one do you want him to answer first?
BY MR. PHILLIPS:
Q. Well, better question: What do you mean by a vehicle coming over the center line and picking up speed and its lights going off could result in a disaster? What do you mean by disaster?
A. I believe an accident could take place.
Q. Are all accidents disasters?
A. Not all accidents, no. I believe accidents, certain accidents, are accidents.
Q. Well, what was it about this that could create a disaster, the speed?
A. The fact that they were going into oncoming traffic over a railroad track, into oncoming traffic without headlights at a high rate of speed I believe is pretty substantial and an emergent -- for law enforcement, elevates that to an emergent run.
Q. Okay. So the things that could make this a disaster would be speed, the lights off, and going into the opposite lane of traffic,

right?
A. Yes, sir.
Q. Okay. Disasters can result when cars can't see other cars traveling at high rates of speed, agreed?
A. Yes.
Q. Okay. The policies of the South Bend Police Department, you were required to follow all of them, correct?
A. Yes, sir.
Q. Okay. Now, at night you guys tended to use your lights and siren on emergency calls less often than during the day, right?
A. Yes, sir.
Q. What percentage of call -- emergency calls at night were without lights and siren?
A. I couldn't give you a percentage.
Q. Can you give me a rough estimate, ballpark?
A. I don't have a rough estimate on that.
Q. Was it 5 percent, 10 percent, 50 percent, 75 percent? What percentage of emergency calls at night were done without lights and siren?

A. It depends on what your definition of the emergency calls is, sir. There's a lot of context that would go into that question.

Q. Well, based on your definition of emergency calls.

A. If you're going to a robbery at night, you wouldn't, obviously, alert with lights and sirens. If you're going -- whatever the call is, every call is different. So to give you a number of a percentage that we run lights and/or sirens, I can't give you a percentage.

A lot of times we ran lights, and tactically speaking, we didn't always use a siren. So if you want a roundabout answer, I'd say 40, 50, 60, maybe 70 percent of the time you would have lights on, maybe not sirens, just because of a pure tactical advantage.

Some calls you wouldn't -- obviously, being the dark, your lights travel, you wouldn't have your lights on an overwhelming amount of time heading to that call.

Q. Okay. Let me break that down a bit. If you took all of the emergency calls for all of the reasons that you went on at night in the

years you worked for South Bend, what percentage of them did you not use sirens?

A. 60, 70 percent, probably.

Q. Okay. What percentage did you not use lights, emergency lights?

A. Again, it depends on the call, sir. Domestics, et cetera, you would still -- you needed to get there, but at nighttime in the city your lights travel, and if the suspect sees you coming, that creates a further risk. So I -- I truthfully cannot give you an exact percentage because it's sheer based on calls.

Q. Okay. I'm not asking for an exact percent.

A. 30 -- 30 to 60 percent in a roundabout area.

Q. Okay. So of all the emergency calls that you did on the midnight shift, for whatever reason, anywhere from 30 to 60 percent of them were done without emergency lights, agreed?

A. Approximately, sure.

Q. Okay.

MR. PHILLIPS: I need five minutes, guys. I'm going to talk to Terry and see if I'm done.

MR. KAUTZMAN: Okay.
THE VIDEOGRAPHER: Going off the record. The time is 4:30 p.m.
(WHEREUPON, at this time a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 4:35 p.m.
BY MR. PHILLIPS:
Q. Okay. Mr. Gorny, we just took another break, right?
A. Yes, sir. I don't see a picture for you, just an FYI.
Q. That's okay. That's okay. I'm not a good looking guy, so it's a good thing.
Did you have a private conversation during the break with your lawyers?
A. No. Not this time, no.
Q. Okay.
MR. PHILLIPS: That's all I have for now. You guys can go ahead.
CROSS-EXAMINATION,
QUESTIONS BY MR. JOSEPH SMITH:
Q. Good afternoon, Detective Gorny.
A. Yes, sir.
Q. My name is Joseph Smith. I'm one of

the attorneys for the City of South Bend in the lawsuit that was filed by the Flores estate. I'd like to ask you some questions about the training that you received at the academy and at South Bend. I don't plan to ask you any questions about the event itself.

A. Yes, sir.

Q. So you -- you received training at the Indiana Law Enforcement Academy, correct?

A. Yes, sir.

Q. Was that in Plainfield?

A. Yes, sir.

Q. When did you complete your academy training?

A. In 2015.

Q. How long was that academy training?

A. 15 weeks.

Q. After you -- and you successfully completed that academy, right?

A. Yes, sir.

Q. After you successfully completed the academy, did you have more classroom training with the City of South Bend?

A. Upon return, I had I believe it was 12 weeks FTO program, which stands for field

training officer.
Q. And part of that is a classroom setting, correct?
A. Yes, sir.
Q. Do you recall how much of -- of that FTO program was in the classroom setting?
A. I do not recall, no, sir.
Q. And part of that FTO program was being paired with a more experienced officer and going out together, right?
A. Yes, sir.
Q. And that officer would critique your performance, give you advice, that sort of thing, right?
A. Yes, sir. I believe we received a grade every day at the end of your shift.
Q. And if they thought you did something wrong, they would tell you about that, right?
A. Yes, sir.
Q. All right. So I believe you already said that the academy taught you that you needed to drive with due regard when driving in emergency mode, right?
A. Yes, sir.
Q. What -- as best you recall, what did

they tell you about the requirement to drive with due regard?

A. Never to exceed 80 percent of your threshold.

Q. Anything else that you can recall?

A. Due regard to being in control of your vehicle, the safety of the public. They train you to have your eyes scan so you don't focus on one specific point while driving to help create tunnel vision. All of which I believe on the night in question I was following all my training.

Q. And we've talked a lot about due regard, but what does the phrase "due regard" mean to you?

A. To drive in a manner that you're in control of your vehicle for the safety of the public.

Q. And for yourself, right?

A. Yes, sir.

Q. Did the -- when you had your FTO program, did South Bend also teach you about the requirement to drive with due regard when you're operating an emergency vehicle?

A. I believe so, yes.

(WHEREUPON, Deposition Exhibit A was marked for identification.)

BY MR. SMITH:

Q. All right. Give me a second here. I want to show you something. I'm going to mark this as Exhibit A. All right. Do you see a document on your screen?

A. Yes, sir.

Q. Okay. Does it say "Training Brief" at the top?

A. Yes, sir.

Q. Okay. And then it says "Training Brief, Emergency Vehicle Operation" below that, correct?

A. Yes, sir.

Q. All right. I'm going to scroll down to the second page. Do you see some signatures near the bottom?

A. Yes, sir.

Q. All right. It has FTO initials and PIN, right?

A. Yep.

Q. And then date?

A. Yes, sir.

Q. And the second line, same -- it has

PO initials and PIN, right?
A. Yes, sir.
Q. And then date next to that, correct?
A. Yes, sir.
Q. All right. Is that -- are those your initials that appear on the second line of the second page of this document?
A. Yes, sir.
Q. And then what's the date on here?
A. 12-25-2015.
Q. Of 2015?
A. Yes, sir.
Q. Is that while you were in the FTO program?
A. Yes, sir.
Q. All right. So would you agree with me that this is a document that you went over during your FTO training after the academy?
A. Yes.
Q. All right. So I want you to read for us A. 2. right here. Do you see where it is?
A. Yes.
Q. All right. Could you read that in the record, please?
A. "You must use due regard for the

safety of all citizens when running signal 10, as you can be held responsible for accidents caused by negligence."

Q. Thank you. Were you required to drive with due regard when responding to calls on the midnight shift?

A. Yes, sir.

Q. And you understood that before July 2018, correct?

A. Yes, sir.

Q. If you were driving without your siren on, were you still required to use due regard?

A. Yes, sir.

Q. If you were driving without your lights on, were you still required to use due regard?

A. Yes, sir.

Q. Did the academy teach you about clearing intersections?

A. Yes.

Q. What, to the best of your recollection, did the academy teach you about clearing intersections?

A. You need -- when approaching an

intersection, specifically red lights, you need to slow down, come to nearly a complete stop to clear both left and right of your intersections, and proceed with caution.

Q. Was clearing intersections a topic that was discussed during your FTO program?

A. I'm sure throughout that program, yes.

Q. Did the academy include any EVO track training?

A. Yes.

Q. What do you remember about the EVO track training that you received at the academy?

A. Evasive maneuvers, speeds at high -- high speeds, hitting your brakes and taking a corner, the dos and the don'ts of taking a corner at a high rate of speed, such as tapping your brakes can put you into a spin. A lot of the -- a lot of the maneuvers at the track was extended, so a lot of evasive maneuvers.

Q. What kind of speeds were you able to achieve during your EVO track training at the academy?

A. 85, 90, a little bit more.

Q. Are you familiar with something called "Below 100"?
A. I've heard of it, yes.
Q. What do you -- what have you heard about below 100?
A. It's trying to keep, I believe, the fatalities a year of officers under 100.
Q. Do you know what the -- what the tenets of the Below 100 program are?
A. Safety vest, seatbelts, speed.
Q. How did you become familiar with Below 100?
A. I don't recall the specific way.
Q. Was it something that you learned about while you were with the South Bend Police Department?
A. Yes.
Q. Did the South Bend Police Department have Below 100 posters hanging up at the department?
A. They could have.
(WHEREUPON, Deposition Exhibit B was marked for identification.)
BY MR. SMITH:
Q. All right. I'm going to show you

something else here. Give me a second. I'm marking this as Exhibit B. Do you see something on here that says "Below 100" on it?

A. Yes, sir.

Q. Does this look like the poster that you -- that was displayed at the South Bend Police Department?

A. It could have been, yes.

Q. But you don't recall specifically?

A. I don't specifically recall that one, no.

Q. Okay. Give me one second here. I want to make sure I covered everything I wanted to talk about. Give me a second.

Oh, do you recall while with the South Bend Police Department having alerts brought to your attention if you had a certain number of pursuits in a year or something like that?

A. I believe -- I don't know how many there was, but I knew -- it was called an IAPro. Any physical use of force I believe was flagged in that, whether it was pursuit or actual physical use of force, because I believe South Bend qualifies pursuits into the use-of-force continuum.

Q. So if you had a certain number of those in a certain amount of time, they'd sit down with you and talk to you about them, right?

A. Yes.

Q. And did that happen from time to time while you were at the South Bend Police Department?

A. Yeah. I had conversations at the time with Captain Noonan, reference -- the conversation was, "You had a use of force. Everything was clear. You're good to go. Initial here."

Q. All right. And when you had any of those meetings about the use of force or the pursuits, did they --

MR. PHILLIPS: I object to the form of the question. He didn't say about the pursuits.

MR. SMITH: All right. Your objection is noted.

BY MR. SMITH:

Q. When you had the -- the meetings about these alerts, did they talk to you about any of -- anything that happened during the

events that were shown in the alert?

A. I was notified that I was a proactive officer, and that IAPro is flagging anytime a use-of-force incident was taking place. I was never told that I was either going too fast or I used too much force. It was always, "Everything was good," I was clear, "Initial and move on. Keep up the good work."

Q. So from those conversations you understood that your use of force and pursuits were within policy, right?

A. Yes, sir.

MR. SMITH: Okay. I have nothing further.

MR. KAUTZMAN: Okay. On behalf of the deponent, a few questions on cross.

CROSS-EXAMINATION,

QUESTIONS BY MR. JOHN KAUTZMAN:

Q. Justin, do you recall questions from Mr. Phillips in direct testimony about emergency calls? Do you recall that?

A. Yes, sir.

Q. And do you recall him using different labels for emergency calls, including things like signal 10 or you had mentioned running hot

or step it up? And I think he talked about those being three types of nomenclature that might be used in emergency runs, is that right?
A. Yes, sir.
Q. Is there a requirement as a South Bend Police Officer or in any of your law enforcement training that officers announce that they're "on an emergency call" or "an emergency run"?
A. No. Every call is different. You try to save the radio traffic and keep it minimal.
Q. So labeling is not required?
A. No, sir.
Q. And specific verbiage is not required?
A. No, sir.
Q. Is the nature of the emergency dependent on all of the circumstances that you're learning at the time?
A. Yes.
Q. On the day in question, or the evening in question, did you learn information over time that led you to believe that this became increasingly urgent and increasingly

emergent for you to act?
A. Yes.
Q. And is that what you were sensing as you turned off of Sheridan, started coming eastbound on Western, and approached the intersection where the collision occurred?
A. Yes, sir.
Q. And did you believe this became an emergency run requiring your action to get there and try to intercept the car that you were dealing with?
A. Yes, sir.
Q. And as a matter of fact, when he asked you about testimony at the board hearing and questions about whether or not this was "Deemed to be anything other than a traffic stop," was there testimony at the hearing that made this a lot more than anything other than a traffic stop?
A. Yes, sir.
MR. PHILLIPS: Objection, asked and answered.
MR. KAUTZMAN: All right. Your objection is noted.
BY MR. KAUTZMAN:

Q. Was there testimony throughout the transcript about all of the information you were learning in real time that caused you to deem this an urgent/emergent situation?
A. Yes, sir.
Q. And did your driving then correspond with the urgency to get to the point you were going to?
A. Yes, sir.
Q. Notwithstanding that, were you always driving with due regard?
A. In my belief, yes.
Q. And do you believe you were always driving with your car in control?
A. 100 percent.
Q. And do you believe as you were approaching that intersection, to go through the intersection at Kaley, you had a green light?
A. I do, sir.
Q. Mr. Phillips asked you about the fact that people could be out -- and this occurred about what, 4:00 to 4:30 in the morning, is that right?
A. Approximately.

Q. He asked you about people could be out walking their dog or exercising, is that right?
A. Yes, sir.
Q. That was a possibility, correct?
A. Yes, sir.
Q. Was it a likelihood?
A. Not likely at that point in time, no.
Q. Did you feel that you had adequate sense of what the environmental conditions were?
A. Yes, I do.
MR. PHILLIPS: Objection, leading.
BY MR. KAUTZMAN:
Q. Okay. Did you or did you not feel that you had an adequate sense of what the environmental conditions were?
A. I felt, at that point in time, especially that night, that I was in control of my vehicle. I felt that I was observant of my surroundings, especially of Sheridan and east on Western.
Q. Okay. Do you recall seeing an exhibit, I think it was Exhibits either 2 or 4 that Mr. Phillips put up that had the route

that you traveled and certain red and green arrows on that document?

A. Yes, sir.

Q. And do you recall that there were certain areas where there was a red light I think indicating that your exterior emergency light bar was off, and maybe a green arrow indicating when it was on, is that correct?

A. Yes, sir.

Q. Do you recall certain pathways during that -- or on that exhibit where there is no red or green arrow at all?

A. Yes.

Q. Do you know why that is?

A. I don't. I believe when I turned my lights on at Falcon my lights should have been on all the way until the brief second where I accidentally shut them off.

Q. You didn't prepare that document, correct?

A. No, sir.

Q. So you don't know as to its true accuracy as to whether or not your light was on or off at any given time?

A. No, sir.

STATE OF INDIANA )
) SS:
COUNTY OF JOHNSON )

CERTIFICATE

I, Valerie Fillenwarth, RPR, a Notary Public in and for the County of Johnson, State of Indiana, maintaining an office in Johnson County, Indiana, do hereby certify the following:

That the witness herein, JUSTIN GORNY, was first duly sworn to tell the truth, the whole truth and nothing but the truth in the foregoing deposition;

That all testimony was taken down in stenographic notes and afterward reduced to typewritten form under my direction and then presented to counsel for the purpose of obtaining the deponent's signature;

That I recorded and transcribed any and all objections made by counsel and the reasons

therefore; and

That I am not a relative or employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in this action.

IN WITNESS HEREOF, I have hereunto set my hand and affixed my Notarial Seal this 18th day of March 2024.



Valerie Fillenwarth, RPR
Notary Public
(Electronically signed)

Commission Number: NP0749965
County of Residence: Johnson
My Commission Expires on: July 5, 2031