IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 2:19-cv-00064-PPS-JEM |
| CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY, | ) | |
| Defendants. | ) | |

\- - -

VIDEOTAPED DEPOSITION OF CAPTAIN DAVID HERRON
Monday, March 25, 2024

\- - -

The remote 30(b)(6) video deposition of CAPTAIN DAVID HERRON, held remotely at the location of the witness, commencing at approximately 1:04 p.m., on the above date, before Juliana F. Zajicek, Registered Professional Reporter, Certified Shorthand Reporter and Certified Realtime Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
Deps@golkow.com

A P P E A R A N C E S :
(ALL PARTIES APPEARED REMOTELY)

ON BEHALF OF THE PLAINTIFF:
PHILLIPS LAW OFFICES
161 North Clark Street, Suite 4925
Chicago, Illinois 60601
312-964-8296
BY: STEPHEN D. PHILLIPS, ESQ.
sphillips@phillipslegal.com;
TERRENCE M. QUINN, ESQ.
tquinn@phillipslegal.com

ON BEHALF OF THE CITY OF SOUTH BEND:
KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.
233 East 84th Drive, Suite 301
Merrillville, Indiana 46410
219-322-0830
BY: JOSEPH W. SMITH, ESQ.
jsmith@khkklaw.com

CITY OF SOUTH BEND
227 West Jefferson Boulevard, Suite 1200S
South Bend, Indiana 46601
574-235-5863
BY: KYLIE CONNELL, ESQ.
kconnell@southbendin.gov

A P P E A R A N C E S :
(ALL PARTIES APPEARED REMOTELY)

ON BEHALF OF JUSTIN GORNY:
RUCKELSHAUS KAUTZMAN BLACKWELL
BEMIS & DUNCAN, LLP
135 North Pennsylvania Street, Suite 1600
Indianapolis, Indiana 46204
317-634-4356
BY: JOHN F. KAUTZMAN, ESQ.
jfk@rkblegalgroup.com
KIGHTLINGER & GRAY, LLP
Bonterra Building, Suite 200
3620 Blackiston Boulevard
New Albany, Indiana 47150
812-949-2300
BY: R. JEFFREY LOWE, ESQ.
jlowe@k-glaw.com

ALSO PRESENT:
MS. JULIE WISNER,
Director of Legal Administration
City of South Bend
MS. SARAH CURL-LARSON,
Paralegal claims Administrator
City of South Bend

THE VIDEOGRAPHER:
HENRY MARTE

# I N D E X


| WITNESS: | PAGE: |
| --- | --- |
| CAPTAIN DAVID HERRON | |
| EXAM BY MR. QUINN.................... | 7 |


*****

# E X H I B I T S


| CAPTAIN HERRON EXHIBIT | | MARKED FOR ID |
| --- | --- | --- |
| No. 1 | Notice of Deposition | 10 |
| No. 2 | Resume of Captain David Herron | 15 |
| No. 3 | South Bend Police Department Vehicle Pursuit Form, 2013-2018; CITY 7902 | 66 |
| No. 4 | Vehicle Pursuit Form regarding Officer Gorny; CITY 7901 | 68 |
| No. 5 | IA No. VP2018-0045, Officer Gorny; CITY 7895-7987 | 74 |
| No. 5A | IA No. VP2015-0001, Patrolman Jackson; CITY 4413 - 4416 | 92 |
| No. 5B | IA No. VP2016-0041; CITY 5021-5022 | 97 |
| No. 5C | IA No. VP2016-0045, Patrolman Gates; CITY 5032 - 5033 | 100 |

E X H I B I T S

| CAPTAIN HERRON EXHIBIT | | MARKED FOR ID |
|---|---|---|
| No. 5D | IA No. VP2016-0047, Sergeant Calvert; CITY 5041 - 5042 | 101 |
| No. 5E | IA No. VP2016-0048, Patrolman Brooks; CITY 5045 - 5046 | 102 |
| No. 5F | IA No. VP2016-0049, Sergeant Mills, 07/26/16; CITY 5048 - 5049 | 103 |
| No. 5G | IA No. VP2017-0002, Patrolman Donlon, 01/12/17; CITY 5428 - 5430 | 104 |
| No. 5H | IA No. VP2017-0006, Patrolman Gilbert; CITY 5446 - 5449 | 105 |
| No. 5I | IA No. VP2018-00016, Patrolman Howard; CITY 6839 - 6841 | 108 |
| No. 5J | IA No. VP2018-0003, Sergeant Calvert, 01/16/18; CITY 6917 - 6920 | 110 |
| No. 5K | IA No. VP2018-0004, Patrolman Howard; CITY 6952 - 6956 | 119 |
| No. 5L | IA No. VP2018-0005, Patrolman Bair; CITY 6999 - 7002 | 120 |
| No. 5M | IA No. VP2018-0006, Patrolman Bourn; CITY 7024 - 7025 | 122 |

THE VIDEOGRAPHER: We are now on the record. My name is Henry Marte. I am a videographer on behalf of Golkow Litigation Services.

Today's date is March 25th, 2024, and the time is 1:04 p.m.

This deposition is being held In the Matter of Soraida Flores as personal representative of the estates of Erica Flores, deceased, versus City of South Bend.

The deponent today is Captain David Herron.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Counsel, please identify themselves for the record, afterwards the court reporter will administer the oath to the witness.

MR. QUINN: Terrence Quinn and Stephen Phillips for the plaintiffs.

MR. SMITH: Joseph Smith for the City of South Bend.

MR. LOWE: Jeff Lowe for Justin Gorny.

MR. KAUTZMAN: John Kautzman for Justin Gorny.

(WHEREUPON, the witness was duly

sworn.)

CAPTAIN DAVID HERRON,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. QUINN:

Q. Good afternoon, sir.

A. Good afternoon.

Q. My name is Terry Quinn. I'm going to be taking your deposition today. Okay?

A. Okay.

Q. And you are Captain Herron?

A. That's correct.

Q. Nice to meet you, sir.

A. Nice meeting you.

Q. Have you given a deposition before?

A. Yes.

Q. All right. I'm going to just run through the ground rules real quick. You're probably familiar with them.

But can you please let me or any lawyer who is asking you a question at any time know if you don't understand the question? Will you do that, please?

After it has been entered into IAPRO, we also -- we also do intake with the community complaints. We also review those, if we have any of those, and administrative advisories as well.

We also have specific projects that we may need to work on, you know, regarding one of our cases. Also for City Legal anything related to them that they may need regarding -- regarding the APRA requests.

Q. Okay. I'd like to focus specifically on the pursuit incidents, okay.

A. Okay.

Q. The vehicle pursuits.

So in terms of vehicle pursuits, the -- Internal Affairs reviews the documentation that is generated by the involved officer, is that correct?

A. That's correct.

Q. Okay. And as well as gathering video footage associated with the vehicle pursuit?

A. Yes. One question, is this -- is this related to now or before, during that time?

Q. Well, that's a good question. I'm going to ask -- be asking you about the period of time 20 -- say 2013 to 2018.

A. Okay.

Q. That kind of encompasses the time that we have the documentation for, and then I'll ask you how that might be the same or different currently, okay?

A. Okay. That's fine.

Q. All right. So between 2013 and 2018, Internal Affairs would gather documentation related to vehicle pursuits, including any video footage, and would enter all the information gleaned from that into the IAPRO system, is that correct?

A. So since we are talking about that timeframe, let me back up a little bit. So what would happen is if there is a vehicle pursuit, the IA investigator would collect it out of the drawer. At that time during that time period, Vehicle Pursuit Forms were separate from the reports.

So the officer would fill it out, and they would place it in the IA drawer. Moving on from there, the IA investigator would review the IA or the vehicle pursuit and gather the reports, and then they would enter that information into IAPRO.

Once that information is entered, if there is an alert generated, they would assign that to the shift captain and that captain will review that incident, the latest incident with the officer.

Moving on from there, the -- once everything is collected, is -- it was then turned over to the Office of Risk Management, which was Captain Keith Schweizer. Captain Schweizer would then download -- would review the body cam MVR footage and also download that and review the reports.

At that time if there was -- if he reviewed a video footage and did not see a violation of department policy or pursuit policy, he would hang on to that pursuit.

If he saw something that may be possibly violation of department policy or he felt that the pursuit went too long or -- and/or he observed any other type of department policy violation, possible violation, he would forward that to the vehicle pursuit committee.

The vehicle pursuit committee is comprised of officers who are emergency vehicle instructors, they're certified through ILEA, the Indiana law Enforcement Academy. So they use their training, knowledge, and experience to evaluate each pursuit that has been submitted to that board or committee.

They would look at every one that was involved in that pursuit, look at their -- their MVR

footage, and then they would render if it was within policy. If it was -- did the pursuit outweigh the -- the public and if the pursuit was in policy.

Q. Okay. That process that you just described, was -- was that the process in place the entire period from 2013 to 2018?

A. From my understanding, that's the way it has always been under Captain Schweizer.

Q. Okay. And Captain Schweizer, as I understand it, is no longer with City of South Bend Police Department, correct?

A. That's correct.

Q. And when did he leave?

A. 2019.

Q. Okay. So the process as you've described it, did that change in 2019?

A. Yes.

Q. How is it different now?

A. The difference is now is that all pursuits, whether I feel that they are within policy or not, they all go to the committee for the committee to review and to give their opinion on that pursuit, whether if it was terminated seconds after the pursuit was initiated or if it was well -- you know, a pursuit

ten minutes long. Every pursuit, they -- they now get to review.

Q. So I understand you correctly, when Captain Schweizer was with the Office of Risk Management between 2013 and 2019, not every vehicle pursuit was reviewed by the Pursuit Review Committee, is that correct?

A. That's correct.

Q. Only those -- strike that.

While Captain Schweizer was at ORM between 29 -- between 2013 and 2019, the only vehicle pursuits that would be reviewed by a Pursuit Review Committee were those pursuits that Captain Schweizer had found there to be a violation with?

A. A possible violation.

Q. So if Captain Schweizer between 2013 and 2019 found no violation in regard to an individual vehicle pursuit, that vehicle pursuit would not be forwarded to the review committee, is that correct?

A. That's correct.

Q. But currently all vehicle pursuits are reviewed both by ORM and by a Pursuit Review Committee, is that correct?

A. That's correct.

Q. And since 2019, have you been reviewing vehicle pursuits for ORM like Captain Schweizer was doing before?
A. Yes.
Q. So you guys did the same job, just at different times and under different processes?
A. Yes.
Q. And we'll talk a little bit more about that process in a bit. I'm going to ask you a few more questions about your -- your resume here, okay?
A. Okay. That's fine.
Q. So since 2019, have you directed and participated -- well, strike that.
Since 2016, have you directed and participated in all internal investigations of the Department?
A. Not all. I've either directly or indirectly from 2016 to current. 2016 is when I started. When I started in IA, there was another investigator that was promoted as well. So we split the duties. So I -- so I directly or indirectly investigated almost every complaint from 2016 until now.
Q. Would that include vehicle pursuits?

A. As far as vehicle pursuits, the only thing we did at the time was input the data entry into IAPRO.

Q. And we'll talk about the IAPRO.

Do vehicle pursuit reviews -- well, strike that. From 2013 to 2019, did vehicle pursuit reviews fall under the jurisdiction of Internal Affairs?

A. Yes. It's always been under Internal Affairs.

Q. All right. And I see from your curriculum vitae that you oversaw the Use of Force in Vehicle Pursuit Committees from 2016 to the present, is that correct?

A. No. It's from 2019 to current.

Q. Okay. So before 2019 Captain Schweizer oversaw the Use of Force in Vehicle Pursuit Committees, Correct?

A. That's correct.

Q. And you've done so from 2019 to the present, correct?

A. Yes, that's correct.

Q. Now, the Pursuit Review Committee that you've mentioned, is that a permanent standing committee?

A. They switch out every -- back then every now and then, but it was normally the -- pretty much the same people that were involved.

Q. Okay. Let me focus you on the period of time 2013 to 2019. Well, strike that.

Let me focus you on the period of time 2013 to 2018.

Who are the members of the Pursuit Review Committee during that period of time?

A. You have Captain Schweizer, you have Sergeant Stuart, you have Officer Chris Brady, you have Sergeant Mark Walsh. We have Sergeant James Caufman.

Q. Can you spell that last name?

A. Caufman, C-A-U-F-M-A-N.

Q. Um-hum.

A. Lieutenant Steve Noonan, Sergeant Harvey Mills.

Q. I'm sorry. Can you spell that name?

A. Harvey Mills, M-i-l-l-s.

Q. Okay.

A. And Officer Jeff Cummings, C-u-m-m-i-n-g-s.

Q. Okay. And would those individuals that

you mentioned serve on every Pursuit Review Committee that was formed between 2013 and 2018?

A. I wouldn't -- I will say, be safe to say that, no, not every committee meeting. A lot of times with those committee meetings it's hard to gather everyone together.

So normally it's anywhere from three to five people that are present at the -- at a meeting, committee meeting.

Q. And between 2013 and 2018, when Captain Schweizer was at ORM and was overseeing the vehicle pursuit committees, the only vehicle pursuits that would be reviewed by that committee are those pursuits where Captain Schweizer had found a potential violation of department policy?

A. That's correct.

Q. How often did the Pursuit Review Committee meet between 2013 and 2018?

A. I can't give you a specific number, but I know that whenever they were to get maybe possibly, like, ten pursuits, they would try to -- to get those done. Even today when we get an average of ten pursuits, then that's what the committee would convene, but it's hard to get everyone together

because everyone's schedule.

Q. So would it be true that between 2013 and 2018, the Pursuit Review Committee run by Captain Schweizer would meet once a certain number of pursuits and pursuit reports had been compiled?

A. Yeah. I believe it's once a month that they would meet. Even to this day we meet once a month because that's how it was.

Q. Okay. So between 2013 and 2018, when Captain Schweizer was running the vehicle pursuit committee, that committee met approximately once a month?

A. That's correct.

Q. And that would be for the purpose of reviewing the vehicle pursuits that Captain Schweizer had identified as having potential violations of department policy?

A. Correct.

Q. Tell me how the Pursuit Review Committee worked once it was formed. What did it do from start to finish?

A. Well, what they would do is they would review the pursuit. If there was one person in a pursuit, they would play that video footage, and once

that video footage was completed or complete, they would talk about that incident and see if everyone agrees that that incident was within policy.

And then once they -- they agree or disagree, they'll talk about it, and then what they would do was they would fill out the evaluation form to say if that pursuit was within policy. If it wasn't, they would explain why.

Q. And I'll -- I'll show you some documents in a little bit, and I think you can -- I think I know what you're saying, and we'll take a look at those. You can explain those a little more, okay.

But let me back up for a second. Before a Pursuit Review Committee meeting was held for the numbers of pur- -- the vehicle pursuits that would be reviewed, were IAPRO summaries entered for all of those pursuits?

A. From 2016 to 2018, I can say that myself and Lieutenant Hinton put every pursuit in the IAPRO.

Q. Tell me what IAPRO is.

A. IAPRO is an early intervention system to use to document, store, record incidences related to an individual officer of the police department regarding investigations, incidences involving the use

of force, incidences involving vehicle pursuits.
Q. And I saw -- oh, I'm sorry. Go ahead.
A. It keeps a record for us.
Q. Okay. I saw from my review of the pur- -- the vehicle pursuit documents, it appeared to me that the IAPRO summaries began in early 2015, is that correct?
A. From my knowledge IAPRO started in 2004 when injuries were started being entered into IAPRO.
Q. Okay. Was the South Bend Police Department using IAPRO for review of vehicle pursuits by police officers in 2013 and 2014?
A. Can you ask that -- rephrase that question again?
Q. Sure.
The IAPRO system, was that being used to catalog vehicle pursuits by South Bend police officers in 2013 and 2014?
A. Yes.
Q. And if a particular vehicle pursuit in 2013 and 2014 was entered into the IAPRO system, there should be a corresponding IAPRO summary for that pursuit, correct?
A. Yes.

Q. Was there any policy in place at South Bend Police Department between 2013 and 2018 that stated what vehicle pursuits were required to be reviewed by the Pursuit Review Committee?
A. So we had Captain Schweizer who was the Risk -- Office of Risk Management who also was a certified EVO instructor. So he reviewed the pursuits, and if it was a short pursuit or something that was terminated shortly after the pursuit was initiated, those pursuits did not go to the committee.
Q. Okay. So it sounds to me like you're saying that Captain Schweizer, between 2013 and 2018, decided which vehicle pursuits would be reviewed by the Pursuit Review Committee, is that correct?
A. Yes.
Q. Okay. My question is a little different. I understand what you told me, but my question is a little different. Strike that.
Was there any policy in place at South Bend Police Department that stated to Captain Schweizer or ORM or anyone which vehicle pursuits were required to be reviewed by the Pursuit Review Committee?
A. With the policy, it says pursuits are to

be reviewed by the Pursuit Committee -- Vehicle Pursuit Committee.

Q. I'm sorry, I didn't hear that.

A. Yes, there is -- there was a policy -- there is a policy that we're supposed to review -- or the committee is supposed to review the vehicle pursuits.

Q. What is the number of that policy?

A. Right now, it's 30 -- I believe it's 306 is the vehicle pursuit policy, I believe.

Q. And that Policy 306 states that all vehicle pursuits are to be reviewed by the Pursuit Review Committee?

A. Yes, I believe so.

Q. Was that policy, that same policy in place in the period 2013 to 2018?

A. I'm pretty -- well, the -- I'm pretty sure the verbiage is quite different. We ended up switching from the -- our policies over, and I think that was 2018, 2019, maybe 2017 when the policy switched over to Lexipol.

So I know the wording is totally different.

Q. Okay. What was the wording of the South

reviewed by the Pursuit Review Committee prior to July 2018? Can you find that for me, please?

A. I can pull it up.

Q. Can you have them do that? I can move on, but I would like to -- while we are here today, I would like to discuss that policy with you.

A. 306.

MR. SMITH: It should -- that policy should be available to you in discovery. I don't -- I don't have a copy of every document that's been provided in discovery in front of me.

BY MR. QUINN:

Q. Okay. So that was -- that would be Policy 306, sir?

A. Yes.

Q. Okay. So Captain Schweizer was with Office of Risk Management between 2013 and 2018, correct?

A. That's correct.

Q. What was Office of Risk Management's role in reviewing vehicle pursuits between 2013 and 2018?

A. They -- Office of Risk Management with Captain Schweizer was -- had an active role in the review of the pursuits, vehicle pursuits, during that

time period -- timeframe.
Q. Then what was the purse of Office of Risk Management, Captain Schweizer, reviewing vehicle pursuits in the timeframe 2013 to 2018?
A. To ensure accountability from our officers, to make sure that all of our policies and procedures are being followed, the pursuit policy.
Q. As part of his review of vehicle pursuits within ORM, did Captain Schweizer make determinations as to whether vehicle pursuits were within policy or not within policy?
A. What he did was he reviewed the video footage, the MVR footage. If he seen that there was no violations from his training and experience, he did not forward that incident or that vehicle pursuit incident to the committee.
Q. So my question is a little different. Strike that.
As part of his review of vehicle pursuits with ORM, did Captain Schweizer make a determination as to whether a vehicle pursuit was within policy or not within policy?
A. Yes.
Q. Okay. And as I understand it, if Captain

Schweizer between 2013 and 2018 determined that a vehicle pursuit was not within policy or was outside policy, he would forward that pursuit to the Pursuit Review Committee, correct?

A. That's correct.

Q. And if Captain Schweizer between 2013 and 2018 determined that a vehicle pursuit was within policy, he would not forward that pursuit to Pursuit Review Committee for review, correct?

A. That's correct.

Q. Okay. After -- well, strike that. I want to talk to you about vehicle pursuits that were reviewed by the pursuit committee -- Pursuit Review Committee between 2013 and 2018, okay?

A. Okay.

Q. Okay. So within that timeframe, 2013 to 2018, if vehicle pursuit was reviewed by the Pursuit Review Committee, would there be any other entity or person that would review the vehicle pursuit after that committee?

A. Possibly the captain that's -- that's over that officer or their immediate supervisor to oversee that.

Q. All right. So between 2018 -- strike

that.

Between 2013 and 2018, you know from your experience that following a Pursuit Review Committee, vehicle pursuits were potentially reviewed by the involved officer's immediate supervisor or captain?

A. Yes. If there was a possible violation, the pursuit committee would turn it back over to Captain Schweizer, and then he would notify the captain of that ship. There would be coaching where they may review the body cam -- or the MVR footage of the incident, and if there was any violation, they would talk about that --

Q. Okay.

A. -- to make sure it was corrected.

Q. Okay. So let me see if I understand you there. Strike that.

Once the Pursuit Review Committee reviewed a vehicle pursuit and determined that that pursuit was not within policy, the committee would turn that case back over to Captain Schweizer?

A. Yes.

Q. Okay.

A. He is the guy that oversees the committee.

Q. I'm sorry?

A. He was the guy that -- he was the person that would oversee the committee.

Q. Okay. So in the event that a Pursuit Review Committee found a pursuit not to be within policy and turned it back over to Captain Schweizer, what would happen then?

A. It depends on the -- the incident, the severity of the incident. If it were something minor, it could be a coaching. It could have been an on-spot correction which would have occurred -- have occurred before it made it to the committee.

Or an advisory could have been administered from the captain after the captain was informed by Captain Schweizer of the incident and they both reviewed it, then that would turn into discipline.

So after the committee would review, and if they found any violation, they'll either get a coaching, to prime them for success, or they would receive an advisory where they could possibly receive days off or suspension of their car.

Q. Okay. So tell me if I have this correct. Strike that.

Between 2013 and 2018, if a vehicle

pursuit was found by the pursuit committee to be outside policy or a violation of policy, it would be returned to Captain Schweizer and the involved officer would receive either coaching or an advisory would be created by the involved officer's captain with possible discipline, is that correct?

A. Yes, and remedial training.

Q. So would both discipline to the involved officer or remedial training of the involved officer who was found to have been in a pursuit outside of policy depend on there being an advisory from the captain?

A. It doesn't necessarily mean -- for remedial training, it doesn't necessarily mean there has to be an advisory. An advisory -- let me -- I'm going to back up.

So once if there is an advisory that has been made by the captain of that shift with that officer for possible violation, it goes to the chief.

So the chief will review that incident and decide if that officer, you know, they are disciplined as far as either remedial training, coaching, or maybe be a -- might be a training deficiency. Those are the different types of closures with it.

Q. I see. And I'm just trying to understand the process here. So let me see if I got you correctly, okay. Strike that.

So if the Pursuit Review Committee found a violation of policy, the case would be returned to Captain Schweizer, Captain Schweizer would then take that case to the involved officer's captain?

A. Yes, and also depending on the severity of the violation or the type of violation, it may be presented to the command staff during a meeting.

Q. Okay. So which -- whichever was the case, whether it was a Pursuit Review Committee determination that a vehicle pursuit was out of policy, would it be either the involved officer's captain or the command staff that decided the next steps in terms of either coaching, remedial training, or discipline?

A. Yes.

Q. And if a vehicle pursuit was found to be outside policy by the physician -- strike that.

If a vehicle pursuit was found to be outside policy by a Pursuit Review Committee and that involved officer received either coaching or remedial training or discipline --

A. Yes.
Q. -- would -- would that decision to coach or discipline or provide remedial training to the officer be placed into the pursuit file?
A. Yes, if there is an advisory, it would be in their IA file, which the chief was the one that renders that discipline.
Q. So any -- strike that.
Between 2013 and 2018, any advisory that led to remedial training or discipline would be an advisory placed in the involved officer's IA file, true?
A. Yes.
Q. And if there is no advisory in the IA file for any particular vehicle pursuit, that means that there was no remedial training or no discipline provided with regard to that vehicle pursuit?
A. Can you re -- can you rephrase that question again?
Q. Sure.
A. I'm sorry.
Q. Sure.
If there is a vehicle pursuit -- well, strike that.

If there is an IA file for a vehicle pursuit that was found to be outside of policy by the review committee and there is no advisory in the file, does that mean that there was no discipline or remedial training of the involved officer?

A. Not necessarily. It could be a verbal coaching, a verbal warning.

Q. Is there any documentation placed in the IA file as a matter of custom to reflect that an involved officer in a pursuit had received a verbal warning?

A. Yes, it could.

Q. Would that be true of every case of a verbal warning, there would be something placed in the IA file?

A. Not every verbal warning would be in there.

Q. And what would -- when you use the term "verbal warning," what does that mean?

A. Meaning, like, for example, if a person was -- let's say, like, during the pursuit, they get out of the car and they ran up on the car, and that's not what -- how we trained, we trained to do a felony stop if we were chasing somebody and they stopped, you

just don't run up on the car.

So you may have a supervisor that may pull that officer aside and talk with them about their tactics and Say, hey, this is going to be a verbal warning or this is a good verbal coaching. Just make sure this doesn't happen again.

So that supervisor may have that in their individual notes documenting that. That would not be in the officer's file.

Q. Between 2013 and 2018, the verbal warning that you've been describing, would that only occur if -- well, strike that.

Between 2013 and 2018, would an officer involved in a vehicle pursuit only receive a verbal warning from a supervisor if the Pursuit Review Committee found the pursuit was out of policy or a violation of policy?

A. No. A supervisor also reviews the incidences, the vehicle pursuits before the end of shift if they can. If they see the supervisor first front -- first-line supervisor sees something that is a possible violation, they will address it immediately with that officer and then also notify the IA or Office of Risk Management of what has taken place and

that they gave that person a verbal warning or on-spot correction.

Q. So between 2013 and 2018, verbal warnings and on-spot corrections are not things that would be documented in an AI -- an IA file for pursuit in every case, correct?

A. Not in every case.

Q. So I want to ask you just in kind of a stepwise process, we're going to look at some of the documents in a minute, but before we do that, I want to see if I have an understanding of the process in terms of the documentation that's involved in reviewing a vehicle pursuit, okay?

A. That's fine.

Q. All right. There is something called a Vehicle Pursuit Form that was in use with the South Bend Police Department between 2013 and 2018, correct?

A. That's correct.

Q. Okay. Was that Vehicle Pursuit Form the first documentation that would be created in the case of a vehicle pursuit?

A. Normally they would do their report and then do the vehicle pursuit. In some it just depends on the officer.

Q. Okay. Every officer involved in a vehicle pursuit at South Bend Police Department between 2013 and 2018 were required to create a vehicle pursuit report, correct?

A. That is correct, if they were the top -- or not top, but the three cars that were involved, they would create the -- or fill out the form, the Vehicle Pursuit Form, sorry.

Q. And the Vehicle Pursuit Form or vehicle pursuit report was required between 2013 and 2018 as a matter of department policy?

A. Yes.

Q. Okay. And so then in just the stepwise process, once an officer involved in a vehicle pursuit created the Vehicle Pursuit Form and submitted that, where did it go?

A. That form would go to IA, Internal Affairs.

Q. What would IA then do with that pursuit form? Would it use the information on that to enter into the IAPRO system?

A. That is correct.

Q. Okay. And then between 2013 and 2018 when Captain Schweizer was at ORM, would Captain Schweizer

use the information on the Vehicle Pursuit Form that he entered into IAPRO to decide whether the pursuit was within policy or not?

A. He would review the MVR before he'd make that decision if it would go before the committee or not, if I'm hearing your question.

Q. Yeah, no, that's fine.

We're at the -- we're at the point where the Vehicle Pursuit Form has been submitted to Internal Affairs and Captain Schweizer has entered that information into the IAPRO system, right?

A. Normally the investigator would enter the information into IAPRO. I know for a short time, 2015, the investigator had left. It was the end of 2014 or the end of 2015, the IA investigator left, so Captain Schweizer was entering everything in at that time before 2016.

Q. Okay.

A. I just wanted to supply that.

Q. Okay. Okay.

And we already talked about the fact that Captain Schweizer after reviewing the information that he had reviewed for vehicle pursuit would determine whether the pursuit was in policy or out of policy,

correct?

A. If it was possibly out of -- allegedly out of policy. If he felt that the car was going too fast, you know, seatbelt violation or any other department policy.

Q. But my point is --

A. Alleged.

Q. Yeah, my -- my point is on his documentation, Captain Schweizer would indicate whether he determined at that point that the pursuit was within policy or not, right?

A. He would sign off on it.

Q. Okay.

A. Yes.

Q. That's something he -- that's something he would do at the level of Internal Affairs, correct?

A. Yes.

Q. Okay. And the information that Captain Schweizer would use to reach that determination was the MVR?

A. That's correct.

Q. Which is what, for the record?

A. It is a motor vehicle -- our mobile video system that we have.

Q. Is that the same or different than a body cam footage?
A. It's a -- it's different. It's in the car. Right now we use AvailWeb. I believe at that time in 2018 we were using AvailWeb. So the body cam footage is on the body, and it pretty much works pretty much the same as far as looking it up.
The body -- the MVR is ran off of the car's system that's in the -- located in the trunk.
Q. Okay. So tell me what the MVR top to bottom would record?
A. For speeds, it would record everything in front and the compartment, the rear compartment. If you -- if an officer drove over 80 miles an hour, it would automatically turn on.
If your lights were activated in the No. 2 position, No. 2, No. 3 position, the light would come on or the camera would come on. Actually, if the lights were activated, meaning the overhead lights were activated, the MVR would turn on.
Q. Okay. So this M -- I thought I heard you say that the MVR would come and -- well, strike that.
The MVR system, which is the recording system, video recording system, would automatically

come on if there was a pursuit where the police officer exceeded 80 miles an hour, correct?

A. Yes, or if the lights are on or activated, emergency lights are activated.

Q. Okay. So the MVR would turn on automatically during a pursuit in two ways: Number one, if the pursuit exceeded 80 miles an hour, or, number two, if the overhead lights were on?

A. Yes, if they were activated.

Q. Okay. So that's something that Captain Schweizer would review with respect to any vehicle pursuit to between 2013 and 2018, correct?

A. Yes.

Q. He would also review the vehicle pursuit report created by the involved officer?

A. That's correct.

Q. Anything else he would review?

A. Alerts. If there was an alert generated, he would pass it onto the captain, excuse me, of that shift to review with the officer. The alerts does not necessarily mean -- well, it does not mean that the officer did something wrong.

It just let's -- let's the IA investigator or whoever is entering IAPRO that this guy or this

Q. So specific to vehicle pursuits, the captain of the shift or Captain Schweizer would review a vehicle pursuit alert if an officer had registered a third vehicle pursuit within a 12-month period?

A. As far as the counseling with the officer, it would be that shift captain. It would not be Captain Schweizer. It would be that shift captain or designee from that shift captain.

Q. Would that interaction between the shift captain and the involved officer over an alert of three pursuit incidents within 12 months be documented in an IA file?

A. Yes, that would be in the officer's physical file. The officer and the captain would have to sign, sign off on it.

Q. And are those alerts things that as you were reviewing the materials in preparation for the deposition, those alerts you saw are from time to time contained in IA files?

A. Yes, alerts are in the IA files.

Q. Okay. That's a better way of saying it. So strike that.

The alerts of an officer's involvement in vehicle pursuits is a documentation that is placed in

an IA file, correct?
A. That's correct.
Q. Okay. So we've been talking about Captain Schweizer's review of vehicle pursuits within Internal Affairs. If Captain Schweizer determined that there was a possible violation of department policy, he would then forward that pursuit to the Pursuit Review Committee, correct?
A. That is correct.
Q. And then based on the Pursuit Review Committee's determination of whether that pursuit was in policy or outside policy, that pursuit may be returned to Captain Schweizer?
A. That's correct.
Q. And if it was outside policy as determined by the review committee, that pursuit would be taken to either the involved officer's supervisor or the staff command -- command staff?
A. Yes, by Captain Schweizer.
Q. By Captain Schweizer, okay.
And is that the last place that review of a vehicle pursuit would be conducted, at the level of a captain of an involved officer or command staff, or is there any other entity that might review that

vehicle pursuit further?
A. It's the command staff that would be the highest, along with the chief, if there's a violation, even if there is a -- an advisory that comes out of that, it's reviewed by the chief.
Q. Okay. And just, if I didn't make this clear, the advisory is issued by -- well, strike that.
An advisory with respect to a vehicle pursuit and the review of that vehicle pursuit is issued by whom?
A. It is issued by a supervisor. It could be any supervisor, sergeant up to captain.
Q. All right. Okay. I'm going to show you --
MR. LOWE: Hey, Terry?
MR. QUINN: Yeah.
MR. LOWE: Would now be a good time for a break? I just need a --
MR. QUINN: That would be just fine.
THE VIDEOGRAPHER: All right. The time is 2:19 p.m., off the record.
(WHEREUPON, a recess was had from 2:19 to 2:31 p.m.)
THE VIDEOGRAPHER: All right. The time is

BY THE WITNESS:
A. Yes.
BY MR. QUINN:
Q. And the Pursuit Review Committee, that is one of the main tools that South Bend Police Department had during the period 2013 to 2018 to ensure officer accountability with regard to pursuits, right, vehicle pursuits?
A. That's one layer. There is multiple layers to ensure the accountability.
Q. Okay. Internal Affairs, the Office of Risk Management, that cap -- that Captain Schweizer ran was another important tool that the South Bend Police Department used to ensure officer accountability for vehicle pursuits, correct?
A. That's correct.
Q. So Captain Schweizer, he ran ORM and he ran the Pursuit Review Committees between 2013 and 2018 itself then, correct?
A. That's correct.
Q. When is the last time you spoke to Captain Schweizer?
A. Last month.
Q. Did you speak to Captain Schweizer about

this lawsuit?
A. Yes.
Q. What did you discuss with him?
A. Well, I discussed his role and the things that he reviewed between, we'll say, 2013 and 2018. You know, his role is RM -- ORM, and he informed me his role and that his -- and how he processed things and how he came up with the determination if the board was to see certain things as far as pursuits.
If there was a short pursuit and terminated, you know, he would not move that one on to the committee because it was short and he could see that the person was within policy.
Q. Okay. Did you tell you anything else about his involvement in the Pursuit Review Committees or in ORM during the period 2013 to 2018?
A. Yes, he did. He told me when he reviewed, he reviewed every -- every pursuit that had a form. If a form came in for a pursuit, he reviewed it. If -- he would look -- as he is reviewing the video footage, he is looking for possible department violations, if the -- if the pursuit was too long or if he felt that the person was driving too fast. Those are the things that he was looking for.

If it was something short, he would not, like I said, pass it on to pursuit -- or that to the pursuit committee, but if it was too fast, too long or some other department policy may have been alleged -- or not alleged, but possibly violated, he would move that on to the committee.

Q. How long did you speak to Captain Schweizer for approximately a month ago?

A. I would say maybe 30 minutes or so, 30 minutes -- about 30 minutes.

Q. And from your standpoint, the purpose of that conversation was to understand how it was that Captain Schweizer analyzed or reviewed vehicle pursuits during the period 2013 to 2018 at South Bend?

A. Yes.

Q. And Captain Schweizer told you when you spoke to him about a month ago that one of the things that he looked for in vehicle pursuits when deciding whether to forward that pursuit to the committee was whether the officer was driving too fast, correct?

A. Too fast, the pursuit was too long, or he observed another possible violation of department policy, for example, let's say, like a seatbelt.

Q. Okay. So it's true that one of the

factors that Captain Schweizer told you he looked for when deciding whether to forward a vehicle pursuit to the Pursuit Review Committee was whether the officer was driving too fast, correct?

A. That's one of them, yes, one of the reasons.

Q. And did he define "driving too fast"?

A. No, he did not.

Q. Did he define a pursuit that went on for too long?

A. No, he did not.

Q. Do you know what Captain Schweizer is doing now?

A. As far as I know, he works for the Federal Government, and a lot of times he is out of the country.

Q. Where was he when he spoke to him?

A. I can -- all I know is he was within the country.

Q. Who did Captain Schweizer report to between 2013 and 2018? Did he have a supervisor for these activities that he took regarding pursuit reviews?

A. Yes, he -- he was part of operations, and

These IA -- the IAPRO summaries that we see were produced by the City, those were also kept and stored in the normal course of activity for the period that they existed in the production materials, right?
A. In the production materials? Yes.
Q. All right. And it was certainly the regular activity of South Bend Police Department to create the IAPRO summaries that they produced in this case from 2013 to 2018, right?
A. I'm going to say from 2016 to 2018 with -- that I have knowledge of, 100 percent knowledge of, yes.
Q. Okay.
A. It was produced like this.
Q. All right. So let me ask you something -- about some specific information using Exhibit 5 as an example, okay. And this is -- this is an IAPRO summary that you entered. So let me ask you, the time of day is -- is information that you would have entered into this IAPRO summary, Exhibit 5?
A. Yes. Can you make it a little bit larger so I can --
Q. Sure.

A. -- see some things here. Thank you.
Q. Can you see that?
A. A little bit bigger. That's fine.
That's too big.
Q. Too big?
A. The top is there so...
Q. How is that?
A. Yes.
Q. Okay. So the time of day is something that you as the person creating this IAPRO summary would enter into the document, correct?
A. That's correct.
Q. Okay. And the -- the officer's maximum speed during the pursuit was included also in an IAPRO summary as a matter of custom, correct?
A. Yes.
Q. Now, the IAPRO summary asks the question here. Can you see that?
A. Yes.
Q. And it asks the person inputting this data, pursuit justified, pursuit within policy, correct?
A. Yes, that's what it says.
Q. Okay. And there is an option for the

person inputting the data to respond yes or no to each of those questions, pursuit justified, pursuit within policy, correct?
A. That's correct.
Q. Okay. And --
A. There is a section, as -- as you see there, you click the box -- you either click the box for yes or you leave it blank, but I've never put if a pursuit was justified.
If you leave the block -- the box blank and you print it off, it puts -- it generates a no.
Q. Okay.
A. If the box is not checked, it generates a no.
Q. Okay. So the IAPRO system gives the person creating an IAPRO summary a drop box to choose to answer pursuit justified, pursuit within policy, yes or no, correct?
A. It is just a check box. There is no drop down.
Q. Okay. It's a check box. And the two options are yes and no?
A. No. It is just a check the box for yes, that's it. I've never -- when you print it off,

that's how it is. Even with, I think it with the -- I think it was aerial, we don't even input that information in there. We don't even check that box.

Q. Okay. So let me see if I can understand you here.

When it comes to filling out the IAPRO summary between, say, 2015 and 2018, when you get to the section pursuit justified, what are the options for the person inputting the information?

A. It's not an option for us. We don't use that. We just put in the main information and that's it. We do not check the box. It is -- normally it is blank. Even if I was -- even now to this date, we do not check the box.

Q. Okay. So you are tell me that with respect to this Exhibit 5, you would not have entered that this pursuit was not justified and the pursuit was not within policy?

A. I did not say that the pursuit was not within policy.

Q. Why does this Exhibit 5 state the answer is no to pursuit justified and pursuit within policy?

A. If you do not check the box, one thing with IAPRO, they try to have a report system, one that

fits all. We do not use the justified box, we don't use the aerial box. There are several boxes that we don't check. And that's one box that we don't check.

Everything is in the summary or listed as an attachment to the report or to the incident in IAPRO.

Q. Okay. I think you mentioned another section that you do not check. What other section is that?

A. I thought it said aerial. I dont' know. Never mind. I thought I saw something else.

Q. Okay.

A. So no.

Q. But you're tell me that what I'm circling here in yellow on Exhibit 5 is something that you when you're entering this IAPRO summary, you don't check pursuit justified yes or no, is that right?

A. No, I do not.

Q. And you're telling me that since you leave pursuit justified and pursuit within policy blank, that when this form gets printed out it automatically defaults to no for those questions?

A. Yes.

Q. In order for someone to -- well, strike

that.

There is the ability to answer no in this system to the question pursuit justified and pursuit within policy, correct?

A. It's just a check box.

Q. Right. So that's my question.

A. It's just a regular check box, if I remember correctly.

Q. Okay. You're saying -- so you're telling me that you personally never checked yes or no in answer to the question pursuit justified --

A. I never checked yes or no.

Q. -- and pursuit within policy, is that right?

MR. SMITH: Let him finish the question first before you answer.

THE WITNESS: Okay.

BY THE WITNESS:

A. No, I did not.

BY MR. QUINN:

Q. Okay. You did not work with Captain Schweizer in answering or entering, I should say -- strike that.

You did not work with Captain Schweizer

while he was entering his IAPRO summaries, did you?
A. No.
MR. SMITH: Objection; misstates the testimony again.
BY MR. QUINN:
Q. Do you know whether Captain Schweizer -- well, did you ever see Captain Schweizer entering an IAPRO summary for a vehicle pursuit between 2013 and 2018?
A. In our training when he was teaching us how to use IAPRO, he did not show us or tell us to check the box. We were just supposed to put the other information in, and that's what we did.
There's attachments to the -- to the case that would say if it was justified or not, and that's where it would say final. If it was -- if it was a -- something where it was not justified, there would probably be an IA number or AI number attached to this number, and I don't see that.
So I did not check no or check that box for the pursuit justified, pursuit within policy, I did not. I can tell you that 100 percent because I don't even do it now.
Q. So who reviews this form attached as

Exhibit A? I'm sorry, strike that.
Who reviews this form attached as Exhibit 5 before it's entered into the IAPRO system?
A. As far as this form here, this is part of the IAPRO system. I mean, we put the information in from the pursuit form.
Q. How many different people review the IAPRO system attached as Exhibit 5 here before it gets entered?
MR. SMITH: Objection; misstates the testimony again.
Go ahead if you can answer.
BY THE WITNESS:
A. There was only -- there was only two people that entered that information in, myself and at that time Sergeant Hinton who would enter this information in, and then we would pass it on to Captain Schweizer.
BY MR. QUINN:
Q. Okay. How many people would review this IAPRO summary attached as Exhibit 5 after it was entered?
A. No, no one.
Q. Wouldn't Captain Schweizer?

A. I mean, he may review, but he would normally, from my understanding, and, you know, with working with him, he knew we knew what we were doing and he would just put his attachments and move forward, if there were any incidents.

Q. So you are telling me that no one would review the IAPRO summary, to your knowledge, at the South Bend Police Department after it was entered between 2013 and 2018?

A. From 2016 to 2018 with me working with Captain Schweizer, he trusted us, taught us how to use IAPRO to enter the information. We have never checked that box. In the beginning, he would review our -- the work that we put in to complete the IA portion.

Moving on from there, he would take his information and move on with that to the next step, which would be the pursuit committee. Once that is done, he would either, just depending on what it is, he would either take it to the -- to the command staff or he would load it in as an attachment.

The attachment would have all the information, especially if the person did something that was not within policy.

Q. When you say "load it as an attachment,"

just clarify, what do you mean by "load it as an attachment"?

A. A PDF attachment, like the forms, we would attach those forms to the report in IAPRO.

Q. All right. So back to my original question, you are telling me that between 2016 and 2018 when you were working with Captain Schweizer in ORM or Internal Affairs, no one would read this IAPRO summary after it was entered?

A. We would enter the information. I -- you know what, I can't speak for Captain Schweizer, he may have looked at it, reviewed it, but I can't answer that question. I know I didn't go back and review it.

Q. Wouldn't the people reviewing, for example, Exhibit 5, think that the person who entered the information thought that the pursuit was not justified and was not within policy?

MR. SMITH: Objection; calls for speculation.

You can answer.

BY THE WITNESS:

A. Can you rephrase the question?

BY MR. QUINN:

Q. Yeah. Wouldn't someone reading this IAPRO summary attached as Exhibit 5 conclude that someone

determined that the pursuit was not justified and the pursuit was not within policy?

MR. SMITH: Same objection.

Go ahead.

BY THE WITNESS:

A. If they didn't understand the system and the check box, then they would assume that it was not within policy.

BY MR. QUINN:

Q. Okay. Don't you think that creates confusion in the person reading this summary?

MR. SMITH: Objection to form.

Go ahead.

BY THE WITNESS:

A. I am not the creator of the IAPRO software. Maybe this is something that I can bring up to them, that they can troubleshoot, but when you print it off, that's what you get. You know, I -- that's the best I can answer on that.

BY MR. QUINN:

Q. Okay. So you were taught by Captain Schweizer when you are entering an IAPRO summary not to check yes or no, right, for pursuit justified, pursuit within policy?

MR. SMITH: Objection; misstates the testimony.
Go ahead.
BY THE WITNESS:
A. We were not taught to check that box. There are plenty of other boxes that we do not fill in --
BY MR. QUINN:
Q. Okay. And --
A. -- in IAPRO.
Q. And your testimony is that when this box is not checked, pursuit justified and pursuit within policy, it automatically prints out as "no" as default, right?
A. That's correct.
Q. Okay. Give me one second. Let me show you something else here.
Okay. Let me know when you are able to see the screen that I am sharing with you?
A. I can see it.
Q. All right. I'll mark this as Exhibit 5A.
(WHEREUPON, a certain document was marked Exhibit 5A, for identification, as of 03/25/2024.)
BY MR. QUINN:

Q. Okay. Do you see that?
A. Yes, I see it.
Q. Okay. So this is, just for reference, let me blow this up, this is an IAPRO No. VP 2015-1, correct?
A. Yes.
Q. And this involves Patrolman Andrew Jackson, right?
A. Yes.
Q. Okay. And this was entered -- let me scroll down. By Captain Schweizer on February 2nd, 2015, correct?
A. Yes.
Q. All right. Now, on this Exhibit 5A, I am going to highlight this. Pursuit justified, pursuit within policy states yes, correct?
A. Yes.
Q. So does that mean that Captain Schweizer checked yes?
A. He checked the box. That's what I would assume by seeing yes.
Q. All right. Which is what you've told me he taught you not to do, right, he taught you not to check the pursuit justified box and the pursuit within

policy box when filling out an IAPRO between 2016 and 2018, right?

A. Yes.

Q. Did you perform -- did you provide personally training, remedial training for officers in connection with pursuit reviews between 2015 and 2018?

A. No.

Q. Did you provide training or remedial training as part of Internal Affairs' review of vehicle pursuits at South Bend Police Department between 2015 and 2018?

A. No.

Q. Do you know what kind of training or remedial training was provided to officers at South Bend Police Department concerning vehicle pursuits between 2013 and 2018?

A. Yes. Between 2016 and 2018, yes.

Q. Well, tell me, between 2016 and 2018 what kind of training or remedial training was provided to officers in connection with pursuit reviews?

A. Below 100, some officers were not allowed to get into a pursuit, counseling, coaching, different things like that.

Q. And would the counseling or coaching that

an officer involved in a pursuit received as a form of remedial training be information that was contained in the IA file?

A. Yes, it should be documented.

Q. And if a -- an officer between 2016 and 2018 was not allowed to engage in a pursuit as a matter of training or discipline or remedial training, would that be information that would be contained in their IA file?

A. Yes, it should be, yes.

Q. So, let's go back to this -- hold on one second.

I'm sharing -- I'm going back to the Exhibit 5A. This is -- I'll scroll to the top here. This is the Jackson pursuit, just to orient you.

Do you see that VP 2015-1?

A. Yes.

Q. All right. And we -- we see that pursuit justified, pursuit within policy is marked in each case as yes.

Tell me why some pursuits will be marked justified and within policy, and others would be marked not justified and not within policy --

MR. SMITH: Objection; misstates testimony

REPORTER'S CERTIFICATE

I, JULIANA F. ZAJICEK, a Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination of the witness herein, the witness was duly remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my availability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand on this 10th day of April, 2024.

JULIANA F. ZAJICEK, Certified Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, | ) | |
| Plaintiff, | ) | Case No. 2:19-cv-00064-PPS-JEM |
| -v- | ) | |
| CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY, | ) | VOLUME II |
| Defendants. | ) | |

The 30(b)(6) videotaped deposition upon oral examination of CITY OF SOUTH BEND by CAPTAIN DAVID HERRON, a witness produced and sworn before me, Charolette Martinez, Notary Public in and for the County of St. Joseph, State of Indiana, taken on behalf of the Plaintiff at Stewart Richardson & Associates, 1400 East Angela Boulevard, South Bend, Indiana, on Tuesday, July 16, 2024, at 9:35 a.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800) 869-0873

APPEARANCES

FOR THE PLAINTIFF:

MR. STEPHEN D. PHILLIPS, ESQ.
MR. MICHAEL PHILLIPS, ESQ.
MR. TERRENCE M. QUINN, ESQ.
MR. ALEC MESROBIAN (via videoconference)
Phillips Law Offices
161 North Clark Street, Suite 4925
Chicago, Illinois 60601

VIA VIDEOCONFERENCE FOR DEFENDANT, JUSTIN GORNY:

MR. R. JEFFREY LOWE, ESQ.
Kightlinger & Gray, LLP
3620 Blackiston Boulevard, Suite 200
New Albany, Indiana 47150

-- and --

MR. JOHN KAUTZMAN, ESQ.
Ruckelshaus Kautzman Blackwell Bemis
Duncan & Merchant, LLP
135 North Pennsylvania Street, Suite 1600
Indianapolis, Indiana 46204

FOR THE DEFENDANT, CITY OF
SOUTH BEND:

MR. KEVIN C. SMITH, ESQ.
SMITH SERSIC
9410 Calumet Avenue, Suite 203
Munster, Indiana 46321

-- and --

MS. KYLIE CONNELL, ESQ.
City of South Bend, Legal Department
227 West Jefferson Boulevard, Suite 1200
South Bend, Indiana 46601

APPEARANCES (Continued)

ALSO PRESENT:

TOM TEMPEL, VIDEOGRAPHER

ROGER LARSON (Via Videoconference)

JULIE WISNER (Via Videoconference)

INDEX OF EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| MR. S. PHILLIPS | 141 |
| MR. SMITH | 281 |
| MR. S. PHILLIPS | 289 |


INDEX OF PLAINTIFF'S EXHIBITS


| NUM | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1A | Amended Notice of Rule 30(b)(6) Video Deposition | 145 |
| Exhibit 1B | Supplemental Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action | 151 |
| Exhibit 1C | Pursuits document | 159 |
| Exhibit 6 | Spreadsheet of vehicle damage 2011-2018 | 191 |
| Exhibit 6A | Replacement spreadsheet of vehicle damage 2011-2018 | 199 |
| Exhibit 7C | Pursuit Review Committee (City 4993) | 202 |
| Exhibit 8A | IA Pro (City 5054) | 205 |
| Exhibit 8B | Pursuit Review Form (City 5056) | 226 |
| Exhibit 9B | IA Pro Summary (City 5083-5084) | 209 |
| Exhibit 9C | Pursuit Review Form (City 5085) | 210 |
| Exhibit 10B | IA Pro Summary (City 5327-5328) | 218 |
| Exhibit 11B | IA Pro Summery (City 5878) | 231 |
| Exhibit 12B | VP 2017-0046 IA Pro Summary (City 6076-6078) | 231 |
| Exhibit 13A | IA Pro Summary (City 6103-6105) | 232 |
| Exhibit 13B | IA Pro Summary (City 6103-6105) | 231 |

| | | |
|---|---|---|
| Exhibit 13C | Signed Incident Alert | 233 |
| Exhibit 14B | IA Pro Summary (City 6310-6318) | 235 |
| Exhibit 15B | IA Pro Summary (City 6465) | 237 |
| Exhibit 16B | IA Pro Summary (City 6716-6719) | 244 |
| Exhibit 17A | Final Vehicle Pursuit Form (City 7901) | 253 |
| Exhibit 17B | IA Pro Summary (City 7895-7987) | 250 |
| Exhibit 17C | Signed Incident Alert (City 7898-7900) | 249 |
| Exhibit 18B | VP2018-0048 IA Pro Summary (City 7943-7945) | 255 |
| Exhibit 38A | Pursuit Review Committee Notes 6/25/2015 | 256 |
| Exhibit 38B | Pursuit Review Committee Notes 3/17/2018 | 257 |
| Exhibit 38C | Pursuit Review Committee Notes 7/27/16 | 257 |
| Exhibit 38D | Pursuit Review Committee Notes 8/15/2018 | 257 |
| Exhibit 39A | Oath of the Police Department | 258 |
| Exhibit 39B | South Bend Policy 306 - Vehicle Pursuits | 258 |
| Exhibit 39C | South Bend Policy 308 - Officer Response to Calls | 259 |
| Exhibit 39D | Officer Response to Calls Power Point | 259 |
| Exhibit 39E | Emergency Response or Signal 10 Power Point | 259 |
| Exhibit 39F | Policy 320 (Retained by counsel.) | 260 |
| Exhibit 40E | August 2017 Pursuit Policy | 263 |

| | | |
|---|---|---|
| Exhibit 40F | October 11, 2017 Pursuit Policy Changes | 265 |
| Exhibit 41 | Gorny Training History | 266 |
| Exhibit 42 | Transcript of Radio Transmissions for this call | 267 |
| Exhibit 43 | Photo of Gorny Vehicle Interior | 268 |
| Exhibit 44 | Crash Data Retrieval | 269 |
| Exhibit 45 | Crash Report 7/20/18 | 272 |
| Exhibit 46 | Gorny Interview (video) | 279 |
| Exhibit 47A | Screenshot | 272 |
| Exhibit 47B | PRN list | 276 |
| Exhibit 48A | IA Pro NextGen VP2018-0061 User Log | 220 |
| Exhibit 48B | IA Pro NextGen VP2017-0002 User Log | 222 |
| Exhibit 48C | IA Pro NextGen VP2018-0005 User Log | 222 |

THE VIDEOGRAPHER: We're going on the record at 9:35 a.m. Today's date is July 16th, 2024.

This deposition is being held at Innovation Park at Notre Dame, 1400 East Angela Boulevard, South Bend, Indiana.

Here begins the video deposition of Captain David Herron, taken by the plaintiff. This case is filed in the US District Court, Northern District of Indiana, Hammond Division, Case No. 2:19-cv-00064-PPS-JEM, in the matter of Flores versus the City of South Bend and Justin Gorny.

My name is Tom Tempel, in association with Stewart Richardson, located in Indianapolis, Indiana. I'm the video specialist.

The court reporter is Charolette Martinez, also associated with Stewart Richardson.

And now will counsel please state their appearance for the record? And then the court reporter will swear in the witness.

MR. S. PHILLIPS: Steve Phillips, Michael Phillips, and Terry Quinn on behalf of the plaintiffs.

MR. SMITH: Joseph Smith for City of South Bend.

MR. LOWE: Jeff Lowe for Justin Gorny.

MR. KAUTZMAN: John Kautzman for Justin Gorny.

CAPTAIN DAVID HERRON,

called as a 30(b)(6) witness for CITY OF SOUTH BEND, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. S. PHILLIPS:

Q. Would you state your name, spell your last name, please?

A. David Herron, H-e-r-r-o-n.

Q. Okay. Mr. Herron, you've given two depositions in this case thus far; right?

A. Yes.

Q. Have you reviewed both of them before this morning's deposition?

A. Yes. I reviewed all material.

Q. Okay. You understand I'm going to be asking you a series of questions; right?

A. Yes.

Q. If there's any question I ask you that you do not understand, will you stop me and let me know before you answer?

A. Yes, I will.

Q. Okay. Also, you understand a lot of my questions are going to call for a "yes" or "no"; okay?

Strike -- don't strike that one. I'm going to ask a new question, Ms. Court Reporter.

COURT REPORTER: What are you telling me to do?

MR. S. PHILLIPS: No, just leave that as-is, but now I'm going to start a new question.

COURT REPORTER: Okay.

Q. All the documents that are in Exhibit A, that are listed as Exhibit A, which are part of 1B, all those documents available to you today?

A. I would say yes.

Q. Okay.

A. I'm not sure about 14.

Q. Why don't you check real quick and see if you have them.

MR. SMITH: I should have access to all documents that have been produced in discovery in this case.

MR. S. PHILLIPS: I'm sorry, I didn't hear you.

MR. SMITH: I said I should have access to all documents that have been produced -- been produced in discovery in this case.

MR. S. PHILLIPS: Okay. But my question is: Does he have access to No. 14 of Exhibit A? It's

listed as Exhibit A. That's all I want to know.
Q. Do you have those?
A. Oh. I would say City Legal has them.
City Legal has them.
Q. Okay. So if --
A. If --
Q. -- you need them, we'll look at them --
A. Yes.
Q. -- and you can look at them. Okay.
There was a Pursuit Review Committee in place for the 5 years prior to this incident; right?
A. Yes.
Q. Was there any committee or person who reviewed emergency calls or Code 10s?
A. No. As far as service runs, as far as with lights and siren, is that what you mean?
Q. No. There are Code 10s and there's emergency calls; right?
A. Uh-huh.
Q. "Yes"?
A. Yes.
Q. Was there any person or any committee that reviewed emergency calls that South Bend police officers were involved in in the 5 years prior to this occurrence?

A. No.
Q. Did any person or committee ever review traffic stops in the 5 years prior to this occurrence?
A. I can't answer that. I can't answer that.
Q. Why can't you answer that?
A. Because I wasn't involved with that as far as looking at the reviewing of emergency runs or anything like that. I wasn't involved.
Q. Who would you ask to determine if there was a person or committee that reviewed traffic stops?
A. It would be Captain Schweizer, retired Captain Schweizer.
The only time that they would look at something like that, unless there was a complaint or an incident may have happened.
Q. My question is: Who would be the person that you would check with to determine if there were traffic stop reviews in the 5 years prior to this occurrence?
A. Captain Schweizer.
Q. Okay. And it's your testimony that the only time that would be looked at is if there was a complaint about the traffic stop?
A. Complaint about a traffic stop or reviewing a -- arrest report. Like a periodic check that would

any of the case -- the State and Federal cases related to policing prior to July of 2018?
A. These -- these court cases here, no.
Q. Okay. But -- but my question to you is prior to July of 2018, did you, personally --
A. No.
Q. -- as part of your duties with the police department, did you review Supreme Court cases?
A. No.
Q. Did someone go over them with you, like Captain Schweizer?
A. During our training, they would always relate to court cases. That's with all of our training.
(Reporter clarification.)
A. Related -- that's with all of our training on our department.
Q. Is that the yearly training, too?
A. Yes.
Q. Okay. So yearly training of police officers prior to July of 2018 would include court cases, such as important Supreme Court cases?
A. Yes.
Q. And who would go over that with you?
A. That would be the EVO instructor or the defensive tactics instructor, whoever has that concentration.

If there's a legal update, they would make sure that that is relayed to each officer with -- on the South Bend Police Department during our training.

Q. Okay. So the South Bend Police Departments on a yearly basis were well advised of recent Supreme Court opinions and holdings.

Is that fair?

A. Yes.

Q. You knew prior to July of 2018 that police officers could be held responsible for injuries or death caused by their conduct.

Is that fair?

A. That's correct.

Q. And you knew prior to July of 2018 that citizens had Constitutional rights to be free of injuries and death caused by police officers; right?

A. That's correct.

MR. SMITH: Objection to form.

Go ahead.

A. Yes.

(Plaintiff's Exhibit No. 8A marked.)

MR. S. PHILLIPS: Let's go to 8A.

Q. Big enough for you to see?

A. Make it probably 125, 150. That's what I was making it. A little bit bigger.

It has to be a lot bigger. Maybe 200.
That should be good.
Q. Okay. This is a -- Gorny pursuit, August of 2016; right?
A. Yes.
Q. And the last time we got into a discussion about pursuit justified, not justified and how it was filled out.
Do you recall that?
A. Yes.
Q. And there we showed you various pursuits; some where there was attachments, some were there weren't attachments, some that said pursuit justified, some said not pursuit justified --
A. Uh-huh.
Q. -- right?
A. That's correct.
Q. Have you clarified how pursuits got marked "justified" and "unjustified" when there was not an attachment and it was only your name --
A. Yes.
Q. -- on the pursuit?
What did you find out?
A. Captain Schweizer's the one that closed the cases out.

MR. SMITH: Got it.

MR. S. PHILLIPS: Sphillips@phillipslegal.com.

MR. LOWE: While we're waiting on this, can we take another rest room break?

MR. S. PHILLIPS: You know, I'm going to finish up these -- these pursuits, and then I thought we'd break for a quick lunch. I've only got a couple more.

MR. LOWE: Yeah. Actually, if we can talk about that after we get back from the rest room. I'd rather just continue on.

MR. S. PHILLIPS: I need a quick lunch. I'm a senior citizen.

MR. LOWE: I understand, Steve. I'm just on vacation, so I'm sitting in my rental property, and I'd rather be outside. That's -- that's why.

MR. S. PHILLIPS: Then why don't you go fishing or something for God sakes?

MR. LOWE: I'd love to, but I have to be on this deposition of yours.

MR. S. PHILLIPS: You've got John here. He's fine. He's very -- he's very competent.

MR. LOWE: I agree. He also had another hearing at 11:30, so he'll be back.

MR. KAUTZMAN: I'm back, but any time I can

get a competency evaluation from Steve, that's worth it.

MR. SMITH: All right. Did you guys get the document?

MR. S. PHILLIPS: Did you guys get it?

MR. M. PHILLIPS: Yes.

MR. S. PHILLIPS: Okay. Pull it up. Put it on the screen.

You sent it to me, right, too? Right? Sphillips@phillipslegal.com?

This is -- this is not the committee report, Joe, or is it?

MR. SMITH: This is -- well, you can -- you can ask the witness about it.

MR. S. PHILLIPS: Yeah.

MR. SMITH: I don't want to testify for him.

MR. S. PHILLIPS: Okay. I had this one. I didn't -- okay.

Which exhibit did we have this as?

(Plaintiff's Exhibit No. 17A marked.)

Q. Okay. We had -- this is Exhibit 17A.

What is this?

A. This is the form that Officer Gorny had completed.

At the bottom you see where Captain Schweizer did the ORM. Normally when he does the ORM, it

does not go to the committee. That means he's reviewed it.

The pursuit was -- in his eyes was within policy.

Q. Where do you see within policy?
A. Pardon me?
Q. Where do you see it was within policy?
A. No, I'm just --
Q. Hang on. Hang on.

Where do you see on Exhibit 17A that it was within the policy?

A. It's not on Exhibit A.
Q. Okay.
A. It's --
Q. Where is it?
A. From earlier -- the earlier deposition that we had, I gave you the information regarding Captain Schweizer, when he would submit something to the Vehicle Pursuit Committee.

If it was something that he felt that did not go to -- did not need to go to the Vehicle Pursuit Committee and he felt it was within policy, he would just sign off on the bottom ORM and he would not send it to the Vehicle Pursuit Committee.

Q. So Captain Schweizer signed off on Exhibit 17A on

June 21st, 2018; right?
A. Yes.
Q. Okay. Let's go to the next one.
(Plaintiff's Exhibit No. 18B marked.)
Q. This is 18B, which is June of 2018; right?
A. Yes.
Q. Scroll down.
Was there video footage available for this one?
A. It says yes.
Q. Okay. When it says, "Video ID number, MVR," what does that number stand for? Does that stand for the camera number or does it stand for the actual video?
A. That normally is the car number when they put that on there, or when that's added on there. Unless it's a camera number, meaning it could be a spare car or camera, or something like that.
Q. Let's go to the next one.
MR. S. PHILLIPS: Now's a good time for a quick lunch, guys.
THE VIDEOGRAPHER: We're going off the record at 12:19 p.m.

* * *

LUNCHEON

Mr. Gorny about this occurrence; fair?
A. Yes.
If you can scroll, just so I can see, make sure, verify that that was him in that interview room.
Yes.
Q. Okay.
A. Okay.
Q. So after you've seen a portion of this video, you can verify that Exhibit 46 is the video recording of the interview you did with Mr. Gorny; correct?
A. Yes.
MR. S. PHILLIPS: Give me 5 minutes, guys. Off the record.
THE VIDEOGRAPHER: You want to go off the record?
MR. S. PHILLIPS: Yes.
THE VIDEOGRAPHER: We're going off the record at 1:42 p.m.
(Break taken.)
THE VIDEOGRAPHER: We're back on the record at 1:48 p.m.
MR. S. PHILLIPS: I'm finished, subject to a discussion I had with counsel before we came back in that one or both of the witnesses next week or

someone else is going to be designated to talk about emergency vehicle operations, the crash sheets, emergency vehicle training, supervision, discipline, lesson plans, and the like; fair?

MR. SMITH: Fair.

MR. S. PHILLIPS: Okay.

MR. SMITH: All right. Jeff or John, do you guys have anything?

MR. LOWE: Do not.

MR. KAUTZMAN: Nothing from me.

MR. SMITH: I've got a few questions.

Can we see Exhibit 47, again?

MR. M. PHILLIPS: A or B?

MR. SMITH: It was the IA Pro screen with all the drop-down --

MR. M. PHILLIPS: That's A.

MR. SMITH: -- menus.

Was this 47A or 47B?

MR. M. PHILLIPS: A.

MR. SMITH: A, okay.

EXAMINATION

QUESTIONS BY MR. SMITH:

Q. All right. So can you talk about what your process would be when receiving a new Vehicle Pursuit Form and entering the system into the IA Pro?

A. Yeah. So we'll receive the form, and then what we do is we would input the information into IA Pro, you know, the reason for the pursuit. We'll go through and fill in the boxes -- not all of them, but what's applicable to our department. The -- the minutes, number of minutes it took, the maximum speeds. That's -- everything that's on the pursuit form, we would apply to this page --
Q. All right. I assume there are -- there are other pages as well. But this is one of the -- one of the pages you would use?
A. Yes.
Q. Okay. Now, on the right side it says, "Pursuit was justified," and "Pursuit was in policy."
Do you see that?
A. Yes.
Q. Okay. Am I correct to say that those fields are -- have a -- a check box next to them?
A. That's correct.
Q. Now, if those boxes are not checked when you're using the IA Pro system, does it tell you -- give you any indication that the pursuit was not justified or the pursuit was not within the policy?
A. Give me --
Q. Okay. So when you're -- when you're in the IA Pro

system working with the policy --
A. Yes.
Q. -- and a pursuit was justified or pursuit was within policy, fields are not checked, does the IA Pro system say that it was not -- not justified or not within policy?
A. If the box is not checked, it's going to say, "No, it's not within policy."
Q. Where does it say?
A. On the printout.
(Reporter clarification.)
Q. On -- okay. Talking about in the software. Working in the software.
A. Yes.
Q. Does it -- does it say, "Not justified or not within policy"?
A. No.
Q. Okay. Where does it say, "Not justified or not within policy"?
A. On this page here, which is the last page.
Q. Okay. You said the printout a second ago?
A. Yes.
Q. Okay. We saw all those printouts. It says, "Pursuit justified," "Pursuit within policy," and it says, "No" and, "No"; right?

A. That's correct.
Q. That happens when the check mark -- or the check box is not checked next to those two fields; correct?
A. That's correct.
Q. Is that the only place that it says, "No, not within policy," or "Not justified"?
A. As far as the check box, this is the only thing, unless there's an attachment from Captain Schweizer, saying that the pursuit is not within policy.
Q. Okay. When did you --
(Discussion off record.)
Q. When did you first become aware that when you print out the information from IA Pro and those check -- check boxes next to, "Justified, within policy," are not checked, it's -- the printout says, "No"?
A. The last deposition.
Q. Okay. Before that you -- you were not aware that the printout would say, "No," if those two check boxes are not checked?
A. That's correct.
Q. Based on your review of all the documents that you looked at for your deposition and the first part of your deposition, was it Captain Schweizer's usual

practice to update --
MR. SMITH: Can we have that back, please?
Q. All right. Let me start over.
Based on your review of all the documents you looked at for your deposition and the first part of your -- of this deposition --
A. Uh-huh.
Q. -- was it Captain Schweizer's usual practice when a pursuit was found to be justified and within policy to update this screen shown here as Exhibit 47A?
MR. S. PHILLIPS: Objection. Foundation.
A. Not all the time.
Q. It happens sometimes?
A. Sometimes.
Q. Based on your review of the documents that you looked at for this deposition, did you identify instances where the IA Pro printout said, "No" for within -- for "Pursuit was justified, pursuit within policy," where Captain Schweizer had actually determined that the pursuit was justified and within policy?
A. Yes.
Q. Would you describe it as many instances?
A. Yes.
Q. Based on your review and information available to

you, when Captain Schweizer was reviewing the pursuits, would he review the -- the video footage if it was available?

MR. S. PHILLIPS: Objection. Foundation.

A. If it was available, yes, he would. He's the person that would download the video footage for the committee.

MR. SMITH: All right. We can take the exhibit down now.

Q. Based on the information available to you, was it Captain Schweizer's usual practice to provide the video footage to the Pursuit Review Committee if a pursuit was -- was referred to them and video was available?

A. Yes.

Q. There are a couple things that I wanted to clarify from some of your earlier testimony.

Were pursuits only reviewed if they were over 80 miles per hour?

A. No.

Q. So was -- was every pursuit reviewed by somebody?

A. Yes.

Q. Was the officer's speed considered during -- excuse me. I'm sorry. Sorry about that.

Was the officer's speed considered during the

review?
A. Yes.
Q. How so?
A. I mean, in the pursuit it could be 5 miles an hour. It could be 50 miles an hour. It could be 100 miles an hour. Every pursuit is to be reviewed, if not by Captain Schweizer, then by the Vehicle Pursuit Committee.
Q. You had testified a little bit earlier about instances where the car's video camera will turn on. I think you mentioned if it goes over a certain speed; correct?
A. Yes.
Q. And what speed is that?
A. Threshold is 80 miles an hour.
Q. And I think you also mentioned that the officer can turn it on manually; is that right?
A. Turn their camera on manually, yes.
Q. Does the camera also turn on automatically if the officer turns on the emergency lights and siren of the vehicle?
A. Yes.
Q. Okay. Is it -- is it lights and siren, or lights?
A. It can be lights. You have three different positions. So the Position 2 can be just the

lights. And then Position 3 is just the lights and siren.

So let me go back. So Position 3 is just the overheads -- Position 1 is just the -- the -- the wig wags in the back. That's Position 1. position 2 is the overall light bar itself. And 3 is lights and siren.

Q. All right. So Position 1 with the lights on the back, the camera would not turn on by itself?

A. From my understanding, no.

Q. Okay. But Position 2, with the lights on the front and the back, it would turn on?

A. Yes. From my training and experience, yes.

Q. And that -- that -- where the officer might use the Position 2 would be like a -- if they're initiating a traffic stop, something like that?

A. Yes.

Q. I think you said Position 3 was lights and sirens; right?

A. That's correct.

Q. And it would turn on if they turned it to a Position 3?

A. Yes.

Q. Is there any form of review of a -- is there any form of review of a vehicle pursuit before the

pursuit comes to your office?
A. Yes. It's policy that the front line supervisor that overseen that pursuit on that shift, they have to review the pursuit before -- before -- actually before the report is turned in, or shortly after that report's turned in, they review it. So it's reviewed by -- prereviewed by the first line supervisor.
So if there's any issues that are noticeable issues, then that supervisor can address that -- that officer then and there, whether speeding or whatever it may be.
Q. All right. That's all I have.
MR. S. PHILLIPS: I've got a handful here.
EXAMINATION
QUESTIONS BY MR. S. PHILLIPS:
Q. You had mentioned that Exhibit 48, which is the -- strike that.
Looking at Exhibit 47, which is up on the screen right now, which is the IA Pro data entry box, you had mentioned there was a second page?
A. This is the -- okay. So this is the last page. So you have the initial page, where you upload information, where you add the officer. Any attachments you need to add, you can add those.

And then you go to the next tab, which is the summary, I believe. And then you would type in the summary of what took place or say, "See attached documents."

Then you have the assignment page, meaning if it's assigned to the Pursuit Committee and then Captain Schweizer, and then the final person would be Chief Ruszkowski.

Then you would have the location page, where, you know, the information -- actually, let me back up.

You'll have -- where you would input the suspect or witnesses and involved officers. You'll have a page for that, where you add all that in.

With the citizen, if there's any charges that you want to charge -- if that person's going to be up for charge, you can add all that to that -- to that -- under that person's name. So it's a subcategory, and then you move to the last page here.

Q. So how many pages total are there for IA Pro?

A. Approximately, I want to say, 5.

MR. S. PHILLIPS: Joe, can you get those for us for the next one?

MR. SMITH: Yeah. I believe so.

STATE OF INDIANA )
)
COUNTY OF ST. JOSEPH )

I, Charolette A. Martinez, a Notary Public in and for said County and State, do hereby certify that the deponent herein, CAPTAIN DAVID HERRON, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiff; that said deposition was taken at the time and place heretofore mentioned between 9:35 a.m. and 2:10 p.m.;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys nor any of the parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 26th day of July, 2024.

Charolette Martinez
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0659474
My Commission Expires Dec. 18, 2030

NOTARY PUBLIC SEAL INDIANA

Notary Public - State of Indiana
My Commission Expires: 12/18/30

Job No. 192321