IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, | ) | |
| Plaintiff, | ) | |
| -vs- | ) | Case No. 2:19-cv-00064-PPS-JEM |
| CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY, | ) | |
| Defendants. | ) | |

REMOTE VIDEOTAPED DEPOSITION OF
SERGEANT RYAN HIIPAKKA
September 30, 2024

Remote videotaped deposition of SERGEANT RYAN HIIPAKKA, conducted at the location of the witness, commencing at 10:02 a.m., on the above date, before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter, Certified Realtime Reporter and Notary Public.

Job No. MDLG6938605



Exhibit G

APPEARANCES
All Parties Appearing Via Zoom Videoconference

ON BEHALF OF THE PLAINTIFF:
PHILLIPS LAW OFFICES
161 North Clark Street, Suite 4925
Chicago, Illinois 60601
312-964-8296
BY: STEPHEN D. PHILLIPS, ESQ.
sphillips@phillipslegal.com
TERRENCE M. QUINN, ESQ.
tquinn@phillipslegal.com

ON BEHALF OF DEFENDANT CITY OF SOUTH BEND:
CLARK JOHNSON & KNIGHT, LTD.
233 East 84th Drive, Suite 301
Merrillville, indiana 46410
219-322-0830
BY: JOSEPH W. SMITH, ESQ.
jsmith@cjklaw.com

-and-

CITY OF SOUTH BEND
227 West Jefferson Boulevard, Suite 1200S
South Bend, Indiana 46601
574-235-5863
BY: KYLIE CONNELL, ESQ.
kconnell@southbendin.gov

ON BEHALF OF DEFENDANT JUSTIN GORNY:
KIGHTLINGER & GRAY, LLP
Bonterra Building, Suite 200
3620 Blackiston Boulevard
New Albany, Indiana 47150
812-949-2300
BY: R. JEFFREY LOWE, ESQ.
jlowe@k-glaw.com

APPEARANCES (Continued)

ALSO PRESENT:

MS. JULIE WISNER,
Director of Legal Administration,
City of South Bend

MR. ROGER LARSON, Paralegal,
City of South Bend

VIDEOTAPED BY: WILLIAM GEIGERT

REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

I N D E X


| SERGEANT RYAN HIIPAKKA | EXAMINATION |
|---|---|
| BY MR. PHILLIPS............... | 6 |
| BY MR. LOWE................... | 48 |
| BY MR. SMITH.................. | 52 |


E X H I B I T S


| | | FIRST REFERRED TO |
|---|---|---|
| Exhibit 1 | AI Case Number AI2018-001 report | 9 |
| Exhibit 3 | Video clip | 12 |
| Exhibit 6 | Pages 316-317, Ryan Hiipakka Testimony from Gorny Termination Hearing | 29 |
| Exhibit 10 | Narrative Supplemental Report; Bates No. CITY 0028 | 19 |
| Exhibit 11 | Pages 319-320, Ryan Hiipakka Testimony from Gorny Termination Hearing | 31 |
| Exhibit 16B | Policy 308, "Officer Response to Calls"; Bates Nos. CITY 1240 - CITY 1243 | 54 |
| Exhibit 101 | Audio clip | 57 |

THE VIDEOGRAPHER: Good morning. We are now on the record. My name is Bill Geigert. I'm the videographer for Golkow Litigation Services.

Today's date is September 30, 2024, and the time is 10:02 a.m.

This remote video deposition is being held in the matter of Flores, et al. vs. The City of South Bend.

The deponent is Sergeant Ryan Hiipakka.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

All counsel will be noted on the stenographic record.

The Court Reporter is Corinne Marut, and she will now swear in the witness.

(WHEREUPON, the witness was duly sworn.)

THE WITNESS: I do.

THE VIDEOGRAPHER: Please begin.

SERGEANT RYAN HIIPAKKA,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PHILLIPS:

Q. Good morning. Could you state your name and spell your last name.

A. My name is Ryan Hiipakka. Last name is H-i-i-p-a-k-k-a.

Q. My name is Steve Phillips, and I'm going to be asking you a series of questions; and the other lawyers may ask you questions as well. If there is any question -- [audio technical issue]

THE VIDEOGRAPHER: Mr. Phillips, are you still with us?

Off the record. 10:04.

(WHEREUPON, discussion was had off the record.)

THE VIDEOGRAPHER: We are back on the record. 10:04.

BY MR. PHILLIPS:

Q. Officer Hiipakka, I'm going to be asking you a series of questions. If there is any question you do not understand, will you stop me

MR. LOWE: Object to form.
MR. SMITH: Object to form and facts not in evidence.
BY MR. PHILLIPS:
Q. Well, let me ask you this. That music that you heard in Officer Gorny's car, would it be fair to describe that as upbeat music? Are you okay with that?
A. Are you asking what my opinion of that type of music is?
Q. I'm just trying to put a name to that music. Would upbeat music be a fair description? Can we use that phrase? Are you okay with that?
A. You guys can utilize whatever phrasing you would like for it. I mean, it's not the kind of music that I listen to. But if that's Officer Gorny's preference in music while he's working his shift, then that's his decision. And I'm not aware of any policy violation associated with any type of playing of audible music while patrolmen are on shift.
Q. Okay. Let me reask this question.
Are you aware of any policy or rule from the City of South Bend police that prohibits

playing music during a traffic stop call or a high-speed vehicle operation?

A. Not that I'm aware of.

Q. Was -- were you and the other officers involved in this occurrence conducting a traffic stop?

A. So, other officers were involved, including myself, in a traffic stop prior to this incident occurring, yes.

Q. Okay. What I'm getting at is that the -- that the -- before Officer Gorny engaged in the high-speed operations on Western Avenue, you and three other cars, were you involved in a traffic stop?

A. That's correct. We had stopped a vehicle on Olive just south of Western Avenue.

Q. Okay. And just to be clear, was that a traffic stop?

A. That is correct, yes.

Q. Were there three police cars involved in that traffic stop?

A. Off the top of my head I don't know how many marked uniform patrol cars were at that stop.

Q. Were you in a marked police car that

evening?

A. Yes, sir, I was.

Q. And is it correct that Officer Alfrey was in a -- a minivan unmarked?

A. That's correct. Him and another officer were in an unmarked minivan that evening.

Q. Was there also another unmarked car that had lights and siren available?

A. Off the top of my head I honestly -- I don't remember of any unmarked patrol cars that we -- that we were using that night. I don't recall, honestly.

Q. I'm sorry. I froze or you froze.

Was there also another vehicle that was unmarked but did have a siren and lights?

A. I don't know if the connection issue is on my end or your end, sir, but I only heard half of the question.

THE VIDEOGRAPHER: It was on your end that time.

Mr. Phillips, please repeat your question.

MR. SMITH: I think we lost him.

MR. PHILLIPS: I'm sorry. I don't know who

that is. If it's me, I apologize.
THE VIDEOGRAPHER: I think it's on both ends, honestly.
MR. PHILLIPS: Okay. Let's see if we can slug through this.
BY MR. PHILLIPS:
Q. I did not hear an answer.
A. I only got the first part of the question. So, if you could repeat the question, then I could -- I'll happily answer it.
MR. SMITH: I think he's gone again.
MR. PHILLIPS: Can you guys hear me?
THE VIDEOGRAPHER: Yes, we can hear you now.
MR. PHILLIPS: Okay.
BY MR. PHILLIPS:
Q. Officer Hiipakka, was there a fully marked -- I'm sorry.
Was there a vehicle, an unmarked vehicle, that did have lights and siren available as the third car?
A. I don't recall, honestly, sir, if we had an unmarked police car out there with the interior lights and sirens on. I just don't recall.
Q. Okay. Had you pulled over other cars

that were leaving that hot spot area that evening before this event?

A. Yes, sir, we had.

Q. And does it refresh your recollection if I told you there were about 20 or 25 stops before this, traffic stops before this one?

A. I wouldn't know exactly how many we had done, but we had done numerous traffic stops and then stopped traffic, foot traffic, that we had observed in the area as well as individuals on bikes.

But as far as a total number, I don't recall exactly how many stops that we had performed in reference to that specific area that evening.

Q. You locked up again.

MR. PHILLIPS: Did he lock up for everybody?

THE VIDEOGRAPHER: No, sir.

MR. LOWE: No.

MR. PHILLIPS: Okay.

BY MR. PHILLIPS:

Q. The man over that evening -- strike that. I'm sorry.

The driver that you intended to stop in that traffic stop, was he a fleeing felon?

MR. LOWE: Object to form.
BY THE WITNESS:
A. No, sir, he was not.
BY MR. PHILLIPS:
Q. When you pulled over that man for that traffic stop, did you find out that he was actually late for work and that's why he was speeding?
A. I don't recall what that individual had stated to me when I approached the vehicle as to why he was driving in the manner that he was.
Q. Okay.
MR. PHILLIPS: Terry, would you show the police report, please.
(WHEREUPON, Exhibit 10 was shown on the Zoom videoconference and reads as follows:
"Upon arriving to Western Ave. and Olive St. I was directly behind Sgt. Hiipakka as he turned on his red and blue emergency lights and initiated a traffic stop on the suspect vehicle (light colored mini-van) at Olive St. and Ford St. As I exited my vehicle to approach

A. I think any vehicle traveling any speed striking another person or another vehicle or a structure can create substantial damage to any of those factors.

But specific law enforcement vehicles aren't -- aren't a larger factor than anybody else doing the same thing.)

BY MR. PHILLIPS:

Q. Officer, did you tell Mr. Gorny to pass other vehicles on Sheridan and Western at over 70 miles an hour without his lights?

A. No, sir. I didn't tell Officer Gorny to do anything that evening as far as his driving behavior went.

Q. Can you hear me now? Did you get the last question?

A. Yep, I did.

Q. Okay. I missed the answer.

Let me reask you.

Did you tell Officer --

(Clarification requested by the

reporter.)

BY MR. PHILLIPS:

Q. Did you tell Officer Gorny --

THE VIDEOGRAPHER: You cut out, sir.

BY MR. PHILLIPS:

Q. Did you tell Officer Gorny to pass other vehicles on Sheridan and Western without his lights and siren on?

A. No, sir. I did not tell Officer Gorny to do any of his driving behaviors that evening. I didn't speak to him about any of that stuff.

Q. Did you study the 14th and 4th Amendments to the Constitution at the police academy?

A. We had certain factors for criminal law and traffic law while we were down at the police academy, sir.

Q. Did you study the 4th and 14th Amendments of the Constitution as it relates to vehicle operations, either at the police academy or when you were with the City of South Bend?

A. Yes, sir, we touched on those amendments as far as our interaction as law enforcement officers with members of the public.

Q. Did you talk about recklessness as it relates to the 4th and 14th Amendment of the Constitution?

A. We covered certain topics in reference to our use of force as it relates to law enforcement and the application of our use of force in reference to our execution of our duties as law enforcement officers.

Q. My question is did you talk about recklessness as it relates to the 4th and 14th Amendments of the Constitution as it relates to vehicle operations?

A. Did I specifically talk about it?

Q. Well, no. Did they talk to you about the 4th and 14th Amendment of the Constitution of the United States as it relates to recklessness, either at the police academy or the City of South Bend?

A. Yes, sir, we talk about that type of -- those facets down at the police academy.

Q. And at the police academy did they tell you that -- [audio technical issue] -- did reckless driving by police officers?

A. Sorry, sir. You cut off midway through

the question. I didn't hear it all. Could you please repeat that.

Q. At the -- at the police academy, did they train you that reckless driving was a violation of the 14th Amendment of the Constitution?

A. They specifically touch on our emergency vehicle operation courses and speak intently on the fact that we're to utilize due regard during our police operations specific in those courses with emergency vehicle operations.

MR. PHILLIPS: Madam Court Reporter, can you read the answer back. I lost it.

(WHEREUPON, the record was read by the reporter as follows:

A. They specifically touch on our emergency vehicle operation courses and speak intently on the fact that we're to utilize due regard during our police operations specific in those courses with emergency vehicle operations.)

BY MR. PHILLIPS:

Q. And do you remember when they taught you

about the 14th Amendment in the -- [audio technical issue]

A. Only half of your question came through, sir.

Q. Sure. Did they teach you at the police academy that due regard driving is avoiding recklessness because that's a violation of the 14th Amendment?

MR. LOWE: Object to the form of the question.

BY THE WITNESS:

A. I think I missed the whole entire -- whatever the last portion of the question was, sir.

MR. SMITH: Steve, are you there?

THE WITNESS: I don't know if that was the completion of his question or?

MR. SMITH: Yeah, just hang tight, Officer.

I think maybe we can try the phone again.

THE VIDEOGRAPHER: Off the record. 11:04.

(WHEREUPON, discussion was had off the record.)

THE VIDEOGRAPHER: We are back on the record. 11:06.

BY MR. PHILLIPS:

the record.)

(WHEREUPON, the record was read by the reporter as follows:

Q. So, that's not a specific topic that necessarily gets taught when it comes to that.

Now, obviously we touch on behaviors that could be deemed reckless and 14th Amendment violations.)

THE VIDEOGRAPHER: We are back on the record at 11:13.

BY MR. PHILLIPS:

Q. Officer Hiipakka, I just heard your answer and I'd like to drill down a bit on one portion of it. Was --

A. Yes, sir. Go ahead.

Q. Was reckless driving -- [audio technical issue]

THE VIDEOGRAPHER: We lost you, Mr. Phillips.

Mr. Phillips.

MR. PHILLIPS: I'm back.

THE VIDEOGRAPHER: We're on the record. Please continue.

BY MR. PHILLIPS:
Q. Officer, were you taught at the police academy that reckless driving during high-speed vehicle operations was a violation of the 14th Amendment?
A. Can you repeat the question, please?
Q. Were you taught at the police academy that reckless driving during high-speed vehicle operations by a police officer was a violation of the 14th Amendment?
A. That depends on a lot of factors. Not every high-speed vehicle operation by a law enforcement officer is deemed as reckless and a 14th Amendment violation.
Q. But my question to you is were you taught generally that reckless driving can be a 14th Amendment violation?
A. We were taught that, yes, reckless driving could be seen as a 14th Amendment violation.
Q. What year were you at the police academy?
A. Down in 2008.
Q. Okay.

MR. PHILLIPS: That's all I have. Thank you.
THE WITNESS: Thank you, sir.
MR. SMITH: Jeff, do you want to go first or I will go first? Doesn't matter to me.
MR. LOWE: I'll go.
MR. SMITH: Okay.

EXAMINATION

BY MR. LOWE:
Q. Sergeant Hiipakka, my name is Jeff Lowe. I represent Justin Gorny in this lawsuit.
A. Yes, sir.
Q. A few questions to follow up on. Hopefully, we don't have any connection issues.
A. Yep.
Q. Do you have any information that Justin Gorny intentionally turned his lights off during his driving down Western?
A. I would have no way of knowing that, sir, honestly.
Q. Same thing with his sirens. Do you have any information to suggest that he intentionally turned his sirens off as he was driving down Western?
A. No, sir, I would have no way of knowing.

Q. You also have no way of knowing anything about the individual you were about to pull over on Olive before you pulled him over, right?

A. That's correct.

Q. So, you didn't know that -- anything about his criminal history, right?

A. Correct.

Q. Didn't know whether he possessed anything that might have subjected him to criminal liability, correct?

A. Correct.

Q. Didn't know anything that -- whether he possessed drugs, weapons, anything like that, right?

A. Correct.

Q. So, when Mr. Phillips asked you earlier, you didn't -- you weren't pursuing a fleeing felon, you don't know whether he was a felon or not, right?

A. No, sir. We have no way of knowing that prior to.

Q. And with regard to the fleeing aspect, you would agree that an individual who runs a stop sign, that's an indication or could be an

indication of someone fleeing, correct?
A. In my past history as a law enforcement officer, I've had individuals flee from me after simple traffic violations as in running a stop sign, yes.
Q. But in the course of when Officer Alfrey was tailing this vehicle -- Officer Alfrey I believe will testify later today or sometime later in this case --
A. Correct.
Q. -- that that individual ran a stop sign, correct?
A. That's correct.
Q. And that could be consistent with that individual fleeing from an officer when they run a stop sign, right?
A. That's correct.
Q. Another behavior that could be consistent with a person fleeing an attempted stop by an officer is running a stoplight, right?
A. Yes, sir, that's correct.
Q. Another would be -- another behavior that's potentially consistent with someone fleeing is driving at a high speed, correct?

A. Yes, sir, that's correct.
Q. And another indication of someone fleeing could be that they're driving into the opposite lane to pass people when traveling in their lane, correct?
A. That's correct, sir.
Q. And that's all behavior that this person that Officer Alfrey was driving behind showed on the night of this incident or morning of this incident, wasn't it?
A. That's correct.
Q. So -- and this individual was driving south on Olive, correct?
A. Yes, sir, that's correct.
Q. And that individual was traveling from an area that was identified as a hot spot because you were trying to determine if there was criminal activity going on in that area that evening and early morning, correct?
A. Yes, sir, that is correct.
Q. And you were the Sergeant for the northwest region, correct?
A. I was the Sergeant for the entire west region.

Q. Okay. West. And in the area where this hot spot occurred, that was the northwest region, correct?

A. Yes, sir, that's correct.

Q. And the vehicle that was traveling south down Olive was traveling towards an area that would have been outside the northwest region, correct?

A. Correct. They were headed from the northwest towards the southwest side of town.

MR. LOWE: That's all I have. Thank you, Sergeant.

THE WITNESS: Yep, thank you.

EXAMINATION

BY MR. SMITH:

Q. Good morning, Sergeant. My name is Joseph Smith. I'm one of the attorneys for the City of South Bend in this lawsuit. How are you?

A. Good. How are you, sir?

Q. Good. I have a few questions to follow up on some of the questions you've already been asked.

Earlier Mr. Phillips asked you some questions about some music playing in Officer Gorny's vehicle. Do you recall those questions?

A. I do, sir.
Q. Officer Gorny testified in this case that the music came on during the crash.
Do you have any reason to dispute his testimony that the music came on during the crash?
A. I would have no way of knowing when the music turned on, honestly.
Q. You mentioned earlier that there were circumstances when officers on the night shift may turn off their lights or sirens when responding to an emergency. Do you recall that?
A. Yes, sir.
Q. What circumstances would lead officers to turn off their lights or their siren?
A. We would utilize it mostly if we wanted to kind of hide our approach upon our initial making the area. Again, at night our lights travel a further distance.
If we weren't trying to kind of broadcast to any type of criminal activity that was going on that the police were kind of in the area or going to that area, those would be reasons why we would turn off our lights and sirens or not utilize them in the first place depending on our

proximity to the location of incident.

Q. If you were responding to an incident like that without your lights or your sirens, would you still be required to drive with due regard for the safety of all persons?

A. Correct. We would.

Q. And you understood in July of -- on July 20, 2018 you understood that to be the policy of the City of South Bend, that you still had to use due regard at that time?

A. Correct.

Q. I want to show you an exhibit. One moment, please.

All right. Do you see the document on your screen with title "Policy 308. Officer Response to Calls"?

A. Yes, sir, I do.

(Reporter Note: Exhibit 16B referenced)

BY MR. SMITH:

Q. I will represent to you that this was -- this is a policy that was in place on July 20, the date of this incident.

A. Okay.

Q. Directing your attention to the second paragraph under 308.3.1, "Emergency Calls," it reads, "Members may disable the siren only if the call requires a 'silent' response. If running 'silent,' then the officer must exercise extra caution for motorists and pedestrians. The vehicle emergency lighting shall be operated at all times when the siren has been disabled."
Did I read that correctly?
A. Yes, sir, you did.
Q. So, according to the policy, South Bend officers could disable their lights in responding to certain circumstances but not the emergency lights. Is that correct?
A. Yeah, the lights shall remain on but the sirens can be disabled.
Q. In July of 2018 did you understand from your training that you were required to operate your emergency vehicle with due regard for the safety of all persons?
A. Yes, sir.
Q. Did you understand that you were required to drive your emergency vehicle with due regard for the safety of all persons at all times?

A. Yes, sir.
Q. And at all times includes during emergency runs?
A. Yes, sir.
Q. In July of 2018 did you understand from your training that you needed to clear intersections when driving in emergency mode?
A. Yes, sir.
Q. Did you understand from your training in July of 2018 that it was particularly important to clear intersections when driving an emergency -- in emergency mode if it was a blind intersection?
A. Yes, sir.
Q. So, just for the record, do you understand what I mean when I say "blind intersection"?
A. Yeah, an intersection where from a distance I can't clear the intersection safely to proceed.
Q. I have something else, some audio that I'd like to play for you. Give me a moment here to bring that up.
MR. PHILLIPS: Guys, can you hear me?
MR. SMITH: Steve? Is that you, Steve?

MR. QUINN: We're good, Joe.
MR. SMITH: Okay. All right.
(WHEREUPON, the audio clip marked as Exhibit 101 was played.)
BY MR. SMITH:
Q. Are you able to hear that, sir?
A. I can hear it, yes.
Q. Okay. Are you able to understand what they're saying?
A. Something about -- I heard them saying that they were loading somebody up, if we could catch intersections.
Q. All right. It's up as loud as it can get. So, listen carefully and I will play it again.
(WHEREUPON, the audio clip marked as Exhibit 101 was played.)
BY MR. SMITH:
Q. Did you hear someone say "It goes without saying, drive with due regard, please"?
A. Correct, I did.
Q. Was that -- do you believe that was you or another officer?
A. If you could play it back one more time

I, CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was waived;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested dire[illegible] the outcome of this action.

Corinne T. Marut

__________________________________

CORINNE T. MARUT, Certified Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)