IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

SORAIDA FLORES, as Personal )
Representative of the Estate )
of ERICA FLORES, deceased, ) Case No.
) 2:19-cv-00064-JTM-JPK
Plaintiff, )
)
-vs- )
)
CITY OF SOUTH BEND, a )
municipal corporation, and )
JUSTIN GORNY, )
)
Defendant. )

# VIDEO DEPOSITION OF CHIEF SCOTT RUSZKOWSKI

The video deposition upon oral examination of CHIEF SCOTT RUSZKOWSKI, a witness produced and sworn before Wendi Kramer Sulkoske, Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Plaintiff at Anderson, Agostino & Keller, 131 South Taylor, South Bend, St. Joseph County Indiana on August 29, 2022, pursuant to the Federal Rules of Civil Procedure.

**Exhibit J**

APPEARANCES

FOR THE PLAINTIFF:
(Via Zoom Videoconference)
PHILLIPS LAW OFFICES
Stephen D. Phillips
Terrence M. Quinn
Michael Phillips
161 North Clark Street, Suite 4925
Chicago, Illinois 60601
sphillips@phillipslegal.com
tquinn@phillipslegal.com

FOR THE DEFENDANT:

ANDERSON AGOSTINO & KELLER
Peter J. Agostino
Stephanie L. Nemeth
131 South Taylor Street
South Bend, Indiana 46601
nemeth@aaklaw.com
agostino@aaklaw.com.

CITY OF SOUTH BEND
Assistant Legal Counsel
Kylie Connell

ALSO PRESENT: Tom Temple, Videographer

EXAMINATION INDEX

| | Page |
|---|---|
| EXAMINATION | |
| QUESTIONS BY MR. STEPHEN D. PHILLIPS | 5 |

EXHIBIT INDEX


| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Video | 76 |
| Exhibit 1-B | Policy 320.4 | 9 |
| Exhibit 2 | Photograph | 17 |
| Exhibit 2-A | Photograph | 16 |
| Exhibit 3 | Photograph | 17 |
| Exhibit 3-A | Photograph | 16 |
| Exhibit 4 | Photograph | 17 |
| Exhibit 4-A | Photograph | 16 |
| Exhibit 6 | Chief Ruszkowski Statement | 18 |
| Exhibit 7 | Chief Ruszkowski Statement | 18 |
| Exhibit 9 | Policy 320.5(i) | 19 |
| Exhibit 10 | Policy 320.5.8(j) | 20 |
| Exhibit 12 | Chief Ruszkowski Testimony | 64 |
| Exhibit 13 | Gorny Performance Policy Violations | 19 |
| Exhibit 14 | Policy 320.5.10(a) | 21 |
| Exhibit 15 | Policy 320.5.10(f) | 21 |
| Exhibit 16 | Policy 320.5.10(g) | 21 |
| Exhibit 17 | Officer Gorny Conduct | 22 |
| Exhibit 18 | Officer Gorny Safety Policy Violations | 20 |
| Exhibit 19 | Officer Gorny Conduct Safety Belts | 25 |
| Exhibit 22 | Officer Gorny Conduct Emergency Calls | 22 |

## EXHIBIT INDEX

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 23 | Officer Gorny Conduct Emergency Calls | 22 |
| Exhibit 24 | Officer Gorny Conduct Safety Policy | 23 |
| Exhibit 25 | South Bend Safety Policy | 23 |
| Exhibit 26 | Officer Gorny Conduct | 23 |
| Exhibit 43 | Lesson Plan Pursuit Policy | 70 |
| Exhibit 44 | Lesson Plan Emergency Vehicle Operation | 72 |

VIDEOGRAPHER: We are now on the record. My name is Tom Tempel. I'm the videographer for Golkow Litigation Services. Today's date is August 29, 2022. The time is 1:12 p.m. This is in the matter of Flores versus City of South Bend.

The deponent is Scott Ruszkowski. The court reporter is Wendy Sulkoske. I will now, and she will now swear in the witness.

CHIEF SCOTT RUSZKOWSKI

the witness herein, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION,

QUESTIONS BY MR. STEPHEN D. PHILLIPS:

Q Would you please state your full name and spell your last name?

A Scott Ruszkowski. R-U-S-Z-K-O-W-S-K-I.

Q Are you still the chief of police for the City of South Bend, Indiana?

A Yes, sir.

Q How long have you been the chief of police?

A Since October 1, 2015.

Q Would you tell us what your duties and responsibilities are as chief of police?

A Overall oversight of all personnel, budget,

Q True? Let's go to Exhibit 24.
It was your professional conclusion that Officer Gorny violated Safety Policy 308.5 as listed on Exhibit 24, true?
A Yes.
Q Go to Exhibit 25, please. It is your professional conclusion that Officer Gorny violated the safety policy as described on Exhibit 25, correct?
A Yes.
Q Go to Exhibit 26, please. It is your professional conclusion that the conduct listed on Exhibit 26 was a violation of the safety policy, right?
A Yes.
STEPHEN D. PHILLIPS: You can take that down, Michael.
Q Sir, this was a signal ten call, correct?
A No, I don't believe it was.
Q What is a signal ten call?
A So a call when there is emergency assistance needed. That was -- my opinion is I didn't think it warranted a signal ten, which is lights and siren.
Q Okay. This was a traffic stop and a traffic stop is not a signal ten, correct?
A Well, you do use lights and/or siren if you are

making a traffic stop if the vehicle does not stop with the lights alone.

So there are two different time lines here. The traffic stop itself, or those responding to the traffic stop.

Q Well, a signal ten call is an emergency call, right?

A Yes.

Q There is no such thing as a signal ten call without the operation of continuous emergency lights, correct?

A Yes.

Q That is the policy of the City of South Bend, correct?

A Correct.

Q So if Officer Gorny thought this was an emergency call, his thought, he was required under the policies of South Bend to use continuous emergency lights, correct?

A Yes.

Q And it was your impression that Officer Gorny did not operate the lights and siren continuously during this call, correct?

A Yes.

Q And it is your policy at South Bend that lights

and sirens must be used during an emergency call, right?
A Correct.
Q And it is the policy of South Bend that when operating vehicles in emergency mode the law holds officers legally responsible to drive with due regard for the safety of all people, right?
A Yes.
Q Now, as part of your investigation in this case you reviewed vehicle data regarding Officer Gorny's police car, correct?
A Yes.
Q And in the five seconds prior to this occurrence Officer Gorny's speed was as high as ninety-eight miles per hour, right?
A Yes.
Q And it was your conclusion that he did not sufficiently decrease his speed to a safe level before proceeding into that intersection where this collision occurred, right?
A Yes.
STEPHEN D. PHILLIPS: Michael, can we pull up Exhibit 19, please?
Q It was your conclusion after your investigation that Officer Gorny violated the policy that is

others, mechanics. Maybe our people who install our lighting equipment would be another one.

And if the officers are not familiar, they would ask to have that specified for them.

Q Who was that motor pool person? Was that Mr. Simmons?

A Yes, sir. Bob Simmons.

Q It is correct that the highest speed training that Officer Gorny and the other officers received for high speed driving was fifty miles an hour, correct?

A No.

Q Where else did the officers receive high speed driving training? I'm talking about behind the wheel.

A The Indiana Law Enforcement Academy.

Q And where is that?

A Down in Plainfield, Indiana.

Q And would that have been when Officer Gorny was actually going through the academy?

A Yes.

Q Since leaving the academy would Officer Gorny have any training driving at speeds over fifty miles an hour?

A I can't say whether he did or didn't. I have. I

would assume other officers, including himself, would have as well.

Q Well, let's go back to Officer Gorny.

Do you know whether Officer Gorny had any additional training driving over fifty miles an hour after he left the police academy?

A Quite frankly, the answer is yes and no. I don't know what speeds he reached at the track that we use to do our emergency vehicle yearly training.

I know I have reached fifty or over on some of the courses that I have been through, which is the same that all of the other officers go through.

Q Let me back up and stick to Officer Gorny.

Do you know what the highest speed was Officer Gorny obtained since he started working at the City of South Bend with regard to high speed training?

Do you know his highest speed?

A I do not.

Q The training, the high speed training that officers got at the City of South Bend after they left the academy was out at the Tire Rack parking lot, correct?

A Yes.

Q And was it your understanding that officers at the Tire Rack for their additional training would receive training over fifty miles an hour from 2015 to the time of this occurrence?

A Some -- again, the speeds vary based on the way the course is designed. So there could be a long straightaway that they do have at the Tire Rack. I know I have reached speeds in excess of fifty on that before and other times not.

Again, the courses vary each time. So it depends on, you know, on the vehicle, the officer's knowledge and experience, their own. Then, again, what type of course is set up. Some are very short courses where you may only be able to do forty-five or fifty.

Other ones, like I said, I know I have been over sixty like in a straightaway maybe going into, you know, a curve or threshold braking or something of that nature.

So I don't -- each officer varies based on their capacity of their vehicle and their experience.

Q What is your understanding of the highest speeds that are obtained during the training at the Tire Rack in 2015 to the time of this occurrence?

Western and Kaley were operational as far as traffic approaching with the sensors?

A I'm trying to think back. From the internal investigation I believe all of the lights were operating appropriately.

Q Well, let me go back for a minute. There are two ways that the lights could have been operating at Kaley and Western. They could either be on a set cycle. Do you agree with that?

A I don't have firsthand knowledge of that, but that is reasonable.

Q Or the second way that the lights at Kaley and Western could have been operating was based on a sensor system as cars approached the intersection, agreed?

A That as well, yes.

Q Do you know which was operational at the time of this occurrence and shortly thereafter, whether the sensors were working for traffic on Kaley and Western, or whether it was set on a fixed cycle?

A I do not.

Q Did anybody ever tell you anything about that?

A I do not believe so. No, I cannot recall if they did.

Q All right.

MR. STEPHEN D. PHILLIPS: I just need a couple minutes to talk to my guys and see what they have in store for me. Okay.

VIDEOGRAPHER: We are going off the record at 3:21 p.m.

(AT THIS TIME A SHORT RECESS WAS HELD OFF THE RECORD AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

VIDEOGRAPHER: We are back on the record at 3:26 p.m.

BY MR. STEPHEN D. PHILLIPS:

Q We just took another break, did we not?

A Yes, sir.

Q Did you have a private conversation with the lawyers for South Bend again?

A Kind of. Nothing about this. It was something totally different.

Q Well, I'm not getting into what you talked about. I just want to know during the break did you have a private conversation with the lawyers from South Bend?

A No. I did not have a conversation with the lawyers, no.

Q When officers were training in 2016, 2017, and 2018, was there a minimum amount of time that they

needed to be on the track at the Tire Rack?
A No. It was based on their comfort on completing that course successfully.
Q So the answer to my question is, no, there was not a minimum time, correct?
A Correct.
Q By the way, the course at the Tire Rack, that is just simply set up with cones in the parking lot, correct?
A No.
Q What else is it?
A It is an actual track itself, not a parking lot. It is a track designed for vehicles, specific vehicles. For race vehicles actually.
Q So the track at the Tire Rack is not the parking lot?
A Correct.
Q There is an actual track?
A Yes.
Q What is the -- what is the length of the track at the Tire Rack?
A I have no idea overall. I'm guessing by looking at, you know, the pavement and the areas, probably overall a quarter mile. Maybe a half mile total road surface.

Q Do people actually race on the track --
A Yes.
Q -- at the Tire Rack?
A Yes, sir.
Q What kind of races are done there?
A They do anything from go-carts to some of the, I don't know what they call them where you do like a late model, I think is what they are called. Not spectator-wise, but they have car clubs and sports vehicles, like, I don't know, Ferraris and Mini Coopers that are used at that track.
Q Is there any limitations on the speed that the police officers are allowed to get up to on that track?
A Well, it is about having control of the vehicle and navigating the course. So whatever speed that officer can do that safely at without hitting cones or crashing the vehicle, that is what we are looking for, just like they do on the track.
Q My question is, is there a speed limit that you do not allow officers to go faster than during their training on the Tire Rack track, a speed?
A No. Again, each officer is different in their speed. Some could be low. Some could be sixty or seventy.

STEPHEN D. PHILLIPS: That's all that I have for now.

MR. AGOSTINO: One minute. We don't have to go off the record here.

We will read and sign. No questions.

VIDEOGRAPHER: We are going off the record at 3:30 p.m.

COURT REPORTER: Would you like a copy?

STEPHEN D. PHILLIPS: I will order it transcribed. Etran I guess.

MR. AGOSTINO: Etran.

AND FURTHER DEPONENT SAITH NOT

______________________________

CHIEF SCOTT RUSZKOWSKI

STATE OF INDIANA )
) SS:
COUNTY OF BOONE )

I, Wendi Kramer Sulkoske, Notary Public in and for said county and state, do hereby certify that CHIEF SCOTT RUSZKOWSKI, the deponent herein was by me first duly sworn to tell the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiff at the time and place heretofore mentioned with counsel present as noted.

That the deposition was taken down in Stenograph notes, reduced to typewriting under my direction, is a true record of the testimony given by said deponent, and was thereafter presented to the deponent for signature.

That this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of any of the parties or otherwise interested in the event of this action, and am not in the employ of the

attorneys for the respective parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 6th day of September, 2022.

Wendi Kramer Sulkoske, Notary Public

Commission Number NP0661030

My commission expires December 1, 2022.

My County of residence is Boone.