UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, | ) ) ) | |
| PLAINTIFF, | ) ) | |
| v. | ) ) | Cause No. 2:19-cv-64-PPS |
| CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY, | ) ) ) | |
| DEFENDANTS. | ) ) | |

**CITY OF SOUTH BEND'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT**

Defendant CITY OF SOUTH BEND, by and through one of its attorneys JOSEPH W. SMITH of CLARK JOHNSON & KNIGHT, LTD., moves to exclude testimony of Plaintiff's expert Dr. Scott M. Mourtgos, Ph.D., and in support thereof states:

**I.    INTRODUCTION.**

Plaintiff has disclosed a police practices expert, Dr. Scott M. Mourtgos, Ph.D., as a person who will give expert opinion testimony under FRE 702 concerning generally-accepted law enforcement practices and Defendants' failure (so Dr. Mourtgos opines) to comply with generally-accepted law enforcement practices in the training and discipline of officers regarding emergency vehicle operations.  Dr. Mourtgos' opinions are inadmissible because they are immaterial, they do not satisfy the reliability requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny, and they would confuse the issues and mislead the jury.

The applicable constitutional standard asks whether South Bend provided no training at all regarding constitutional standards in recurring situations involving an obvious risk of constitutional violations, or whether South Bend failed to provide additional training in response

to a pattern of similar constitutional violations.  *See* Memo. in Supp. of Defs. Jt. Mot. for Summ. Judgment at 17-21.  Whether South Bend's training was consistent with generally-accepted law enforcement practices is not the constitutional standard.

Dr. Mourtgos did not apply reliable methodology.  He expresses his own personal opinions and claims, without any support, that they reflect generally-accepted law enforcement standards. Dr. Mourtgos also failed to distinguish between generally-accepted law enforcement standards and best practices.  By not distinguishing between generally-accepted law enforcement standards and best practices, Dr. Mourtgos' testimony would suggest to the jury that South Bend is liable for its officers' constitutional violations if it does not employ the best practices within the field of law enforcement.  Dr. Mourtgos' opinions are also based on data on which, by his own admission, a reasonable expert in the field would not rely.

Dr. Mourtgos should be barred from opining that anything that South Bend did or did not do was deliberately indifferent or is evidence of deliberate indifference.  This testimony is outside the scope of Mourtgos' expertise, a conclusion of law, and unhelpful to the jury.  The Court should also bar Dr. Mourtgos from testifying about whether South Bend should have concluded that its officers violated South Bend Police Department policies when engaging in pursuits.  Dr. Mourtgos may testify as to the credibility of witnesses, which is improper for any witness, including experts.

Finally, the Court should bar Dr. Mourtgos' opinions because there is no evidence that South Bend's policymakers were aware of the alleged deficiencies in South Bend's officer training and supervision.

The Court should therefore bar Plaintiff's expert Dr. Mourtgos from giving expert testimony on these issues, in the event that this action survives to trial.

## II.   DR. MOURTGOS' OPINIONS.

Dr. Mourtgos' report is extensive—173 pages in length, including his two-page supplemental report. *See* Exhibit A (initial report); Exhibit B (supplemental report). He comments on nearly every aspect of South Bend's police officer training and supervision related to pursuits and other emergency vehicle operations. However, his opinions can generally be summarized as "*South Bend did not do X, and this was deliberately indifferent and violated generally-accepted law enforcement practices.*" Specifically, Dr. Mourtgos opines in his report:

1. South Bend's training and supervisions of its police officers did not comply with generally-accepted law enforcement practices in the following ways:

   a. Not addressing a 30 mph discrepancy between Officer Gorny's reported speed during a pursuit and his actual speed during that pursuit. Exhibit A at 70; *see also* Exhibit A at 102, 111-12.

   b. "[F]ailing to properly train and retrain Officer [*sic*] in light of his numerous IA alerts,[1] numerous pursuits both within policy and outside of policy, his misrepresentations/misperceptions in his pursuit reports as well as the other reasons stated herein." Exhibit A at 57.

   c. Its process for formal reviews of pursuits. Exhibit A at 62-63; *see also* Exhibit A at 147.

   d. Not enforcing a 60 mph speed limit for pursuits, even though he recognizes that there is no evidence that South Bend had a 60 mph speed limit for pursuits. Exhibit A at 98-100; *see also* Exhibit A at 109, 121-22, 152; Exhibit C at 210:6-22.[2]

   e. Not suspending officers "for excessive speed or improper responses to emergency calls, traffic stops, or pursuits…." Exhibit A at 112-13.[3]

---

[1] If a South Bend officer had a certain number of pursuits, uses of force, or other incidents during a twelve-month period, an alert would be generated by the Department's internal affairs software. The Department would then discuss the alert with the officer. An alert is generated without regard to whether the officer had done anything wrong during any of those incidents. An alert therefore does not establish that an officer did anything wrong. Exhibit C at 140:5-20.

[2] Dr. Mourtgos conceded in his deposition that, if South Bend did not have a policy limiting pursuit speeds to 60 mph, it would not be deliberately indifferent not to enforce that (non-existent) policy. Exhibit C at 211:6-21.

[3] Dr. Mourtgos has not identified any circumstances where he believes that a South Bend officer should have been suspended for excessive speed or improper responses to emergency calls, traffic stops, or pursuits. He opines only that South Bend generally should have imposed more severe consequences on officers who violated policy.

  f. Not comparing its vehicle crashes to national data or statistics.  Exhibit A at 130.

  g. Not imposing "strong discipline" related to the 261 pursuits identified in the IAPro database as "not justified" and "not within policy," if that list is accurate.  Exhibit A at 156.[4]

  h. Not suspending officers for at-fault accidents.  Exhibit A at 165.[5]

2. The following is evidence that South Bend was deliberately indifferent:

  a. South Bend's "contradictions in training and supervision" of Officer Gorny.  Exhibit A at 44.

  b. Officer Gorny playing music as he drove down Western.  Exhibit A at 45; *see also* Exhibit A at 135.[6]

  c. The "we chase them" statement in the video recording of the classroom training session, *see* Defs. Jt. Mot. for Summ. Judgment, Exhibit C-101. Exhibit A at 97; *see also* Exhibit A at 149.

  d. The Assistant Chief's testimony about the "we chase them" statement. Exhibit A at 108.

  e. The fact that Captain Fulnecky was not aware of the "we chase them" statement in the training video.  Exhibit A at 150.

  f. The "bored you" statement in the video recording of the classroom training session, *see* Defs. Jt. Mot. for Summ. Judgment, Exhibit C-101. Exhibit A at 97-98; *see also* Exhibit A at 150.[7]

  g. The Assistant Chief's testimony about the "bored you" statement. Exhibit A at 109.

---

[4] The undisputed evidence demonstrates that this list *is not* accurate.  *See* Exhibit C at 244:18 – 246:13.  Dr. Mourtgos simply disregards that evidence.  *See* Exhibit C at 245:11 – 247:12.

[5] The undisputed evidence establishes that South Bend did impose discipline on its officers for at-fault accidents. Dr. Mourtgos refers specifically to *suspensions*.  However, Dr. Mourtgos also testified that loss of take-home car privileges may be an appropriate punishment for officers who have been involved in an at-fault accident.  Exhibit C at 184:24 – 185:11.

[6] Dr. Mourtgos' belief that Officer Gorny was playing music as he drove down Western is based on Dr. Mourtgos' improperly weighing Officer Gorny's credibility.  *See* No. 3.b, below.

[7] Dr. Mourtgos misrepresents this statement as "Sorry that I bored you to death," *see* Exhibit A at 97, but that is not what the trainer said.  *See* Exhibit C at 214:2 – 215:22.

h. The Assistant Chief's testimony that he would not advise officers not to drive 90-98 mph through a blind intersection when not pursuing someone. Exhibit A at 111.[8]

i. Chief Ruszkowski's testimony about differences in how South Bend officers utilize their lights and sirens during the day versus at night. Exhibit A at 91-92.

j. The fact that no South Bend officer has been "suspended for excessive speed or improper responses to emergency calls, traffic stops, or pursuits." Exhibit A at 112-13.

k. Sergeant Hiipakka's testimony "that it was common practice for officers to cut off their lights and sirens before arriving on the scene of certain incidents, [although] officers were still required to drive with due regard for the safety of all persons." Exhibit A at 126-27; *see also* Exhibit A at 155.[9]

l. Not comparing its officer vehicle crashes to national data or statistics. Exhibit A at 130.

m. Captain Schweizer's notes about certain Pursuit Review Committee meetings. Exhibit A at 140, 157, 164; *see also* Exhibit B at 2.

n. Officer Alfrey's testimony that "he did not believe that the speed of police vehicles during high-speed operations at times placed innocent people and bystanders at risk…." Exhibit A at 153.

o. No formal training on when to initiate and when not to initiate emergency calls under the Department's emergency calls policy. Exhibit A at 156.

p. The absence of any "strong discipline" related to the 262 (actually, 261—*see* Exhibit A at 138-140) pursuits identified in the IAPro database as "not justified" and "not within policy," if that list is accurate. Exhibit A at 156.

---

[8] Dr. Mourtgos misrepresents the Assistant Chief's testimony. The Assistant Chief testified that he would advise officers to "use caution," which Dr. Mourtgos omitted from his report. *See* Exhibit C at 229:16 – 234:3

[9] Despite calling this evidence of deliberate indifference, Dr. Mourtgos conceded in his deposition that Sergeant Hiipakka's testimony accurately describes the different effects of lights and siren during daytime and nighttime use, that Sergeant Hiipakka accurately testified that there are certain types of calls where alerting the suspect to the approach of law enforcement could increase the danger to someone, and that it is not uncommon for policies to provide that sirens need not be used in such circumstances. *See* Exhibit C at 235:16 – 239:11. Sergeant Hiipakka's testimony also does not establish that officers are not using extra caution when responding without their siren as required by South Bend policy. *See* Exhibit C at 158:6-24.

q.   The absence of suspensions for officers' for at-fault accidents.  Exhibit A at 164-65.[10]

r.   The fact that Officer Gorny had been involved in three pursuits prior to July 20, 2018 that had resulted in property damage.  Exhibit B at 2.

3.   Credibility determinations:

a.   Officer Gorny's testimony that he did not activate his siren for tactical reasons "makes absolutely no sense."  Exhibit A at 37.

b.   Officer Alfrey's testimony that Officer Gorny was playing musing as he drove down Western is more believable than Officer Gorny's testimony that he *was not* playing music.  Exhibit A at 45; *see also* Exhibit C at 148 (Officer Gorny's testimony that he did not have his radio on during this event "seems less likely than the other").

c.   Captain Herron's testimony that it was not South Bend's usual practice to check the "yes" boxes in the IAPro database if a pursuit was found to be justified and within policy "does not make a lot of sense to me."  Exhibit C at 172:4-16; *see also* Exhibit C at 246:1-5 (testifying that Captain Herron "didn't appear to be very clear on some of these processes, so he could inadvertently be wrong about some of the things he said on those"), 316:1-15 (testifying that Captain Herron "seemed to be confused about a lot of the processes that he described").

4.   Officer Gorny was reckless, shocked the conscience, and violated South Bend Policies and generally accepted police principles and practices.  Exhibit A at 38-39, 41.

5.   South Bend's failure to properly train Officer Gorny caused or contributed to an Officer Gorny engaging in an unnecessary high-speed vehicle operation that displayed deliberate indifference to a known risk of safety to the public that shocks the conscience.  Exhibit A at 20, 147-48, 156.

6.   Flores' Fourteenth Amendment rights were clearly-established in July 2018.  Exhibit A at 168.

## III.   ARGUMENT.

Expert opinion testimony is admissible under Rule 702 where (1) the witness is qualified, (2) the testimony will assist the trier of fact, and (3) the methods employed are reliable.  Fed. R.

---

[10] It is undisputed that South Bend disciplined officers for at-fault accidents.  Dr. Mourtgos' Report refers specifically to *suspensions* for at-fault accidents, as opposed to loss of take-home car privileges, reprimands, or remedial training.

Evid. 702; *Daubert*, 509 U.S. at 591-93. In applying these standards, District Courts exercise a "gatekeeping" function to ensure that a testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "The purpose of the [*Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) (second alteration in original). Whether to admit expert testimony rests within the discretion of the Court. *See G.E. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### A. DR. MOURTGOS' OPINIONS LACK RELIABLE METHODOLOGY AND WILL NOT ASSIST THE JURY.

"An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion formed by the witness' expertise) rather than simply an opinion broached by a purported expert." *U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) (emphasis in original), *amended on unrelated grounds*, 957 F.2d 301. "Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403." *U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). "'A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.'" *Lewis*, 561 F.3d at 705 (quoting *Clark v. Takata*

*Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)).  An expert cannot merely assert a "bottom line" or provide testimony based on subjective belief or speculation.  *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (citing *U.S. v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (rejecting testimony of expert witness who "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so.'")).  "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702, advisory committee note to the 2000 amendment.

### 1. DR. MOURTGOS' OPINIONS ABOUT LAW ENFORCEMENT PRACTICES ARE UNRELIABLE UNDER FRE 702, WOULD CONFUSE THE ISSUES, AND WOULD MISLEAD THE JURY.

Dr. Mourtgos' opinions that South Bend did not comply with generally-accepted law enforcement practices are inadmissible because they are not based on reliable methodology.  While Dr. Mourtgos ostensibly bases his opinions on generally-accepted law enforcement standards, a closer examination reveals that this is not the case.  Dr. Mourtgos repeatedly accuses South Bend of violating generally-accepted law enforcement standards, but he fails to make any distinction between *standards* and *best practices*.  Exhibit C at 44:21 – 52:6, *& esp.* 51:25 – 52:6 ("Q. Are best practices and generally accepted practices the same thing in your opinion? … A. Based off of what you've shown me in this and how we seem to be talking about it, I think we're talking about the same thing here."), 66:24 – 69:14.  Dr. Mourtgos testified that he had never even considered the possibility that there may be a distinction between industry standards and best practices.  Exhibit C at 44:9-17.  He goes so far as to testify that it is "reckless" for an agency "not to follow generally accepted practices—insert best practices."  Exhibit C at 51:11-18; *see also* Exhibit C at 51:19-24 ("It is reckless not to align with generally accepted practices.").  Dr.

Mourtgos' report is replete with examples of things that he says[11] South Bend could have done better in training or supervising its officers, and slapping a "deliberately indifferent" label to those purported deficiencies, without any basis for his opinion other than his own *ipse dixit*. *See supra* at 3-5. That is not reliable methodology.

Generally-accepted standards are not the same thing as best practices. They cannot be. There is a reason why best practices are called "best" practices. Best practices go over and above standards. Standards are *must*-do's. Best practices are *should*-do's. There may be a whole range of practices that, although they may not be "best," they are considered acceptable in the law enforcement community. This is demonstrated by the very publications on which Dr. Mourtgos bases his opinions. The Police Executive Research Forum ("PERF") identifies its guide for vehicle pursuits as a "best practices" guide. It explicitly states, many times, that it is a "best practices" guide. Exhibit C-4 at xi, 1, 10, 11, 14, 23, 24, 47, 80. The PERF pursuits guide gives a series of "recommendations." Exhibit C-4, *passim*. Nowhere does it say that agencies are acting contrary to generally-accepted standards by not adopting its recommendations.[12] The PERF pursuits guide also describes PERF as an organization that "identifie[s] *best practices* on fundamental issues such as police use of force." Exhibit C-4 at 143 (emphasis added). Confronted with this, Dr. Mourtgos again refused to recognize any distinction between generally-accepted standards and best practices. Exhibit C at 51:2-10. The standards-versus-best practices distinction is further made

---

[11] Or, where the attorneys for the Estate say. Dr. Mourtgos testified that the attorneys for the Estate helped him write his report. Exhibit C at 12:1-13. Shockingly, Dr. Mourtgos could not say what parts of the report *he* wrote and what parts of the report *the attorneys for the Estate* wrote. Exhibit C at 12:6-13. Thus, it appears that Dr. Mourtgos is acting merely as the "mouthpiece" for the Estate's attorneys, which is "unacceptable." *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 324 & n.5 (N.D. Ill. 2008). Because Dr. Mourtgos cannot say what parts of his report he authored, and what parts of his report the Estate's attorneys authored, there is no way for the Court to determine whether Dr. Mourtgos supplied any of his own expertise to his opinions, or whether he is simply parroting what the Estate's attorneys have told him to say. Yet another reason why the Court should exclude Dr. Mourtgos.

[12] Additionally, South Bend notes that this guide was published in 2023, years after this event, so Plaintiff could not argue in this action that South Bend was deliberately indifferent for not adopting any recommendation contained therein.

explicit in the PERF pursuits guide where it recommends that agencies adopt a "restrictive" pursuit policy, allowing pursuits only where the suspect is wanted for a violent crime, but acknowledges that other pursuit policies are also acceptable. Exhibit C-4 at 20-21 (discussing different types of pursuit policies, "Agencies must determine their pursuit philosophy and decide who should manage risk to select the pursuit policy that best fits their culture, goals, and risk tolerance."), 30 ("this guide recommends that pursuits be authorized only for a suspect wanted for a violent crime"). By contrast, the PERF guide states that "[a]gencies *must* train supervisors how to assess the initial pursuit information using a critical decision-making model to determine whether the pursuit is justified," Exhibit C-4 at 4 (emphasis added), indicating that, at least in PERF's opinion, this is a requirement of all police agencies, not simply a recommendation—a *must*-do, not a *should*-do.

Another stark example: Another document on which Dr. Mourtgos cited in his report in support of generally-accepted law enforcement standards states explicitly that it "*is not intended to be a national standard by which all agencies are held accountable, and agencies are not required to institute*" it. Exhibit C-5 at 5 (emphasis in original). The document further recognizes that the U.S. Constitution and state law, not the model policy, govern law enforcement conduct. Exhibit C-5 at 6. Despite these emphatic statements to the contrary, Dr. Mourtgos nevertheless holds this document out as an example of generally-accepted practice, and believes that law enforcement agencies are violating generally-accepted law enforcement standards and acting recklessly and deliberately indifferently if their use-of-force policies do not match the model policy expressed in that document. Exhibit C at 59:2 – 66:22. Dr. Mourtgos twists best practices recommendations into industry standards, rejecting any suggestion that there may be a difference

between the two. That is not a reliable methodology for establishing industry standards. It is junk social science that has no place in a federal courtroom.

Dr. Mourtgos opines that, unless an agency adopts all industry best practices, they are acting recklessly and are deliberately indifferent to the rights of the public. This testimony would confuse the issues and mislead the jury into believing that, unless South Bend complied with every single best practice identified by Dr. Mourtgos, South Bend is liable for any constitutional violation committed by its officer. That would improperly encourage the jury to impose *respondeat superior* liability on South Bend. The Court should bar Dr. Mourtgos' opinions because it would confuse the issues and mislead the jury.

Whether South Bend complied with best practices or generally-accepted law enforcement standards is, of course, not the constitutional standard. A jury could not impose liability on South Bend simply because South Bend did not live up to the best practices in the field. A jury could not impose liability on South Bend if it had failed to adhere to law enforcement standards for officer training, either. The Constitution does not impose a duty on the government to comply with industry standards. That is a matter for state tort law. Under the constitutional standard, a governmental entity can be liable only for failure to train if it failed to provide any training *at all* on the constitutional limitations applicable to recurring situations where the risk of a constitutional violation is obvious, or where there was a pattern of similar constitutional violations, but the governmental entity was deliberately indifferent to the need for additional or different training. *See* Memo. in Supp. of Defs. Jt. Mot. for Summ. Judgment at 17-21. The Court should bar Dr. Mourtgos' opinions because they are irrelevant to the issues in the case, they are not supported by reliable methodology, they would not assist the jury, and they would confuse the issues and mislead the jury.

Dr. Mourtgos' *ipse dixit* opinions are not the product of reliable methodology. Most of the "generally-accepted law enforcement practices" that Dr. Mourtgos discusses in his Report are pulled out of the air. He can cite no publication or any other evidence for them. They are simply made up. For example, his opinion that South Bend was deliberately indifferent and violated generally-accepted law enforcement standards by not imposing more severe discipline for officers' at-fault accidents. Exhibit C at 194:3-6. He can cite no publication or other evidence in support of his opinion that South Bend was deliberately indifferent for not imposing stricter discipline on officers who violated South Bend policy during a pursuit. Dr. Mourtgos can cite no publication or any other evidence for his opinion that listening to music during emergency vehicle operations is a violation of generally-accepted law enforcement standards. He can cite no publication or other evidence in support of his opinion that South Bend was deliberately indifferent for not confronting Officer Gorny about the 30 mph discrepancy in one of his pursuit reports.[13] He cites no publication or any other evidence for his opinion that South Bend violated generally-accepted practices by not comparing its departmental vehicle accidents to national data. He cites no publication or any other evidence in support of his opinion that it is deliberately indifferent for a police officer to have music on in their vehicles while responding to an emergency. He can cite no publication or other evidence in support of his opinion that South Bend violated generally-accepted law enforcement practices in not imposing stronger discipline for officers' at-fault accidents. Exhibit C at 188:4-8. He can cite no publication or other evidence in support of his opinion that South Bend was deliberately indifferent to public safety because of the humor employed by the trainer in the recorded classroom EVO training session. He can cite no publication or other evidence in support

---

[13] Notably, Dr. Mourtgos has not identified a single other pursuit report where there was a significant discrepancy between the speed reported by the officer and the speed shown in the dash camera recording. Not just for Officer Gorny, but for *any* South Bend officer.

of his opinion that the "we chase them" and "bored you" statements would cause the officers being trained to believe that they did not have to follow the training that was provided in that video. These are Dr. Mourtgos' personal opinions, not expert opinions.  Additionally, Dr. Mourtgos is not a psychologist, so he lacks the expertise to opine about what influence the "we chase them" and the "bored you" statements may have on a person.  His opinion about that is no better than the jury's, and should be excluded.  *Thompson v. City of Chicago*, 472 F.3d 444, 457-58 (7th Cir. 2006) (affirming exclusion of expert testimony on issue where "[t]he jury, after having heard all of the evidence presented, was in as good a position as the experts" to decide factual issue).

Dr. Mourtgos' methodology is also unreliable because he relied on evidence that, by his own admission, a reasonable researcher in the field of law enforcement would not rely on.  In his report, he listed 261 pursuits for which the "pursuit justified" and "pursuit within policy" fields in SBPD's IAPro database said "no."  Exhibit A at 138-40.  However, the evidence establishes that it was not SBPD's usual practice to update the "pursuit justified" and "pursuit within policy" fields in the IAPro database once a determination had been made.  The evidence further established that the captain of the Office of Risk Management would only send a pursuit to the Pursuit Review Committee if he thought there was a potential policy violation—if he *did not* send a pursuit to the Pursuit Review Committee, that meant that he found the pursuit to be within policy.[14]  The list of 261 pursuits—which is most of the pursuits that South Bend officers engaged in from 1/1/2015 through 7/20/2018—conflicts with the Department' paper records in nearly every instance.  The Department did not even know that the IAPro printout would say "no" for the "pursuit justified"

---

[14] Dr. Mourtgos misrepresented this testimony in his report.  Dr. Mourtgos reported that the Captain of the Office of Risk Management would send a pursuit to the Committee if he "determined that a vehicle pursuit *was not within policy*."  Exhibit A at 61-62 (emphasis added).  That was not Captain Herron's testimony.  Captain Herron testified that the Captain of the Office of Risk Management would send a pursuit to the Pursuit Review Committee if there was a *possible* policy violation.  Exhibit C at 170:13 – 172:3.

and "pursuit within policy" fields if the "yes" checkbox was not checked in the IAPro data entry screen. Dr. Mourtgos simply rejected all of this uncontroverted evidence. He did so based on his own credibility determination about Captain David Herron's testimony. Dr. Mourtgos acknowledged in his deposition that a researcher in the field of law enforcement wants rely on the most reliable data available, and that it would not be reasonable for a researcher in the field of law enforcement to rely on a department's inaccurate database records instead of the department's more-accurate paper records. Exhibit C at 252:14 – 256:2. Accordingly, Dr. Mourtgos relied on the IAPro database printouts even though he had more accurate data available to him—the Department's paper records. By Dr. Mourtgos' own admission, a reasonable researcher would not have relied on the less-accurate data, so Dr. Mourtgos' opinions are inadmissible.

### 2. DR. MOURTGOS' TESTIMONY WILL CONFUSE THE ISSUES AND MISLEAD THE JURY.

FRE 403 provides that evidence is inadmissible if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. FRE 403 applies to expert testimony. *E.g., G.E. v. Joiner*, 522 U.S. at 148 (Breyer, J., concurring); *Thompson*, 472 F.3d at 457-58 (affirming exclusion of expert testimony under FRE 403). "[E]xpert testimony may be assigned talismanic significance in the eyes of the jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). Dr. Mourtgos' testimony that South Bend's officer training and supervision did not comply with generally-accepted law enforcement practices poses a substantial risk of confusing the issues and misleading the jury, and his testimony should therefore be excluded.

This lawsuit is not about whether South Bend complied with generally-accepted law enforcement practices. It is about whether Officer Gorny and South Bend complied with the Constitution. It is well-established that the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States…." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998); *see also Bublitz v. Cottey*, 327 F.3d 485, 490 (7th Cir. 2003). Whether or not the South Bend police department complied with whatever standards have been established by the law enforcement community is a matter for state tort law. Otherwise, the Fourteenth Amendment becomes simply a vehicle for state tort liability, which is a result that the Supreme Court has rejected time and time again.

Further, although Dr. Mourtgos ostensibly opines on generally-accepted law enforcement standards, he failed to make any distinction between standards and best practices. Expert testimony that South Bend failed to adhere to best law enforcement practices presents an even greater risk of confusing the issues and misleading the jury. The Seventh Circuit has held that professional standards may be relevant and helpful in a Section 1983 lawsuit if it "give[s] a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct…." *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013). Passing off best practices as generally-accepted law enforcement professional standards does not create a "baseline" to help the jury understand how a law enforcement agency deviated from law enforcement professional standards. It instead creates an artificial standard that police are not required to meet, either by professional standards or the Constitution. Dr. Mourtgos' unreliable opinions would only serve to confuse the jury, suggesting that South Bend is liable unless its training and supervision of its officers was beyond reproach.

Dr. Mourtgos does not offer a baseline for law enforcement agency training and supervision. He offers the best practices, and accuses South Bend of being deliberately indifferent for not implementing those best practices. That is neither relevant nor helpful for the jury on the constitutional question. Not only would it suggest that South Bend should be liable if its training and supervision of its officers was substandard, it would suggest that South Bend is liable if it did not employ the *best* training and supervision practices recognized by the law enforcement community. That imposes an impossible standard on governmental entities, a standard to which the law enforcement community would not hold any agency, and a standard that is far higher than the failure-to-train standards established by the Supreme Court. The Court should therefore bar Dr. Mourtgos' opinions that South Bend did not comply with generally-accepted law enforcement practices.

### B. Dr. Mourtgos' Opinions on Witness Credibility Are Inadmissible.

Dr. Mourtgos opines that Officer Gorny's testimony that he did not activate his siren for tactical reasons on July 20, 2018 is not credible. Dr. Mourtgos opines that Officer Gorny's testimony that he did not have his music on as drove down Western is not credible. Dr. Mourtgos opines that Captain Herron's testimony about the Pursuit Review Committee process is not credible. This testimony is inadmissible.

Assessing credibility is always the province of the jury, and an expert generally cannot testify that another witness' testimony should or should not be believed. "Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *U.S. v. Vest*, 116 F.3d 1179, 1185 (7th Cir. 1997) (some internal quotation marks omitted) (finding plain error in admitting expert testimony that the defendant's patients truthfully reported the symptoms that they reported to the defendant); *see also U.S. v. Hall*, 165 F.3d 1095, 1107 (7th Cir.

1999) ("the credibility of eyewitness testimony is generally not an appropriate matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses").

Dr. Mourtgos would testify that the jury should not believe certain testimony by Officer Gorny or by Captain Herron. This is improper, so Dr. Mourtgos should be barred from giving any opinions at trial that Officer Gorny's testimony that he did not turn on his siren for tactical reasons does not make sense, that evidence shows that Officer Gorny was listening to music as he drove down Western, or that Captain Herron is unfamiliar with the Pursuit Review Committee process.

### C. DR. MOURTGOS CANNOT TESTIFY TO LEGAL CONCLUSIONS, INCLUDING THAT SOMETHING IS EVIDENCE OF DELIBERATE INDIFFERENCE.

It is well-settled that an expert may not testify to legal conclusions. "The only legal expert in a federal courtroom is the judge." *U.S. v. Caputo*, 517 F.3d 935. Some of Dr. Mourtgos' opinions are legal conclusions, which he may not give at trial.

Dr. Mourtgos opines that certain facts are evidence of deliberate indifference. *See supra* at 4-5. Whether something is or is not evidence of deliberate indifference is a question of relevance. Whether evidence is relevant is a matter for the Court to determine, not a retained expert. The Court should bar Dr. Mourtgos from testifying that something is evidence of deliberate indifference.

Dr. Mourtgos opines that Flores' Fourteenth Amendment rights were clearly established in July 2018. *See supra* at 6. Whether a constitutional right was clearly established is a question of law for the court. *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985). It is not a proper subject for expert testimony. The Court should bar Dr. Mourtgos from testifying that Flores' rights were clearly established in July 2018.

### D. The Court Should Bar Dr. Mourtgos from Giving any Opinions about whether any Pursuit or Other Emergency Vehicle Operation Violated South Bend Police Department Policy or Generally-Accepted Law Enforcement Practices.

Plaintiff may offer Dr. Mourtgos' opinions that pursuits or other emergency vehicle operations violated South Bend policy or generally-accepted law enforcement practices. Any such testimony would be lacking in foundation and irrelevant, and is therefore inadmissible.

Dr. Mourtgos is not an expert on South Bend's pursuit policies. He did not review any incident other than the July 20, 2018 crash for compliance with South Bend's pursuit policies or generally-accepted law enforcement practices. Exhibit C at 158:18 – 159:15. He therefore has no basis to give any opinions about whether any pursuits or other emergency vehicle operation violated South Bend policy or generally-accepted practice. Likewise, he has no basis to give any opinions that a pursuit or other emergency vehicle operation was "unnecessary." *See* Exhibit C at 202:4-23 (an "unnecessary" pursuit is one that is outside of policy and generally-accepted law enforcement practices).

Further, whether any pursuit or other emergency vehicle operation violated South Bend policy or generally-accepted law enforcement practices is irrelevant to the issues in this lawsuit. South Bend can only be liable in this action if it provided no training at all regarding constitutional standards in recurring situations involving an obvious risk of constitutional violations, or whether South Bend failed to provide additional training in response to a pattern of similar constitutional violations. *See* Memo. in Supp. of Defs. Jt. Mot. for Summ. Judgment at 17-21. South Bend cannot be liable in this action if its officers engaged in pursuits or other emergency vehicle operations that violated South Bend policy, or generally-accepted law enforcement practices. Dr. Mourtgos does not—and cannot—opine that any pursuit or other emergency vehicle operation violated the Fourteenth Amendment. And, because Officer Gorny was not involved in a pursuit

at the time of this accident, any Fourteenth Amendment violation during a pursuit would not satisfy the similarity requirement for failure-to-train liability that the Supreme Court established in *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  Allowing this evidence would dramatically lessen Plaintiff's burden of proof, and "'would result in *de facto respondeat superior* liability….'"  *Id.*

The Court should therefore bar Dr. Mourtgos from giving any testimony that any pursuit or other emergency vehicle operation violated South Bend policy or generally-accepted law enforcement practices, or that any pursuit was "unnecessary."

### E. DR. MOURTGOS' OPINIONS SHOULD BE BARRED BECAUSE THERE IS NO EVIDENCE THAT SOUTH BEND POLICYMAKERS WERE AWARE OF ANY ALLEGED DEFICIENCIES IN OFFICER TRAINING OR SUPERVISION.

Even if the issues discussed in Dr. Mourtgos' report were reliable and helpful to the jury on the issue of whether South Bend's officer training and supervision violated generally-accepted law enforcement standards, there is another hurdle that Plaintiff cannot overcome.  It is not enough for Plaintiff to show that South Bend's officer training and supervision were substandard.  She must also show that South Bend's policymakers were *aware* of that fact, and consciously chose not to correct it.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985) (rejecting *Monell* liability without evidence of "action taken by a municipal policymaker").  But there is no evidence that South Bend's policymakers were aware of the issues identified in Dr. Mourtgos' report.  Without that evidence, Dr. Mourtgos' testimony cannot be tied to the issues in this action.  Instead, his testimony becomes a side-show that would confuse the issues and distract the jury.

Regardless for how "policymaker" is defined in the context of failure-to-train claims,[15] there is no evidence that South Bend's policymakers were aware of any alleged deficiency in the

---

[15] It does not appear that the Supreme Court has defined who may be considered a policymaker in the context of failure-to-train.  The Seventh Circuit has identified the police chief as the final policymaking official for a police department.  *See Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995).  However, *Eversole* is not controlling here

South Bend Police Department's training or supervision of its police officers. There is no evidence that the City of South Bend's Common Council was aware of any deficiencies in the training or supervision of South Bend's police officers. There is no evidence that South Bend's Board of Public Safety was aware of any deficiencies in the training or supervision or South Bend's police officers. *See* Exhibit C at 270:12-21. Such evidence would be necessary before Dr. Mourtgos' testimony could be considered relevant, if it could be considered relevant at all. If the Court allows Plaintiff to present the testimony of Dr. Mourtgos, it should allow Plaintiff to present that testimony only after Plaintiff has established the requisite action of South Bend policymakers.

## IV. CONCLUSION.

For the above and foregoing reasons, Defendant City of South Bend prays the Court enter an Order:

- barring Dr. Mourtgos from giving any opinion testimony about whether South Bend's training and supervision of its police officers complied with generally-accepted law enforcement practices;

- barring Dr. Mourtgos from giving opinion testimony that South Bend was deliberately indifferent, or that anything that South Bend did or did not do is evidence of deliberate indifference;

- barring Dr. Mourtgos from giving opinion testimony about whether any pursuit or other emergency vehicle operation violated South Bend Police Department policy or generally-accepted law enforcement practices;

---

because failure-to-train liability was not at issue in that opinion. Additionally, the statute cited in that opinion provides that the police chief's control of the police department is "subject to the rules and orders of the safety board." IC 36-8-3-3(g). The Board of Public Safety is the "safety board." IC 36-1-2-16. Indiana law confers on the Board of Public Safety the power to "adopt rules for the government and discipline" of the police department and to "adopt general and special orders to the police [department]...." IC 36-8-3-2(d). Thus, it is the Board of Public Safety that creates policy for the South Bend Police Department, not the chief of police.

- barring Dr. Mourtgos from giving opinion testimony about the credibility of other witnesses;

- barring Dr. Mourtgos from giving opinion testimony about whether Flores' Fourteenth Amendment rights were clearly established; and

- ordering such further relief as the Court deems just.

Respectfully Submitted,

/s/ Joseph W. Smith

Joseph W. Smith
CLARK JOHNSON & KNIGHT, LTD.
233 East 84th Drive, Suite 301
Merrillville, Indiana 46410
Telephone:    219-322-0830
Facsimile:    219-322-0834
Attorneys for Defendant, CITY OF SOUTH BEND

## CERTIFICATE OF SERVICE

I hereby certify that, on the 18th day of August, 2025, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to:

- Stephen J. Phillips sphillips2@phillipslegal.com
- Terrence M. Quinn tquinn@phillipslegal.com
- Kevin C. Smith ksmith@smithsersic.com
- Joseph W. Smith Jsmith@cjklaw.com, shazi@cjklaw.com
- Matthew S. Clark Mclark@cjklaw.com, kstocco@cjklaw.com
- R. Jeffrey Lowe jlowe@k-glaw.com
- John Kautzman jfk@rkblegalgroup.com
- Phillip M. Riley, pmr@rkblegalgroup.com

/s/ Joseph W. Smith

Joseph W. Smith

25-08-18 Mot to Exclude Pl Expert 8071