UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SORAIDA FLORES, as                )
Personal Representative           )
of the Estate of Erica            )
Flores, deceased,                 )
                                  )
        Plaintiff,                )
                                  )  CASE NO.
-v-                               )  2:19-cv-64-PPS-JEM
                                  )
CITY OF SOUTH BEND, a             )
municipal corporation,            )
and JUSTIN GORNY,                 )
                                  )
        Defendants.               )

The remote deposition upon oral examination of SCOTT M. MOURTGOS, Ph.D., a witness produced and sworn before me, Amy Doman, RDR, CRR, CCR MO, CSR (CA/IL/TX/WA), Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Defendants via remote videoconference, on April 28, 2025, scheduled to begin at 10:00 a.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800) 869-0873

**Exhibit C**

Page 2

A P P E A R A N C E S
(All via videoconference.)

FOR THE PLAINTIFF
SORAIDA FLORES:

    Stephen J. Phillips, Esq.
    Terrence M. Quinn, Esq.
    PHILLIPS LAW OFFICE
    161 North Clark Street
    Suite 4925
    Chicago, IL 60601
    sphillips@phillipslegal.com
    tquinn@phillipslegal.com

FOR THE DEFENDANT
CITY OF SOUTH BEND:

    Joseph W. Smith, Esq.
    CLARK JOHNSON & KNIGHT LTD.
    233 East 84th Drive
    Suite 301
    Merrillville, IN 46410
    jsmith@cjklaw.com

FOR THE DEFENDANT
JUSTIN GORNY:

    John F. Kautzman, Esq.
    R. Mason Riley, Esq.
    RUCKELSHAUS KAUTZMAN BLACKWELL
    BEMIS & DUNCAN, LLP
    135  N. Pennsylvania Street
    Suite 1600
    Indianapolis, IN 46204
    jfk@rucklaw.com
    rmr@rucklaw.com

ALSO PRESENT:

    Kylie Connell, City of South Bend

INDEX OF EXAMINATION

Page

SCOTT M. MOURTGOS, Ph.D.

EXAMINATION................................    7

  Questions by Mr. Joseph W. Smith

EXAMINATION................................  278

  Questions by Mr. John F. Kautzman

EXAMINATION................................  298

  Questions by Mr. Stephen J. Phillips

FURTHER EXAMINATION........................  318

  Questions by Mr. Joseph W. Smith

FURTHER EXAMINATION........................  324

  Questions by Mr. Stephen J. Phillips

FURTHER EXAMINATION........................  326

  Questions by Mr. John F. Kautzman

FURTHER EXAMINATION........................  328

  Questions by Mr. Stephen J. Phillips

INDEX OF EXHIBITS

(All exhibits attached hereto except as noted.)

Deposition Exhibits:                          Page

Exhibit 1      - Curriculum Vitae ..........    17

Exhibit 2A     - Expert Report of Scott M. ..   11
                 Mourtgos, Ph.D.

Exhibit 2B     - Supplemental Report........    12

Page 4

Deposition Exhibits Continued:                      Page

Exhibit 3      - Listing of Retained Cases ..    39
                 With Testimony

Exhibit 4      - PERF article entitled ......    48
                 "Vehicular Pursuits, a
                 Guide for Law Enforcement
                 Executives on Managing the
                 Associated Risks"

Exhibit 5      - National Consensus Policy ..    58
                 and Discussion Paper on
                 Use of Force, Revised
                 July 2020

Exhibit 8      - Transcript of the .........    89
                 deposition of Justin Gorny

Exhibit 9      - Transcript of the .........    93
                 Deposition of Brad
                 Rohrscheib

Exhibit 11     - Pursuit policy ............    128

Exhibit 14B    - Transcript of the .........    166
                 deposition of Captain
                 David Herron

Exhibit 15     - Transcript of the .........    177
                 deposition of Cory Calvert

Exhibit 16     - Crash matrix for 2018 ......    186

Exhibit 17     - A spreadsheet summary of ...    109
                 city records related to
                 damage to patrol officer
                 vehicles

Exhibit 18     - Video of Officer Myers' ....    197
                 body camera (Retained.)

Exhibit 19     - Transcript of the .........    230
                 deposition of Dan Skibins

Exhibit 20     - Transcript of Sergeant .....    156
                 Ryan Hiipakka Deposition

Page 5

Deposition Exhibits Continued:                        Page

Exhibit 21     -  IAPro printout for pursuit .    267
                  2015-008

Exhibit 22     -  Deposition of Officer ......    152
                  Zachary Alfrey

Exhibit 24     -  Pursuit VP2016-27...........    102

Exhibit 25     -  Pursuit 2018-45 ...........    105

Exhibit 26     -  Pursuit 2018-48 ...........    107

Exhibit 27     -  Video EVO video_TS-02_1 ....   215
                  (retained by counsel)

Exhibit 28     -  Lesson plan from ..........    304
                  October 10th, 2018
                  (retained by counsel for
                  Plaintiff)

Exhibit 29     -  Pursuit review form........    322

STENOGRAPHER'S NOTE:  Please note that due to the quality of a Zoom videoconference and transmission of data, overspeaking can cause audio distortion which disrupts the process of preparing a videoconference transcript.

All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.

Quotation marks are used for clarity and do not necessarily reflect a direct quote.

(Time noted:  10:00 a.m.)

CERTIFIED STENOGRAPHER:  My name is Amy Doman, a certified stenographer and associate of Stewart Richardson located in Indianapolis, Indiana.

Today's date is April 28, 2025.  The time is 10:00 a.m. Eastern Standard Time.

This deposition is being taken remotely.  The deponent is Scott M. Mourtgos, Ph.D.

Will counsel please identify themselves and any persons present with you for the record, beginning with the noticing attorney.

MR. SMITH:  Joseph Smith for the City of South Bend.

MR. PHILLIPS:  Steve Phillips on behalf of the plaintiff.

MR. QUINN:  Terry Quinn on behalf of the plaintiff.

MR. KAUTZMAN:  John Kautzman and Mason Riley on behalf of Justin Gorny.

SCOTT M. MOURTGOS, Ph.D., having been duly sworn to tell the truth, the whole truth, and nothing but the truth relating to said matter, was examined and testified as follows:

EXAMINATION

BY MR. JOSEPH W. SMITH:

Q.  Good morning, Professor.

A.  Good morning.  How are you?

Q.  I am well.  Getting better.  I'm getting over an illness, so if I start coughing, I do apologize.

Can you please state your full name for the record?

A.  Yeah.  My name is Scott Mourtgos.  And same; I'm just getting over a cold from last week, so if I cough, that's why.

Q.  I am one of the attorneys for the City of South Bend.  We are here for your deposition today because you've been identified as an expert retained by the estate of Erica Flores in relation to that lawsuit.

You've been deposed before, so I'm sure you understand generally how these work, but I'll go through a few things real quickly, because we're lawyers, and that's what we like to do.

I'll need to have you answer questions out

Q.   Did you have any assistance in drafting your report that's identified as Exhibit 2A?

A.   All of the opinions in the report are mine specifically.  The report was prepared as a joint effort between me and the attorneys, though.

Q.   What parts of the report did they prepare?

A.   Well, like I said, this was all done in consultation, typically over a Zoom meeting, while we met with each other and talked through the specifics and my opinions.  So to point to specific parts would be very, very difficult.  But again, everything in here as far as the opinions go are specifically mine.

Q.   I'm going to pull up another exhibit.  This is marked Exhibit 2B.

     (Exhibit 2B marked for identification.)

BY MR. SMITH:

Q.   Does Exhibit 2B appear to be a supplemental report that you issued in connection with this case?

A.   Yes.

Q.   Looking at page 2, is that your signature that appears at the bottom of the page?

A.   It is.

Q.   Did you have any assistance in drafting your supplemental report marked as Exhibit 2B?

Page 44

A.   Well, there could be an agency that has a standard that doesn't meet best practices or doesn't meet a generally accepted practice.

Q.   Is there a difference between generally accepted law enforcement standards and best practices in the law enforcement field?

A.   I'm sorry.  Can you ask that again?

Q.   Sure.

     Is there a difference between generally accepted law enforcement standards and best practices in the law enforcement field?

A.   You know, I've never really thought about that in those terms.  When I talking about generally accepted practices, you know, I'm talking about -- one would hope that these best practices are within those generally accepted practices, and they tend to be.

Q.   Law enforcement agencies aren't necessarily obligated to adopt best practices in the field, true?

     MR. PHILLIPS:  Objection, form.

A.   Well, you certainly can have agencies that, for whatever reason, don't stay up to date or choose not to accept generally accepted practices.

BY MR. SMITH:

Q.   Well, I didn't ask about generally accepted practices, I asked about best practices.

      A law enforcement agency doesn't have to adopt the best practices for the law enforcement field?

(Unreportable simultaneous conversation.)

      MR. PHILLIPS:  Objection, form.

A.   And, again, I guess I'm a little confused on what we're talking about here when you're talking about differences between best practices and generally accepted practices.  I don't write or evaluate best practices.  I evaluate what are the circumstances in this case, holding them up to generally accepted practices in the policing profession across the country.  So I guess I'm just a little confused on what you're asking here.

BY MR. SMITH:

Q.   Let me give an example.

      Firearms training.  Everyone would agree, police agencies must provide firearms training to their officers, true?

A.   That would be a generally accepted practice, yes.

Q.   Is there a generally accepted standard in the law enforcement community about how often police

Page 46

agencies must provide firearms training to their officers?

A. Well, I would say that the generally accepted practice for providing firearms training to their officers is at least annually.

Q. Is there a best practice with regard to how often law enforcement agencies should provide firearms training to their officers?

A. Again, I don't understand the difference between those two terms in the way that you're using them.

Q. Well, there are things that police agencies must do, right?

A. Well, I guess it depends on if we're talking about things that are, like, mandated by law, mandated by administrative code. Again, you're being very broad here, and I'm not quite tracking.

Q. Well, your opinions are that South Bend Police Department didn't do things that they were supposed to do, correct?

A. My opinion is, is that that they did not follow generally accepted practices when it came to training on emergency vehicle operations.

Q. So they didn't do what they were supposed to do, right?

A. They didn't conduct themselves in accordance with

generally accepted practices.

Q.   So were they not supposed to do what your report said they were supposed to do?

A.   Sorry.  There were a lot of negatives in there.  I didn't track the question.

Q.   Well, I'm trying to understand what the -- what the threshold is here.

Are we talking about things that South Bend should do because they're best practices or talking about things that South Bend must do because the law enforcement community agrees that they must do that?

A.   Okay.  So this is how I would explain it, and hopefully this answers your question.  There are generally accepted practices when it comes to providing training in this specific instance about emergency vehicle operations.  When it comes to that training, which many of the officers in depositions agreed to, that includes four components:  clear communication, supervision, retraining, and enforcement.  They failed in all of those aspects.

Now, are they required to follow generally accepted practices?  There's no overarching professional organization somehow requiring them

Page 48

to do anything.  They can choose not to follow generally accepted practices.  However, it's reckless to do so.

Q.   All right.  So there is a difference between best practices and generally accepted law enforcement practices.  I think we can at least agree on that, right?

        MR. PHILLIPS:  Objection, form.

A.   Again, I still don't understand your distinction between those two terms.

BY MR. SMITH:

Q.   All right.  So best practices suggests that there are other acceptable practices.  Agreed?

A.   I don't know if I would agree with that.

Q.   Why would you not agree with that?

A.   Because, again, I still don't understand how you're using the term "best practices."

Q.   All right.  I'm going to pull up a document that I've marked Exhibit 4.

     (Exhibit 4 marked for identification.)

BY MR. SMITH:

Q.   I've marked Exhibit 4, a Police Executive Research Forum document titled "Vehicular Pursuits, a Guide for Law Enforcement Executives on Managing the Associated Risks."

Do you see that?

A.   I do.

Q.   What is the Police Executive Research Forum?

MR. PHILLIPS:  For the record, Joe, what year is this document?

MR. SMITH:  Let me see if I can find the copyright.  Published 2023.

BY MR. SMITH:

Q.   All right.  What is the Police Executive Research Forum?

A.   The Police Executive Research Forum is a, for lack of a better term, think tank.  It's a professional organization that frequently does work, research, policy promulgation with police departments across the country.

Q.   And you cite this document in your report, correct?

A.   I do.

Q.   So you would agree that this document here is authoritative?

A.   PERF is one of the leading professional organizations in the U.S. when it comes to policing.  So I would say that it's well-respected, yes.

Q.   All right.  Looking at page 1 of this document, it

reads, near the bottom:  "Recommendations.  This publication reflects the findings from PERF's meetings with the Pursuits Working Group as well as research and policies on best practices in managing vehicular pursuits."

Do you see that?

A.  I see that, uh-huh.

Q.  And going to page 10:  "This guide offers comprehensive advice on managing the risks of vehicle pursuits and provides information about best practices regarding them."

Do you see that?

A.  I do.

Q.  Page 23:  "Project methodology:  To identify best practices in vehicular pursuit policies."

Do you see that?

A.  Yes.

Q.  Page 24:  "Recommendations also cover best practices regarding decisions about pursuits."

Do you see that?

A.  Yes.

Q.  Page 143, under "About PERF":  "Since its founding in 1976, PERF has identified best practices on fundamental issues such as police use of force."

Do you see that?

Page 51

A.   Yes.

Q.   All right.  Do you agree with me that this vehicular pursuits document from PERF is a best practices guide on how to -- or on vehicle pursuit policies?

A.   Well, it seems to me that you're drawing a distinction between best practices and generally accepted practices.  If we're talking about the same thing with those two terms, then yes, I would agree.

Q.   Okay.  So law enforcement agencies are not necessarily required to adopt best practices, correct?

A.   As I stated before, an agency certainly can choose not to follow generally accepted practices -- insert best practices -- if we're talking about this term in the same manner.  But again, it's reckless to not do so.

Q.   Is it reckless to not adopt best practices, in your opinion?

A.   It is reckless not to align with generally accepted practices.  And again, if we're thinking about best practices and generally accepted practices as the same term, then yes.

Q.   Are best practices and generally accepted

Page 52

practices the same thing in your opinion?

A.  Based off of what you've shown me --

            MR. PHILLIPS:  Object to form.

A.  Based off of what you've shown me in this and how we seem to be talking about it, I think we're talking about the same thing here.

BY MR. SMITH:

Q.  Is a law enforcement agency reckless if they do not adopt every recommendation included in this vehicular pursuits PERF guide?

A.  I think context matters.  I would have to look at the specific circumstances for each one and what was going on.  Again, in this particular instance that we're talking about here, they failed on multiple levels, which all added to this very high probability that something horrible was going to happen.

Q.  So you agree with me at a basic level that just because something is identified as a best practice doesn't mean that a law enforcement agency must do it?

A.  There are many things that are generally accepted practices that people should -- that agencies should do, and they might choose not to, for whatever reason.

BY MR. SMITH:

Q.   I am pulling up another document marked Exhibit 5. Exhibit 5 is National Consensus Policy and Discussion Paper on Use of Force, Revised July 2020.

Do you see that?

A.   I do.

Q.   This is a document that you cited in your report as an example of a document evidencing generally accepted law enforcement standards, correct?

A.   Sure.  Yes.

Q.   Going to page 5 of this report, it reads:  "The consensus policy incorporates the most current information and contemporary professional judgment and is designed to provide a framework of critical issues and suggested practices from which agencies can develop their own use of force policies.  It is not intended to be a national standard by which all agencies are held accountable, and agencies are not required to institute the consensus policy."

Do you see that?

A.   I do.

Q.   So the consensus policy here is an example of best practices, correct?

Page 60

A. It's an example of generally accepted practice, yes, which I think we could agree is also best practice.

Q. And this document says that police agencies are not required to adopt the recommendations contained in this document, right?

A. Well, again, these agencies don't have any sort of enforcement oversight over agencies within the country, and so that's what they're implying there. Like, this isn't, in a sense, like somehow an accountability mechanism or a requirement mechanism because they don't have the legal authority to do so. That does not mean that agencies should be ignoring it and not accepting a generally accepted practices.

Q. It says specifically: "It is not intended to be a national standard," right?

A. Well, you have to finish that sentence: "It is not intended to be a national standard by which all agencies are held accountable."

Q. "It is not intended to be a national standard by which all agencies are held accountable," right? That's what that says, the full --

(Unreportable simultaneous conversation.)

A. Yes, because -- because these agencies that are

Page 61

providing this national consensus don't have

accountability oversight over individual agencies.

Again, that doesn't mean that that's somehow an

excuse not to adopt a generally accepted practice.

BY MR. SMITH:

Q.   Can you point me to somewhere in this document

that says that this is the generally accepted

practice in the law enforcement community?

A.   Well, I think the title basically says it for you.

It's the national consensus.

Q.   Can you point me to somewhere in the document that

says this is the generally accepted practice in

the law enforcement community?

MR. PHILLIPS:  Objection, form.

A.   Again, go to the title.

BY MR. SMITH:

Q.   So the only thing that you can point to in this

document in support of your statement that this is

the generally accepted practice is the fact that

they decided to call it the consensus policy?

MR. PHILLIPS:  Objection, form.

A.   No, that's not the case.  Now you're going to have

to give me a minute to pull it up because I'll

need to go through it now that you're pressing me

for specific sentences.  So I'll have to read

Page 62

through it, if you'll give me a minute here.

MR. PHILLIPS:  Can we take two minutes here while he's looking, please?

MR. SMITH:  Sure.

CERTIFIED STENOGRAPHER:  We're off the record.

(A recess was taken.)

CERTIFIED STENOGRAPHER:  We're back on the record.

A.  So I'll read to you from page 5 starting the last sentence in the first column, moving over to the second column.

"However, this guidance is operationalized in the policies of individual law enforcement agencies" -- I'm sorry.

"However, how this guidance is operationalized in the policies of individual law enforcement agencies varies greatly.  This creates a landscape for each agency.  Even neighboring jurisdictions are potentially operating under differing, inconsistent, or varied policies when it comes to the most critical of topics. Symposium members decided to address these disparities by creating a policy document on use of force that can be used by all law enforcement

agencies across the country.  The goal of this undertaking was to synthesize the views of the participating organizations into one consensus document that agencies could then use to draft or enhance their existing policies."

BY MR. J. SMITH:

Q.  That suggests that there was no consensus at the time that this document was issued, doesn't it?

A.  It suggests that there was -- there could be wide variation amongst agencies, and your question was -- is, what is written in here that would justify me saying this is an example of generally accepted practices.  Clearly that's the intent of this based off of what I just read.

Q.  So the -- who issued this paper?  It doesn't say on the cover.

A.  It's on here somewhere.

Okay.  So if you scroll down to the very, very bottom of the last page, it has the -- it has the -- I'm blanking on the right term for this, but the insignia of the organizations that joined it.

Q.  The signatories?

A.  Sure.

So that -- you have the Association of State

Page 64

Criminal Investigative Agencies.  You have CALEA, which is a nationally accrediting standard body. You have the Fraternal Order of Policing.  You have the International Association of Chiefs of Police.  You have the Hispanic American Police Command Officers Association; the Federal Law Enforcement Officers Association; the International Association of Directors of Law Enforcement; the NAPO, the National Association of Police Organizations; the National Association of Women Law Enforcement Executives; the National Tactical Officers Association; and the National Organization of Black Law Enforcement Executives.

Q.  So the part of page 5 that you just read says that departments varied quite a lot in how they implemented Supreme Court guidance on use of force, right?

(Unreportable simultaneous conversation.)

       MR. PHILLIPS:  Objection, form.

       Go ahead.

A.  What it said was is that those court rulings are operationalized in the policies of individual law enforcement agencies, and those can vary.

BY MR. J. SMITH:

Q.  No, it did not say:  "It can vary."

It said:  "It varies greatly."

Correct?

A.  Sure.

Q.  Yes?

A.  Yes, that's what it says.

Q.  And then it says:  "This creates a landscape where each agency, even neighboring jurisdictions, are potentially operating under differing, inconsistent, or varied policies when it comes to the most critical of topics," correct?

A.  Yes.

Q.  So those entities that issued this consensus paper were hoping that police agencies would follow their recommendations, correct?

MR. PHILLIPS:  Objection, form.

A.  Again, as they explain in the next paragraph, they put it together so it could be used by all law enforcement agencies across the country with the goal of synthesizing the views into one consensus document that agencies could then use.

(Unreportable simultaneous conversation.)

A.  In essence, it's creating -- in essence, it's putting forth a generally accepted practice.  Your specific question to me was, what in this document suggests that this is a generally accepted

Page 66

practice.

BY MR. J. SMITH:

Q.  That wasn't my question.

A.  It was your question.

Q.  My question was, where in here says it's the generally accepted practice.

It says it wasn't the generally accepted practice, doesn't it?

MR. PHILLIPS:  Objection, form.

BY MR. SMITH:

Q.  Doesn't it?

A.  I think you are misunderstanding what they're writing there.  I think the clear implication of what they're writing there is that we are putting this together to provide clear guidance on what the generally accepted practice is.

Q.  This document, Exhibit 5, reflects what these agencies -- these organizations consider to be the best practices for use of force policies, correct?

MR. PHILLIPS:  Objection, form.

A.  It puts forth the generally accepted practice of law enforcement use of force, yes.

BY MR. SMITH:

Q.  So do you believe that you don't need to distinguish between generally accepted standards

Page 140

evaluation of any of the pursuits involved in those alerts to even determine whether he did something wrong or not.

BY MR. SMITH:

Q. Those alerts don't have anything to do with whether the officer did or did not violate policy, agreed?

A. Well, not necessarily. They're meant to be able to give an early indicator of possibly problematic behavior and --

(Unreportable simultaneous conversation.)

BY MR. J. SMITH:

Q. Those alerts --

A. South Bend did not seriously engage with them, and so it's not -- they wouldn't know whether or not there were problems in these pursuits or not.

Q. Those alerts pop up whether the officer did something wrong or whether they did everything correctly, right?

A. That would be true, yes. But they wouldn't know that unless they actually evaluated these and had some sort of review, discussion. And all the evidence I've seen has -- indicates that they did nothing with these alerts, even though they themselves determined that more than three within

Did I read your report correctly?

A. Yes, that's what he reported.

Q. And then you conclude that:

"This is yet more evidence of Officer Gorny's and the City of South Bend's reckless indifference and conscience-shocking conduct as Officer Gorny approached the blind intersection intermittently using his emergency lights, traveling over 90 miles an hour while playing music rather than being aware of his surroundings.

That is what you said in your report?

A. It is.

Q. If you accept as true Officer Gorny's testimony that he did not have his radio on during this event, then this is not evidence of reckless indifference, correct?

A. If one were to accept that, yes.  It seems less likely than the other, though.

Q. This accident didn't happen because Officer Gorny failed to hear something, correct?

A. This accident happened for a multitude of reasons, including reckless behaviors on Officer Gorny's part, as well as the failure to train on the South Bend Police Department's part.

Page 158

Do you agree that on page 25 of his transcript, which you cited in your report, he was talking about certain types of incidents?

A. That's the reference he made in that -- on that particular page, yes.

Q. Do you agree that the South Bend Police Department policy, if a police officer was driving to an emergency without their siren on -- or without their siren on, would require them to use extra caution for the safety of all persons?

A. I believe that is in their policy, yes.

Q. Do you agree that the officers' testimony that you cited in your reports about quote/unquote routine to use -- to turn off sirens, does not suggest that they were not using extra caution?

A. I'm sorry.  I'm not following that question.

Q. Sure.

The testimony that you've cited in your report about the officers turning off their siren on the way to emergency calls at night, did any of them say they weren't using extra caution as required by the policy?

A. No, but you certainly see that demonstrated by Officer Gorny in this case.

Q. So other than Officer Gorny, you can point to no

Page 159

incident where an officer for South Bend failed to use extra caution when responding without lights or siren?

MR. PHILLIPS:  Objection, form.

BY MR. SMITH:

Q.  Go ahead.

A.  I evaluated this incident.  If you were to provide me information on another incidents, I could certainly review those.

Q.  So your answer is no, you can't point to any other incidents?

A.  South Bend --

MR. PHILLIPS:  Objection, form.

A.  South Bend has not provided me any other information on that.

BY MR. SMITH:

Q.  Do you agree that the South Bend Police Department policy was that the officers should obey all traffic laws, if they are responding without lights and siren?

A.  Yes.

Q.  Do you agree that the witness's testimony that you've cited in your support of your routine statement in your report did not say that they were not obeying the traffic laws when they were

Page 170

that the evidence showed that Mr. Myers had not actually witnessed the accident?

A.    I didn't review that video, so I don't know.

Q.    So you don't have any opinion about whether it was a reasonable or an unreasonable conclusion for an Internal Affairs investigator to reach, right?

A.    Again, just based off of his statement, according to him, there was body camera footage that cleared up any ambiguity here.  If that is, indeed, accurate, I don't see any particular issue with that.  But again, that's accepting that what he's stating there is accurate.

Q.    I'm looking at page 61 to 62 of your initial report, you say:  "He" -- referring to Captain Herron -- "stated that Captain Schweizer was responsible for deciding whether a vehicle pursuit was within policy and whether it would be reviewed by the pursuit review committee.  If Captain Schweizer determined that a vehicle pursuit was not within policy between 2013 and 2018, he would forward it to the pursuit review committee."

Do you recall Captain Herron's testimony that Captain Schweizer would decide whether to send a pursuit to the pursuit review committee based on

Page 171

whether there was a possible policy violation?

A.   I do not recall that.

Q.   Going back to Exhibit 14 -- Exhibit 14B, that is.
Page 208, beginning at line 4.

"Question:  Who made the determination
whether or not Mr. Gorny's pursuits went to
the pursuit review committee or not?

"Answer:  As stated before the last
deposition, Captain Schweizer would make that
determination.  If he would review the MVR
footage or the car video footage and he seen
that the pursuit was within policy, whether
it was an early termination of a pursuit, he
would not forward that on to the pursuit
committee.  If he felt that there was a
possible policy violation, he would forward
that pursuit to the committee to be
evaluated."

So he testified that Captain Schweizer would
send a pursuit to the committee if he felt there
was a possible violation, correct?

A.   Okay.  Yes.

Q.   Yes?

So the fact that Captain Schweizer sent a
pursuit to the committee did not mean that he had

determined that there was a policy violation, correct?

A.   Yes.  Not necessarily.

Q.   Do you recall Captain Herron's testimony that it was not their usual practice to check the yes boxes in IAPro if a pursuit was found to be justified and within policy?

A.   I recall that testimony, yes.

Q.   Do you accept Captain Herron's testimony as true?

A.   It does not make a lot of sense to me.

Q.   Okay.

A.   I'm not -- I mean, I guess it could be true.  But I don't understand why anybody interested in having good and proper documentation of incidents like these would not check the box of yes or no within or without policy.

        MR. J. SMITH:  Madam Court Reporter, did you catch the whole answer?

(Record read.)

A.   Yes or no whether they were within or without policy, essentially.  Yeah.

BY MR. SMITH:

Q.   We'll get back to that.

        Do you agree that generally accepted law enforcement standards do not require law

Page 184

be suspended because the pursuit review committee found they violated policy, right?

MR. PHILLIPS:  Objection, form.

A.  So one would hope that Internal Affairs would find that they violated a policy as well, and the accountability mechanism occurs then.  But yes, what this is advocating for here is those should be two separate things.

BY MR. SMITH:

Q.  So it would not be a violation of generally accepted law enforcement standards if South Bend never suspended a patrol officer because the pursuit -- or the committee found that they had violated policy, true?

MR. PHILLIPS:  Objection, form.

A.  It would be a violation of generally accepted practices if officers were never suspended and/or disciplined in some other way for violating policy and/or generally accepted practices in pursuits.  From what I can see, that wasn't occurring in the accountability mechanism part.  It certainly also wasn't occurring within the pursuit review part.

BY MR. SMITH:

Q.  Going back to your report, your initial report, you state on page 69 of your initial

report:  "South Bend's failure to properly discipline officers beyond loss of unit was reckless and displayed a deliberate indifference to the safety of the public."

Do you agree that loss of unit is a form of discipline?

A.  It can be a form of discipline, yes.

Q.  And Salt Lake City Police Department used the loss of unit as a form of discipline when you were there, correct?

A.  They did at times.  But again, it's context-specific:  How many times has this occurred; what was the severity of it.  From what I can tell, when it comes to these traffic accidents, the only discipline there ever was, was loss of unit.  I haven't seen any evidence regarding suspensions or more severe discipline than that.

Q.  Do you agree that law enforcement agencies should engage in progressive discipline?

A.  Yes.

Q.  Do you agree that the South Bend Police Department had a program of progressive discipline for officers' at-fault accidents?

A.  In the sense that the loss of take-home units

them were in pretty close concert with each other. As far as like specifically 365 days, again, I didn't take any notes.

Q.   Can you cite any publication establishing that the South Bend Police Department's crash matrix was not in line with generally accepted law enforcement standards?

A.   No.  What I'm telling you is, is that based on my experience dealing with disciplinary -- discipline of officers, I would expect to see more severe discipline sooner than what's on here.

Q.   So you're saying that the South Bend Police Department should have had this corrective action review by the chief further to the left on this matrix?

A.   No.  What I'm saying is that they should have considered something beyond loss of unit well before that.

Q.   From your review of the records provided to you, do you agree that the South Bend Police Department did impose consequences other than loss of unit from time to time?

A.   Specifically for what?

Q.   My question to you was:  Based on your review of the records, do you agree that South Bend Police

doing that either.

Q. So I will reask my question.

Can you point to any publication saying that police agencies must suspend officers for having at-fault accidents?

A. I answered that. I said no.

Q. Going to page 70 of your initial report, Exhibit 2A, on page 70 of your report, you're discussing the 30-mile-per-hour discrepancy in one of Officer Gorny's pursuit reports.

Have you seen any evidence suggesting that Officer Gorny had a habit of underreporting his pursuit speeds?

A. I have not seen any evidence outside of this particular instance of this same sort of issue, just like I haven't seen any evidence of them trying to address this particular issue either.

Q. Have you seen any evidence suggesting that underreporting pursuit speeds was a widespread practice at the South Bend Police Department?

A. I don't recall seeing any information on that.

Q. It's your opinion that the South Bend Police Department was deliberately indifferent because it did not address this one speed discrepancy in this Officer Gorny's report?

Page 202

officers -- a police department should never allow officers to engage in unnecessary high-speed operations.

What, in your opinion, is an unnecessary high-speed operation?

A.   I'm pretty sure we already went over this one. Let me see if I can get the same response. You know, essentially it's, one, again, starting out with, first off, is it outside of their policy, and then, two, is it outside of generally accepted practices as far as looking at the balance between government interest versus the need to do whatever this action is.

In this case, for the high-speed vehicle operations, if we're talking about responding to an emergency call, does the need to get there right now outweigh the public safety risk you're creating. It's the same kind of standard when you're looking at whether a pursuit should be taking place or not.

So when we're talking about unnecessary high-speed vehicle operations, does the need for it outweigh the risks that are being created.

Q.   How are you defining high speed?

A.   You know, it -- I don't have a specific number,

Q.  So for those agencies that do set a maximum speed
    in their policy, their policy would be more
    restrictive than what generally accepted law
    enforcement standards would require, right?

A.  Yes.

Q.  Do you agree that this statement in this training
    video is the only evidence that South Bend has
    ever had a 60-mile-an-hour limit for pursuits?

A.  I have not seen any other evidence that would
    suggest that this was a policy.

Q.  Do you agree that the trainer in this video did
    not say this was the formal policy of the South
    Bend Police Department?

A.  He did not say those words, no.

Q.  Do you agree that that is not what is in South
    Bend's written policy?

A.  Well, I would agree that that's not stated in it.

Q.  Do you agree that the South Bend witnesses have
    testified that there's never been a
    60-mile-per-hour limit in the South Bend pursuit
    policies?

A.  Yes.

Q.  Do you agree that when a police officer is
    deciding whether or not to terminate a pursuit,
    they must look at more than their speedometer?

A.   I don't know what you're asking there.

Q.   When deciding whether to terminate a pursuit, must -- or does the officer need to consider factors in addition to their speed?

A.   Yes.

Q.   Do you agree that if the South Bend Police Department did not have a 60-mile-per-hour limit for their pursuits, it would not be evidence of deliberate indifference if they did not enforce the 60-mile-per-hour pursuit limit?

A.   There was a lot of negatives in there.  So let me state out what my opinion on this is and then tell me if I'm answering your question.

     If there was, indeed, not a 60-mile-per-hour limit, then there would be no need to enforce it. Is that what you're asking?

Q.   Yes.

     And if they didn't enforce the 60-mile-per-hour limit, that wouldn't be deliberately indifferent, right?

A.   If it didn't exist, correct.

Q.   So is your point that if a law enforcement agency does not enforce a policy, that gives its officers the impression that they don't have to follow any of the rules?

A.   Yes, clearly.

Q.   All right.  So on page 97 in your report, you referenced the "sorry that I bored you to death" statement in that same training video.

Do you agree that "sorry that I bored you to death" is not what that trainer said?

A.   I don't remember the exact words.  I'd have to watch it again.  It certainly conveyed the "I'm sorry to bore you to death" right after you're supposed to be having like an impactful statement of, hey, these are the risks that you're creating when you engage in this sort of behavior.  Again, it undermines the seriousness and -- the seriousness in which officers should be trained when it comes to these very impactful and high-risk activities.

Q.   Give me a moment here.

(Video played.)

MR. J. SMITH:  I think I'm at the right spot. I will --

MR. PHILLIPS:  Madam Court Reporter, when he plays the video, make sure you put what's in the video in the transcript, please.  We've had a debate with a couple other court reporters.

CERTIFIED STENOGRAPHER:  Yes, sir.  I usually

Page 215

can't hear it well enough to write it, but I will give it my best shot.

MR. PHILLIPS:  Yeah.  Well, if you don't hear it, stop us and we'll play it again because we've got to get it in there.

MR. J. SMITH:  Yeah.  I'm not going to play this repeatedly to satisfy you.  I don't want to waste all my time replaying video over and over again.

MR. PHILLIPS:  This is not satisfying me, this is creating a record for all of us.

MR. SMITH:  All right.  Let's -- oh, just for the record, this is file EVO video_TS-02_1, beginning at 20 minutes and 20 seconds.

(Exhibit 27 marked for identification.)

(Video played and transcribed herein:

"Yeah.  It was sombering.  All right. Any questions, thoughts, processes?  You've been a great audience and I've bored you into oblivion for an hour and a half here now.  I appreciate your time and effort in staying awake.  Thank you.")

BY MR. SMITH:

Q.  Were you able to hear that?

A.  I was.

Page 229

training throughout.

BY MR. SMITH:

Q.  Do you agree that one thing that a law enforcement trainer needs to do is keep the attention of officers that they're training?

A.  Not at the expense of undermining the material.

Q.  My question to you was:  Do you agree that law enforcement trainers need to keep the attention of the people they're training?

A.  They should endeavor to do so.  But again, not by method of undermining the training material.

Q.  Do you agree that law enforcement trainers commonly use humor as a way to keep their officers' attention?

A.  Yes, but it should be appropriate humor.

Q.  All right.  We mentioned this a little bit earlier.  I want to go back to your report, your initial report.  One moment.

Exhibit 2A, page 111, you say:  "Yet Assistant Chief Skibins also testified that he would not advise his officers to avoid such behavior."

That's -- that wasn't his entire answer, was it?

A.  You'd have to take me back to the deposition,

Page 230

which I'm sure you're going to.

Q. Well, do you remember that he also said that he would tell officers to use caution?

A. I don't recall that specifically. But I do remember him saying that he would not advise those officers to avoid such behavior.

And I think, if I'm remembering correctly, we're specifically talking about speeding through a blind intersection. You absolutely should be advising your officers not to engage in that behavior. It ended up killing somebody in this case.

Q. All right. Looking at a document that I have marked Exhibit 19.

(Exhibit 19 marked for identification.)

BY MR. SMITH:

Q. Does this appear to be a transcript of the deposition of Dan Skibins?

A. Yes, it does.

Q. Beginning on page 34, line 24:

"Question: Would you advise against that?" Talking about Officer Gorny's actions.

"Answer: I would tell officers to use caution if I was an EVO instructor.

Page 231

"Question:  My question is:  Would you advise your officers against the scenario that I just described:  Approaching Kaley, perceived emergencies, speed in the 90s, blind intersection against the red light, would you advise your officers to do that; yes or no?

"Answer:  That specifically?"

"Answer:  "I would tell them to use caution."

You did not --

MR. PHILLIPS:  Read the next part.

MR. SMITH:  No.

BY MR. SMITH:

Q.  You did not include that in your report, did you?

A.  You know, looking at my report, what I put in there is a factual statement.

Q.  You did not include in your report his testimony that he said he would tell officers to use caution, did you?

A.  That's -- using caution driving 98 miles per hour against a red light at a -- at a blind intersection is not something that helps this case.  He --

Q.  That's not using caution, is it?

Page 232

MR. PHILLIPS:  Hey, you interrupted him.

Finish, Scott.

A.  He should be -- the fact that he's not clearly saying, I would advise my officers not to do this, again, very much speaks to this cavalier attitude regarding emergency vehicle operations at the South Bend Police Department.  The fact that he simply could not admit that is highly problematic when you're looking at this from an organizational perspective.

BY MR. SMITH:

Q.  He said in his testimony that he would tell officers to use caution, didn't he?

A.  That's not adequate.

Q.  Didn't he?

A.  Sure.

Q.  Going 90 miles an hour in the middle of the night without your lights and siren and not clearing an intersection is not using caution, is it?

A.  No.  But that shouldn't be occurring regardless. He should be saying, this shouldn't occur.

Q.  So you're saying that South Bend should be liable in this case because an assistant chief did not take a more -- a more definitive stance about the -- what should be said in training?

MR. PHILLIPS:  Objection, form.

A.  What I'm saying is -- what I'm saying is, is that you keep trying to piecemeal all of this out.  And what I'm saying is, is this is just another spoke in that wheel that speaks to this overall organizational attitude and approach towards emergency vehicle operations and a complete lack of accountability.

BY MR. SMITH:

Q.  Do you agree --

A.  Is this -- does his statement that not being strong enough in his statement somehow caused it?  What I'm saying is, is that this is just another instance demonstrating this complete lack of training when it comes to emergency vehicle operations that pervaded the entire agency, when it comes to communicating appropriately about it, supervising it, retraining it, and enforcing their own written policies.

Q.  Are you -- is it your -- sorry.  Let me back up.

Do you agree that Chief Skibins was not saying that it is okay for South Bend police officers to do what Officer Gorny did?

A.  Did he say it was okay?  No.  He said he would use caution.

Page 234

Q.   Which you did not include in your report, did you?

          MR. PHILLIPS:  Objection, form.

A.   Again, I could have put that in my report, and I
     would still come to the exact same conclusion.

BY MR. SMITH:

Q.   You say on pages 119 to 120 of your report that
     "EVO instructors should generally know the
     magnitude of the dangers of high-speed vehicle
     operations so they can properly advise the
     listeners."

          Do you agree there is no generally accepted
     law enforcement standard requiring EVO trainers to
     know the statistics of how many people are harmed
     in police pursuits?

A.   I would agree with that.  I would just say that it
     would be -- as a training division commander, I
     would expect my training officers to be able to
     speak competently about the topic that they were
     discussing.  And this is part of that.

Q.   It's a good idea for them to know those stats, but
     they're not required to, right?

A.   Required to?  I wouldn't put that strong of a term
     on it, no.

Q.   This information can be shared through training
     videos, right?

Page 235

A.  Can it?  Sure.

Q.  Like the training videos that South Bend Police Department had available for its officers, right?

A.  It could be.

Q.  I think you mentioned the information about -- yes, on page 119 of your report, you say:  "As a result of pursuits, over 300 persons die each year, thousands are injured."

     That information came from one of South Bend's training videos, didn't it?

A.  That is correct.  And I would expect EVO trainers to have -- especially -- especially the training supervisors to have watched those videos and know what's in them.  And it doesn't appear that even that low bar was met here.

Q.  On page 126 of your report, you say that Sergeant Hiipakka testified that it was common practice to turn off lights and siren before arriving to certain types of calls, and you described this as evidence of deliberate indifference.

     I'm going to read a portion of his deposition which is marked Exhibit 20.

     Page 27 beginning at line 4:

          "Question:  Did the cultural differences

Page 236

of the midnight or night shift allow City of South Bend police officers to disobey police department policies?"

After an objection, the witness answers:

"No.  No shift had any cultural differences, there was just different ways that we would perform different things on night shift just because of the fact that our lights and sirens traveled different distances than you would deal with on day shift.

"So day shift guys have during the -- during the sun up hours in high traffic, the sirens and lights wouldn't go as far.  And on night shift, our lights would bounce down the road and down buildings, and the sirens would do much of the same because there is less vehicle traffic and some environmental differences in it.

"So we would operate in slightly different ways, depending on the call type that we were dealing with, but I wouldn't necessarily say that's a cultural difference for the shift."

Do you recall this testimony?

Page 237

A. I do.

Q. Do you agree that his testimony accurately described the different effects of lights and sirens between day and night?

A. It can. But it also suggests that if day shift officers are using their lights and sirens during certain circumstances and night shift isn't in those same circumstances, or at least not as frequently as in the day shift officers, then the night shift officers are not using their emergency equipment in the same manner, which means they're not using it as required by policy and generally accepted practices.

Q. Were you ever a night shift officer on patrol?

A. I was.

Q. His testimony on pages 27 and 28 here, is that consistent with your own experiences about the differences between how lights and sirens affected the environment during the day and night?

A. Well, with how far lights might be able to be seen, sure, that can make a difference in the dark versus the light. It certainly is not my experience about whether or not we used it less or more.

Q. What about the siren? Would a siren, in your

Page 238

experience, travel farther during the night because there was less traffic as Officer Hiipakka testified?

A. I mean, it could, I guess, in theory.

Q. As we've discussed already, if the officers are turning off their lights or their siren, they are required to use extra caution by South Bend Police Department policies, right?

A. That's what their written policy says, yes.

Q. Nothing in this testimony by Sergeant Hiipakka that I just read suggested that they weren't doing that.

Do you agree with that?

A. No. It suggests to me that they were not using their lights and sirens as frequently as they should have as the day shift officers were.

Q. Do you agree that there are certain types of calls where you don't want the suspect knowing that you're on the way?

A. There can be, but they're very limited.

Q. Those types of calls may be burglary in progress, right?

A. It could be, yes.

Q. May be a hostage situation, right?

A. Yes.

Page 239

Q.   Something where there could be increased danger to someone if the suspect knows that the police are on the way, right?

A.   Yes.

Q.   Do you agree that generally accepted law enforcement standards do not say that police officers must use their siren even if they're responding to one of those situations?

A.   No.   The exception within the written policy regarding those specific types of calls are not uncommon.

Q.   So going to page 137 of your initial report, Exhibit 2A, you discuss documentation of South Bend Police Department vehicle pursuits.

     And you say --

A.   I'm sorry.  Did you ask me something?

Q.   Hang on.

A.   Okay.

Q.   You say:  "Assuming this list is accurate."

     Were you asked to assume that this list is accurate?

A.   No.  Otherwise I wouldn't have put that statement in there.  I just wanted to make the distinction, if this is accurate, then this; if it wasn't accurate, then that.

justified and within policy?

A.   That sounds about right.  I'm also aware of
numerous memos where Captain Schweizer says these
determinations are extremely problematic as they
were out of policy.

        MR. SMITH:  Objection, nonresponsive, move to
strike.

BY MR. SMITH:

Q.   Are you aware that your list here of the 261
pursuits includes 50 of those 57 pursuits where
the pursuit review committee found that it was
justified and within policy?

        MR. PHILLIPS:  Objection, form.

A.   I'm not aware of that.  But again, we're talking
about two different processes here, so I'm not
quite sure how you're comparing apples to apples.

BY MR. SMITH:

Q.   Do you recall Captain Herron's testimony that he
would only send the pursuit review -- or excuse
me -- the pursuit to the pursuit review committee
if he thought there was a possible violation of
policy?

A.   I do.  But there's very, very few minutes from
those pursuit review committees, even though they
were supposedly occurring at a more regular basis.

Page 245

And based off of their recordkeeping demonstration here, it's very hard for me to align which ones we would expect to actually line up between these two processes.

MR. SMITH: Objection, yet again, nonresponsive, move to strike.

BY MR. SMITH:

Q.   My question was:  Do you recall that testimony? Yes or no.

A.   I don't even remember your question now.

Q.   All right.  So if we accept as true Captain Herron's testimony that Captain Schweizer would only send pursuits to the pursuit review committee if he thought there was a possible policies violation, you agree that suggests that if he did not send a pursuit to the committee, he found no policy violation?

MR. PHILLIPS: Objection, form.

A.   Well, you know, based off of that statement made by Captain Herron, that would certainly seem to indicate it.  But I haven't seen any testimony from Captain Schweizer that actually confirms what his process was, so -- I mean, it's hard for me to say with any certainty yes or no to that.

BY MR. SMITH:

Page 246

Q.  Are you rejecting Captain Herron's testimony that that was Captain Schweizer's procedure?

A.  Am I rejecting it?  No.  But he just didn't seem to know a lot about the processes, so there wasn't certainty.

Q.  So if we can agree that Captain Schweizer would only send the pursuits to the committee if he thought there was a possible policy violation, then any -- any pursuit that was not sent to the committee would have been found by the Office of Risk Management to not be in violation of policy?

        MR. PHILLIPS:  Objection --

A.  Yes.

        MR. PHILLIPS:  -- form.

A.  Yes.

BY MR. SMITH:

Q.  Yes, thank you.

A.  If we make the assumption about all of those things being accurate, then yes.  But again, Captain Herron didn't seem super clear on some of these processes.

        MR. PHILLIPS:  We need -- I need to take a break.

        MR. SMITH:  One question.  One question.

BY MR. SMITH:

Q.  Are you making a credibility determination about Captain Herron's testimony?

A.  If you're asking me if I'm making a credibility assessment in -- like in the sense of whether he's lying or tell telling the truth, no.  I'm simply --

(Unreportable simultaneous conversation.)

A.  -- pointing out -- I'm simply pointing out that he wasn't -- he didn't appear to be very clear on some of these processes, so he could inadvertently be wrong about some of the things he said on those.

MR. SMITH:  Let's take five.

MR. PHILLIPS:  Thanks, guys.

CERTIFIED STENOGRAPHER:  We're off the record.

(Recess from 4:17 p.m. to 4:24 p.m.)

CERTIFIED STENOGRAPHER:  Back on the record.

BY MR. J. SMITH:

Q.  So if we accept as true the testimony that Captain Schweizer would only send a pursuit to the committee if he thought there was a possible policy violation, and we accept it as true that he sent 65 pursuits to the committee from 2015 through 2017, then the maximum number of pursuits

Page 252

(Unreportable simultaneous conversation.)

A. That would require -- that would require us to also ignore all the times in which Captain Schweizer and the pursuit review committee said this is out of policy.

BY MR. J. SMITH:

Q. How many times, from your review of the records, did Captain Schweizer disagree with the pursuit review committee?

A. I don't remember the number of times.

Q. Well, is it more or less than ten?

A. I don't recall off the top of my head. We could certainly go through them all.

Q. So if we assume as true that 141 of these 261 entries on this list that say "no" for pursuit justified within policy were actually found to be justified and within policy, then this list is less than half accurate. Isn't that true?

        MR. PHILLIPS: Objection, form.

A. If I'm following you correctly and we're making all of these assumptions that you're making, okay.

BY MR. SMITH:

Q. A researcher in the field of law enforcement wants to use the most accurate information available to them.

            Do you agree with that?

A.   Yes.

Q.   If the -- if a department's paper records are more

     accurate than a database that the department

     maintains, would a researcher in the field of law

     enforcement use the database or the paper records

     as a basis for their research?

A.   Well, again, you're mixing -- there's so many

     things mixed up in this particular instance, it's

     hard to answer that question.

Q.   I'm not asking --

A.   You have a --

     (Unreportable simultaneous conversation.)

BY MR. J. SMITH:

Q.   I'm asking generally.

A.   You -- you're asking -- well, I'm talking about

     this case.  You're asking about a database that

     clearly wasn't filled out correctly.  You're

     asking about pursuit review committee findings

     that have strong disagreement from the captain

     over Office of Risk Management.  Which way do you

     lean on those?  As I said, this -- these records

     are so convoluted it's hard for me to answer that

     question.

Q.   If the database records are clearly not filled out

Page 254

correctly, would a researcher in the field of law enforcement rely on those database records?

A. Sorry. Ask me that again.

Q. You said that the database records for the South Bend Police Department were clearly not filled out correctly, right?

A. Well, no. What I'm saying is, is they were filled out incorrectly if we're operating under the assumptions that you are that these were actually all within policy pursuits. I still cannot determine that based off of how bad their recordkeeping system is.

Q. All right. Then I will ask you generally speaking. This is a hypothetical question, not talking about South Bend's records in particular. Okay?

Okay?

A. Okay. But I tend not to answer hypotheticals because that's not what I reviewed.

Q. Well, you're an expert. That's your job, so I'm going to ask.

A. My job is to review circumstances and files and documents that are provided to me, not engage in hypotheticals.

Q. Sir, would -- all right. So let's take a

situation where the -- a department has a database and they use their paper records to update that database.  Let's say that more than half of those database entries are wrong.

And I can give you a particular scenario. Let's say a researcher wants to research the racial makeup of the people that the department comes in contact with.  And let's say that they have in their reports, as many agencies do, information about the race that the -- of the person that they came into contact with.

And let's say they have a database that also has that information.  But the department tells the researcher, we don't typically update the database.  And let's say that the database entries are more than 50 percent wrong -- or I'll just say inconsistent, they're more than 50 percent inconsistent with the department's paper records.

Would it be reasonable for a researcher in the field of law enforcement to rely on the database records instead of the paper records?

A.   In that particular context and scenario, no.  But that is not the context and scenario we're operating in here.

Q.   That would be a poor research practice by that

researcher, wouldn't it?

A.   In that particular context and scenario, yes.

Q.   That would cause that researcher's research to be seriously questioned by other experts in the field, wouldn't it?

        MR. PHILLIPS:  Objection, form.

A.   Again, you're asking me about hypotheticals that haven't occurred.  So I can't really answer that.

BY MR. SMITH:

Q.   Would a --

A.   I'm not even sure what we're talking about at this point.

Q.   Would a publication be likely to publish research that was based on that kind of research in the situation that I've suggested?

        MR. PHILLIPS:  Objection, form and scope.

A.   Again, I can't comment on something that hasn't occurred.

BY MR. SMITH:

Q.   All right.  Let's talk about Captain Schweizer's memo since you brought that up.

        Going back to your report, Exhibit 2A, looking at page 141.  I'll zoom in a little bit.  All right.  So you have in your report a copy of Captain Schweizer's March 16, 2016 memorandum.

Page 270

"Chief Ruszkowski had the final authority to address deficiencies and discipline of officers."

On what evidence do you base this statement?

A. Generally accepted practice on how police organizations run. The chief is the chief executive officer. He has final authority for discipline as well as the direction of the agency, policy or otherwise.

Q. Do you know who the policymakers are for the South Bend Police Department?

A. I don't know what you mean by that.

Q. Have you ever heard of the Board of Public Safety?

A. I have.

Q. In the materials that were provided to you, did you see any evidence indicating that the Board of Public Safety was aware of the training and supervision deficiencies that you discuss in your report?

A. I don't recall being provided any materials on that beyond their findings that Officer Gorny's actions on that night were reckless.

Q. Have you seen any evidence in the materials provided to you that South Bend Police Departments generally were unaware in July of 2018 that they were required to drive with due regard for the

Page 330

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SORAIDA FLORES, as              )
Personal Representative         )
of the Estate of Erica          )
Flores, deceased,               )
                                )
      Plaintiff,                )
                                )  CASE NO.
-v-                             )  2:19-cv-64-PPS-JEM
                                )
CITY OF SOUTH BEND, a           )
municipal corporation,          )
and JUSTIN GORNY,               )
                                )
      Defendants.               )


Job No. 198034

        The deposition of SCOTT M. MOURTGOS, Ph.D.,
taken in the above-captioned matter, on
April 28, 2025, and at the time and place set out
on the title page hereof.

        It was requested that the deposition be
transcribed by the reporter and that same be
reduced to typewritten form.

        It was agreed that the reading and signature
by the deponent to the deposition were waived on
behalf of the parties plaintiff and defendant by
their respective counsel, the witness being
present and consenting thereto, and/or pursuant to
the Fed. R. Civ. P. 30(e), the deposition to be
read with the same force and effect as if signed
by said deponent.



        STEWART RICHARDSON & ASSOCIATES
        Registered Professional Reporters
        One Indiana Square, Suite 2425
             Indianapolis, IN 46204
                (800) 869-0873

Page 331

STATE OF INDIANA

COUNTY OF HAMILTON

        I, Amy Doman, RDR, CRR, CSR (CA/IL/TX/WA), a
     Notary Public in and for said county and state, do
     hereby certify that the deponent herein was by me
     first duly sworn to tell the truth, the whole
     truth, and nothing but the truth in the
     aforementioned matter;
        That the foregoing deposition was taken on
     behalf of the Defendants; that said deposition was
     taken at the time and place heretofore mentioned
     between 10:00 a.m. and 6:23 p.m.;
        That said deposition was taken down in
     real-time stenographic translation and afterwards
     prepared under my direction; and that the final
     transcript is a true record of the testimony given
     by said deponent;
        Absent a request by the parties or by
     agreement, the reading and signing by the deponent
     to the deposition were waived on behalf of all the
     parties by their respective counsel, the witness
     being present and consenting thereto, and/or
     pursuant to the Fed. R. Civ. P. 30(e); and the

deposition is to be read with the same force and effect as if signed by said deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 13th day of May, 2025.

Amy Doman
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0705866
My Commission Expires Sept. 30, 2025

Amy Doman, RDR, CRR, CCR, CSR
California CSR Number 14465
Texas CSR Number 6203
Illinois CSR Number 084004926
Washington CSR Number 22031067
Missouri CCR Number 1529
Notary Public NE0705866

My Commission Expires:
September 25, 2025

Job No. 198034