**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased,<br><br>Plaintiff,<br>v.<br><br>CITY OF SOUTH BEND, a municipal corporation, and JUSTIN GORNY,<br><br>Defendants. | ) | Case No. 2:19-cv-00064-JTM-JPK |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, SORAIDA FLORES, as Personal Representative of the Estate of ERICA FLORES, deceased, by and through her attorneys, PHILLIPS LAW OFFICES, and pursuant to Northern District of Indiana Local Rule 56-1(b)(2) submits the following response to Defendants' Statement of Material Facts. In support thereof, Plaintiff states as follows:

**TABLE OF CONTENTS**

**Page, Paragraph**

**Defendant's Statement of Material Facts (With Plaintiff's Response)** ....3
**I. The Events of July 20, 2018** ....3
**A. The Hot Spot Patrol** .... 3, ¶ 1
**B. Officer Gorny Responds to Radio Traffic about an Erratic Driver Leaving the Area of the Hot Spot Patrol, and Traveling toward Officer Gorny's Beat**.... 5, ¶ 12
**C. The Accident** .... 16, ¶ 50
**II. South Bend Policy and Training on Emergency Vehicle Operations**
**A. Academy Training** .... 20, ¶ 62
**B. South Bend Police Department Policy on Emergency Vehicle Operations**.... 22, ¶ 67
**C. South Bend's Field Training Officer Program** .... 28, ¶ 72
**D. In-Service Training** .... 35, ¶ 79

**E. South Bend Police Department Review of Damage to Department Vehicles. 43, ¶ 87**
**F. South Bend Police Officer's Understanding of Department Policy on Emergency Vehicle Operations ........ 45, ¶ 92**
**III. South Bend Policy on Training and Pursuits**
**A. South Bend's Pursuit Policy ........ 52, ¶ 101**
**B. South Bend Training on Pursuits ........ 56, ¶ 103**
**C. South Bend Review of Police Pursuits........ 60, ¶ 106**
**IV. Officer Gorny's Training on Emergency Vehicle Operations and Pursuits ....70, ¶ 115**

**Plaintiff's Additional Material Facts........84**
**I. Events of July 20, 2018........84**
**A. Gorny Goes Through a Red Light At an Obstructed Intersection........ 84, ¶ 128**
**B. This was a Traffic Stop That Gorny was not Assigned To........ 89, ¶ 153**
**C. Gorny Did not Activate Continuous Lights and Sirens as Required........ 90, ¶ 166**
**D. Testimony of Police Chief Scott Ruszkowski on Gorny's Conduct ........ 91, ¶ 172**
**E. Gorny was Found to Have Driven Extremely Recklessly........ 94, ¶ 194**
**II. Gorny's Training With South Bend ........ 97, ¶ 205**
**III. South Bend's Review of Police Pursuits........104**
**A. Captain Schweizer Ran the Pursuit Review Committee ........ 104, ¶ 223**
**B. Captain Schweizer's Ongoing Criticisms........ 104, ¶ 228**
**C. Captain Schweizer's 2016 Admonishments ........111, ¶ 243**
**D. Officer Gorny's History of High-Speed Operations ........ 124,¶ 267**
**IV. Importance of Training........ 126,¶ 270**
**A. Captain Herron – The City's 30(b)(6) witness........ 126,¶ 270**
**B. Sergeant Calvert – The City's 30(b)(6) witness ........ 128, ¶ 286**
**C. Captain Fulnecky – The City's 30(b)(6) witness ........ 131, ¶ 308**
**D. Assistant Chief Dan Skibbins – The City's 30(b)(6) witness ........ 131, ¶ 313**
**V. South Bend Police Officer Training on Constitutional Violations ........ 133, ¶ 329**

**Defendants Statement of Material Facts (With Plaintiff's Response)**

**I. The Events of July 20, 2018.**

**A. The Hot Spot Patrol**

1. On the morning of July 20, 2018, South Bend Police Department Sergeant Ryan Hiipakka, Officer Zachary Alfrey, Officer James Wagner, Officer Gregory Howard, and Officer Mollie O'Blenis were working a "hot spot" patrol in the Northwest District. ECF #1, ¶¶12-15; Exhibit D at 33:13 -- 34:9; Exhibit L at 313:2-13. A "hot spot" patrol involves an increase of police monitoring within that designated area. ECF #1, ¶12.

**RESPONSE 1. Plaintiff does not dispute Movant's Fact No. 1.**

2. Officer Gorny was not assigned to work the hot spot. Exhibit D at 31:17-22. Officer Gorny was assigned to the Southwest District, otherwise known as "The Lake," that night. ECF #1, ¶25; Exhibit D at 32:18-24; Exhibit L at 313:14-16, 431:8-18.

**RESPONSE 2. Plaintiff does not dispute Movant's Fact No. 2.**

3. Officer Gorny was assigned to the "X car." Exhibit L at 313:14-16.

**RESPONSE 3. Plaintiff does not dispute Movant's Fact No. 3.**

4. An X car is expected to assist with traffic stops. Exhibit L at 307:12-18.

**RESPONSE 4. Plaintiff does not dispute Movant's Fact No. 4. However, Plaintiff disputes that an X car from a different district is expected to assist with traffic stops in another district. Exhibit A at 9:22-10:6, 38:14-39:10; Exhibit J at 13:11-21.**

5. Officer Alfrey was working in an unmarked, undercover van with Officer Wagner. ECF #1, ¶13; Exhibit A at 8:16-19, 9:8-10; Exhibit D at 33:24 -- 34:2; Exhibit G at 16:3-6. They were observing a residence that was believed to be distributing narcotics. Exhibit A at 22:2-25. If they observed someone at the house for a short time and then leave, they would follow that

vehicle until a traffic stop could be performed to investigate the possible narcotics offenses. Exhibit A at 22:2-25; Exhibit G at 17:24 -- 18:3.

**RESPONSE 5. Plaintiff does not dispute Movant's Fact No. 5.**

6. Officer O'Blenis and Officer Howard were working in an unmarked car that was equipped with lights and siren. ECF #1, ¶14; Exhibit A at 8:22-9:7; Exhibit D at 34:6-9.

**RESPONSE 6. Plaintiff does not dispute Movant's Fact No. 6.**

7. Sergeant Hiipakka was working in the hot spot area in a marked patrol car. ECF #1, ¶15; Exhibit A at 8:19-21; Exhibit D at 34:3-5; Exhibit G at 15:25 -- 16:2.

**RESPONSE 7. Plaintiff does not dispute Movant's Fact No. 7.**

8. Officers working the hot spot patrol were using a dedicated channel, Channel 7, to communicate with each other. ECF #1, ¶19.

**RESPONSE 8. Plaintiff does not dispute Movant's Fact No. 8. However, answering further, Plaintiff states there were a total of 5 officers working and assigned to the hot spot area and using the dedicated radio channel 7 to communicate with each other. Exhibit A at 9:22-10:6, 38:14-39:10.**

9. Officer Gorny was monitoring Channel 7. ECF #1, ¶21. It was not inappropriate for Officer Gorny to monitor Channel 7. Exhibit L at 290:7-12.

**RESPONSE 9. Plaintiff does not dispute Movant's Fact No. 9.**

10. Officers are expected to monitor each other's safety and radio traffic and be available and proactive to intervene when officers need assistance. Exhibit A at 25:17-21.

**RESPONSE 10. Plaintiff does not dispute Movant's Fact No. 10 when they are assigned to the same district. Plaintiff disputes that this applied to Gorny on the night of the incident as no one requested Gorny and the five (5) officers assigned to the hotspot had plenty of personnel/ manpower and did not need Gorny to assist. Exhibit A at 9:22-10:6, 38:14-39:10.**

11. Officers working the hot spot patrol discussed over the radio their belief that someone had "made" them---i.e. identified the undercover van as a police vehicle. Exhibit N, 4:18:50 through 4:27:20, "Merged Radio Traffic (x94) START" at 00:00 through 1:45; Exhibit O, 4:18:50 through 4:27:20.

**RESPONSE 11. Plaintiff does not dispute Movant's Fact No. 11.**

### B. Officer Gorny Responds to Radio Traffic about an Erratic Driver Leaving the Area of the Hot Spot Patrol, and Traveling toward Officer Gorny's Beat.

12. Officer Alfrey observed a vehicle that was suspected of being involved in a narcotics transaction and left the hot spot in a fairly rapid fashion. Exhibit A at 23:1-12.

**RESPONSE 12. Plaintiff does not dispute Movant's Fact No. 12.**

13. Officer Alfrey followed the vehicle, and observed it speeding and driving erratically. Exhibit A at 9:11-14, 23:13-16.

**RESPONSE 13. Plaintiff does not dispute Movant's Fact No. 13. However, Plaintiff disputes that any officer used the word "erratic" on the police radio. Exhibit O (radio transmission transcript) (no mention of the term "erratic").**

14. Officer Alfrey began to broadcast the vehicle's movements over the radio. Exhibit A at 23:13-16; Exhibit N, 4:30:02; Exhibit O, 4:30:02.

**RESPONSE 14. Plaintiff does not dispute Movant's Fact No. 14.**

15. Officer Alfrey began to broadcast the vehicle's movements over the radio less than three minutes after the radio transmissions about the undercover officers being "made." Exhibit A at 23:13-16; Exhibit N, 4:27:20 through 4:30:02; Exhibit O, 4:27:20 through 4:30:02.

**RESPONSE 15. Plaintiff does not dispute Movant's Fact No. 15.**

16. Officer Alfrey's goal was to perform a traffic stop. Exhibit A at 9:11-14.

**RESPONSE 16. Plaintiff does not dispute Movant's Fact No. 16.**

17. Undercover officers rely on marked patrol cars to make traffic stops. Exhibit A at 25:12-16.

**RESPONSE 17. Plaintiff generally agrees that marked patrol cars are used to make a traffic stop, but disputes that this was always the case, as unmarked squad cars are also equipped with emergency lights and sirens. Exhibit A at 25:12-16, 39:1-4.**

18. Officer Gorny was at the intersection of South Sheridan and West Sample Street, talking with Officer Brandon Myers, when he heard the radio traffic about the reckless driver. ECF #1, ¶29; Exhibit D at 35:11-19.

**RESPONSE 18. Plaintiff does not dispute Movant's Fact No. 18 as to the location of the Officer Gorny but disputes that anyone on the radio said this was a "reckless" driver. Exhibit O (No mention of the term "reckless").**

19. Officer Gorny understood that the undercover officers needed a marked vehicle to initiate the traffic stop. Exhibit D at 35:17-22.

**RESPONSE 19. Plaintiff does not dispute that Gorny testified to this but disputes that Officer Gorny was asked to initiate or get involved in this traffic stop.**

**Exhibit A at 32:2-18; Exhibit O (no indication that Officer Gorny was asked to initiate or get involved).**

20. Officer Alfrey was following the driver that committed the traffic violation until a marked car could get him pulled over. Exhibit A at 14:14-22.

**RESPONSE 20. Plaintiff does not dispute Movant's Fact No. 20.**

21. Officer Alfrey was unable to keep up with the vehicle. Exhibit A at 14:23-15:2.

**RESPONSE 21. Plaintiff does not dispute that Officer Alfrey testified to this but further responds that the radio transmission indicates that Officer Alfrey stated several times that he was behind the white minivan and was able to call out the white minivan's location throughout the radio transmission. Exhibit O at 4:30:22, 4:31:28, 4:31:51, 4:32:42, 4:33:27.**

> *We're behind them west on Lincolnway and they blew through the stop sign up here.*

*Exhibit O, 4:30:22.*

> *He's uh right on Linden or Orange. Headed towards Olive.*

*Exhibit O, 4:31:28.*

> *OK, we're on Linden coming up to Olive. He's still moving pretty good. He's, uh, turning left on Olive. Looks like he's gonna go over the tracks.*

*Exhibit O, 4:31:51.*

> *OK, uh, I'll stay behind him until uh you get him pulled over.*

*Exhibit O, 4:32:42.*

> *OK, yeah, that's him right in front of you. Uh, the rear van. We're coming up to him.*

*Exhibit O, 4:33:27.*

22. The vehicle that Officer Alfrey was following turned southbound, heading toward the Southwest District, Officer Gorny's assigned district. Exhibit D at 41:24 -- 42:8; Exhibit L at 290:13-21.

**RESPONSE 22. Plaintiff does not dispute that the vehicle turned southbound while still in the hot spot district. Exhibit O, 4:30:54.**

23. Officer Alfrey made the following radio transmissions about the vehicle he was following:

> *We do have a white minivan that's whipping pretty hard back through here, coming down College (unintelligible) Lincolnway and no plate light. And uh they're moving pretty good.*

Exhibit N, 4:30:02; Exhibit O, 4:30:02.

> *We're behind them west on Lincolnway and they blew through a stop sign up here.*

Exhibit N, 4:30:02; Exhibit O, 4:30:22.

> *He's uh south on Brookfield. He's zooming pretty good.*

Exhibit N, 4:30:02; Exhibit O, 4:30:54.

**RESPONSE 23. Plaintiff does not dispute that these radio transmissions were made as part of the traffic stop discussion. However, Plaintiff disputes any characterization that Officer Alfrey stated or believed that this traffic stop was an emergency. Exhibit A at 9:15-18, 17:13-15, 38:14-18.**

24. Sergeant Hiipakka then radioed that he was at Lincolnway and Bendix. Exhibit N, 4:31:05; Exhibit O, 4:31:05.

**RESPONSE 24. Plaintiff does not dispute Movant's Fact No. 24.**

25. The intersection of Lincolnway and Bendix is one mile from the intersection of College and Lincolnway. Exhibit Q.

**RESPONSE 25. Plaintiff does not dispute Movant's Fact No. 25.**

26. Officer Alfrey then radioed:

> *He's uh right on Linden or Orange. Headed towards Olive.*

Exhibit N, 4:31:28; Exhibit O, 4:31:28.

**RESPONSE 26. Plaintiff does not dispute Movant's Fact No. 26.**

27. Officer Howard radioed that he was at Wilber and Lincolnway. Exhibit N, 4:31:42; Exhibit O, 4:31:42.

**RESPONSE 27. Plaintiff does not dispute Movant's Fact No. 27.**

28. The intersection of Wilber and Lincolnway is approximately one mile driving distance from the intersection of Linden and Olive. Exhibit R.

**RESPONSE 28. Plaintiff does not dispute Movant's Fact No. 28.**

29. Officer Alfrey then radioed:

> *OK, we're on Linden coming up to Olive. He's still moving pretty good. He's uh, turning left on Olive. Looks like he's gonna go over the tracks.*

Exhibit N, 4:31:51; Exhibit O, 4:31:51.

**RESPONSE 29. Plaintiff does not dispute that this radio transmission was made as part of the traffic stop discussion. However, Plaintiff disputes any characterization that Officer Alfrey stated or believed that this was an emergency. Exhibit A at 9:15-18, 17:13-15, 38:14-18.**

30. Officer Alfrey's radio transmissions indicated that the suspect vehicle had come from the area of the hot spot patrol, and that it was traveling toward the southwest region. Exhibit G at 51:15-20, 52:1-9.

**RESPONSE 30. Plaintiff does not dispute the suspect vehicle's path of travel but disputes that any of Officer Alfrey's radio transmissions indicated or stated to anyone that this traffic stop was an emergency. Exhibit A at 9:15-18, 17:13-15, 38:14-18.**

31. Officer Gorny radioed:

> *95's not too far away from Olive* [*and*] *Western. What do you need?*

Exhibit D at 41:24 -- 42:8; Exhibit N, 4:32:15; Exhibit O, 4:32:15.

**RESPONSE 31. Plaintiff does not dispute that this statement is in the radio transmission transcript.**

32. "95" is Officer Gorny. Exhibit D at 37:2-10.

**RESPONSE 32. Plaintiff does not dispute Movant's Fact No. 32.**

33. Officer Gorny proceeded north on Sheridan toward Western. ECF #1, ¶38.

**RESPONSE 33. Plaintiff does not dispute Movant's Fact No. 33.**

34. The intersection of Sheridan and Sample is 1.5 miles driving distance from the intersection of Western and Olive. Exhibit S.

**RESPONSE 34. Plaintiff does not dispute Movant's Fact No. 34.**

35. Officer Gorny turned right onto Western Avenue and proceeded east on Western. ECF #1, ¶40.

**RESPONSE 35. Plaintiff does not dispute Movant's Fact No. 35.**

36. Officer Alfrey radioed:

> *OK, we've got a uh white or silver Ford Windstar, looks like. Um, no plate light. He's moving really good. He's getting ready to come over the tracks on Olive. We're behind him in our van.*

Exhibit N, 4:32:22; Exhibit O, 4:32:22.

**RESPONSE 36. Plaintiff does not dispute that this transmission was made as part of the traffic stop discussion. However, Plaintiff disputes any characterization that Officer Alfrey stated or thought this was an emergency. Exhibit A at 9:15-18, 17:13-15, 38:14-18.**

37. Officer Gorny activated his overhead emergency lights as he proceeded east on Western because the radio traffic was sounding increasingly urgent. Exhibit D at 163:9-19, 181:22 -- 182:2. Officer Gorny believed that it was urgent to stop the vehicle. Exhibit D at 77:19 -- 78:4, 181:22 -- 182:12.

**RESPONSE 37. Plaintiff does not dispute that Officer Gorny testified to this in his deposition. However, Plaintiff disputes that any officer stated over the radio that the traffic stop was "urgent" or became an emergency at any time. Exhibit O (no reference to "urgent"). Answering further, every officer involved in this traffic stop or who reviewed it on behalf of the City of South Bend stated that they believed this traffic stop was not an emergency. Exhibit J at 13:4-10; 22:16-23:3; Exhibits J23-J25[1]; Exhibit E at 9:20-10:2; 17:7-17; 54:10-20; 55:17-56:4; 58:2-21.**

38. When he activated his emergency lights, Officer Gorny did not activate his siren. Exhibit D at 87:22 -- 88:1. He made this decision for tactical purposes. Exhibit D at 87:22 -- 88:1. He believed that the siren would alert the suspect and put pedestrians at risk. Exhibit D at 88:2-13.

**RESPONSE 38. Plaintiff does not dispute that Officer Gorny testified to this. However, Plaintiff disputes that Gorny's alleged reasons for not activating his siren were valid or within South Bend policy, as South Bend's Chief of Police Scott Ruszkowski, and Captain of Internal Affairs, David Herron, who investigated this incident, testified that**

[1] These are Deposition Exhibits 23-25 from Exhibit J, the deposition of Chief Ruszkowski.

**Gorny's reasoning that this was an emergency was not valid and that he violated police department policy regarding the use of lights and sirens. Exhibit J at 13:4-10; 22:16-23:3; Exhibits J23-J25; Exhibit E at 9:20-10:2; 17:7-17; 54:10-20; 55:17-56:4; 58:2-21.**

39. Officer Gorny radioed:

> *95's coming up Western towards Olive.*

Exhibit N, 4:32:37; Exhibit O, 4:32:37.

**RESPONSE 39. Plaintiff does not dispute Movant's Fact No. 39.**

40. Officer Alfrey responded:

> *OK, uh, I'll stay behind him until uh you get him pulled over.*

Exhibit N, 4:32:42; Exhibit O, 4:32:42.

**RESPONSE 40. Plaintiff does not dispute that these transmissions are in the radio transcript. However, Plaintiff disputes that Alfrey requested or asked Gorny to pull over the driver or assist in the traffic stop. Plaintiff also disputes that the officers involved in the traffic stop needed Gorny to effectuate or assist in the traffic stop. Exhibit O (no mention of any request or instruction for Gorny to assist or pull over the driver).**

41. Officer Alfrey radioed:

> *OK. He's, uh, passing cars into oncoming traffic. He's, uh, driving in the opposite lane of traffic, coming back over into the correct lane. He's, uh, coming up Olive and Western now.*

Exhibit N, 4:32:53; Exhibit O, 4:32:53.

> *OK, he just blew through Western, uh, on Olive, going up towards the roundabout.*

Exhibit N, 4:33:15; Exhibit O, 4:33:15.

**RESPONSE 41. Plaintiff does not dispute that these transmissions are in the radio transcript. However, Plaintiff disputes that these radio transmissions were in response to Gorny's radio transmission or that Alfrey requested or asked Gorny to pull over the driver or assist in the traffic stop. Plaintiff also disputes that the officers involved in the traffic stop needed Gorny to effectuate or assist in the traffic stop. Exhibit O (According to Alfrey his transmissions were not directed to Gorny or that he requested Gorny's assistance).**

42. Based on the actions of the vehicle Alfrey was following and its erratic and dangerous driving, Alfrey believed that this was more than just a routine traffic stop or traffic violator. Exhibit A at 26:8-15.

**RESPONSE 42. Plaintiff does not dispute that Officer Alfrey testified to this in his deposition. However, Plaintiff disputes that this was ever stated in any radio transmission on the night of this occurrence. Exhibit O (no mention of this statement in any radio transmission).**

**Plaintiff also disputes that this was more than just a traffic stop and disputes that this was an emergency. South Bend's Chief of Police Scott Ruszkowski, and Captain of Internal Affairs, David Herron, who investigated this incident. Exhibit J at 13:4-10; 22:16-23:3; Exhibits J23-J25; Exhibit E at 9:20-10:2; 17:7-17; 54:10-20; 55:17-56:4; 58:2-21.**

43. Alfrey also believed, based on what he observed, that it was important for officers to promptly get that person stopped. Exhibit A at 26:19-22

**RESPONSE 43. Plaintiff does not dispute that Officer Alfrey testified to this. However, Plaintiff disputes that this was ever stated in any radio transmission on the night of this occurrence. Exhibit O (no mention of this statement in any radio transmission).**

44. A driver who runs a stop sign could be an indication that they are fleeing from police. Exhibit G at 49:22 -- 50:17

**RESPONSE 44. Plaintiff does not dispute that Officer Hiippaka testified to this. However, Plaintiff disputes that this was ever stated in any radio transmission on the night of this occurrence. Exhibit O (no mention of this statement in any radio transmission).**

**Answering further, Plaintiff disputes that the traffic violator ever fled from the officers or ever disobeyed any request by any officer to stop his vehicle, as he stopped promptly and stated he was late for work when asked to stop and was let go without being issued a ticket. Exhibit A at 14:1-13.**

45. Driving at high speed is potentially consistent with someone fleeing. Exhibit G at 50:22 -- 51:1.

**RESPONSE 45. Plaintiff does not dispute that Officer Hiippaka testified to this. However, Plaintiff disputes that this was ever stated in any radio transmission on the night of this occurrence. Exhibit O (no mention of this statement in any radio transmission).**

**Answering further, Plaintiff disputes that the traffic violator ever fled from the officers or ever disobeyed any request by any officer to stop his vehicle, as he stopped promptly and stated he was late for work when asked to stop and was let go without being issued a ticket. Exhibit A at 14:1-13**

46. Driving into the opposite lane to pass other vehicles could be another indication that the driver is fleeing. Exhibit G at 51:2-6.

**RESPONSE 46. Plaintiff does not dispute that Officer Hiippaka testified to this. However, Plaintiff disputes that this was ever stated in any radio transmission on the night of this occurrence. Exhibit O (no mention of this statement in any radio transmission).**

**Answering further, Plaintiff disputes that the traffic violator ever fled from the officers or ever disobeyed any request by any officer to stop his vehicle, as he stopped promptly and stated he was late for work when asked to stop and was let go without being issued a ticket. Exhibit A at 14:1-13.**

47. While Officer Alfrey was following the vehicle, the driver of the vehicle that Officer Alfrey was following exhibited all of those behaviors. Exhibit G at 51:7-11.

**RESPONSE 47. Plaintiff does not dispute that Officer Hiippaka testified to this. However, Plaintiff disputes that this was ever stated in any radio transmission on the night of this occurrence. Exhibit O (no mention of this statement in any radio transmission).**

**Answering further, Plaintiff disputes that the traffic violator ever fled from the officers or ever disobeyed any request by any officer to stop his vehicle, as he stopped promptly and stated he was late for work when asked to stop and was let go without being issued a ticket. Exhibit A at 14:1-13.**

48. Before Sergeant Hiipakka pulled the vehicle over, he did not know anything about the driver, including anything related to his criminal history or whether he possessed anything that might subject him to criminal liability, such as drugs or weapons, so he did not know whether the person was a felon. Exhibit G at 49:1-11.

**RESPONSE 48. Plaintiff does not dispute that Officer Hiippaka testified to this. However, Plaintiff disputes that this was ever stated in any radio transmission on the night of this occurrence. Exhibit O. Answering further, Plaintiff disputes that the traffic violator**

**ever fled from the officers or ever disobeyed any request by any officer to stop his vehicle, as he stopped promptly and stated he was late for work when asked to stop and was let go without being issued a ticket. Exhibit A at 14:1-13.**

49. The suspect vehicle's path of travel is shown in Exhibit T.

**RESPONSE 49. Plaintiff disputes that Exhibit T shows the suspect vehicle's complete path of travel both before and after the subject collision.**

**C. The Accident.**

50. As Officer Gorny was driving on Western, he believed that the urgency of stopping the vehicle was increasing as he heard the radio traffic about the erratic driver. Exhibit D at 77:24–78:4, 85:3–17, 181:22–183:5; Exhibit L at 449:10–15; Exhibit O at 4:32:53.

**RESPONSE 50. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that any officer stated on the radio that the traffic stop was "urgent" or that this traffic stop became an emergency at any time. Exhibit O (no mention of any officer describing the traffic stop as "urgent" or an "emergency").**

**Answering further, every officer involved in this event or who reviewed it on behalf of the City of South Bend believed this was not an emergency and was simply a traffic stop. Exhibit D at 118:10-18.**

51. Officer Gorny's driving down Western corresponded with the urgency to get to the suspect. Exhibit D at 183:1-9.

**RESPONSE 51. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that any officer stated on the radio that the traffic stop was "urgent" or**

**that this traffic stop became an emergency at any time. Exhibit O (no mention of any officer describing the traffic stop as "urgent" or an "emergency").**

**Answering further, every officer involved in this event or who reviewed it on behalf of the City of South Bend believed this was not an emergency and was simply a traffic stop. Exhibit D at 118:10-18.**

52. As Officer Gorny drove down Western, he saw the suspect vehicle go south on Olive Street. Exhibit L at 459:1-8. Officer Gorny attempted to activate his siren after he saw the suspect vehicle go through the intersection of Olive and Western. Exhibit L at 459:1 -- 460:19.

**RESPONSE 52. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny attempted to activate his siren as the available video shows he instead turned off his emergency overhead lights. Exhibit E-1B (Gorny dash cam, 0:01–0:33); Exhibit E-5 (overhead view of Western Avenue, as determined by Captain Herron, showing Gorny without activated emergency lights).**[2]

53. When Officer Gorny attempted to activate his siren, he accidentally deactivated his emergency lights for a brief second. Exhibit D at 85:3-17; Exhibit L at 460:13-19. As soon as Officer Gorny realized that he had accidentally turned off his emergency lights, he looked down to turn his emergency lights and siren on. Exhibit D at 85:3-17, 88:14-18.

**RESPONSE 53. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny attempted to activate his siren as the available video shows he instead turned off his emergency overhead lights. Plaintiff further disputes that his turning off the emergency lights was "an accident." Exhibit E-1B; Exhibit E-5.**

---

[2] These are Deposition Exhibits 1B and 5 from Exhibit E, Deposition of Captain Herron.

54. As Officer Gorny approached the intersection of Western and Kaley from the west, Erica Flores ("Flores") entered the intersection of Western and Kaley from the south. ECF #1, ¶45.

**RESPONSE 54. Plaintiff does not dispute Movant's Fact No. 54.**

55. Flores entered the intersection as Officer Gorny was looking down to turn his siren on. Exhibit D at 85:3-17.

**RESPONSE 55. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny attempted to activate his siren as the available video shows he instead turned off the emergency overhead lights. Exhibit E-1B; Exhibit E-5.**

56. Officer Gorny saw Flores' vehicle just before the crash occurred. Exhibit D at 61:2-11. When Officer Gorny saw Flores' vehicle, he tried to swerve to avoid hitting it. Exhibit D at 61:2-11. He hit his brakes hard enough for the anti-lock braking system to engage. Exhibit E-45 at 1; Exhibit L at 68:1 -- 71:6.

**RESPONSE 56. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny saw the Flores vehicle just before the crash, disputes that Officer Gorny tried to swerve to avoid hitting Ms. Flores' vehicle as this is not shown in the video of the collision. Exhibit CC-I.[3] Also the electronic data in his car showed Gorny was actually accelerating at the time of the impact. Exhibit E at 44:22-45:4.**

57. Officer Gorny struck Flores' vehicle. ECF #1, ¶46. Flores died as a result of the accident. ECF #1, ¶46.

[3] This is Deposition Exhibit I from Exhibit CC, Deposition of City Engineer Eric Horvath.

**RESPONSE 57. Plaintiff does not dispute Movant's Fact No. 57 that Mrs. Flores died as a result of the collision and events leading up to it.**

58. Officer Gorny believed that he was operating his vehicle with due regard and was driving with his car under control. Exhibit D at 183:10-15.

**RESPONSE 58. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny was operating his vehicle with due regard and disputes that he was driving with his car under control. Exhibit E at 17:12-17; Exhibit J at 12:7-10.**

59. Officer Gorny believed that he properly considered environmental Factors, in that it was unlikely that pedestrians would have been out at this time and he was observant of his surroundings as he operated his vehicle down Sheridan and Western. Exhibit D at 183:21 -- 184:22.

**RESPONSE 59. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny properly considered environmental factors because he recognized the possibility of pedestrians being in or crossing the street and could be injured as he operated his vehicle down Sheridan and Western. Exhibit D at 54:1-55:7.**

60. Officer Gorny believed that the traffic light at the intersection of Western and Kaley was green for his direction of travel when he entered the intersection. Exhibit D at 75:6-11, 76:13-15.

**RESPONSE 60. Plaintiff does not dispute that Gorny testified to this in his deposition. However, Plaintiff disputes that the traffic light at Western and Kaley was green for his direction of travel when he entered the intersection. The City of South Bend traffic engineer testified that Gorny approached and entered the intersection while the traffic light was red. Exhibit CC at 73:18-74:9. Plaintiff also disputes that Gorny believed**

**that the traffic light at the intersection was green for his direction of travel when he entered the intersection as he admitted to investigators on the morning of the occurrence that he ran a red light. Exhibit Z (CITY 0079).**

61. At all times relevant, Officer Gorny was acting under the color of state law and within the scope of his employment with the City of South Bend. ECF #1, ¶10.

**RESPONSE 61. Plaintiff does not dispute that Gorny was on duty for the City. Plaintiff disputes any argument or inference that Gorny is in any manner or fashion immune from liability.**

II. **South Bend Policy and Training on Emergency Vehicle Operations.**

**A. Academy Training.**

62. The Indiana Law Enforcement Academy teaches recruits about operating their emergency vehicles safely. Exhibit B at 133:24 -- 134:9; Exhibit P (CITY 306-308, 356-517). The Academy teaches recruits about operating their emergency vehicles with due regard. Exhibit A at 28:10-19; Exhibit B at 134:10-15; Exhibit G at 42:3-11; Exhibit P (CITY 364, ¶11; CITY 366, ¶7; CITY 374, 381-89, 1302). The Academy teaches recruits the laws relating to reckless speed and operating their emergency vehicles with due regard. Exhibit B at 31:2-10; Exhibit K at 54:6-14.

**RESPONSE 62. Plaintiff does not dispute Movant's Fact No. 62. Plaintiff also does not dispute that the Academy teaches recruits that driving recklessly can be a violation of the 14th amendment of the constitution.**

63. "Due regard" means driving with proper care and concern for others. Exhibit B at 30:18-21; Exhibit L at 91:23-24.

**RESPONSE 63. Plaintiff does not dispute Movant's Fact No. 63. However, Lieutenant Herron and Chief Ruszkowski characterized Gorny's lack of due regard by him driving high speeds, not using his lights or sirens, and his statements. Exhibit L at 46:6-12; Exhibit J at 11:7-12:16.**

64. The Indiana Law Enforcement Academy teaches recruits about how the Constitution relates to law enforcement vehicle operations, and that reckless driving could be seen as a violation of the Fourteenth Amendment. Exhibit G at 40:18 -- 42:11, 47:7-20.

**RESPONSE 64. Plaintiff does not dispute Movant's Fact No. 64.**

65. The Academy teaches recruits about the Fourteenth Amendment "shocks the conscience" standard, and that due process claims are typically brought by innocent third parties who were injured or killed during emergency responses or pursuits. Exhibit B at 144:12 -- 146:9; Exhibit B-10B; Exhibit P (CITY 401-406).

**RESPONSE 65. Plaintiff does not dispute Movant's Fact No. 65.**

66. The Indiana Law Enforcement Academy teaches recruits to clear intersections. Exhibit A at 29:5-7; Exhibit P (CITY 486).

**RESPONSE 66. Plaintiff does not dispute that Officer Alfrey testified that he was taught to clear intersections at the police academy. However, Plaintiff disputes that Gorny's training on clearing intersections was adequate. Plaintiff further disputes that SBPD officers were properly trained and instructed on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-**

**85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including Emergency Vehicle operations instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A[4].**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. *Infra* at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved emergency operation, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

**B. South Bend Police Department Policy on Emergency Vehicle Operations.**

67. When the South Bend Police Department adopts a new policy, that policy is provided to its officers, who are required to acknowledge that they reviewed it. Exhibit B at 71:6 -- 72:4; Exhibit K at 86:23 -- 87:2. South Bend officers are expected to know and comply with departmental policies. Exhibit B at 139:20-25; Exhibit K at 86:15-20. It is a normal practice for law enforcement agencies to require their officers to review and comply with departmental policies. Exhibit H at 97:21 -- 98:3.

---

[4] This is Exhibit 5-A from Exhibit C, Deposition of Captain Fulnecky.

**RESPONSE 67. Plaintiff does not dispute that certain witnesses testified to this. However, Plaintiff disputes that SBPD officers were properly trained to know and comply with all departmental policies and revisions, as the City's 30(b)(6) witness for training testified that certain policies might or might not be discussed during training with a Field Training officer. Exhibit B at 76:3-77:3. Answering further, Plaintiff disputes SBPD officers were properly trained on all relevant policies, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to initiate and terminate pursuits, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A. Plaintiff disputes that the officers were required to properly acknowledge it, understand it or comply with it as training sessions contradicted the policies. Exhibit C-5-A, Exhibit C-5-B.[5]**

68. South Bend has a policy on emergency vehicle operations that its officers are required to know. Exhibit B at 56:19-22, 57:16-20; Exhibit P (CITY 1240-43).

[5] This is deposition exhibit 5-B from Exhibit C, Deposition of Captain Fulnecky.

**RESPONSE 68. Plaintiff does not dispute that certain witnesses testified to this but disputes officers are properly "required to know" the policy as training sessions contradicted the policies. Exhibit C-5-A.**

69. South Bend Police Department policy 308 Officer Response to Calls provides, "This policy provides officers with guidelines for the safe and appropriate vehicular response to emergency and non-emergency incidents or requests for assistance, whether these are dispatched or self-initiated." Exhibit B-16B, §308.1; Exhibit K at 82:8-15, 83:10-24; Exhibit P (CITY 1240, §308.1). This policy further provides, "Officers responding to non-emergency calls shall proceed accordingly, unless they are sent or redirected to a higher priority call, and shall obey all traffic laws." Exhibit B-16B, §308.3; Exhibit K at 82:8-15, 83:10-14, 83:25 -- 84:7; Exhibit P (CITY 1240, §308.3). This policy further provides,

Officers responding to an emergency call shall proceed immediately and shall continuously operate the emergency vehicle lighting and siren as required by law (I.C. § 9-21-1-8). Even when operating a vehicle in emergency mode, the law holds officers legally responsible to drive with due regard for the safety of all people.

Members may disable the siren only if the call requires a "silent" response. If running "silent," then the officer must exercise extra caution for motorists and pedestrians. The vehicle emergency lighting shall be operated all times when the siren has been disabled.

Exhibit B-16B, §308.3.1; Exhibit K at 82:8-15, 83:10-14, 84:8-24; Exhibit L at 128:2 -- 130:8; Exhibit P (CITY 1240, §308.3.1). This policy further provides,

Officers responding to an emergency shall proceed immediately as appropriate and shall continuously operate the emergency vehicle lighting and siren as required by law (I.C. § 9-13-2-6(1)(B)).

Responding with emergency lights and siren does not relieve the operator of an emergency vehicle of the duty to continue to drive with due regard for the safety of all persons and property and does not protect the operator from the consequences of reckless disregard for the safety of others.

Exhibit B-16B, §308.5; Exhibit K at 82:8-15, 83:10-14, 85:3-15; Exhibit P (CITY 1241, §308.5). This policy further provides, "if the emergency equipment on the vehicle should fail to operate, the officer must terminate the emergency response and continue accordingly." Exhibit B-16B, §308.6; Exhibit K at 82:8-15, 83:10-14, 85:16-23; Exhibit P (CITY 1242, §308.6).

**RESPONSE 69. Plaintiff does not dispute that such a written policy exists. However, Plaintiff disputes that SBPD officers were properly trained to know and comply with all departmental policies and revisions, as the City's 30(b)(6) witness for training testified that certain policies might or might not be discussed during training with a Field Training officer. Exhibit B at 76:3-77:3. Answering further, Plaintiff disputes the city's officers were properly trained on all relevant policies, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to initiate and terminate pursuits, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-**

**speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. *Infra* at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C, 40:14-41:11.**

70. South Bend's policy requiring the use of lights *and* siren when responding to an emergency, unless circumstances justify a silent response, is more restrictive than Indiana law, which only requires law enforcement officers to use lights *or* siren when responding to an emergency. Exhibit B-16B, §308.3.1; Exhibit K at 82:8-15, 83:10-14, 84:8-24; Exhibit L at 184:21 -- 185:6; Exhibit P (CITY 1240, §308.3.1); IC 9-21-1-8(c) ("This section [authorizing emergency vehicles to disregard traffic laws] applies to an

authorized emergency vehicle only when the vehicle is using audible or visual signals as required by law.").

**RESPONSE 70. Plaintiff does not dispute that these policies exist. However, Plaintiff disputes that SBPD officers were properly trained to know and comply with all departmental policies and revisions and that South Bend's policy" was more restrictive than Indiana law, as SBPD's training sessions were inconsistent with and contradicted its own policy, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. *Infra* at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for**

**South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

71. South Bend officers understand that they are required to use both their lights and their siren when responding to emergency calls, except in certain circumstances for tactical reasons. Exhibit A at 15:15 -- 16:20; Exhibit B at 40:17-42:10, 138:22 -- 139:16. South Bend officers understand that, if they are responding without their siren, they are required to use their emergency lights and use extra caution. Exhibit B at 139:7-11; Exhibit G at 54:2-11.

**RESPONSE 71. Plaintiff disputes this based on Gorny's inconsistent testimony regarding the use of lights and sirens generally and in this instance. Gorny testified that he believed that this traffic stop was an emergency, which required the use of lights and sirens. However, he did not use lights and sirens for what he called tactical reasons for a simple traffic stop, the goal of which was to alert the car to the police presence and to pull him over. Exhibit D at 182:8-12, 87:22-88:13, 121:14-122:16.**

**C. South Bend's Field Training Officer Program.**

72. The South Bend Police Department utilizes a field training officer ("FTO") program for new officers who have completed the Academy. Exhibit A at 30:7-15; Exhibit C at 73:18 -- 74:12.

**RESPONSE 72. Plaintiff does not dispute Movant's Fact No. 72. However, Plaintiff disputes it was used properly or was adequate.**

73. The FTO program includes a post-basic training program, which is two-to-three weeks of additional classroom instruction. Exhibit A at 29:13-17, 30:7-15; Exhibit C at 72:8 -- 74:12; Exhibit D at 170:21 -- 171:4; Exhibit L at 342:14-21; Exhibit M, ¶5.

The SBPD post-basic training program includes instruction on operating emergency vehicles with due regard, including in emergency situations. Exhibit A at 29:18 -- 30:6; Exhibit L at 104:6 -- 105:8, 343:1 -- 344:8; Exhibit M, ¶5; Exhibit P (CITY 2689, 2691, 2693). This training includes instruction that Fourteenth Amendment claims may be "brought by innocent third parties injured or killed in emergency runs or pursuit situations by fleeting suspect or by law enforcement vehicle(s)." Exhibit P (CITY 2681). This training includes instruction on what is an emergency. Exhibit P (CITY 2690).

**RESPONSE 73. Plaintiff does not dispute that certain witnesses testified to a Field training program. However, Plaintiff disputes that the FTO program includes proper instruction on what constituted an emergency and on operating with due care in emergency situations, and disputes that this training was adequate on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits.**

> **We chase them around, up and down side streets, all the time, lots of people, lots of cars, lots of intersections, lots of stop signs. We chase them to the city limits where, God Bless 'em, there's just corn fields; right? And that's where we stop. Cause we left our jurisdiction; right?**

**Exhibit C at 32:21-35:19.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

**Answering further, Plaintiff does not dispute that officers knew that driving recklessly could be a violation of the 14th Amendment at the time of this occurrence. Exhibit B at 31:11-22; Exhibit G at 47:15-23; Exhibit K at 54:19-55:6; 55:14-56:13.**

74. In the FTO program, a field training officer is assigned a probationary or new officer; the field training officer rides with the probationary or new officer and gives them hands-on training. Exhibit B at 68:7-14; Exhibit D at 171:8-11. The field training

officer gives the new officer advice, critiques their performance, and grades their performance at the end of every shift. Exhibit D at 171:12-16. If the new officer does something wrong, the field training officer tells them about it. Exhibit D at 171:17-19.

**RESPONSE 74. Plaintiff does not dispute that certain witnesses testified to this. However, Plaintiff disputes that the FTO program includes proper instruction on what constituted an emergency and on operating with due care in emergency situations, and disputes that this training was adequate on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for**

**South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

75. The FTO program utilizes written training materials called "Training Briefs," which give topics for the officer and their FTO to talk about and learn various aspects of the job. Exhibit B at 140:25 -- 141:11. One of the Training Briefs used by SBPD discusses emergency vehicle operations, and instructs the officer that "You must use due regard for the safety of all citizens when running signal 10, as you can be held responsible for accidents caused by negligence." Exhibit B at 141:6 -- 142:3; Exhibit B-20 at 1 (§A.2).

**RESPONSE 75. Plaintiff does not dispute that certain witnesses testified to the existence of "Training Briefs" that were part of a field training program. However, Plaintiff disputes that they include proper instruction on what constituted an emergency and on operating with due care in emergency situations, and disputes that this training was adequate on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 32:21-33:9; 35:12-36:1; 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

76. "Signal 10" is SBPD's term for running in emergency mode. Exhibit D at 37:11-13; Exhibit J at 24:6-15.

**RESPONSE 76. Plaintiff does not dispute Movant's Fact No. 76.**

77. One of the Training Briefs used by SBPD instructs the officer that "All employees, on or off duty, using Department vehicles shall exercise good judgment at all times and respect the safety and property of all people." Exhibit P (CITY 872, §A.1).

**RESPONSE 77. Plaintiff does not dispute that there is evidence of this. However, Plaintiff disputes that the SBPD Training Briefs include proper instruction on what constituted an emergency and on operating with due care in emergency situations, and disputes that this training was adequate on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44;**

**Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

78. Officers in SBPD's FTO program are instructed on driving with due regard. Exhibit A at 30:11-15; Exhibit B at 52:13 -- 53:12, 134:19 -- 135:2. Officers in the FTO program are graded on whether they operated their vehicle with due regard. Exhibit A at 30:16-18. Officers in the FTO program are taught to use their lights and siren. Exhibit L at 344:9-13, 345:2-5. Officers in the FTO program are instructed that, if they are not using their emergency equipment, they are required to abide by posted traffic laws. Exhibit B at 53:20 -- 54:6.

**RESPONSE 78. Plaintiff does not dispute that certain witnesses testified to the existence of a field training program. However, Plaintiff disputes that the FTO program includes proper instruction on what constituted an emergency and on operating with due care in emergency situations, and disputes that this training was adequate on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

**D. Inservice Training.**

79. South Bend officers receive annual state-mandated training on emergency vehicle operations ("EVO"). Exhibit B at 97:2-9, 136:5 -- 137:1. During the state-mandated EVO training, officers are instructed about driving with due regard. Exhibit B at 136:5 -- 137:1.

**RESPONSE 79. Plaintiff does not dispute that officers receive annual state-mandated training. However, Plaintiff disputes that the annual state mandated training includes proper instruction on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit,**

**which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

80. The South Bend Police Department trains its officers in emergency vehicle operations twice per year, in late spring and in early fall. Exhibit D at 140:4-9; Exhibit E at 85:6-14.

**RESPONSE 80. Plaintiff does not dispute that officers receive training in emergency vehicle operations. However, Plaintiff disputes that the EVO training includes proper instruction on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about**

**the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

81. The emergency vehicle operations training would generally be held at a track at a Tire Rack facility. Exhibit E at 86:24 -- 87:18; Exhibit J at 35:22-25. The track is a racetrack, not cones set up in a parking lot. Exhibit J at 84:7-19. It is between a quarter mile and a half mile in length. Exhibit J at 85:20-25.

**RESPONSE 81. Plaintiff does not dispute that certain emergency training was held at the Tire Rack facility.**

82. The South Bend Police Department also has its EVO instructors discuss EVO training at roll calls from time to time. Exhibit E at 85:6-14.

**RESPONSE 82. Plaintiff does not dispute that there is evidence of this. However, Plaintiff disputes that the EVO training includes proper instruction on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C, 40:14-41:11.**

83. South Bend trains its officers about constitutional responsibilities. Exhibit F at 205:14-20; Exhibit K at 54:19 -- 55:3, 55:14-25.

**RESPONSE 83. Plaintiff does not dispute Movant's Fact No. 83 that South Bend does some training. Plaintiff disputes that it was done properly or adequately at times.**

84. The South Bend Police Department has a video of classroom EVO training for officers who missed the track training. Exhibit C-101; Exhibit L at 412:6-10.

**RESPONSE 84. Plaintiff does not dispute that there was a video of classroom EVO training for officers who missed the track training. However, Plaintiff disputes that the EVO training includes proper instruction on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at**

**98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C, 40:14-41:11.**

85. The South Bend Police Department has additional EVO training videos available for officers. Exhibit C at 74:22 -- 83:11; Exhibit C-103; Exhibit C-104; Exhibit C-105; Exhibit C-106.

**RESPONSE 85. Plaintiff does not dispute that there was a video of classroom EVO training for officers who missed the track training. However, Plaintiff disputes that the EVO training videos include proper instruction on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated**

**30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

86. The South Bend Police Department utilizes the "Below 100" program as part of its EVO training. Exhibit D at 177:1-17; Exhibit L at 99:8 -- 100:16, 102:4-13, 498:21-25; Exhibit P (CITY 2594, 2642, 2662). The goal of the Below 100 program is to bring officer fatalities down to below 100 per year. Exhibit D at 177:1-7; Exhibit L at 99:8 -- 100:16; Exhibit P (CITY 2642, 2662). The tenets of the Below 100 program are "Wear your belt," "Wear your vest," "Watch your speed," "WIN---What's important now?" and "Remember: Complacency

Kills!" Exhibit D at 177:8-10; Exhibit D-B; Exhibit L at 99:8 -- 100:16, 100:20 -- 102:3, 498:21-25; Exhibit P (CITY 2594, 2642).

**RESPONSE 86. Plaintiff does not dispute that the "Below 100" program was part of the City's training program. However, Plaintiff disputes that the "Below 100" program was properly reinforced with proper instruction on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that such training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that such training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could**

**send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

### E. South Bend Police Department Review of Damage to Department Vehicles.

87. South Bend policy requires its officers to report any damage to a department vehicle. Exhibit B-16B, §703.6; Exhibit K at 83:1-5, 83:10-14; Exhibit P (CITY 1257, §703.3.2 ("Any previously unreported damage ... shall be promptly reported to a supervisor and documented as appropriate."); CITY 1262, §703.6); *see also* Exhibit P (CITY 874-75, ¶7).

**RESPONSE 87. Plaintiff does not dispute Movant's Fact No. 87.**

88. South Bend maintains records of all instances of damage to police vehicles. Exhibit B-16B, §703.6; Exhibit I at 27:17 -- 30:7, 60:18-25; Exhibit K at 83:1-5, 83:10-14; Exhibit U.

**RESPONSE 88. Plaintiff does not dispute Movant's Fact No. 88.**

89. South Bend reviews all instances of damage to police vehicles to determine whether the officer was at fault. Exhibit B-16B, §703.6; Exhibit I at 31:8-11; Exhibit K at 83:1-5, 83:10-14; Exhibit U.

**RESPONSE 89. Plaintiff does not dispute Movant's Fact No. 89. However, Plaintiff disputes it was used properly or adequately as the City's designated 30(b)(6) representative on discipline for officer-involved vehicle damage testified that he was unaware of any officer ever being suspended, reprimanded or fired because of a traffic collision, using excessive speed, not obeying traffic laws or reckless driving before Gorny. Exhibit I at 41:16-45:2; 61:13-62:8.**

90. South Bend takes corrective action for officers' at-fault accidents. Exhibit I at 60:18-25; Exhibit I-6C. The severity of the corrective action increases with the amount of damage to the department vehicle and the number of at-fault accidents within the preceding 12 months. Exhibit I-6C; Exhibit U.

**RESPONSE 90. Plaintiff does not dispute Movant's Fact No. 90. However, Plaintiff disputes it was used properly or adequately as the City's designated 30(b)(6) representative on discipline for officer-involved vehicle damage testified that he was unaware of any officer ever being suspended, reprimanded or fired because of a traffic collision, using excessive speed, not obeying traffic laws or reckless driving before Gorny. Exhibit I at 41:16-45:2; 61:13-62:8.**

91. Corrective action for at-fault damage incidents is typically "loss of unit," meaning that the officer loses their take-home car privileges for a specified number of days. Exhibit I at 33:19 -- 34:4; Exhibit U. The take-home car privilege is an economic benefit for South Bend's police officers; officers who are able to use a take-home car do not have to drive their own car to and from work. Exhibit I at 34:4-10. "Loss of unit" ranges from 1 day, for minor accidents where the officer has no at-fault accidents within the prior 12 months, to 120 days, for serious accidents where the officer had several at-fault accidents within the prior 12 months. Exhibit I-6C; Exhibit U. Officers found to be at fault for an accident have also received verbal warnings, written reprimands, and additional training. Exhibit I at 34:11 -- 35:9, 36:20 -- 37:2; Exhibit U.

**RESPONSE 91. Plaintiff does not dispute that certain officers testified to Movant's Fact No. 91. However, Plaintiff disputes it was used properly or adequately as the City's designated 30(b)(6) representative on discipline for officer-**

**involved vehicle damage testified that he was unaware of any officer ever being suspended, reprimanded or fired because of a traffic collision, using excessive speed, not obeying traffic laws or reckless driving before Gorny. Exhibit I at 41:16-45:2; 61:13-62:8.**

### F. South Bend Police Officers' Understanding of Department Policy on Emergency Vehicle Operations.

92. In July 2018, Sergeant Hiipakka understood from his training that he was required to operate his emergency vehicle with due regard for the safety of all persons. Exhibit G at 55:17-21. He understood that he was required to drive his emergency vehicle with due regard for the safety of all persons at all times, including emergency runs. Exhibit G at 55:22 -- 56:4.

**RESPONSE 92. Plaintiff does not dispute that this officer testified to Movant's Fact No. 92. However, However, Plaintiff disputes that SBPD officers were properly trained and instructed on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C, 40:14-41:11.**

93. In July 2018, Officer Alfrey understood that he was required to drive with due regard for all persons at all times while driving a police vehicle, including during emergency runs. Exhibit A at 30:19-31:6.

**RESPONSE 93. Plaintiff does not dispute that this officer testified to Movant's Fact No. 93. However, Plaintiff disputes that SBPD officers were properly trained and instructed on what constituted an emergency and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 32:21-33:9; 35:12-36:1; 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

94. No South Bend officer has testified in this action that they did not know that they were required to drive their patrol vehicles with due regard.

**RESPONSE 94. Plaintiff disputes that SBPD officers were properly trained and instructed on operating with "due regard" and disputes that the principle of "due regard" was properly considered by officers, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

95. In July 2018, Sergeant Corey Calvert knew that recklessness may be considered a violation of the Fourteenth Amendment. Exhibit B at 31:15-22. South Bend trains its officers to watch their speed during an emergency call. Exhibit B at 43:19-21.

**RESPONSE 95. Plaintiff does not dispute Movant's Fact No. 95 with regard to Sergeant Calvert's Fourteenth Amendment training. However, Plaintiff disputes that SBPD officers were properly trained and instructed on driving at proper speed and on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training**

**materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

96. In July 2018, Sergeant Hiipakka understood that he was required to clear intersections when driving in emergency mode. Exhibit G at 56:5-8. He understood that it was particularly important to clear blind intersections. Exhibit G at 56:9-19.

**RESPONSE 96. Plaintiff does not dispute that Sergeant Hiippaka testified to this. However, Plaintiff disputes that Gorny's training on clearing intersection was adequate. Plaintiff further disputes that SBPD officers were properly trained and instructed on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6)**

**representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

97. A "blind" intersection is an intersection where you cannot see traffic coming from the left or right. Exhibit A at 34:2-7.

**RESPONSE 97. Plaintiff does not dispute Movant's Fact No. 97.**

98. In July 2018, Officer Alfrey understood that he needed to clear intersections when driving in emergency mode, especially blind intersections. Exhibit A at 31:7-13.

**RESPONSE 98. Plaintiff does not dispute that Officer Alfrey testified to this. However, Plaintiff disputes that Gorny's training on clearing intersection was adequate. However, Plaintiff disputes that SBPD officers were properly trained and instructed on**

**operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C, 40:14-41:11.**

99. No South Bend officer has testified in this action that they did not know that they needed to clear intersections when driving in emergency mode.

**RESPONSE 99. Plaintiff does not dispute this. Plaintiff disputes this "knowledge" was fully informed or adequately trained. Plaintiff further disputes that SBPD officers were properly trained and instructed on operating with due care in emergency situations,**

**on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

100. Officer Gorny had never had trouble with the overhead emergency lights before this incident. Exhibit D at 85:18-23. No South Bend police officer ever mentioned to Officer Gorny that they were uncomfortable with the new switch to active the overhead emergency lights. Exhibit D at 85:24 -- 87:21.

**RESPONSE 100. Plaintiff does not dispute that Gorny testified to this.**

III. **South Bend Policy and Training on Pursuits.**

**A. South Bend's Pursuit Policy**

101. South Bend has a pursuit policy that all of its officers are required to abide by. Exhibit B at 55:24 -- 56:14; Exhibit B-16B (§306); Exhibit P (CITY 1244-48).

**RESPONSE 101. Plaintiff does not dispute that South Bend had a written pursuit policy. However, Plaintiff disputes that SBPD officers were properly trained and retrained on this policy, and disputes that that policy was properly communicated and enforced, as The City's pursuit records show that Gorny had a total of twelve (12) pursuits between June 16, 2016 and June 18, 2018. Of those, the IA Pro system records show that ten (10) were found to "Not Justified" and "Not Within Policy".**

**Exhibit AA (documents produced by the City, CITY 4997 [VP 2016-0039]; CITY 5054 [VP 2016-0052]; CITY 5878 [VP 2017-0034]; CITY 6076 [VP 2017-0046]; CITY 6103 [VP 2017-0048]; CITY 6316 [VP 2017-0057]; CITY 6464 [VP 2017-0063]; CITY 6716 [VP 2017-0081]; CITY 7895 [VP 2018-0045]; CITY 7943 [VP 2018-0048]). Gorny testified that he never received any criticisms or critiques about his driving, emergency driving or pursuits. Exhibit D at 147:21-148:3. The City's 30(b)(6) witness, Captain Fulnecky, confirmed that she saw no evidence that Gorny was ever retrained or disciplined for any of these incidents. Exhibit C at 61:8-12.**

**Answering further, Plaintiff disputes that SBPD officers were properly trained and retrained on this policy, and disputes that this policy was properly communicated and enforced, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO**

**instructor statements, contained reckless material. Exhibit C at 32:21-33:9; 35:12-36:1; 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

102. SBPD's pursuit policy provides that "The decision to initiate pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large." Exhibit P (CITY 1244, §306.3(a)). This policy provides that, in deciding whether to initiate pursuit, the officer will consider road, weather, and environmental conditions; population density; vehicular and pedestrian traffic; the relative performance capabilities of the pursuit and the vehicle being pursued; and the seriousness of the offense. Exhibit P (CITY 1244, §306.3(c)). This policy provides that "[w]hen engaged in pursuit, officers have a legal responsibility to drive with due regard for the safety of all people." Exhibit P (CITY 1245, §306.4(d)). This policy

provides that an officer must terminate a vehicle pursuit if the "[r]isks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension." Exhibit P (CITY 1247, §306.8(a)(2)).

**RESPONSE 102. Plaintiff does not dispute that Movant's written policy states that. However, Plaintiff disputes that SBPD officers were properly or adequately trained on this policy, as the City's 30(b)(6) witness for training testified that this might or might not be discussed depending on whether there was a pursuit with the FTO officer. Exhibit B at 76:3-77:3. Answering further, Plaintiff disputes SBPD officers were properly trained on this policy, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to initiate and terminate pursuits, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 32:21-33:9; 35:12-36:1; 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

**B. South Bend Training on Pursuits.**

103. South Bend officers are trained on the pursuit policy during the FTO program. Exhibit B at 58:15 -- 59:2, 66:6 -- 67:2. South Bend officers are trained on when to initiate and terminate pursuits during the FTO program. Exhibit B at 76:17 -- 79:16. If an officer in the FTO program engages in a pursuit, the training officer will discuss that pursuit with the officer they are training, and advise them about things that they could do better or should have done differently during the pursuit. Exhibit B at 135:3 -- 136:4.

**RESPONSE 103. Plaintiff disputes that every officer was trained about when to initiate and when to terminate a pursuit in every FTO program, as the City's 30(b)(6) witness testified that . Exhibit B at 76:23-77:17. Plaintiff further disputes that SBPD officers were properly trained and instructed on operating with due care in emergency situations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influences the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations,**

**including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

104. One of the training briefs used in SBPD's FTO program is titled "Vehicle Pursuit." Exhibit B at 142:17-21; Exhibit B-20 at 6; Exhibit P (CITY 850-55). This training brief instructs that "due regard" is "The duty to drive with Due Regard for the safety of all persons. Driving with the safety and welfare of all citizens on the roadway in mind in all circumstances." Exhibit B at 142:25 -- 143:4; Exhibit B-20 at 6; Exhibit P (CITY 850). This training brief instructs on the Fact that officers should consider when determining whether to initiate or continue a pursuit, including "[t]o drive with utmost Due Regard for the safety of all persons, especially the Public...." Exhibit P (CITY 852-53).

**RESPONSE 104. Plaintiff does not dispute this training brief states that. However, Plaintiff disputes that SBPD officers were properly trained on vehicle pursuits, as the City's 30(b)(6) witness for training testified that pursuits might or might not be discussed depending on whether there was a pursuit with the FTO officer. Exhibit B at 76:3-77:3. Answering further, Plaintiff disputes SBPD officers were properly trained to drive with due regard, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to pursuits and due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by**

**the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

105. South Bend trains its officers to always use both their lights and their siren during a pursuit. Exhibit B at 42:20-24. South Bend trains its officers to watch their speed during a pursuit. Exhibit B at 43:13-18.

**RESPONSE 105. Plaintiff does not dispute that certain officers testified to this fact. However, Plaintiff disputes that SBPD officers were properly trained on vehicle pursuits, as the City's 30(b)(6) witness for training testified that pursuits might or might not be discussed depending on whether there was a pursuit with the FTO officer. Exhibit B at 76:3-77:3. Answering further, Plaintiff disputes SBPD officers were properly trained to drive with due regard, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to pursuits and due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO**

**instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

**C. South Bend Review of Police Pursuits.**

106. South Bend's practice is to informally review all pursuits with officers. Exhibit B at 34:18 -- 35:13; Exhibit F at 43:13 -- 44:2, 288:24 -- 289:12; Exhibit P (CITY 1248, §306.10(b)). South Bend's policy and practice is for a supervisor to review the pursuit with the officer on the same shift if possible, to go over things that they could have done better, things that they did well, and other things to take into consideration. Exhibit B at 137:10 -- 138:21; Exhibit F at 43:13 -- 44:2, 288:24 -- 289:12.

**RESPONSE 106. Plaintiff does not dispute that certain officers testified to Movant's Fact No. 106. However, Plaintiff disputes that this happened with every pursuit, was taken seriously and that it was done properly or adequately. The City's pursuit records show**

**that Gorny, for example, had a total of twelve (12) pursuits between June 16, 2016 and June 18, 2018. Of those, the IA Pro system records show that ten (10) were found to "Not Justified" and "Not Within Policy". Exhibit AA (CITY 4997 (VP 2016-0039); CITY 5054 (VP 2016-0052); CITY 5878 (VP 2017-0034); CITY 6076 (VP 2017-0046); CITY 6103 (VP 2017-0048); CITY 6316 (VP 2017-0057); CITY 6464 (VP 2017-0063); CITY 6716 (VP 2017-0081); CITY 7895 (VP 2018-0045); CITY 7943 (VP 2018-0048)). Gorny testified that he never received any criticisms or critiques about his driving, emergency driving or pursuits. Exhibit D at 147:21-148:3. The City's 30(b)(6) witness, Captain Fulnecky, confirmed that she saw no evidence that Gorny was ever retrained or disciplined for any of these incidents Exhibit C at 61:8-12.**

107. South Bend also has a procedure for formal review of all of its pursuits. Exhibit F at 18:5 -- 20:8, 286:21 -- 287:8; Exhibit M, ¶6; Exhibit P (CITY 1247-48, §306.10).

**RESPONSE 107. Plaintiff does not dispute that certain officers testified to Movant's Fact No. 107. However, Plaintiff disputes that all pursuits were formally reviewed, and disputes that all pursuits were reviewed in a serious and adequate manner, as the City's designated 30(b)(6) representative for pursuit reviews stated that the PRC had monthly meetings. Exhibit F at 26:9-13. However, minutes were produced for only four meetings for the period of 2015 -2018: June 25, 2015, March 16, 2016, July 27, 2016, and August 15, 2018. Exhibit F at 256:21-258:3.**

Pursuit Review Committee

March 16, 2016 1400hrs Chief's Conference Room

Committee Members: Lieutenant Noonan, Sergeant Cauffman, Sergeant Mills, Sergeant Walsh, Captain Schweizer

The following cases were reviewed:

**15-22303 Bair**-Traffic violation turned into MVT. Members agreed within policy, procedure, and the law. Captain Schweizer dissenting. Too long, too much traffic, for a traffic violation.

**16-3394-Gray-** MVT No video from Gray but other officers in the pursuit were deemed adequate by the committee members to be within policy procedure and the law. Captain Schweizer had a dissenting opinion as too many vehicles were in the pursuit and it was once again a property crime (MVT) and the risks to officers and the public do not outweigh the dangers posed in his opinion.

Pursuit Review Committee 07-27-16

The Committee found no problems with this pursuit despite watching the entire thing and viewing the GPS map. ORM strongly disagrees and finds the following problems. The reason for joining the pursuit is questionable. At no time could I hear any supervisor ask radio to find out the reason for the pursuit. The distance covered and the time our cars were involved is excessive. At no time does Sergeant Riddle call off our east side and south side cars. This pursuit was on a Friday night around midnight and at least 2 beats cars were way out of their beats.

Mishawaka had more than one car involved and by the time it got to the farm field there were no fewer than 6 cars involved. There were at least 3 SBPD (Kukla, Knepper, PFC Sanchez all identified by ORM) and three others. The other 3 cars could have all been MPD or a combination of MPD and county.

**The pursuit committee found this pursuit to be within policy, training, and the law. ORM ***DOES NOT AGREE***** with the findings of the committee on this pursuit. ORM will enter the committee report along with this report.

The committee failed to complete the evaluation form (this was discovered after everyone left the room and I was compiling the paperwork and videos). Only 3 of the 6 evaluators (Lieutenant Ross, Captain Noonan and Lieutenant Eyster) circled or initialed anything on the form. Lieutenant Eyster wrote that the officer could not have avoided a collision at those high speeds.

**ORM is of the opinion this pursuit violated the policy in the following areas.** 1. The reason for the pursuit did not outweigh the reason for the stop. 2. Sergeant Wolff did not drive with due regard for public safety. 3. Sergeant Wolff failed to properly monitor the pursuit (calling for speeds and conditions) and did not call it off. Both PFC Bair and Sergeant Wolff knew the pursuit was heading toward a construction zone and neither called off the pursuit. Instead they both went through a busy intersection just north of the construction against a red light and with traffic obstructing their view.

The lack of candor from the committee suggests that the pursuit review format be changed. New ORM officer or new committee or new procedure. This review was abysmal.

**VP2016-0031 PFC Cummins** Officer Cummins attempted to stop a vehicle that was traveling at a high rate of speed on Western Ave and it disregarded a red light. PFC Cummins attempted to stop the vehicle but it went north on Sheridan at a high rate of speed and disregarded stop signs. It then went east on Linden at a high rate of speed. PFC Cummins stated he was losing sight of the suspect and slowed his police vehicle down because of the wet road, darkness, and the curves in the road. As PFC Cummins came around a curve he noticed the suspect had crashed and the driver was fleeing on foot. The passenger was seriously injured and the crash was investigated by the FACT unit. This was a paper review because no video was available due to an equipment malfunction with a new in car camera. **The committee found PFC Cummins to be within policy, training, and the law. ORM AGREES with the committee.**

**VP2016-0039 Officer Gorny** attempted to stop a vehicle for disregarding a stop sign. The vehicle fled and Officer Gorny chased the suspect for somewhere between 2.1 to 5 miles and approximately 7 minutes on wet roads before the suspect crashed. The pursuit started at 3300 South High and ended at Notre Dame and Sorin.

The pursuit committee found no violation of policy, training, or the law. I reminded them prior to their watching the video that dynamic hydroplaning starts at speeds of 10.6 multiplied by the square root of the tire pressure. I wanted them to think about the dangers of pursuits in rain. Despite me trying to get them to think about everything in the video they only mentioned that there was no vehicular traffic during the pursuit. **ORM DOES NOT AGREE with the committee.**

ORM is of the opinion this pursuit went on too long based on the weather conditions and the violation committed. Sergeant Riddle was the supervisor monitoring this pursuit and he allowed it to run from the south side all the way to the east side and ultimately it crashed into a fixed object. Due regard for public safety is only one aspect of pursuits. Officer safety must also be a priority. When an officer is involved in a pursuit sometimes they do not check their speed and they do not pay attention to how long the pursuit has gone on. Supervisors must be monitoring pursuits better to protect officers from harm as well as the public.

It is incomprehensible that a pursuit travels between 5 and 10 miles at speeds exceeding 100 mph for a misdemeanor traffic violation and half of the committee failed to initial the evaluation form or write comments on the bottom.

If the review committee was uninformed, if this were the first time they were ever part of the review, if they had no time to prepare for the review one might be able to rationalize why there was leniency on the forms.

None of this is the case here. The committee had the cases several days before. Several of the committee members were experienced in pursuit reviews. All of the embers were briefed about Indiana Supreme Court rulings and U.S. Supreme Court rulings and all were given opportunity to ask any questions about policy or the law.

Unless we start an internal process that holds officers accountable when the stakes are low an external process will most certainly hold us accountable when the stakes are high. Nothing further to report.

07-27-16

1545hrs

Captain Keith Schweizer

Office of Risk Management

In December of 2017 Sergeant Stuart was given eight vehicle pursuits for review along with any available videos associated with each pursuit. Sometime in December Sergeant Stuart organized a Pursuit Review Committee and gave them the pursuits to be reviewed.

The undersigned officer was on vacation when this took place. When I returned after the first of the year I requested and received the reviews from Sergeant Stuart. Upon looking at them nothing was filled out on the pursuit review forms. Apparently he did not give the forms to the committee and PFC Bair wrote on the back of the pursuit form instead of using a regular pursuit review committee form.

PFC Bair wrote comments like "where are the rest of the videos?" "Need all of the videos" "Are we just picking on Tony Dawson?" "We are doing a review we need all videos" none of which had anything to do with the review. All available videos were given to Sergeant Stuart. PFC Bair's comments should have been checked by Sergeant Stuart before they were turned back in to ORM.

This pursuit review was invalid because it is unknown who the reviewers were. None of the problems with the pursuits were documented and none of the involved officers were counseled about their driving.

This pursuit review is over 8 months old and is being filed as information only. The pursuit review committee will have to be redesigned and whomever takes over will receive training in how they are to be conducted.

It is unclear who will be running it at this point but none of these pursuits were reviewed properly. None of the officers counseled in a timely fashion. If Sergeant Stuart is going to continue to run the pursuit reviews he must do a better job of it.

Nothing Further.

Captain Keith Schweizer

Office of Risk Management 08-15-18

CITY 6501

Exhibit BB (Pursuit Review Committee notes, produced by the City)

108. South Bend officers are required to fill out a Vehicle Pursuit Form for every vehicle pursuit that they are involved in, and to provide those forms to internal affairs. Exhibit F at 18:5 -- 20:8, 45:1-18; Exhibit M, ¶6; Exhibit P (CITY 1247, §306.10(a)). The internal affairs investigator then enters data into the Department's internal affairs data management system (which is called "IAPro"), gathers the reports, and turns it over to the captain of the South Bend Police Department Office of Risk Management ("ORM"). Exhibit F at 18:5 -- 20:8, 27:13 -- 28:3, 45:19-22, 281:23 -- 284:8. The ORM captain then downloads and reviews the dash camera video. Exhibit F at 18:5 -- 20:8, 47:18 -- 48:9, 59:14 -- 60:6, at 285:25 -- 286:7.

**RESPONSE 108. Plaintiff does not dispute that certain witnesses testified to this Fact No. 108. However, Plaintiff disputes that all officers filled out the pursuit forms accurately and candidly, as multiple witnesses, including the City's designated 30(b)(6) representatives on pursuits and training testified that Gorny reported his maximum speed during a September 2016 pursuit as 85 miles an hour when his actual maximum speed was 114 miles per hour. Exhibit F at 211:1–14; Exhibit C at 52:22–53:13.**

**Answering further, Plaintiff disputes that dash camera video is reviewed in every case. Exhibit BB at 7 (PFC Bair wrote comments such as "Where are the rest of the videos?" and "Need all of the videos.").**

**Answering further, Plaintiff disputes that reviewers took any appropriate action when the officers, and particularly Officer Gorny, filled the forms out in manner which misrepresented the speed used in the pursuit and other facts, as multiple witnesses, including Gorny, and the City's designated 30(b)(6) representatives on pursuits and training testified that Gorny's misrepresentation or misperception of his maximum speed**

**in his 114 miles per hour pursuit was never addressed with him and nothing was done about it. Exhibit C at 56:91-3; Exhibit D at 194:1-10; Exhibit F at 214:11-20.**

109. The South Bend Police Department has a Pursuit Review Committee ("PRC"). Exhibit F at 18:5 -- 20:8, at 154:10-12; Exhibit M, ¶7. The PRC is comprised of officers who are emergency vehicle instructors. Exhibit F at 18:5 -- 20:8.

**RESPONSE 109. Plaintiff does not dispute that certain witnesses testified to Movant's Fact No. 109. However, Plaintiff disputes that this procedure was followed in every case, as the City's designated 30(b)(6) representative for pursuit reviews stated that the PRC had monthly meetings. Exhibit F (Vol. 1) at 26. However, minutes were produced for only four meetings for the period of 2015 -2018: June 25, 2015, March 16, 2016, July 27, 2016, and August 15, 2018. Exhibit F (Vol. 2) at 256:21–258:3.**

110. The captain of ORM acts as a gatekeeper for the PRC. Exhibit M, ¶8. The captain of ORM sends a pursuit to the PRC if there is a possible violation of SBPD policy. Exhibit F at 18:5 -- 20:8, 21:10-15, 25:10-16, 29:11-15, 35:24 -- 36:5, 53:3-9; Exhibit M, ¶8. If the captain of ORM finds no violation of SBPD policy, he does not send that pursuit to the PRC. Exhibit F at 18:5 -- 20:8, 21:16-20, 25:10-16, 29:11-15, 35:8-16, 36:6-10, at 253:21 -- 254:24; Exhibit M, ¶8.

**RESPONSE 110. Plaintiff does not dispute that certain witnesses testified to this. However, Plaintiff disputes that the captain of ORM was only a gatekeeper as stated in Fact No. 110. This is based on the fact that, of the 377 vehicle pursuits conducted by the South Bend police department from 2013-2018, 262 were documented by South Bend in the IA Pro Summaries as being "Not Justified" and**

**"Not Within Policy".There is no evidence of the PRC reviewing these 262 pursuits. Exhibit H-2A (Report of Dr. Mourtgos) at 156.[6]**

111. When a pursuit is sent to the PRC for review, the PRC reviews the dash camera video, evaluates whether the pursuit was within policy, and then fills out a form with its findings. Exhibit F at 18:5 -- 20:8, 26:19 -- 27:8, 44:15-18, 286:10-15.

**RESPONSE 111. Plaintiff does not dispute certain witnesses testified to this. However, Plaintiff disputes that this procedure was followed in every case. This is based on the fact that, of the 377 vehicle pursuits conducted by South Bend police department from 2013-2018, 261 were documented by South Bend in the IA Pro Summaries as being "Not Justified" and "Not Within Policy". The City's designated 30(b)(6) representative for pursuit reviews stated that the PRC had monthly meetings. (Herron 30(b)(6), Vol. 1, p. 26). However, minutes were produced for only four meetings for the period of 2015 -2018: June 25, 2015, March 16, 2016, July 27, 2016, and August 15, 2018. (Herron 30(b)(6), Vol. 2, 256:21-258:3). There is no evidence of the PRC reviewing the 262 pursuits as being as being "Not Justified" and "Not Within Policy". Exhibit H-2A at 156.**

**Answering further, Plaintiff disputes that dash camera video is reviewed in every case. Exhibit BB at 7.**

**Answering further, Plaintiff disputes that the captain of ORM was only a gatekeeper as stated in Fact No. 110. This is based on the fact that, of the 377 vehicle pursuits conducted by South Bend police department from 2013-2018, 262 were documented by South Bend in the IA Pro Summaries as being "Not Justified" and "Not Within Policy". There is no evidence of the PRC reviewing these 261 pursuits. Exhibit H-2A at 156.**

[6] This is Deposition 2A from Exhibit H, Deposition of Dr. Mourtgos.

112. If the PRC finds a policy violation, the ORM captain notifies that officer's shift captain, and the officer is coached to make sure that the policy violation is corrected. Exhibit F at 37:2 -- 39:25, 53:3-19. Other consequences for violating policy during a pursuit could be additional training or forbidding an officer from engaging in pursuits. Exhibit F at 94:18-23.

**RESPONSE 112. Plaintiff does not dispute that certain witnesses testified to this. However, Plaintiff disputes that all policy violations resulted in coaching and correction. The City's pursuit records show that Gorny had a total of twelve (12) pursuits between June 16, 2016 and June 18, 2018. Of those, the IA Pro system records show that ten (10) were found to "Not Justified" and "Not Within Policy". Exhibit BB (CITY 4997 (VP 2016-0039); CITY 5054 (VP 2016-0052); CITY 5878 (VP 2017-0034); CITY 6076 (VP 2017-0046); CITY 6103 (VP 2017-0048); CITY 6316 (VP 2017-0057); CITY 6464 (VP 2017-0063); CITY 6716 (VP 2017-0081); CITY 7895 (VP 2018-0045); CITY 7943 (VP 2018-0048)). Gorny testified that he never received any criticisms or critiques about his driving, emergency driving or pursuits. Exhibit D at 147:21-148:3. The City's 30(b)(6) witness, Captain Fulnecky, confirmed that she saw no evidence that Gorny was ever retrained or disciplined for any of these incidents Exhibit C at 61: 8-12.**

**Answering further, Plaintiff further disputes this procedure was followed in every case, based on inconsistent and shifting testimony by the City's 30(b)(6) witness on determinations of policy violations on the IA Pro Summaries. When initially questioned about IA Pro Summaries indicating pursuits were not justified and not within policy, Captain Herron testified he never checked these boxes and that "No" appeared by default. (Herron 30(b)(6), 92:10-14). However, when confronted with multiple IA Pro Summaries**

**from 2016-2018 that he personally entered showing "Yes" checked for these same fields, Captain Herron changed his testimony, first suggesting he may have been in training and entered information incorrectly, then acknowledging he must have checked them, before claiming – after a break and a discussion with his attorney – that Captain Schweizer may have checked the boxes. Exhibit F at 97:13–99:13, 105:12–107:23, 112:6–115:15.**

113. The IAPro database has fields for "Pursuit justified" and "Pursuit within policy." Exhibit F at 82:24 -- 83:4, at 282:13-19. If the checkbox is not selected for these fields, these fields default to "no" when the summary for that pursuit is printed. Exhibit F at 82:24 -- 86:19, 92:10-14, at 282:25 -- 284:5. SBPD was not aware until 2024 that, if the checkbox is not checked, the IAPro printout says "No" for the "Pursuit justified" and "Pursuit within policy" fields. Exhibit F at 284:14-22.

**RESPONSE 113. Plaintiff does not dispute that Captain Herron stated this. However, Plaintiff disputes Captain Herron's explanation based on inconsistent and shifting testimony by the City's 30(b)(6) witness on the IA Pro system When initially questioned about IA Pro Summaries indicating pursuits were not justified and not within policy, Captain Herron testified he never checked these boxes and that "No" appeared by default. Exhibit F at 92:10–14. However, when confronted with multiple IA Pro Summaries from 2016-2018 that he personally entered showing "Yes" checked for these same fields, Captain Herron changed his testimony, first suggesting he may have been in training and entered information incorrectly, then acknowledging he must have checked them, before claiming – after a break and a discussion with his attorney – that Captain Schweizer may have checked the boxes. Exhibit F at 97:13–99:13, 105:12–107:23, 112:6–115:15.**

114. It is not SBPD's usual practice to update the "Pursuit justified" and "Pursuit within policy" fields in IAPro if a pursuit is found to be justified and within policy. Exhibit F at 83:21 -- 86:19, 87:6-23, 285:4-24. The determination of whether a pursuit was justified and within policy is found in the documents that are scanned and attached to the IAPro file. Exhibit F at 87:6-23, 89:6 -- 90:4.

**RESPONSE 114. Plaintiff does not dispute that Captain Herron stated this. However, Plaintiff disputes Captain Herron's explanation based on inconsistent and shifting testimony by the City's 30(b)(6) witness on the IA Pro system When initially questioned about IA Pro Summaries indicating pursuits were not justified and not within policy, Captain Herron testified he never checked these boxes and that "No" appeared by default. Exhibit F at 92:10–14. However, when confronted with multiple IA Pro Summaries from 2016-2018 that he personally entered showing "Yes" checked for these same fields, Captain Herron changed his testimony, first suggesting he may have been in training and entered information incorrectly, then acknowledging he must have checked them, before claiming – after a break and a discussion with his attorney – that Captain Schweizer may have checked the boxes. Exhibit F at 97:13–99:13, 105:12–107:23, 112:6–115:15.**

**IV. Officer Gorny's Training on Emergency Vehicle Operations and Pursuits.**

115. Officer Gorny received training at the police academy on emergency vehicle operations. Exhibit L at 93:18 -- 94:18. Officer Gorny was trained at the police academy that he had to drive with due regard for the safety of the public when driving in emergency mode. Exhibit D at 156:7-13, 171:20-24; Exhibit L at 483:11-17; Exhibit P (CITY 306 ("[T]he driver of an emergency vehicle must show 'due regard for the safety

of all persons.'")). Officer Gorny understands "due regard" to mean driving in a manner that you are in control of your vehicle for the safety of the public and for yourself. Exhibit D at 172:13-20.

**RESPONSE 115. Plaintiff does not dispute Certain witnesses said this. However, Plaintiff disputes SBPD officers were properly trained to drive with due regard, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to pursuits and due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about**

**the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

116. Officer Gorny received track training at the police academy, which included evasive maneuvers, high speeds, braking, and taking corners at high speed. Exhibit D at 176:12-21. Officer Gorny achieved speeds of at least 85 miles per hour during his track training at the police academy. Exhibit D at 176:22-25.

**RESPONSE 116. Plaintiff does not dispute that Officer Gorny testified that he achieved speeds of up to 85 miles per hour during his track training at the police academy, but disputes that he reached such speeds during his EVO track training once he joined the South Bend Police Department. Specifically, Officer Gorny testified that the highest speed he reached during EVO training with South Bend between 2016 and 2018 was approximately 50 miles an hour. Exhibit D at 130:22-131:3; 139:1-14.**

117. Officer Gorny was trained about clearing intersections at the police academy. Exhibit D at 175:19-21. The academy taught him that, when approaching a red light, you need to slow down, come to nearly a complete stop to clear both left and right of your intersection, and proceed with caution. Exhibit D at 175:22 -- 176:4.

**RESPONSE 117. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny's general training on clearing intersection generally was adequate.**

**Answering further, Plaintiff disputes SBPD officers were properly trained to clear intersections and on emergency vehicle operations, as the City's 30(b)(6) witness for**

**training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to pursuits and due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

118. South Bend trained Officer Gorny that he had to use due regard for the safety of the public while driving his patrol car. Exhibit D at 154:5 -- 156:10; Exhibit L at 483:18-24. He

was trained in the FTO program that he was required to drive with due regard when operating an emergency vehicle. Exhibit D at 172:21 -- 174:19; Exhibit D-A; Exhibit P (CITY 548-56, *& esp.* CITY 552; CITY 785-86, §A.2). Officer Gorny was trained that "You must use due regard for the safety of all citizens when running signal 10, as you can be held responsible for accidents caused by negligence." Exhibit D at 172:21 -- 175:3; Exhibit D-A, § A.2.

**RESPONSE 118. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny's general training on clearing intersection generally was adequate.**

**Answering further, Plaintiff disputes SBPD officers were properly trained to clear intersections and on emergency vehicle operations, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to pursuits and due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

119. During his FTO training, Officer Gorny was commended for driving with due regard during emergency runs. Exhibit L at 47:6 -- 48:1; Exhibit P (CITY 919, 923, 998, 1026, 1052, 1061).

**RESPONSE 119. Plaintiff disputes that all cited instances of positive feedback during training equate to formal commendation and disputes that each cited instance involved emergency runs. Exhibit P (CITY 919, 923).**

120. During his FTO training, Officer Gorny was noted to have engaged in unsafe emergency driving on one occasion; this was noted on the Daily Observation Report form that Officer Gorny signed. See Exhibit P (CITY 910).

**RESPONSE 120. Plaintiff does not dispute that evidence of this exists. Plaintiff disputes the remedial action adequate also disputes that Gorny's training on safe driving was complete or adequate. Exhibit P (CITY 910).**

121. South Bend trained Officer Gorny on clearing intersections during his FTO program. Exhibit D at 176:5-8.

**RESPONSE 121. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny's general training on clearing intersections was adequate or proper.**

**Answering further, Plaintiff disputes SBPD officers were properly trained to clear intersections and on emergency vehicle operations, as the City's 30(b)(6) witness for training testified that there was no formal training given to SBPD officers on when to initiate and terminate pursuits other than their being given the policy itself. Exhibit B at 80:12-19. Plaintiff further disputes that SBPD officers were properly trained and instructed on when to pursuits and due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video**

**watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C, 40:14-41:11.**

122. During his FTO program, Officer Gorny was commended for thoroughly clearing intersections during an emergency run when it was raining. Exhibit P (CITY 1026).

**RESPONSE 122. Plaintiff admits there is such commendation, but Plaintiff denies that this training was adequate or proper .**

123. Officer Gorny received inservice emergency vehicle operations training, which included hands-on training on a closed course. Exhibit D-15 at 2 ("EVO Training" in October 2017, "E.V.O" in April 2017), 3 ("EVO Classroom Version/Video" on December 21, 2016, "Mandatory EVO Training October 2016"), 4 ("SBPD EVO 2016" in April 2016); Exhibit D-19; Exhibit L at 94:6 -- 96:13; Exhibit P (CITY 600-603).

**RESPONSE 123. Plaintiff does not dispute that various witnesses testified to this. However, Plaintiff disputes that this emergency vehicle operations training was adequate or proper, as according to Gorny his emergency vehicle operations training consisted of driving around a track at the Tire Rack in South Bend for approximately 10 minutes. Exhibit D at 141:3-13.**

**Answering further, Plaintiff further disputes that SBPD officers were properly trained and instructed on emergency vehicle operations, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their**

**attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

124. In December 2016, Officer Gorny satisfied part of his annual EVO training requirement by watching a video of a recorded classroom training session. Exhibit C at 63:22 -- 64:2, 86:1-3; Exhibit L at 484:10-22.

**RESPONSE 124. Plaintiff does not dispute that various witnesses testified to this. However, Plaintiff disputes that SBPD officers were properly trained and instructed through these EVO training videos, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence**

**the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video three (3) times during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

125. On July 20, 2018, Officer Gorny knew that he was required to drive with due regard when responding to calls on the midnight shift. Exhibit D at 175:4-10. He understood that he was required to use due regard if he was driving without his lights or siren on. Exhibit D at 175:11-18.

**RESPONSE 125. Plaintiff does not dispute that various witnesses testified to this. However, Plaintiff disputes that SBPD officers were properly trained and instructed on driving with due regard, on the basis that the City's designated 30(b)(6) representatives on**

**training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video three (3) times during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

126. On July 20, 2018, Officer Gorny knew that he was required to clear an intersection before proceeding through the intersection against a red light. Exhibit D at 74:15 -- 75:6.

**RESPONSE 126. Plaintiff does not dispute that Gorny testified to this. However, Plaintiff disputes that Gorny's training on clearing intersection was adequate.**

**Answering further, Plaintiff disputes that SBPD officers were properly trained and instructed on driving with due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video three (3) times during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

127. On July 20, 2018, Officer Gorny understood that he was required to follow all of the South Bend Police Department policies. Exhibit D at 166:7-10.

**RESPONSE 127. Plaintiff does not dispute that Gorny testified to this. However,**

**Plaintiff disputes that SBPD officers were properly trained and instructed on driving with due regard, on the basis that the City's designated 30(b)(6) representatives on training testified that EVO instructors' attitudes undoubtedly influence the attitudes of officers concerning pursuits and can influence their attitudes toward high-speed operations, including emergency calls and traffic stops. Exhibit B at 98:15-99:44; Exhibit C at 83:18-85:23. Furthermore, the City's designated 30(b)(6) representatives on training testified that certain of the City's emergency vehicle operation's training materials, including EVO instructor statements, contained reckless material. Exhibit C at 83:18-86:14; Exhibit C-5-A.**

**Answering further, Plaintiff disputes that officer training was adequate, continuous and reinforced, as Gorny was shown a video during EVOC training that encouraged reckless pursuits. Supra at Response 73.**

**Answering further, Plaintiff disputes that officer training was conducted in a serious manner, as the City's 30(b)(6) on training testified that a EVO training video watched by Gorny and other officers on an annual basis contained a statement by the EVO instructor "I have bored you into oblivion," at the end of a video showing a woman speaking about the death of her only children in an officer-involved pursuit, which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.**

INDIANA LAW ENFORCEMENT ACADEMY

LESSON PLAN

| | | | | | | |
|---|---|---|---|---|---|---|
| Course Level: | Basic | In-Service | Supervision | Management | Specialized: | |
| Lesson No: | Title: Emergeny Vehicle Operations Policy & Law | | | | Hrs. Required: 1 | of 2 |

Scope of Lesson Coverage:

Through lecture, policy distribution, and discussion students will be able to recite five key points of SBPD Policy 306 Vehicle Pursuit and 308 Officer Response to Calls.

Specific Objectives:

Given a lecture officers will identify five of the following important points of SBPD Policy 306 Vehicle Pursuits:

1. Seatbelt use is mandatory.
2. Officers are required by law to drive with due regard for the safety of all.
3. Reason for the pursuit?
4. Three car rule.
5. Watch the speed.
6. Officers should not run in emergency mode to try to get into a pursuit.
7. Officers should not take over a pursuit from an outside agency.

Policy 308 Officer Response to Calls

1. Seatbelt use is mandatory
2. When operating in emergency mode policy requires Lights AND Siren be used for the entire run.
3. Watch the speed.
4. Officer are required by law and policy to slow down when disregarding traffic control devices and may only proceed when it is safe to do so.
5. DO NOT go against red lights at blinder intersections until it is safe to do so.

Training Aids, Equipment (etc.) Required:

Copy of Policy 306 and 308, Below 100 posters, Policy 306 poster, Policy 308 poster.

Material for Issue:

Policy is on laptops.

References:

SBPD Policy Manual Lexipol

Prepared by: SBPD EVO STAFF Date: 10/10/18

ILEA/180

**Exhibit B at 16-20.**

**PLAINTIFF'S ADDITIONAL MATERIAL FACTS**

## I. EVENTS OF JULY 20, 2018

### A. GORNY GOES THROUGH A RED LIGHT AT AN OBSTRUCTED INTERSECTION AT OVER 90 MPH AND COLLIDES WITH ERICA FLORES

128. On July 20, 2018 at 4:30 am Erica Flores, age 23, was driving home from work as a cleaning contractor at Martin's Super Markets. Exhibit DD (Dep. of Soraida Flores, 11:23–12:12). Erica had two daughters, then aged 5 and 6 years old (now 10 and 11 years old). Exhibit DD at 11:8–15. Erica would pick her daughters up at her sister's house after finishing third shift and take them home. Exhibit DD at 106:24–108:19.

129. Erica's route home that night included traveling northbound on Kaley Street and travelling through its intersection with Western Avenue in South Bend, Indiana. Answer to Complaint, ¶ 45.

130. On Western Avenue, the street Gorny traveled leading up to the collision, there was a mix of commercial and residential buildings. Exhibit F at 278:7–18.

131. The speed limit on Western Avenue traveling eastbound for Gorny was 30 miles per hour. Exhibit F at 277:9-16.

132. Gorny reached speeds up to 98 miles per hour on Western Avenue in the moments leading to the collision, without his siren activated and intermittently using his emergency lights. Exhibit F at 269:9-270:24; 296:20-23; Exhibit G at 62:16-19.

133. As Gorny approached the intersection of Western and Kaley at speeds up to 98 miles per hour he knew it was a "bad" and "blind" intersection with obstructed views of northbound on Kaley Street, which was Erica's path of travel. Exhibit at 55:18-58:23.

134. Gorny's view of northbound traffic on Kaley was obstructed by a building as he was driving eastbound on Western. Exhibit D at 58:10-19.

135. Gorny had a responsibility to clear any intersection he approached when approaching a red light. Exhibit D at 74:19-25.

136. Clearing the intersection means ensuring that no other vehicles are passing through when proceeding through the red light. Exhibit D at 75:1-5.

137. Gorny failed to clear the intersection. Exhibit E at 46:8-13.

138. Officer Alfrey testified it was reckless of Gorny to drive through the intersection at 90 miles an hour without clearing the blind intersection. Exhibit A at 33:10–16.

139. Before reaching Western and Kaley, Gorny went through fourteen (14) intersections with only intermittent use of lights and sirens at speeds up to 98 miles per hour. Exhibit L at 29:17–24. These intersections, and Gorny's intermittent use of lights and sirens, are shown in the following exhibit authenticated by Captain Herron:

Exhibit 5




Exhibit E-5

140. In the four seconds before the collision, Gorny approached the intersection at speeds up to 98 miles per hour. Exhibit E at 44:3–6; Exhibit F at 269:9–270:20.

141. Gorny had a red light as he approached the traffic signal at Kaley and Western. Horvath, Exhibit CC at 73:18–74:9.

142. Gorny ran a red light at the intersection of Western and Kaley. Exhibit CC at 76:1–5.

143. Gorny collided with Erica's car at high speed, pushing her car over trees and onto the sidewalk.
















Exhibit CC-I.

144. Gorny's speed was between 90 and 76 miles per hour at the moment of the collision. Exhibit F at 270:21-24.

145. Gorny was accelerating 1.5 seconds prior to impact. Exhibit E at 44–45; Exhibit F at 270–271.

146. Nothing necessitated the high speeds Gorny chose to drive that night. Exhibit J at 12:17–13:3.

147. On the night of the Flores incident, Sheridan was a residential area. Exhibit E at 22:19–21.

148. Gorny knew that residents in the neighborhood along Sheridan, which he took to Western, could be heading to work. Exhibit D at 48:3-19.

149. The speed limit on Sheridan was 25 miles per hour. Exhibit E at 276:22–277:4.

150. Gorny knew people could be outside at that time and that they might possibly be crossing the street. Exhibit D at 51:20-52:3.

151. As Gorny was driving northbound on Sheridan, he was aware of the possibility that people could be in the street---walking their dogs, exercising, or getting into their cars to go to work---and could be killed or seriously injured by a car speeding up Sheridan at 70, 80, or 90 miles per hour. Exhibit D at 54:1-55:8.

152. Gorny was driving on Sheridan at speeds reaching into the high seventies, with a top speed of 78 miles per hour without using his lights or siren. Exhibit E at 23:17-24:13.

### B. THIS WAS A TRAFFIC STOP THAT GORNY WAS NOT ASSIGNED TO OR ASKED TO PARTICIPATE. IT WAS NOT AN EMERGENCY.

153. This incident began when Sergeant Hiipakka's "Hot Spot" team attempted to initiate a traffic stop on a vehicle. Exhibit D at 36:17-23; Exhibit G at 15:4-9, Exhibit A at 9:15-18; Exhibit E at 13:15-18.

154. When Gorny joined channel 7, the channel involved in the traffic stop, he was not part of the hot spot team. Exhibit J at 16:1–4.

155. Gorny was not requested to assist with this traffic stop. Exhibit A at 32:14-18.

156. Gorny decided on his own to respond to this traffic stop without being asked to do so. Exhibit J at 13:16–21.

157. A traffic stop is not an emergency. Exhibit A at 17:13–15; Exhibit J at 23:16–24:15; Exhibit F at 156:16–18.

158. Gorny was not needed in this traffic stop as the Hot Spot team had plenty of manpower. Exhibit A at 38:14–39:10.

159. Five (5) officers in three different police vehicles were involved in this traffic stop: Sergeant Hiipakka; Officer Howard; Officer O'Blenis; Officer Alfrey and Officer Wagner. Exhibit E at 25:16–26:3.

160. The traffic stop was not an emergency. Exhibit A at 17:13–15; Exhibit J at 23:16–24:15; Exhibit F at 156:16–18.

161. On the night of the Flores incident, no one from the "Hot Spot" Team called out on the radio that the traffic stop they were attempting was a Signal 10 emergency call. Exhibit G at 37:21-38-1.

162. Before Gorny spoke to the "Hot Spot" team on the radio no one asked him to get involved in this traffic stop. Exhibit G at 42:15-24.

163. None of the other officers involved in the traffic stop described it as anything other than a routine traffic stop. Exhibit G at118:10-18.

164. No one told Gorny that this was an emergency or that he should engage in a high-speed vehicle operation. Exhibit A at 16:22-17:15.

165. The driver that was being followed by the "Hot Spot" team pulled over after Sergeant Hiippaka turned on his lights. Exhibit A at 14:1-5. The driver stated he was late for work and was let go without being issued a ticket. Exhibit A at 14:6-13.

### C. GORNY DID NOT ACTIVATE CONTINUOUS LIGHTS AND SIREN AS REQUIRED ON EMERGENCY RUNS

166. Gorny did not have his emergency lights and siren activated while traveling northbound on Sheridan before turning onto Western on the night of the Flores

incident because he did not consider it an emergency run. (Gorny, pp. 44; 157.) (Ruszkowski, p. 24.)

167. Gorny did not activate his emergency lights the entire time he was traveling eastbound on Western, only doing so intermittently. Exhibit D at 62:11-15; Exhibit F at 296:20-23.

168. Gorny did not use his siren at all on either Western or Sheridan. Exhibit D at 62:16-19.

169. Gorny did not have his emergency lights on when he was four blocks away from Kaley and Western in front of the Taqueria or when he was three blocks away in front of Rosales Supermarket. Exhibit E at 52:1-53:7.

170. Based on video footage and all the evidence in the case, Gorny turned on his overhead emergency lights two to three seconds before the impact. Exhibit E at 53:25-54:4.

171. Gorny must have manually turned off his video camera before the collision automatically turns on when the officer's speed exceeds 80 miles per hour and when emergency lights and sirens are activated. Exhibit F at 287:9-22.

**D. TESTIMONY OF POLICE CHIEF SCOTT RUSZKOWSKI ON GORNY'S CONDUCT**

172. Chief Ruszkowski testified that Officer Gorny violated the oath of office, which includes the United States constitution and the Indiana constitution. Exhibit J, at 10:6-10.

173. Chief Ruszkowski testified that after reviewing all of the materials in this case that his office of professional standards gave him, internal affairs, going to the scene, and looking at all of the other evidence, he came to the conclusion that Officer Gorny did not operate the South Bend police car in a careful, prudent, or safe manner. In fact, it was his conclusion that Officer Gorny operated the vehicle in an imprudent and improper manner. It was his conclusion

that Officer Gorny did not drive with due regard and attention to the safety of others or himself. Exhibit J at 10:20-11:10.

174. Chief Ruszkowski testified that based on his review of the information, Officer Gorny did not drive with due regard for others, including himself. Officer Gorny had no attention to others, attention to himself, care and concern, no. Not for anybody or himself. Exhibit J at 11:21-12:2.

175. Chief Ruszkowski testified that he believed that Mr. Gorny did not drive with due regard for the safety of others, attention to himself, care and concern for anybody. Exhibit J at 12:11-16.

176. Chief Ruszkowski testified that from his position as the chief of police, he agreed that there was nothing in the radio transcript that necessitated the high speeds that Officer Gorny chose that night. Exhibit J at 12:24-13:3.

177. Chief Ruszkowski testified that it was his professional conclusion that Officer Gorny violated the training safety standards and practices while operating his vehicle in an improper manner and his actions and his decisions contributed to this incident and the collision with Mrs. Flores. Exhibit J at 13:4-10.

178. Chief Ruszkowski testified that he concluded after reviewing all of the materials in this case that this was simply a response to a traffic stop and that it ultimately resulted in a collision. Exhibit J at 13:11-15.

179. Chief Ruszkowski testified that he believed that the police officers involved in this traffic stop called out that they needed a vehicle stopped, and Officer Gorny without being asked to respond, decided on his own to respond to that traffic stop. Exhibit J at 13:16-21.

180. Chief Ruszkowski testified under oath at the public hearing (Page 282) on November 5, 2018:

Q: Was he assigned to monitor the hot spot channel?

A: No.

Exhibit J at 15:20-25.

181. Chief Ruszkowski testified that Officer Gorny was not even assigned to monitor the hot spot channel. Exhibit J at 16:8-11.

182. Chief Ruszkowski testified that using street maps that were part of his investigation, he concluded that Officer Gorny used excessive speed, and he operated his lights and sirens intermittently. He further concluded that Officer Gorny turned his emergency lights on and off on a couple of different occasions. Exhibit J at 17:24-18:7.

183. Chief Ruszkowski testified that it was his conclusion and impression after reviewing all of the materials that all of the policy violations that Officer Gorny engaged in that night contributed to that collision. Exhibit J at 20:18-21:3.

184. Chief Ruszkowski testified that it was his conclusion and impression that Officer Gorny's actions led to this accident which was preventable. He testified that Officer Gorny contributed to an accident that could have been prevented. He testified that it was his conclusion that Officer Gorny's actions and decisions contributed to this accident, this collision. Exhibit J at 22:6-14.

185. Chief Ruszkowski testified that it is the policy of South Bend that when operating vehicles in emergency mode the law holds officers legally responsible to drive with due regard for the safety of all people. Exhibit J at 25:4-8.

186. Chief Ruszkowski testified that in the five seconds prior to this occurrence Officer Gorny's speed was as high as ninety-eight miles per hour. Exhibit J at 25:13-16.

187. Chief Ruszkowski testified that it was his conclusion that Officer Gorny did not sufficiently decrease his speed to a safe level before proceeding into that intersection where this collision occurred. Exhibit J at 25:17-21.

188. Chief Ruszkowski testified that if an officer turns on his emergency lights there should be video footage of that time. Exhibit J at 29:22-25.

189. Chief Ruszkowski testified that Officer Gorny received training at the academy through the City of South Bend to drive over fifty miles an hour. Exhibit J at 42:23-43:2.

190. Chief Ruszkowski testified that the department's pursuit policy set out the reasoning and criteria for discontinuing emergency vehicle operations prior to July of 2018. Exhibit J at 46:8-13.

191. Chief Ruszkowski testified that he did not know what Officer Gorny's thought process was regarding turning the traffic stop into an emergency call, but that he disagreed with it, regardless of what it was. Exhibit J at 61:3-9.

192. Chief Ruszkowski testified that from Sample to Western on Sheridan is primarily residential, and that on Western from Sheridan to Kaley is mostly business with some residential. Exhibit J at 63:7-12.

193. Chief Ruszkowski testified that Exhibit 29 was a letter he submitted to the board of public safety. Exhibit J at 65:5-9.

## E. GORNY WAS FOUND TO HAVE DRIVEN EXTREMELY RECKLESSLY AND OUTSIDE OF POLICY

194. The South Bend Board of Public Safety specifically found that Gorny was not engaged in an emergency response at the time of the collision. Exhibit FF (Findings of Fact., ¶¶ 24-27, CITY 0099.)

195. The Board found that Gorny's speed on Western over the 10 blocks between Sheridan and Kaley was excessive under the circumstances. (Id., ¶ 18, CITY 0098.)

196. The Board found that Gorny failed to operate his vehicle with due regard for the safety of other motorists, bicyclists or pedestrians by failing to slow and clear the intersection along his route of travel, most particularly the intersection of Western and Kaley. (Id., ¶¶ 28-298, CITY 0099; ¶ 4, CITY 0100.)

197. The Board of Public Safety found that Gorny's operation of his patrol car on July 20, 2018 "in an unsafe (and extremely reckless) manner" violated standards of conduct and contributed to this collision. (Id., ¶ 2, CITY 0100.)

198. The Board ultimately concluded that "the actions of Gorny on July 20, 2018 constituted both violations of the South Bend Police Policy Manual and a significant and reckless deviation from the standards of the South Bend Police Department for the safety of its officers and the citizens of South Bend" and recommended Gorny be terminated from his employment. (Id., CITY 0100.)

199. Gorny violated five different South Bend police department policies during this event, including policy relating to emergency calls, speed, manner of driving in emergency mode, turning his lights on and off, and general lack of due regard to public safety. Exhibit E at 17:7-17; Exhibit E-22; Exhibit J at 27:1–9.

200. Chief Ruszkowski stated the following conclusion in his termination letter to Officer Gorny: Officer Gorny violated Section 320.5.8 (i and j):

> 1. **320.5.8 (i and j) Performance**
> *"(i) Any act on or off-duty that brings discredit to this department.*
> *(j) Shall operate departmental vehicles in a careful and prudent manner and shall obey state laws or departmental orders pertaining to such operation."*

Exhibit GG (CITY 0093)

201. Chief Ruszkowski stated the following conclusion in his termination letter to Officer Gorny: Officer Gorny violated Section 320.5.10 (a, f, and g):

> 2. **320.5.10 (a, f, and g) Safety**
> *"(a) Failure to observe or violating department safety standards or safe working practices.*
> *(f) Unsafe or improper driving habits or actions in the course of employment or appointment, and at any time while using a city vehicle.*
> *(g) Any personal action contributing to a preventable accident."*

Exhibit GG (CITY 0093)

202. Chief Ruszkowski stated the following conclusion in his termination letter to Officer Gorny: Officer Gorny violated Section 1008.3:

> 3. **1008.3 Wearing of Safety Restraints**
> *"All members shall wear properly adjusted safety restraints when operating or riding in a seat equipped with restraints, in any vehicle owned, leased or rented by this department while on- or off-duty, or in any privately owned vehicle while on-duty. The member driving such a vehicle shall ensure that all other occupants, including those who are not members of the Department, are properly restrained."*

Exhibit GG (CITY 0094)

203. Chief Ruszkowski stated the following conclusion in his termination letter to Officer Gorny: Officer Gorny violated Section 308.3.1:

4. **308.3.1 Emergency Calls**
*"Officers responding to an emergency call shall proceed immediately and shall continuously operate the emergency vehicle lighting and siren as required by law (I.C. 9-21-1-8). Even when operating a vehicle in emergency mode, the law holds officers legally responsible to drive with due regard for the safety of all people."*

Exhibit GG (CITY 0094)

204. Chief Ruszkowski stated the following conclusion in his termination letter to Officer Gorny: Officer Gorny violated Section 308.5:

5. **308.5 Safety Considerations**
*"Officers responding to an emergency call shall proceed immediately as appropriate and shall continuously operate the emergency vehicle lighting and siren as required by law (I.C. 9-13-2-6(1)(B)).*

Exhibit CC (CITY 0094)

## II. GORNY'S TRAINING WITH SOUTH BEND INCLUDED A VIDEO WHICH THE HEAD OF TRAINING DESCRIBED PARTS AS RECKLESS

205. Officer Gorny was required to do two (2) hours of emergency vehicle operation (EVO) training every year at South Bend. Exhibit G at 133:5-10. He watched a training video during EVO in-services in 2016, 2017 and 21018. Exhibit G, 133:5-134:12; 135:15-136:24. This video was created before the Flores incident and was shown to South Bend police officers over multiple years, including 2013, 2014, 2015, and 2016. Exhibit C 83:18-86:7; Exhibit C-5C.

206. South Bend showed Gorny the same video three years in a row. Exhibit G at 141:3-8. South Bend officers joked about watching the same video every year. Exhibit G at 142:12-21.

207. The Emergency vehicle operations (EVO) video in-service lasted less than the two hours indicated on Gorny's training history record. Exhibit D at 136:1-11.

208. Nothing from the EVO classroom videos in 2016, 2017, or 2018 helped Gorny handle high stress driving situations. Exhibit D at 138:2-6.

209. This was the last training video Gorny saw before the Flores incident. Exhibit C at 63:22-64:2.

210. The video included the following passage from one of South Bend's Emergency vehicle operations instructors:

> **We chase them around, up and down side streets, all the time, lots of people, lots of cars, lots of intersections, lots of stop signs. We chase them to the city limits where, God Bless 'em, there's just corn fields; right? And that's where we stop. Cause we left our jurisdiction; right?**

Exhibit C at 32:21-34:21.



Exhibit C-5-B

211. Captain Kathy Fulnecky oversees the training department, ensuring that all officers are up to date with their training and arranging any necessary remedial training. (Exhibit F at 180:11-181:5). At the time of the Flores incident, Captain Fulnecky was a lieutenant in the training department. (Exhibit F at 180:11-181:5).

212. Captain Fulnecky, the City's designated Rule 30(b)(6) representative on the training videos, did not know the above statement was being made to South Bend Police Department officers during Emergency vehicle operations training. Exhibit C at 32:21-33:16. She considered it to be improper, reckless and potentially dangerous. Exhibit C at 83:18-86:14.

Had she known, she would have requested its removal from the training video. Exhibit C at 33:12-34:4.

213. The casual nature of this statement had the potential to influence emergency vehicle operations and traffic stops, giving the impression that such actions were permissible. Exhibit C at 35:12-36:23. This statement could have suggested to Gorny that it was acceptable to chase people at high speeds through intersections, stop signs, and side streets, without considering termination. Exhibit C at 34:12-35:19.

214. The instructor who made this reckless statement was not reprimanded and Captain Fulnecky was unaware of any action taken to correct the statement. Exhibit C at 36:3-10, 37:7-10.

215. Sergeant Corey Calvert, the City's designated Rule 30(b)(6) representative on training, testified that he would never teach police officers this statement. Exhibit B at 108:13-16; Exhibit C-5A. He thought this statement was potentially dangerous and could be perceived as reckless. Exhibit B at 109:15-110:1; 113:20-23; 114:17-115:6.

216. Sergeant Calvert testified that innocent people could die needlessly if the teachings in Exhibit 5-A were reflective of the instruction provided by the South Bend Police Department. Exhibit C at 117:3-8.

217. That same Emergency vehicle operations training video contained a victim impact statement from a woman who described losing her two children in an unnecessary high speed police pursuit. Exhibit C at 37:16-39, Exhibit C-5C. This message was intended to be serious, impactful, and persuasive and to make officers consider the consequences before operating a vehicle at high speeds. Exhibit C at 37:16-39:1.

218. At the conclusion of the woman's video statement, the same instructor commented, "I have bored you into oblivion," which the head of training for South Bend police department acknowledged could send the message that high-speed vehicle operations are not that serious. Exhibit C at 40:14-41:11.

219. Sergeant Calvert does not believe the EVO instructor's comment about being bored is the right message to officers. Exhibit B at127:9-21. He believes the message should have been communicated differently. Exhibit B at 125:23-126:24.

220. Before the Flores incident, Gorny engaged in a high-speed emergency vehicle pursuit whose maximum speed he later misrepresented or misperceived by close to thirty (30) miles per hour:

FOR ATTORNEY EYES ONLY

# South Bend Police Department
## Pursuit Review

| | |
|---|---|
| Case # | 16-16914 |
| Officer | Gorniak / Kukla |
| Supervisor | / |
| Date of Incident | 9/19/2016 |
| Time of Incident | 2338 |
| Vehicle and Pedestrian Traffic | Moderate |
| Speed | 114 |
| Road Conditions | DRY |
| Weather | CLEAR |
| Reason for Pursuit | Assist Outside Agency |

1. Was the pursuit within policy?

| | | Initial | PN | Date |
|---|---|---|---|---|
| YES (circled) | NO | KSS | 2093 | 12-06-16 |
| YES (circled) | NO | CB | 2137 | 12/06/16 |
| YES | NO | | | |
| YES | NO | | | |
| YES | NO | | | |

If not explain.

2. Did the severity of the crime outweigh the danger to the community?

| | | | Initial | PN | Date |
|---|---|---|---|---|---|
| YES | ? | NO | KSS | 2093 | 12-06-16 |
| YES | ? | NO | CB | 2137 | 12/06/16 |
| YES | | NO | | | |
| YES | | NO | | | |
| YES | | NO | | | |

If not explain.

3. Did the officer operate with due regard for public safety?

| | | | Initial | PN | Date |
|---|---|---|---|---|---|
| YES | ? | NO | KSS | 2093 | 12-06-16 |
| YES | ? | NO | CB | 2137 | 12/06/16 |
| YES | | NO | | | |
| YES | | NO | | | |
| YES | | NO | | | |

If not explain.

WHAT INCIDENT WAS THE SUSPECT INVOLVED IN W/OUTSIDE AGENCY?? EXCESSIVE SPEED UNLESS WARRANTED

Revised 05-26-16 KAS403

Exhibit 7-A

CITY 3507

FOR ATTORNEY EYES ONLY

SOUTH BEND POLICE DEPARTMENT
RESPONSE TO RESISTANCE / VEHICLE PURSUIT FORM

CASE NO 16 | 16914

**OFFICER INFORMATION**

Name of Officer: PTL J. Gorny PN 2242 | PN: 2242 | Duty Status: On Duty [X] Off Duty [ ] | Were You Wearing SBPD Uniform: Yes [X] No [ ] | Were You Injured: Yes [ ] No [X] | If Yes, Were You Treated at Hospital: Yes [ ] No [X]

**INCIDENT INFORMATION**

Location: 424 W. Eleventh Street Mishawaka | Date: 9-19-2016 | Time: 2338 hours

**SUSPECT INFORMATION (USE SEPARATE FORM FOR EACH SUSPECT)**

Name: Daryl Suggs | Suspect Demeanor: Intoxicated [ ] Mentally Unstable [ ] Under Influence of Narcotics [ ] | Suspect Armed: Yes [ ] No [X] | Weapon Type:

Did you know, or were you told that the suspect possessed any special combat abilities? Yes [ ] No [X] | If Yes, Briefly Explain:

Was Suspect Injured: Yes [ ] No [X] | Did Suspect Require Medical Attention: Yes [X] No [ ] | Was Suspect Transported to Hospital: Yes [X] No [ ]

**LEVEL OF RESISTANCE SUSPECT PRESENTED THAT RESULTED IN USE OF FORCE / PURSUIT**

[ ] Psychological Intimidation [ ] Verbal Non-compliance [ ] Defensive Resistance [ ] Active Aggression [ ] Aggravated Active Aggression [X] Fled in Vehicle [ ] Passive Resistance

**PHYSICAL FORCE** — Effective Yes [ ] No [X]; [ ] Strike / Punch / Kick; [ ] Choke; [ ] ______

**CHEMICAL AGENT** Includes munitions — Effective Yes [ ] No [X]; Lot # ______; Distance from suspect (specify inches or feet): ______

**IMPACT WEAPON** Includes munitions — Effective Yes [ ] No [X]; Impact weapon used: [ ] Expandable [ ] PR-24 [ ] Straight Baton [ ] ______

**TASER** — Effective Yes [ ] No [X]; Serial # ______; Drive [ ] Probe [ ]; Number of cycles ______

**FIREARM** — Effective Yes [ ] No [X]; Make ______ Type ______; Model ______ Dept. Issue ______; Caliber ______ Serial # ______

**VEHICLE PURSUIT ACTIVITY**

Location Pursuit Started: Mumford Ct/ E. Calvert | Time Started: 2338 hours | Location Pursuit Ended: 424 W. Eleventh Street Mishawaka | Time Ended: 2343

Reason for Pursuit: [X] Traffic Violation [ ] Criminal Activity [ ] Assisting Other Agency [ ] ______

Suspect Vehicle: [X] Car [ ] Pick-Up [ ] Semi [ ] SUV [ ] Motorcycle [ ] Moped [ ] ______

Road Conditions: [X] Dry [ ] Wet [ ] Ice [ ] ______

Type of Locale/ Level of Traffic (includes Pedestrians and Vehicles):

| Locale | None | Light | Medium | Heavy |
|---|---|---|---|---|
| [X] Neighborhood | [X] | [ ] | [ ] | [ ] |
| [X] Business District | [X] | [ ] | [ ] | [ ] |
| [ ] School Zone | [ ] | [ ] | [ ] | [ ] |
| [ ] Park | [ ] | [ ] | [ ] | [ ] |
| [X] Open Highway / Street | [X] | [ ] | [ ] | [ ] |
| [ ] ______ | [ ] | [ ] | [ ] | [ ] |

Reason Pursuit Ended: [ ] Officer Terminated [ ] Supervisor Terminated [X] Driver Terminated [ ] Suspect Vehicle Disabled [ ] Automobile Crash [ ] ______

Pursuit Distance: [ ] Less than 1 Mile [ ] 1 to 2 Miles [ ] 2.1 to 5 Miles [X] 5.1 to 10 Miles [ ] Beyond 10 Miles

Was an Accident Report Filed? Yes [ ] No [X]

**Regardless if accident report filed, estimate dollar amount of damages**

Police Vehicles ______ Moving Vehicles ______ Suspect Vehicle: ______ Property: (i.e. building, etc.) ______ Parked Vehicles ______ Other ______

Level of Force Used: [X] Presence (lights/siren) [ ] Tire Deflation Device [ ] "Box In" [ ] PIT Manouver [ ] Ram [ ] Firearms

If Driver was Arrested was one of the charges DUI? Yes [ ] No [X] | Maximum Estimated Speed of Police Vehicle: 85 MPH | Primary Supervisor Monitoring Pursuit:

**With** the exception of training or recreational purposes, an officer must complete this ... and write a case report ... he/she:

1. Discharges a firearm (includes shooting animals for self-defense or humane purposes); or
2. Takes an action that resulted in, or is alleged to have resulted in, visible injury or death to another person; or
3. Applies force through the use of lethal or less-lethal weapons; or
4. Punches, slaps, kicks, knee strikes chokes, or uses any other type of physical striking technique

**Because of the brevity of this form, the case report will be the primary document used to gather the details surrounding the circumstances that required the officer to use force. When writing your case report, it is required that it contain, at minimum, the following information (where applicable).**

- Describe the citizen's actions/behavior and/or the circumstances that influenced your decision to use force. Write facts (i.e. "the suspect swung his fist at my face." Avoid writing conclusions (i.e. "the suspect was fighting", "the suspect was resisting", "the suspect struggled").
- Document verbal warning given prior to the use of force, if verbal warning were not possible, then provide an explanation.
- Multiple applications of force (same or different) must be explained.
- Describe where on the person's body you used force, and what you hoped your action would accomplish.
- TASER usage specify the number of discharges; OC-spray specify the distance from the citizen.
- If at any time the level of force you used did not have the desired effect, then describe why/what happened that made the force ineffective
- If you were injured during the encounter or the citizen was injured by the use of force, then explain how the injury occurred, the type of injury, the steps taken to treat the injury, and what if any type of medical treatment was provided. For serious bodily injury or death take photographs.
- If the suspect demonstrated signs of intoxication, under the influence of narcotics, or symptoms of mental illness, then describe what made you come to that conclusion.

Report Completed By: PTL J. Gorny PN 2242 [signature] Date: 9-20-2016

Office of Risk Management Review: ______ Date: ______

SUBMIT THIS FORM ONLY TO THE OFFICE OF PROFESSIONAL STANDARDS DO NOT file with Report

Exhibit 7-A

CITY 3508

Exhibit F at 211:4-212:3; Exhibit E at 70:18-24; Exhibit C at 53:9-13; Exhibit C-7-A.

221. The City's 30(b)(6) designated witness admitted that the department should have addressed Gorny's misrepresentation or misperception of his maximum speed in the 114 mph

pursuit because the public can be at significant risk when an officer underestimates or is unaware of their actual speed. Exhibit F at 213:15-214:10.

222. No one in the South Bend police department addressed either Gorny's speed or his misrepresentation or misperception of his speed with him and nothing was ever done about it. Exhibit F at 214:11-216:9; Exhibit D at 194:1-10; Exhibit E at 104:8-14; Exhibit C at 56:9-13, 61:4-12; Exhibit K at 46:21-24, 73:12-17.

## III. SOUTH BEND'S REVIEW OF POLICE PURSUITS

### A. CAPTAIN SCHWEIZER RAN THE PURSUIT REVIEW COMMITTEE

223. Captain Herron was designated as a corporate representative for the City of South Bend on topics including its pursuit review process, pursuit review documents, and Officer Gorny's pursuit reviews. Exhibit F at 9:9-13:14.

224. South Bend required its officers to prepare a report for every pursuit. Exhibit M, ¶ 6.

225. Captain Keith Schweizer was the head of Internal Affairs and the Captain of the Risk Management in 2018, the year of the Flores incident. Exhibit M, ¶¶ 2-3; Exhibit E at 6:16–22. His duties and responsibilities included reviewing vehicle pursuits. Exhibit M, ¶ 4. All pursuit reports were forwarded to Captain Schweizer to ensure officer accountability and to confirm that all pursuit policies and procedures were being followed. Exhibit F at 34:16-35:7.

226. Of the 377 vehicle pursuits conducted by the South Bend police department from 2013-2018, 262 were documented by South Bend in the IA Pro Summaries as being "Not Justified" and "Not Within Policy". There is no evidence of the PRC reviewing these 262 pursuits. Exhibit H-2A (Report of Dr. Mourtgos) at 156.

227. Captain Schweizer also ran the department's Pursuit Review Committee (PRC) between 2013 and 2018. Exhibit F at 57:15-19. The PRC played a key role in reviewing pursuits between 2013 and 2018. Exhibit F at 57:7-10.

## B. CAPTAIN SCHWEIZER'S ONGOING CRITICISMS OF THE PURSUIT REVIEW COMMITTEE

228. Captain Herron testified that the PRC had monthly meetings. Exhibit F at 26:2-13. Plaintiff requested the committee minutes from 2015-2018 which would have been 36 committee meeting minutes. Pursuit review committee minutes were produced for only four meetings for the period of 2015 -2018: June 25, 2015, March 16, 2016, July 27, 2016, and August 15, 2018. Exhibit F at 256:21-258:3.

229. Captain Schweizer voiced strong concerns and criticisms about the Pursuit Review Committee in the committee meeting minutes that were produced. Exhibit F at 173:5-9.

230. In his March 16, 2016 memo, Captain Schweizer disagreed with the PRC Committee's determination that one pursuit (15-23303 Bair) was within policy, procedure and the law, finding it went on too long, in too much traffic, for a traffic violation:

> **15-22303 Bair**-Traffic violation turned into MVT. Members agreed within policy, procedure, and the law. Captain Schweizer dissenting. Too long, too much traffic, for a traffic violation.

Exhibit BB (CITY 4820)

231. Captain Schweizer also disagreed with the PRC's decision on a second pursuit (16-3394 Gary) on the basis that the risk didn't outweigh the dangers where too many vehicles pursued for a simple property crime:

> **16-3394-Gray**- MVT No video from Gray but other officers in the pursuit were deemed adequate by the committee members to be within policy procedure and the law. Captain Schweizer had a dissenting opinion as too many vehicles were in the pursuit and it was once again a property crime (MVT) and the risks to officers and the public do not outweigh the dangers posed in his opinion.

Exhibit BB (CITY 4820).

232. Captain Schweizer's March 2016 PRC Memo also provided information about an officer at another local agency who was fired and criminally charged after striking and killing an individual while driving to a call. Exhibit BB (CITY 4820).

233. In July 2016, Captain Schweizer issued another PRC Memo in which he read from the ILEA EVOC instructor's manual and explained that there is no duty to chase a traffic violator. Exhibit BB (CITY 4932).

234. Captain Schweizer identified multiple problems with the PRC process in his July 2016 memo. He questioned and strongly disagreed with the Committee's finding that one pursuit was within policy based on many problems that included a questionable reason for joining the pursuit, lack of supervision and excessive time, distance and number of units involved:

> The Committee found no problems with this pursuit despite watching the entire thing and viewing the GPS map. ORM strongly disagrees and finds the following problems. The reason for joining the pursuit is questionable. At no time could I hear any supervisor ask radio to find out the reason for the pursuit. The distance covered and the time our cars were involved is excessive. At no time does Sergeant Riddle call off our east side and south side cars. This pursuit was on a Friday night around midnight and at least 2 beats cars were way out of their beats.
>
> Mishawaka had more than one car involved and by the time it got to the farm field there were no fewer than 6 cars involved. There were at least 3 SBPD (Kukla, Knepper, PFC Sanchez all identified by ORM) and three others. The other 3 cars could have all been MPD or a combination of MPD and county.
>
> **The pursuit committee found this pursuit to be within policy, training, and the law. ORM ***DOES NOT AGREE***** with the findings of the committee on this pursuit. ORM will enter the committee report along with this report.
>
> Page **1** of **4**
>
> CITY 4932

235. Writing about a different pursuit in July 2016 that he termed "abysmal", Captain Schweizer identified a "lack of candor from the committee" that suggested the pursuit review format needed to be changed. Exhibit BB (CITY 4932). He disagreed with the PRC that the pursuit was within policy for reasons that included the reason for the stop not outweighing the

reason for the stop, failure to drive with due regard and officers act of running a red light with an obstructed view:

The committee failed to complete the evaluation form (this was discovered after everyone left the room and I was compiling the paperwork and videos). Only 3 of the 6 evaluators (Lieutenant Ross, Captain Noonan and Lieutenant Eyster) circled or initialed anything on the form. Lieutenant Eyster wrote that the officer could not have avoided a collision at those high speeds.

**ORM is of the opinion this pursuit violated the policy in the following areas.** 1. The reason for the pursuit did not outweigh the reason for the stop. 2. Sergeant Wolff did not drive with due regard for public safety. 3. Sergeant Wolff failed to properly monitor the pursuit (calling for speeds and conditions) and did not call it off. Both PFC Bair and Sergeant Wolff knew the pursuit was heading toward a construction zone and neither called off the pursuit. Instead they both went through a busy intersection just north of the construction against a red light and with traffic obstructing their view.

The lack of candor from the committee suggests that the pursuit review format be changed. New ORM officer or new committee or new procedure. This review was abysmal.

Exhibit BB (CITY 4932).

236. In that same July 2016 memo, Captain Schweizer determined that one of Officer Gorny's pursuits violated policy, training and the law and specifically disagreed with the PRC in that regard. Exhibit BB (CITY 4934). Among other things, he pointed out officers' failure to check their speed during pursuits and the correlative need for supervision and monitoring to protect officers and the public from harm:

**VP2016-0031 PFC Cummins** Officer Cummins attempted to stop a vehicle that was traveling at a high rate of speed on Western Ave and it disregarded a red light. PFC Cummins attempted to stop the vehicle but it went north on Sheridan at a high rate of speed and disregarded stop signs. It then went east on Linden at a high rate of speed. PFC Cummins stated he was losing sight of the suspect and slowed his police vehicle down because of the wet road, darkness, and the curves in the road. As PFC Cummins came around a curve he noticed the suspect had crashed and the driver was fleeing on foot. The passenger was seriously injured and the crash was investigated by the FACT unit. This was a paper review because no video was available due to an equipment malfunction with a new in car camera. **The committee found PFC Cummins to be within policy, training, and the law. ORM AGREES with the committee.**

**VP2016-0039 Officer Gorny** attempted to stop a vehicle for disregarding a stop sign. The vehicle fled and Officer Gorny chased the suspect for somewhere between 2.1 to 5 miles and approximately 7 minutes on wet roads before the suspect crashed. The pursuit started at 3300 South High and ended at Notre Dame and Sorin.

The pursuit committee found no violation of policy, training, or the law. I reminded them prior to their watching the video that dynamic hydroplaning starts at speeds of 10.6 multiplied by the square root of the tire pressure. I wanted them to think about the dangers of pursuits in rain. Despite me trying to get them to think about everything in the video they only mentioned that there was no vehicular traffic during the pursuit. **ORM DOES NOT AGREE with the committee.**

ORM is of the opinion this pursuit went on too long based on the weather conditions and the violation committed. Sergeant Riddle was the supervisor monitoring this pursuit and he allowed it to run from the south side all the way to the east side and ultimately it crashed into a fixed object. Due regard for public safety is only one aspect of pursuits. Officer safety must also be a priority. When an officer is involved in a pursuit sometimes they do not check their speed and they do not pay attention to how long the pursuit has gone on. Supervisors must be monitoring pursuits better to protect officers from harm as well as the public.

Exhibit BB (CITY 4934).

237. Commenting on a different pursuit in his July 2016 memo, Captain Schweizer wrote that "(t)he pursuit review process needs to be reviewed and revamped" because it was giving "a pass" to unreasonable pursuits. Exhibit BB (CITY 4935). He further deemed it "incomprehensible" that three of the six committee members failed to initial the evaluation form or provide comments on a pursuit that traveled between five and ten miles at speeds exceeding 100 mph for a traffic violation. Exhibit BB (CITY 4935). Captain Schweizer further wrote that the PRC committee members were experienced, prepared and had been briefed on both Indiana and United States Supreme Court rulings, for which reason he did not understand the committee's leniency. Exhibit BB (CITY 4935). He further admonished the PRC that if the City

did not "start an internal process that holds officers accountable when the stakes are low an external process will most certainly hold (it) accountable when stakes are high":

The pursuit review process needs to be reviewed and revamped. There is no way that a pursuit goes on for nearly 20 minutes, leaves the city and causes damages to our mechanical and is given a pass by the entire review committee.

It is incomprehensible that a pursuit travels between 5 and 10 miles at speeds exceeding 100 mph for a misdemeanor traffic violation and half of the committee failed to initial the evaluation form or write comments on the bottom.

If the review committee was uninformed, if this were the first time they were ever part of the review, if they had no time to prepare for the review one might be able to rationalize why there was leniency on the forms.

None of this is the case here. The committee had the cases several days before. Several of the committee members were experienced in pursuit reviews. All of the embers were briefed about Indiana Supreme Court rulings and U.S. Supreme Court rulings and all were given opportunity to ask any questions about policy or the law.

Only 3 questions were asked. Sergeant Cauffman asked me if I knew the findings of the court in each of these cases. I told him I did not and all of these cases were too recent to have had their day in court. Lieutenant Ross asked me if we were looking into technology. I told him that the technology that we have had demonstrated didn't show promise.

He then asked if we were looking at policy changes. I don't know if his questions were to shift decision making responsibility from supervisors to the officer or to eliminate any discretion on the part of the officer.

Sergeant Cauffman said he asked about court outcomes because if the suspect is not being found guilty it might demonstrate to the officer that engaging in a risky pursuit does not guarantee a suspect will be punished for fleeing from the police.

Unless we start an internal process that holds officers accountable when the stakes are low an external process will most certainly hold us accountable when the stakes are high. Nothing further to report.

07-27-16

1545hrs

Captain K Schweizer 403

Captain Keith Schweizer

Office of Risk Management

Page **4** of **4**

CITY 4935

Exhibit BB (CITY 4935).

238. In the last PRC memo produced by the City, dated August 15, 2018, Captain Schweizer documents the PRC's continuing dysfunction, including failure to identify the reviewers or the problems with the pursuits and the failure to counsel the involved officers, and states that the PRC will need to be redesigned and that the officers would need to be counseled in a timely fashion:

In December of 2017 Sergeant Stuart was given eight vehicle pursuits for review along with any available videos associated with each pursuit. Sometime in December Sergeant Stuart organized a Pursuit Review Committee and gave them the pursuits to be reviewed.

The undersigned officer was on vacation when this took place. When I returned after the first of the year I requested and received the reviews from Sergeant Stuart. Upon looking at them nothing was filled out on the pursuit review forms. Apparently he did not give the forms to the committee and PFC Bair wrote on the back of the pursuit form instead of using a regular pursuit review committee form.

PFC Bair wrote comments like "where are the rest of the videos?" "Need all of the videos" "Are we just picking on Tony Dawson?" "We are doing a review we need all videos" none of which had anything to do with the review. All available videos were given to Sergeant Stuart. PFC Bair's comments should have been checked by Sergeant Stuart before they were turned back in to ORM.

This pursuit review was invalid because it is unknown who the reviewers were. None of the problems with the pursuits were documented and none of the involved officers were counseled about their driving.

This pursuit review is over 8 months old and is being filed as information only. The pursuit review committee will have to be redesigned and whomever takes over will receive training in how they are to be conducted.

It is unclear who will be running it at this point but none of these pursuits were reviewed properly. None of the officers counseled in a timely fashion. If Sergeant Stuart is going to continue to run the pursuit reviews he must do a better job of it.

VP2017-0065

VP2017-0068

VP2017-0070

VP2017-0071

VO2017-0073

VP2017-0076

VP2017-0077

Nothing Further.

Captain Keith Schweizer

Office of Risk Management 08-15-18

CITY 6501

Exhibit BB (CITY 6501)

239. There is no documentation or evidence indicating that any person addressed Captain Schweizer's strong feelings or concerns as listed in the summary section of Exhibit 16-B. Exhibit F at 170:1-171:21.

240. Captain Schweizer and the head Emergency Vehicles Operations instructor, Sergeant Ken Stuart, had the final authority to address deficiencies in the pursuit review process or committees prior to July 2018. Exhibit F at 175:14-20.

241. None of Captain Schweizer's recommendations or concerns about the Pursuit Review Committee process were implemented or addressed before 2018, except for a change in the makeup of the committee. Exhibit F at 171:14-21.

242. Although the Pursuit Review Committee fell under the umbrella of Office of Risk Management, which was run by Captain Schweizer, there is no evidence that Chief Ruszkowski discussed Schweizer's concerns about the committee with him. Exhibit F at 171:22-172:19.

## C. CAPTAIN SCHWEIZERS'S 2016 ADOMONISHMENT AGAINST PURSUING FOR TRAFFIC VIOLATIONS.

243. In a March 16, 2016, Captain Schweizer admonished that that supervisors should cancel pursuits for traffic violations and that failure to do so could result in supervisors sharing liability with the involved officers:

Pursuit Review Committee

March 16, 2016 1400hrs Chief's Conference Room

Committee Members: Lieutenant Noonan, Sergeant Cauffman, Sergeant Mills, Sergeant Walsh, Captain Schweizer

The committee members were given 2 handouts reference supervisor liability and a new piece from the Benton Township officer who was fired and charged in the death of a citizen who was struck by the police cruiser while driving to a call. The supervisors were informed that they are responsible for monitoring and terminating any pursuit deemed too dangerous. They were further advised that if a pursuit is initiated based only on a traffic violation they should terminate the pursuit. If the pursuit is allowed to continue and ends badly they could share responsibility with the involved officer for any damages.

Exhibit BB (CITY 4820).

244. By way of history, the City of South Bend conducted 377 total vehicle pursuits between 2013 and 2018, of which 171 (approximately 45%) began as minor, traffic-related incidents:

CITY 3980 (VP2013-0021)

CITY 3982 (VP2013-0023)

CITY 3983 (VP2013-0024)

CITY 3986 (VP2013-0025)

CITY 3987 (VP2013-0026)

CITY 3988 (VP2013-0027)

CITY 3989 (VP2013-0028)

CITY 3990 (VP2013-0029)

CITY 3994 (VP2013-0033)

CITY 3995 (VP2013-0034)

CITY 3999 (VP2013-0038)

CITY 4007 (VP2014-0004)

CITY 4018 (VP2014-0007)

CITY 4023 (VP2014-0010)

CITY 4024 (VP2014-0011)

CITY 4025 (VP2014-0012)

CITY 4026 (VP2014-0013)

CITY 4030-1 (VP2014-0015)

CITY 4036 (VP2014-0016)

CITY 4063 (VP2014-0020)

CITY 4071 (VP2014-0022)

CITY 4086 (VP2014-0025)

CITY 4094 (VP2014-0026)

CITY 4110 (VP2014-0028)

CITY 4114 (VP2014-0030)

CITY 4117 (VP2014-0033)

CITY 4119 (VP2014-0035)

CITY 4124 (VP2014-0038)

CITY 4131 (VP2014-0045)

CITY 4132 (VP2014-0046)

CITY 4133 (VP2015-0001)

CITY 4152 (VP2015-0014)

CITY 4153 (VP2015-0015)

CITY 4169 (VP2015-0019)

CITY 4170 (VP2015-0020)

CITY 4174 (VP2015-0022)

CITY 4175 (VP2015-0023)

CITY 4177 (VP2015-0024)

CITY 4181 (VP2015-0025)

CITY 4183 (VP2015-0027)

CITY 4184 (VP2015-0028)

CITY 4185 (VP2015-0029)

CITY 4186 (VP2015-0030)

CITY 4187 (VP2015-0031)

CITY 4191 (VP2015-0034)

CITY 4195 (VP2015-0036)

CITY 4198 (VP2015-0038)

CITY 4202 (VP2015-0040)

CITY 4204 (VP2015-0042)

CITY 4206 (VP2015-0044)

CITY 4217 (VP2015-0049)

CITY 4220 (VP2015-0051)

CITY 4222 (VP2015-0053)

CITY 4227 (VP2015-0057)

CITY 4235 (VP2015-0061)

CITY 4236 (VP2015-0062)

CITY 4237 (VP2015-0063)

CITY 4243 (VP2015-0067)

CITY 4244 (VP2015-0068)

CITY 4245 (VP2015-0069)

CITY 4252 (VP2016-0005)

CITY 4253 (VP2016-0006)

CITY 4254 (VP2016-0007)

CITY 4255 (VP2016-0008)

CITY 4256 (VP2016-0009)

CITY 4264 (VP2016-0013)

CITY 4269 (VP2016-0016)

CITY 4271 (VP2016-0018)

CITY 4857-8 (VP2016-0021)

CITY 4865 (VP2016-0023)

CITY 4943 (VP2016-0031)

CITY 4277 (VP2016-0032)

CITY 4279 (VP2016-0034)

CITY 4999-5000 (VP2016-0039)

CITY 5013 (VP2016-0040)

CITY 5023 (VP2016-0042)

CITY 4284 (VP2016-0043)

CITY 5031 (VP2016-0044)

CITY 5034 (VP2016-0045)

CITY 4286 (VP2016-0046)

CITY 5043-4 (VP2016-0047)

CITY 4326 (VP2016-0050)

CITY 4327 (VP2016-0051)

CITY 4329 (VP2016-0054)

CITY 4330 (VP2016-0055)

CITY 4331 (VP2016-0056)

CITY 4335 (VP2016-0058)

CITY 5078 (VP2016-0059)

CITY 5084 (VP2016-0061)

CITY 4340 (VP2016-0062)

CITY 5088 (VP2016-0063)

CITY 4343 (VP2016-0066)

CITY 4345 (VP2016-0068)

CITY 5138 (VP2016-0070)

CITY 4347 (VP2016-0071)

CITY 5184 (VP2016-0073)

CITY 5193 (VP2016-0074)

CITY 5264 (VP2016-0076)

CITY 4352 (VP2016-0085)

CITY 4355 (VP2016-0088)

CITY 5450 (VP2017-0006)

CITY 5527 (VP2017-0009)

CITY 5544 (VP2017-0013)

CITY 5586 (VP2017-0017)

CITY 5593 (VP2017-0018)
CITY 5608 (VP2017-0020)
CITY 4362 (VP2017-0022)
CITY 5721 (VP2017-0025)
CITY 4363 (VP2017-0027)
CITY 4364 (VP2017-0030)
CITY 5854 (VP2017-0032)
CITY 5870 (VP2017-0033)
CITY 5882 (VP2017-0034)
CITY 5907 (VP2017-0036)
CITY 5934 (VP2017-0038)
CITY 5980 (VP2017-0039)
CITY 4366 (VP2017-0044)
CITY 4368 (VP2017-0047)
CITY 6107 (VP2017-0048)
CITY 6124 (VP2017-0049)
CITY 6179 (VP2017-0052)
CITY 4373 (VP2017-0061)
CITY 6457 (VP2017-0062)
CITY 4374 (VP2017-0067)
CITY 6474 (VP2017-0071)
CITY 6598 (VP2017-0072)
CITY 6602 (VP2017-0073)
CITY 6634 (VP2017-0074)
CITY 4378 (VP2017-0075)
CITY 4380 (VP2017-0080)
CITY 4381 (VP2017-0082)
CITY 4395 (VP2017-0084)
CITY 4396 (VP2017-0085)
CITY 4399 (VP2017-0088)
CITY 6843 (VP2018-0001)
CITY 6959 (VP2018-0004)
CITY 7029 (VP2018-0006)
CITY 7040 (VP2018-0007)
CITY 7062 (VP2018-0008)
CITY 7090 (VP2018-0010)
CITY 7118 (VP2018-0011)
CITY 7159 (VP2018-0014)
CITY 7179 (VP2018-0015)
CITY 7209 (VP2018-0016)
CITY 7251 (VP2018-0018)
CITY 7269 (VP2018-0020)
CITY 7323 (VP2018-0021)
CITY 4403 (VP2018-0023)
CITY 7376 (VP2018-0024)
CITY 7404 (VP2018-0025)
CITY 4405 (VP2018-0026)
CITY 4406 (VP2018-0027)
CITY 4407 (VP2018-0028)
CITY 7467 (VP2018-0029)
CITY 4410 (VP2018-0032)
CITY 4411 (VP2018-0035)

CITY 7715 (VP2018-0036)

CITY 7757 (VP2018-0039)

CITY 7786 (VP2018-0041)

CITY 7869 (VP2018-0043)

CITY 7874 (VP2018-0044)

CITY 7902 (VP2018-0045)

CITY 7921 (VP2018-0046)

CITY 7946 (VP2018-0048)

CITY 7986 (VP2018-0050)

CITY 8023 (VP2018-0053)

CITY 8096 (VP2018-0056)

CITY 8166 (VP2018-0059)

CITY 8203 (VP2018-0061)

245. After Captain Schweizer's memo advised that officers should not engage in Emergency vehicle pursuits, South Bend police officers still engaged in ninety-three (93) traffic-related pursuits. Exhibit BB, page 1.

CITY 4271 (VP2016-0018)

CITY 4857-8 (VP2016-0021)

CITY 4865 (VP2016-0023)

CITY 4943 (VP2016-0031)

CITY 4277 (VP2016-0032)

CITY 4279 (VP2016-0034)

CITY 4999-5000 (VP2016-0039)

CITY 5013 (VP2016-0040)

CITY 5023 (VP2016-0042)

CITY 4284 (VP2016-0043)

CITY 5031 (VP2016-0044)

CITY 5034 (VP2016-0045)

CITY 4286 (VP2016-0046)

CITY 5043-4 (VP2016-0047)

CITY 4326 (VP2016-0050)

CITY 4327 (VP2016-0051)

CITY 4329 (VP2016-0054)

CITY 4330 (VP2016-0055)

CITY 4331 (VP2016-0056)

CITY 4335 (VP2016-0058)

CITY 5078 (VP2016-0059)

CITY 5084 (VP2016-0061)

CITY 4340 (VP2016-0062)

CITY 5088 (VP2016-0063)

CITY 4343 (VP2016-0066)

CITY 4345 (VP2016-0068)

CITY 5138 (VP2016-0070)

CITY 4347 (VP2016-0071)

CITY 5184 (VP2016-0073)

CITY 5193 (VP2016-0074)

CITY 5264 (VP2016-0076)

CITY 4352 (VP2016-0085)

CITY 4355 (VP2016-0088)

CITY 5450 (VP2017-0006)

CITY 5527 (VP2017-0009)

CITY 5544 (VP2017-0013)

CITY 5586 (VP2017-0017)

CITY 5593 (VP2017-0018)

CITY 5608 (VP2017-0020)

CITY 4362 (VP2017-0022)

CITY 5721 (VP2017-0025)

CITY 4363 (VP2017-0027)

CITY 4364 (VP2017-0030)

CITY 5854 (VP2017-0032)

CITY 5870 (VP2017-0033)

CITY 5882 (VP2017-0034)

CITY 5907 (VP2017-0036)

CITY 5934 (VP2017-0038)

CITY 5980 (VP2017-0039)

CITY 4366 (VP2017-0044)

CITY 4368 (VP2017-0047)

CITY 6107 (VP2017-0048)

CITY 6124 (VP2017-0049)
CITY 6179 (VP2017-0052)
CITY 4373 (VP2017-0061)
CITY 6457 (VP2017-0062)
CITY 4374 (VP2017-0067)
CITY 6474 (VP2017-0071)
CITY 6598 (VP2017-0072)
CITY 6602 (VP2017-0073)
CITY 6634 (VP2017-0074)
CITY 4378 (VP2017-0075)
CITY 4380 (VP2017-0080)
CITY 4381 (VP2017-0082)
CITY 4395 (VP2017-0084)
CITY 4396 (VP2017-0085)
CITY 4399 (VP2017-0088)
CITY 6843 (VP2018-0001)
CITY 6959 (VP2018-0004)
CITY 7029 (VP2018-0006)
CITY 7040 (VP2018-0007)
CITY 7062 (VP2018-0008)
CITY 7090 (VP2018-0010)
CITY 7118 (VP2018-0011)
CITY 7159 (VP2018-0014)
CITY 7179 (VP2018-0015)
CITY 7209 (VP2018-0016)
CITY 7251 (VP2018-0018)
CITY 7269 (VP2018-0020)
CITY 7323 (VP2018-0021)
CITY 4403 (VP2018-0023)
CITY 7376 (VP2018-0024)
CITY 7404 (VP2018-0025)
CITY 4405 (VP2018-0026)
CITY 4406 (VP2018-0027)
CITY 4407 (VP2018-0028)
CITY 7467 (VP2018-0029)
CITY 4410 (VP2018-0032)
CITY 4411 (VP2018-0035)
CITY 7715 (VP2018-0036)
CITY 7757 (VP2018-0039)
CITY 7786 (VP2018-0041)
CITY 7869 (VP2018-0043)
CITY 7874 (VP2018-0044)
CITY 7902 (VP2018-0045)
CITY 7921 (VP2018-0046)
CITY 7946 (VP2018-0048)
CITY 7986 (VP2018-0050)
CITY 8023 (VP2018-0053)
CITY 8096 (VP2018-0056)
CITY 8166 (VP2018-0059)
CITY 8203 (VP2018-0061)

246. Officer Gorny was personally involved in multiple pursuits for traffic-related incidents after Captain Schweizer's March 16, 2016 PRC memo and before the Flores incident.

247. Officer Gorny was involved in a June 6, 2016 pursuit stemming from a traffic violation, VP 2016-0039. Exhibit HH (CITY 4999.) Captain Schweizer determined that this pursuit was not justified and not within policy:

| Pursuit justified | Pursuit within policy |
|---|---|
| No | No |

Exhibit II (CITY 4997)

248. The PRC found otherwise. Exhibit BB (CITY 5000). In response, Captain Schweizer wrote a memo specifically disagreeing with the PRC's conclusion, stating:

> **VP2016-0039 Officer Gorny** attempted to stop a vehicle for disregarding a stop sign. The vehicle fled and Officer Gorny chased the suspect for somewhere between 2.1 to 5 miles and approximately 7 minutes on wet roads before the suspect crashed. The pursuit started at 3300 South High and ended at Notre Dame and Sorin.
>
> The pursuit committee found no violation of policy, training, or the law. I reminded them prior to their watching the video that dynamic hydroplaning starts at speeds of 10.6 multiplied by the square root of the tire pressure. I wanted them to think about the dangers of pursuits in rain. Despite me trying to get them to think about everything in the video they only mentioned that there was no vehicular traffic during the pursuit. **ORM DOES NOT AGREE with the committee.**

Exhibit BB.

249. There is no evidence that Officer Gorny received any reprimand or remedial training in response to this traffic-related pursuit.

250. Officer Gorny was involved in another pursuit on August 25, 2016, VP2016-0052. Exhibit 8-A (CITY 5054-55). This pursuit caused the other vehicle to drive through yards and

into oncoming traffic. Exhibit 8-A (CITY 5054). Again, Captain Schweizer determined that this pursuit was not justified and not within policy:

| Pursuit justified | Pursuit within policy |
|---|---|
| No | No |

Exhibit 8-A (CITY 5054).

251. Once again, the Pursuit Review Committee disagreed with Captain Schweizer. Exhibit 8 (CITY 5056). Captain Schweizer wrote no memo in response to this decision and there is no evidence that Officer Gorny received any reprimand or remedial training in response to this traffic-related pursuit.

252. Officer Gorny was involved in another pursuit – through a neighborhood street - stemming from a traffic violation on May 28, 2017, VP2017-0034. Exhibit 11-A (CITY 5882.) Captain Herron's IA Pro paperwork states that this pursuit was not justified and not within policy.

| Pursuit justified | Pursuit within policy |
|---|---|
| No | No |

Exhibit 11-B (CITY 5878.)

253. Once again, the Pursuit Review Committee disagreed with Captain Schweizer. Exhibit 11-C (CITY 5881.) There is no memo discussing the PRC's decision and no evidence

that Officer Gorny received any reprimand or remedial training in response to this pursuit despite its stemming from a traffic violation.

254. Officer Gorny was involved in another pursuit stemming from a traffic violation on July 21, 2017, VP2017-0046. (CITY 6079.) Captain Herron's IA Pro paperwork states that this pursuit was not justified and not within policy:

| Pursuit justified | Pursuit within policy |
| --- | --- |
| No | No |

Exhibit 12-B (CITY 6076.)

255. This pursuit was reviewed by ORM. Exhibit 12-A (CITY 3536). There is no evidence that Officer Gorny received any reprimand or remedial training in response to this pursuit despite its stemming from a traffic violation.

256. Officer Gorny was involved in another pursuit stemming from a traffic violation – through neighborhood streets, business district and light traffic – on July 26, 2017, VP2017-0048. Exhibit 12- C (CITY 6079). Lieutenant Kris Hinton's IA Pro paperwork states that this pursuit was not justified and not within policy:

| Pursuit justified | Pursuit within policy |
| --- | --- |
| No | No |

Exhibit 13-B (CITY 6105).

257. This pursuit was reviewed by ORM. Exhibit 13-A (CITY 3538.) There is no evidence that Officer Gorny received any reprimand or remedial training in response to this traffic-related pursuit.

258. Officer Gorny was involved in yet another pursuit stemming from a traffic violation – through neighborhood streets, business district with medium traffic – on September 1, 2017, VP2017-0057. Exhibit 14-A (CITY 6320). Lieutenant Hinton's IA Pro paperwork states that this pursuit was not justified and not within policy:

| Pursuit justified | Pursuit within policy |
|---|---|
| No | No |

Exhibit 14-B (CITY 6318.)

259. This pursuit was reviewed by ORM. Exhibit 13 A (CITY 3538.) There is no evidence that Officer Gorny received any reprimand or remedial training in response to this pursuit despite its stemming from a traffic violation.

260. Officer Gorny was involved in yet another pursuit stemming from a traffic violation – through neighborhood streets – on June 15, 2018, VP2018-0045. Exhibit 17-D (CITY 7902.) Captain Herron's IA Pro paperwork states that this pursuit was not justified and not within policy:

| Pursuit justified | Pursuit within policy |
|---|---|
| No | No |

Exhibit 17- D (CITY 7895.)

261. This pursuit was reviewed by ORM. Exhibit 19 (CITY 3570.) There is no evidence that Officer Gorny received any reprimand or remedial training in response to this traffic-related pursuit.

262. Officer Gorny was involved in yet another pursuit stemming from a traffic violation – through neighborhood streets – on June 19, 2018, VP2018-0049. Exhibit 18- A (CITY 7946.) Captain Herron's IA Pro paperwork states that this pursuit was not justified and not within policy:

| Pursuit justified | Pursuit within policy |
|---|---|
| No | No |

Exhibit 18-B (CITY 7945.) This pursuit was reviewed by ORM. Exhibit 18-A (CITY 7946.) There is no evidence that Officer Gorny received any reprimand or remedial training in response to this pursuit despite its stemming from a traffic violation.

263. All told, no fewer than 77 pursuit-related traffic accidents between 2015 and 2018 resulted in property damage during that time, while 15 resulted in pursuit-related personal injuries. Exhibit H-2B, Supplemental Report of Dr. Mourtgos.

264. The City's 30(b)(6) witness on vehicle damage, Sergeant Rohrscheib testified that he never looked for or determined whether South Bend compared its officer vehicle crashes to any national data or statistics, nor did he know whether such information exists. Exhibit I at 38:23-39:9.

265. Testimony from the City's 30(b)(6) witnesses establish that there is no evidence no police officer, other than Gorny following the Flores incident, who had ever been terminated or suspended for speed-related issues or improper responses to emergency calls in emergency vehicle operations. Exhibit C at 32:7-19; Exhibit B at 29:10-30:12, 37:16-19; Exhibit I at 61:25-62:8. There is no evidence that any officer was ever reprimanded or suspended because of a damage to South Bend vehicles or traffic collisions. Exhibit I at 46:19-23; 61:17-20; Exhibit 6L from Exhibit I

266. Captain Herron testified that he has not seen any reports or documents indicating that the South Bend Police Department used research or national or state statistics related to pursuits. Exhibit F at 178:8-14.

### D. OFFICER GORNY'S HISTORY OF HIGH – SPEED VEHICLE OPERATIONS

267. An alert for pursuits was triggered after an officer was involved in three pursuits in a 12-month period. Exhibit F at 234:1-4. Gorny had nine early intervention alerts over a year and a half (November 2016 – June 2018) in the IA Pro system, including seven pursuit incidents between June 15, 2017 and June 19, 2018 Exhibit 20 (CITY 3574); Exhibit 17-C (CITY 7898-7900) and five vehicle pursuits between May 28, 2016 and May 28, 2017.

**Officer: Patrolman Justin David Gorny [2242/]**

**Alert description:**

Overall Alert: IA No: VP2018-0045 Case No: 18-8698: Vehicle pursuit has triggered an alert.

As of 06/15/2018, 13 incidents included in the overall alert setting are linked to Patrolman Justin David Gorny [2242/] that have occurred since 06/15/2017.

7 or more incidents during a 12 month period indicates that the officer's performance may need to be reviewed.

**Action(s) taken in response to alert:**

THIS ALERT WAS PRINTED OFF AND GIVEN TO CAPT. GALEA.

User alerted/making original entry: Sergeant David Herron on Jun 15, 2018

Incident/officer links that caused this alert
(Includes current assignement of involved officer at time of alert):

Jul 21, 2017 Vehicle pursuit VP2017-0046 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-314/ SOUTH

Jul 26, 2017 Vehicle pursuit VP2017-0048 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail

Aug 13, 2017 Use of force UF2017-0031 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-WEST REGION/ 326

Aug 30, 2017 Firearm discharge FD2017-0001 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail

Sep 05, 2017 Vehicle pursuit VP2017-0057 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail

Sep 19, 2017 Citizen Complaints CC2017-0009 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-326/ WEST REGION

Sep 23, 2017 Vehicle pursuit VP2017-0063 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-328/ WEST REGION

Nov 06, 2017 Use of force UF2017-0047 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-SFU

Nov 12, 2017 Vehicle pursuit VP2017-0081 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-326/ WEST REGION

Dec 27, 2017 Use of force UF2017-0057 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail

Feb 05, 2018 Citizen Complaints CC2018-0001 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-WEST REGION

Mar 08, 2018 Use of force UF2018-0008 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-TWO

CITY 7899

Alert Page: 2

MAN UNIT

Jun 15, 2018 Vehicle pursuit VP2018-0045 Patrolman Justin David Gorny [ / 2242] Uniform-3rd Detail-UNIT 395/ WEST REGION

268. While Officer Gorny participated in many pursuits, the Pursuit Review Committee never spoke to him about its meetings or findings. Exhibit D at 148:11-23.

269. None of Officer Gorny's supervisors ever expressed concerns or issues about his driving. Exhibit D at 149:4-10.

## IV. THE IMPORTANCE OF TRAINING AND THE RISKS OF IMPROPER AND RECKLESS TRAINING

### A) Captain Herron – The City's 30(b)(6) Witness

270. Captain Herron testified that a police department must properly train and retrain its officers when to engage in high speed vehicle operations. Exhibit F at 181:20-25.

271. Captain Herron testified that a police department must properly train its officers when to terminate high speed operations of vehicles. Exhibit F at 182:1-6

272. Captain Herron testified that a police department must continuously supervise its officers to make sure they are not engaging in unnecessary high speed vehicle operations. Exhibit F at 182:7-12.

273. Captain Herron testified that it would be reckless if a police department did not properly train and retrain its officers when to engage in high speed vehicle operations. Exhibit F at 165:13-18.

274. Captain Herron testified that it would be reckless if a police department did not properly train and retrain its officers when to terminate high speed operation of a vehicle. Exhibit F at 182:19-25.

275. Captain Herron testified that it would be reckless if a police department did not continuously supervise and discipline its officers to make sure they are not engaging in unnecessary high speed vehicle operations. Exhibit F at 183:1-7.

276. Captain Herron testified that it is highly likely that a police vehicle traveling in excess of 90 miles an hour hitting another car broadside will cause serious damage. Exhibit F at 164:19-165:5.

277. Captain Herron testified that it is highly likely that a police vehicle traveling in excess of 50 or 60 miles an hour hitting another car broadside will cause serious damage. Exhibit F at 165:10-17.

278. Captain Herron testified that it is highly predictable that improper training or supervising of police officers with regard to speeding can cause serious injury or harm. Exhibit F at 165:18-24.

279. Captain Herron testified that it is highly predictable that improperly disciplining or not disciplining police officers at all who use excessive speed can cause serious injury or harm. Exhibit F at 165:25-166:6.

280. Captain Herron testified that it is highly predictable that a police officer who repetitively uses excessive speed can cause severe injury or harm to the public. Exhibit F at 166:7-21.

281. Captain Herron testified that a police officer who unnecessarily uses high speeds can cause serious injury to the public or other motorists. Exhibit F at166:22-25-167:1-2.

282. Captain Herron testified that a police officer who creates unnecessary risk for other motorists or the public should be carefully supervised and disciplined. Exhibit F at 167:4-10.

283. Captain Herron testified that he knew prior to July of 2018 that improper training, improper supervision, excessive speed, and unnecessary risk can cause serious damage. Exhibit F at 168:5-10.

284. Captain Herron testified that it would be reckless if the police department did not properly reinforce that police cars should never enter obstructed or blind intersections at high speed without making sure there were no cars there. Exhibit F at 188:21-189:6.

285. Captain Herron testified that the police department knew before this incident that the public had the right not to be injured or killed by officers traveling at high speed through intersections against the red light before making sure it was safe to proceed. Exhibit F at 189:18-190:3.

**Sergeant Calvert – The City's 30(b)(6) Witness**

286. Sergeant Corey Calvert is the city's 30(b)(6) witness on officer training issues. Exhibit B at 6:24-27:24.

287. Sergeant Calvert agreed that instruction and supervision of pursuits needs to be taken very seriously. Exhibit B at 103:14-18

288. Sergeant Calvert agreed that proper training and supervision is paramount to protect the public from needless and improper high-speed operation of police vehicles. Exhibit B at 105:7-12.

289. Sergeant Calvert agreed with the following principle regarding proper training:

**Proper training includes:**

**Clear Communication**

**Supervision**

**Retraining**

**Enforcement**

Exhibit B at 107:10-13; Exhibit B-4.

290. Sergeant Calvert agreed that training of police officers with regard to high-speed vehicle operations should be done in a serious and persuasive manner. Exhibit B at 107:14-23.

291. Sergeant Calvert agreed that when teaching high speed vehicle operations, instructors are trying to influence police officer behavior. Exhibit B at 108:1-4.

292. Sergeant Calvert agreed that how information about high speed vehicle operations is presented to police officers can be critical to them taking it seriously and hopefully changing their behavior. Exhibit B at 108:5-9.

293. Sergeant Calvert agreed that officers who teach emergency vehicle operations have to do it in a meaningful, persuasive and serious manner. Exhibit B at 98:3-8.

294. Sergeant Calvert agreed that when teaching emergency vehicle operations, instructors want to make sure that the audience is getting the message, understanding the message and hopefully will abide by the message. Exhibit B at 98:9-14.

295. Sergeant Calvert agreed that emergency vehicle operations lectures should be taken by the instructors to be serious. Exhibit B at 98:15-17.

296. Sergeant Calvert agreed that what's said in emergency vehicle operations discussions can certainly influence the training and retraining and supervision of officers. Exhibit B at 98:18-22.

297. Sergeant Calvert agreed that when an officer is teaching emergency vehicle operations to students, it can and is intended to influence the attitude of the officers with regard to pursuits. Exhibit B at 98:23-99:4.

298. Sergeant Calvert agreed that people who can be injured as a result of pursuits would include other motorists on the highway, bystanders who are nearby, people on sidewalks,

people who may be on private property such as their homes, and even people in nearby buildings. Exhibit B at 104:18-105:6.

299. Sergeant Calvert agreed that a police officer going through a red light with an obstructed view of traffic coming at 80 or 90 miles an hour or greater would be a reckless disregard for the safety of the public. Exhibit B at 128:20-129:9.

300. Sergeant Calvert agreed that it would be a reckless disregard for the safety of the public for a police officer to go through a red light with an obstructed view, not being able to see what traffic is coming, at greater than 70 or 80 miles an hour. Exhibit B at 129:24-130:6.

301. Sergeant Calvert testified that it is highly predictable that a police officer who uses excessive speed when not necessary can cause severe injury or harm to the public. Exhibit B at 130:7-12.

302. Sergeant Calvert agreed that a police officer who uses excessive speed or unnecessary speed should be carefully supervised and disciplined. Exhibit B at 130:19-24.

303. Sergeant Calvert testified that not properly training supervisors how to monitor and discipline other officers who use excessive speed could be a reckless disregard for the safety of the public. Exhibit B at 30:25-131:5.

304. Sergeant Calvert testified that supervisors' failure to properly supervise or monitor their subordinates can cause serious harm to the general public. Exhibit B at 131:6-11.

305. Sergeant Calvert testified that there is a chance that a police vehicle traveling in excess of 60, 70 or 80 miles an hour hitting another car broadside will cause serious damage. Exhibit B at 128:10-15.

306. Sergeant Calvert testified that the consequences of not driving with due regard include personal injury or death, civil and criminal proceedings, discipline through the department, and property damage. Exhibit B at 137:5-9.

307. Sergeant Calvert agreed with the statement that an instructor related to high speed operation of a police car should project an attitude of both seriousness of harm and appreciation of the risk during pursuits. Exhibit B at 124 5-11.

**Captain Kathy Fulnecky - The City's 30(b)(6) Witness**

308. Captain Fulnecky acknowledged that "if training is not done properly or if it's done inadequately that innocent people can get hurt." Exhibit C at 13:3-6.

309. Captain Fulnecky confirmed that police departments should never allow officers to engage in unnecessary high-speed vehicle operations. Exhibit C at 14:9-15.

310. Captain Fulnecky agreed that proper training and retraining are essential to prevent unnecessary deaths and severe injuries from high-speed vehicle operations. Exhibit C at 24:10-23.

311. Captain Fulnecky agreed that officers are supposed to be disciplined for improper high-speed vehicle operations. Exhibit C at 25:5-7.

312. Captain Fulnecky agreed that if an officer is engaging in unnecessary high-speed vehicle operations, they are supposed to be disciplined. Exhibit C at 25:9-15.

**Assistant Chief Dan Skibins - The City's 30(b)(6) Witness**

313. Assistant Chief Skibins agreed that "proper training, supervision, and discipline is vitally important to protect the public from needless or improper high-speed operation of police vehicles." Exhibit K at 19:2-5.

314. Assistant Chief Skibins agreed that training of police officers with regard to high-speed operations of police vehicles should be done in a serious and persuasive manner. Exhibit K at 20:15-18

315. Assistant Chief Skibins confirmed that proper training, supervision, and discipline of officers decreases injuries and deaths in emergency vehicle operations. Exhibit K at 41:14-17

316. Assistant Chief Skibins confirmed that proper training, supervision, and discipline of officers decreases the number of bystanders and other motorists getting injured or killed with high-speed vehicle operations. Exkbit K at 41:19-22

317. Assistant Chief Skibins agreed that it is highly predictable that improperly training, supervising, or disciplining police officers with regard to speeding can cause serious injury or harm. Exhibit K at 60:15-17

318. Assistant Chief Skibins agreed that monitoring and disciplining police officers who unnecessarily engage in high-speed operation of a police vehicle lowers the risk of collisions, crashes, injuries, and deaths. Exhibit K at 79:16-23

319. Assistant Chief Skibins agreed that improper or needless high-speed police vehicle operations can kill or seriously injure innocent members of the public. Exhibit K at 17:14-16.

320. Assistant Chief Skibins acknowledged that innocent members of the public who can be killed or injured include other motorists, bystanders, pedestrians, people on sidewalks, people on private property including their own homes, and even people in nearby buildings. Exhibit K at 17:17-18:25.

321. Assistant Chief Skibins agreed that it is highly predictable that a police vehicle traveling in excess of 60 miles an hour hitting another car broadside will probably cause serious damage. Exhibit K at 60:7-12.

322. Assistant Chief Skibins agreed that it is highly likely that a police officer who uses excessive speed when not necessary can cause severe injury or harm to the public. (Skibins Exhibit K at 61:3-8.

323. Assistant Chief Skibins agreed that a police officer who unnecessarily uses high speeds can cause serious injury or death to the public or other motorists. Exhibit K at 61:10-15.

324. Assistant Chief Skibins agreed that a police officer who creates unnecessary risk for other motorists or the public should be carefully supervised and disciplined. Exhibit K at 61:22-24.

325. Assistant Chief Skibins agreed that not properly supervising and disciplining officers in emergency vehicle operations who go at excessive speeds could be a reckless disregard for the safety of the public. Exhibit K at 62:5-10.

326. Assistant Chief Skibins agreed that it is highly predictable that, if supervisors do not properly supervise or discipline their subordinates in vehicle operations, that can cause serious harm to the public. Exhibit K at 62:25-63:4.

327. Assistant Chief Skibins agreed that if police officers are getting involved in multiple at-fault accidents, they should be monitored and disciplined. Exhibit K at 65:1-7.

328. Assistant Chief Skibins agreed that the discipline given to officers found at fault multiple times should be escalated. Exhibit K at 65:8-14.

## V. SOUTH BEND POLICE OFFICER TRAINING ON CONSTITUTIONAL VIOLATIONS

329. Sergeant Calvert, who graduated from the Indiana Police Academy in 2011, testified that he was taught about constitutional violations of the 4th and 14th Amendments, and that acts and conduct that "shocks the conscience" where "life, liberty or property have been deprived" were discussed during the course of his training. Exhibit B at 30-31; 145.

330. Sergeant Calvert further testified that he knew in 2018 that recklessness could be considered a constitutional violation. Exhibit B at 31:15-22.

331. Sergeant Hiipakka was taught that reckless driving could be seen as a 14th Amendment violation when he was at the police academy in 2008. Exhibit G at 47:15-20.

332. Assistant Chief Skibins testified that he was taught about the Constitutional violations of the 14th Amendment at the police academy and at the City of South Bend, and he knew in July 2018 that these violations included reckless high-speed vehicle operations and high-speed operations that showed an indifference to the safety of people. Exhibit K at 54:11-55:23.

333. Assistant Chief Skibins was familiar with the deliberate indifference standard under the Constitution, as well as federal and state law, and knew prior to July 2018 that unnecessary or reckless high-speed vehicle operations that injure the public or bystanders could be a Constitutional violation. Exhibit K at pp. 56:9-15.

334. South Bend's training did not stop at the academy; the City’s 30(b)(6) witnesses on training and pursuits testified that officers received continuing education about constitutional limits on an ongoing basis.

335. The yearly training of police officers prior to July 2018 included important court cases, such as key Supreme Court rulings. Exhibit F at 204:19-205:8.

336. The South Bend Police Department was kept well-informed of recent Supreme Court holdings and opinions on an annual basis, and EVO instructors would relay legal updates to each officer. Exhibit F at 204:19-205:8.

337. Sergeant Calvert saw a PowerPoint prior to July of 2018 concerning tort claims and liability, including 4th and 14th Amendments. Exhibit B at 106:17-107:7.

Respectfully submitted,

*Terrence M. Quinn*
_______________________
One of the Plaintiff's Attorneys

Stephen D. Phillips
Terrence M. Quinn
Stephen J. Phillips
Phillips Law Offices
161 N. Clark Street, Suite 4925
Chicago, Illinois 60601
T: (312) 346-4262
F: (312) 346-0003
sphillips@phillipslegal.com
tquinn@phillipslegal.com
sjphillips@phillipslegal.com

Kevin C. Smith
Smith Sersic
9301 Calumet Avenue, Suite 1F
Munster, Indiana 46321
T: (219) 933-7600
F: (219) 836-2848
ksmith@smithsersic.com
ssersic@smithsersic.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service.

By: /s/ ***Terrence M. Quinn***
Stephen Phillips
Terrence M. Quinn

**PHILLIPS LAW OFFICES**
161 N. Clark Street, Suite 4925 Chicago, Illinois 60601

T: (312)346-4262
F: (312)346-0003

sphillips@phillipslegal.com
tquinn@phillipslegal.com

***One of the Attorneys for the Plaintiff***