UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SORAIDA FLORES, as Personal Representative of the Estate of Erica Flores, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | Cause No. 2:19-cv-64-PPS |
| v. | ) ) | |
| CITY OF SOUTH BEND, and JUSTIN GORNY, | ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

This case arises out of the tragic death of Erica Flores, who was killed in an early morning collision with South Bend police officer Justin Gorny.  Ms. Flores was on her way home after working the overnight shift and was obeying all traffic laws. The collision—which was captured on video—was violent, disturbing, and unnecessary. Gorny was racing through the neighborhoods of South Bend at three times the speed limit, with no siren, and only the occasional use of his emergency lights. After speeding through multiple intersections, Gorny approached a known blind intersection, where he ran a red light and violently collided with Flores's car, killing her. Where was Gorny in such a hurry to get to?  A nonemergency routine traffic matter miles away already being effectively handled by other officers and for which no other officer requested his assistance.

Ms. Flores' personal representative brought this action against Officer Gorny and the City of South Bend under 42 U.S.C. § 1983 and state tort law. Gorny and the City of South Bend both seek summary judgment on all claims. [DE 137.] South Bend also seeks to exclude the testimony of Plaintiff's expert, Dr. Scott M. Mourtgos. [DE 141.] The motion for summary judgment will be denied as to Officer Gorny because a reasonable jury could readily conclude that Gorny acted with deliberate indifference to Ms. Flores, and he is not protected by the doctrine of qualified immunity. But summary judgment will be granted as to the City of South Bend on Flores's failure to train theory because the undisputed evidence demonstrates the City had a robust training program. Additionally, Dr. Mourtgos will be permitted to testify as to some of the opinions in his report, subject to the limitations laid out below.

## Background

### Facts Relating to the Collision

In the early morning hours of July 20, 2018, five South Bend police officers ("the Hot Spot Team") were patrolling a "hot spot" area in the city's Northwest District. [DE 151, ¶ 1.] A "hot spot" is an area the police have determined requires increased monitoring. *Id.* The area the Hot Spot Team was patrolling that morning was focused on a residence they believed was involved in narcotics distribution. *Id.* at ¶ 5. The Hot Spot Team included officers in an unmarked car, officers in an unmarked van, and officers in a marked patrol car. *Id.* at ¶¶ 5-7. The Hot Spot Team was using a dedicated radio channel, Channel 7, to communicate with one another. *Id.* at ¶ 8.

2

Meanwhile, Officer Justin Gorny was at an intersection miles away talking with another officer. Gorny was assigned to patrol the Southwest District of South Bend and was in a marked police car. *Id.* at ¶ 2. Officer Gorny was not assigned to the hot spot area, nor was he patrolling in the same district as the Hot Spot Team. *Id.* He was, however, monitoring Channel 7 on his radio, the channel the Hot Spot Team was using. *Id.*

Around 4:30 a.m., the Hot Spot Team observed a white minivan that caught their attention. *Id.* at ¶ 23. Officer Alfrey, a member of the Hot Spot Team, reported on Channel 7 that the minivan was speeding in a manner the officer described on the radio as "zooming pretty good" and had failed to stop at a stop sign. *Id.* Officer Alfrey began to pursue the minivan in the unmarked police van to make a traffic stop. *Id.* at ¶¶ 13, 16. Officer Gorny heard this transmission and radioed the Hot Spot Team that he was "not too far away" and asked what they needed. *Id.* at ¶ 31. No one appears to have directly responded. Officer Alfrey messaged on the channel shortly afterward with some details of the car they were pursuing, and that it had briefly crossed the centerline in the road. *Id.* at ¶¶ 36, 41. Officer Gorny began traveling toward the hot spot area and radioed on Channel 7 that he was approaching the area. *Id.* at ¶¶ 37-39. Officer Alfrey responded: "Ok, uh, I'll stay behind him until uh you get him pulled over." *Id.* at ¶ 40. No one in the Hot Spot Team specifically requested assistance from Officer Gorny or told him this was an emergency, facts that the Defendants do not dispute. [DE 166 at ¶¶ 162, 164.]

Officer Gorny drove towards the hot spot area at speeds ranging from 78 to 98 miles per hour. *Id.* at ¶¶ 139, 152. Officer Gorny did not activate his siren, [DE 151, ¶ 38]

and only used his emergency lights intermittently while traveling towards the hot spot area. [DE 166, ¶ 167.] Officer Gorny turned onto Western Avenue, a street with a mix of residential and commercial buildings with a speed limit of 30 miles per hour, going east. *Id.* at ¶¶ 130, 131.

While Officer Gorny was traveling east on Western Avenue, Erica Flores was traveling north on Kaley Street. [DE 151, ¶ 54]. Erica Flores was a 23-year-old mother of two driving home after finishing the third shift as a cleaning contractor at a nearby grocery store. [DE 166, ¶ 128.] Ms. Flores began to drive through the intersection of Western and Kaley going north. She was obeying all traffic laws. As Gorny approached the same intersection, which was the fourteenth intersection he would be going through, he reached speeds of up to 98 miles per hour. *Id.* at ¶¶ 132, 139. Officer Gorny knew he was approaching a "blind" intersection with obstructed views of traffic going north on Kaley. *Id.* at ¶ 133. All agree that Officer Gorny had a red light. *Id.* at ¶ 142. Officer Gorny's siren was still not on, and his emergency lights were off as he approached the intersection, with him turning them back on just two to three seconds before passing through the intersection. *Id.* at ¶¶ 168-70. In the intersection, Officer Gorny collided with Erica Flores' car at high speed, crushing the driver side of Flores' car and sending it crashing through a nearby tree. *Id.* at ¶ 143. Erica Flores died in the crash. As noted above, the collision is captured on video from a neighboring business, and a quick view of it proves the maxim that a picture (or better still, a video) is worth a thousand words. It's jarring.

In the meantime, Sergeant Hippaka, the officer on the Hot Spot Team who was in a marked car, continued to pursue the white minivan that initiated this whole episode. Hippaka turned on his lights, and the van pulled over. [DE 166, ¶ 165.] It turned out to be a nothing burger. The driver of the van stated that he was running late for work, and he was let go without being issued a ticket. *Id.*

**Facts Relating Training Officers for Emergency Vehicle Operations**

The Indiana Law Enforcement Academy teaches recruits how to operate emergency vehicles, and that driving recklessly can be a constitutional violation. [DE 151, ¶¶ 62, 64.] The South Bend Police Department has an emergency vehicle policy that has guidelines for how to appropriately operate a vehicle when responding to an emergency, which includes guidelines on the use of emergency lights and sirens. *Id.* at ¶¶ 69-70. Newly graduated officers from the academy must complete a field officer training program when they join the South Bend Police Department, which includes additional emergency vehicle training for officers. *Id.* at ¶¶ 72-73. Officers receive annual training on emergency vehicle operations, including training on operating their vehicles with due regard. *Id.* at ¶ 79. The South Bend Police Department also trains its officers twice a year at a racetrack on how to operate their vehicles in emergency scenarios. *Id.* at ¶¶ 80, 81.

Part of the annual emergency vehicle operations training is watching a training video.  The instructor explains many aspects of emergency vehicle operations, including clearing intersections, how legal liability may arise from improper driving, what constitutes an emergency under state law and the need to operate emergency vehicles

with due regard. [DE 166, ¶ 210, Reply; DE 139, Ex. C-101.] However, on one occasion, the instructor made comments about chasing suspects "up and down side streets, all the time…." [DE 166, ¶ 210.] Additionally, after showing the officers a statement by a mother who lost two children during a police pursuit, the instructor commented that the video was "sombering" [*sic*][1] but also that he had "bored" the officers "into oblivion." [DE 166, ¶ 218, Reply.]

Through a Pursuit Review Committee, the South Bend Police Department reviews instances of potentially unjustified police pursuits. [DE 151, ¶¶ 109, 112.] If the committee finds that a pursuit was unjustified, they will notify the shift captain and may prescribe additional training to the offending officer or can ban the officer from engaging in pursuits completely. *Id.* at ¶ 112. The South Bend Police Department also reviews all accidents involving police vehicles and determines whether the officer was at-fault.  *Id.* at ¶¶ 89, 90. If the department does determine that the officer was at-fault, the department may take away the officer's take-home car privileges, may give a verbal warning to the officer, a written reprimand, may prescribe additional training, or may engage in other disciplinary actions. *Id.* ¶ 91.

The South Bend Police Department documented 377 vehicle pursuits between 2013 and 2018. [DE 166, ¶ 226.] The department used a software called IA Pro for its pursuit reports, which included a data field for whether the pursuit was justified or not. Printouts of the data from that software showed that 262 of the 377 vehicle pursuits

---

[1] The training officer likely meant "sobering" not "sombering".

were not justified. *Id.*  Eight of these "unjustified" pursuit data entries from 2013 to 2018 were for pursuits conducted by Officer Gorny. *Id.* at ¶¶ 247-62. Defendants claim that the data is misleading because the software would automatically deem a pursuit "not justified" if that data field was not filled out, which it often was not. The software, they claim, therefore overrepresented the number of unjustified pursuits. *Id.* at ¶ 226, Reply. The fact that the printouts had an unjustified or justified marker on it did not mean that they were necessarily reviewed by the Pursuit Review Committee. *Id.*  According to Defendants, the Pursuit Review Committee would only review pursuits that Captain Keith Schweizer, the head of Internal Affairs and the Captain of Risk Management, thought could violate department policy. *Id.* at ¶¶ 225-26,

Captain Schweizer was a member of the Pursuit Review Committee himself in the years leading up to the events of this case, and while he recognized that the Committee members were experienced and knowledgeable of the relevant state and federal caselaw, he sometimes disagreed with the Committee's decisions and had called for revamping the Committee to make it more stringent. *Id* at ¶¶ 229-237. After Captain Schweizer's complaints and prior to the events of this case, the department changed which personnel were on the Committee, but there is no other evidence that the Pursuit Review Committee addressed Captain Schweizer's complaints. *Id.* at ¶ 241.  The Pursuit Review Committee reviewed at least one of Officer Gorny's pursuits in 2016 and found that it was justified and within policy. *Id* at ¶¶ 247-48. Captain Schweizer drafted a memo documenting that he disagreed with the decision. *Id.* at ¶ 248.

**Procedural History**

Soraida Flores, as personal representative of the estate of Erica Flores, filed her complaint on February 15, 2019. [DE 1.] She brought five counts: (1) a § 1983 claim against Justin Gorny for violating Erica Flores' constitutional rights; (2) a *Monell* claim against the City of South Bend under a theory that the municipality failed to train its police officers leading to the violation of Flores' constitutional rights; (3) a *Monell* claim against the City of South Bend for having a widespread practice or custom that led to the violation of Flores' constitutional rights; (4) a state law wrongful death claim against Justin Gorny based upon willful and wanton conduct; and (5) a second wrongful death claim against Justin Gorny based upon negligence.

The case was originally assigned to Judge Moody who dismissed it under Federal Rule of Civil Procedure 12(b)(6). *Flores v. City of South Bend*, 2020 WL 1234869 (N.D. Ind. Mar. 13, 2020). Judge Moody found that Plaintiff would need to sufficiently allege that Justin Gorny intended to inflict harm upon Erica Flores to state a claim upon which relief could be granted, and that Plaintiff had failed to do that. *Id.* at *2. Judge Moody further found that, because there was no underlying constitutional violation, the *Monell* claims against the City of South Bend necessarily had to be dismissed as well. He also relinquished supplemental jurisdiction over the state law claims. *Id.* at *3-4.

Plaintiff appealed, and the Seventh Circuit reversed. *Flores v. City of South Bend*, 997 F.3d 725, 734 (7th Cir. 2021). The Seventh Circuit found that Plaintiff had sufficiently alleged a constitutional violation and noted that the standard for finding a constitutional violation shifts depending on whether the officer is confronted with an

emergency or not. *Id.* at 729. As the Seventh Circuit determined that Plaintiff sufficiently alleged that this was not an emergency situation, they found that Plaintiff's claims passed muster under the lower standard for non-emergencies. *Id.* at 730. On the *Monell* claims, the Seventh Circuit stated that the complaint failed to sufficiently allege a *Monell* claim based upon a *de facto* policy of permitting or encouraging excessively fast driving, but allowed the *Monell* claim based upon a failure to train theory to proceed. *Id.* at 733-34. The Seventh Circuit did not specifically mention the state law claims.

On remand, the case was reassigned to me. [DE 34.] The case has now proceeded fully through discovery and the summary judgment issues have been briefed and argued. I'll start with the claims against Gorny and his invocation of the doctrine of qualified immunity. Then I'll address the failure to train claims against the City of South Bend. Finally, I'll discuss what to do with the state law claims.

### Discussion

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary

judgment motion may not rely merely on allegations or denials in its own pleading but must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

## 1. Constitutional Claims Against Officer Gorny

Section 1983 provides a remedy for violations of federal rights committed by persons acting under color of state law. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Plaintiff, as personal representative of the estate of the deceased, Erica Flores, has brought a claim against Justin Gorny, claiming his conduct violated Erica Flores' substantive due process rights under the Fourteenth Amendment of the United States Constitution.

### a. Violation of Flores' Substantive Due Process Rights

The standard for determining whether a government official violated someone's Fourteenth Amendment substantive due process rights is whether the alleged violation "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998). Given this fuzzy standard, it's not surprising that whether conduct "shocks the conscience" depends on its context. In evaluating actions of police officers, the standard depends largely on whether the challenged conduct occurred in an emergency or nonemergency situation.

When there is an emergency in the context of a sudden, high-speed police chase, the plaintiff faces an exceedingly high standard—proof that the officer acted with "intent to harm." *Flynn v. Consolidated City of Indianapolis and Marion Cnty.*, 148 F.4th

565, 569 (7th Cir. 2025). This is sensible because in the emergency context we are evaluating the actions of police officers who are making split-second judgments in a highly stressful environment. It *should* be hard to "shock the conscience" in such a situation. But for good reasons, a non-emergency presents a different kettle of fish. When there is no emergency, and a plaintiff is hurt in an officer-caused accident, the plaintiff still has a high burden, just not as high as in the emergency context. In those non-emergency situations, an injured plaintiff must prove the officer acted with "deliberate indifference—that is, that the officer acted recklessly." *Id.*; *see also Flores*, 997 F.3d at 729 ("Officers responding to a nonemergency situation or inserting themselves into a situation that is already under control face a different set of constraints. They cannot reasonably expect to engage in the same conduct considered acceptable in the heat of an emergency.").

So, the critical preliminary question here is whether Officer Gorny was confronted with an emergency. The answer to that question will guide what standard governs his conduct. In the context of a police pursuit, there are a range of considerations to determine this, but they generally fit into two inquiries.

The first inquiry is determining what the officer knew of the danger posed by the driver he is pursuing and if that knowledge could justify his conduct. Consider *Flynn*, where the pursuit occurred for "serious reasons" that made it an emergency, including that the suspect was in a car the police believed stolen, drove away from a police officer who approached the car, crashed into a patrol car, nearly hit two police officers, and took the police on a five and a half minute long chase at speeds of 80 to 100 miles per

11

hour. 148 F.4th at 567-69. Likewise, in *Steen v. Myers*, the Seventh Circuit found that a pursuit constituted an emergency when the police attempted a traffic stop, the driver did not pull over and instead took the police on a high-speed chase for six minutes with speeds ranging up to 130 miles per hour. 486 F.3d 1017, 1019-1020 (7th Cir. 2007). And then there is *County of Sacramento v. Lewis*, where the chase followed a failed traffic stop and reached speeds of up to 100 miles per hour, with the suspect weaving through traffic, forcing other cars and a bicycle off the road, and was thus deemed an emergency. 523 U.S. 833, 836-37.

These cases involve high-speed pursuits where the police had already tried and failed to get the driver to pull over, the driver did not do so, and then the driver proceeded to demonstrably put other drivers at risk with their driving. In other words, the driver being pursued in all of these cases was the person creating the emergency. The facts of this case do not demonstrate that Officer Gorny was aware of similar dangers posed by the driver he chose to pursue. Indeed, it was Officer Gorny who was the one creating the danger, or so a reasonable jury could find.

Recall that the officers in pursuit of the white minivan had not attempted a traffic stop yet. [DE 158-1, 15: 11-14]. There was no sign, nor had anyone reported on Channel 7, that the car they were pursuing would speed off or refuse to pull over once the police lights came on. And indeed, once the police displayed their lights, the driver promptly pulled over. This was not a situation—like in *Flynn*, *Steen*, or *Lewis*—where the police attempted to pull over the driver and the driver fled. Indeed, the fact that the driver of the white minivan was not fleeing was what *Flynn* used in distinguishing this very case

12

when it was on appeal. *Flynn*, 148 F.4th at 569 ("*Flores* is readily distinguishable… *Flores* did not involve a failed traffic stop or the chase of the suspect.").

What's more, the record does not show that the Hot Spot Team was reporting that the car they were tracking was putting others at risk in the ways the drivers were in *Flynn*, *Steen*, or *Lewis*. It is true the driver of the white van failed to stop at a stop sign, was reportedly "zooming pretty good," and had crossed the centerline to attempt to pass a car in traffic. But there is no evidence the van failed to pull over when requested to do so with lights and sirens. And there is no showing that the van was going nearly as fast as the vehicles in *Flynn*, *Steen*, or *Lewis*, nor that he had crashed into any other cars or almost hit two officers like the suspect in *Flynn* or had forced other cars off of the road like the suspect in *Lewis*.

It is therefore entirely unsurprising that no other officers considered this to be an emergency nor told Officer Gorny that it was one. Officer Alfrey testified that he did not tell Officer Gorny this was an emergency, and that, to his knowledge, everyone was considering this a traffic stop. [DE 158-1, Dep. at 9:11-18, 17:13-15.] Officer Hippaka, another member of the Hot Spot Team that night, testified similarly that he viewed this as a routine traffic stop and noted that the driver was not fleeing. [DE 158-10, 15:10-19, 18:21-19:3.

Defendants emphasize in their briefs that the driver was "coming from a hot spot known for drug activity" and that the "officers did not know if the suspect van had drugs, weapons, or other instrumentalities of criminal activity" nor "why the driver of the van was driving recklessly until after the stop." [DE 140, 13]. A determination by the

13

police that an area is a "hot spot" does not mean all regular police activities in that area, such as following and then pulling over a non-fleeing driver who committed traffic violations, become emergencies that grant all police in the area the heightened standard of intent to harm. Further, it is almost *always* the case that the police do not know why a driver is driving recklessly or if a vehicle has drugs or weapons until after the stop. To consider that sufficient to show an emergency would be to elevate many routine police activities to emergencies.

The other critical determination is whether Officer Gorny had the time to consider his conduct before engaging in it. The Supreme Court has noted that officers do not always have "time to make unhurried judgements" and that they often must make decisions "in haste, under pressure, and without the luxury of a second chance." *Lewis*, 523 U.S. at 853. Because of this, the same "behavior considered reasonable in an emergency situation might be criminally reckless when state actors have time to appreciate the effects of their actions." *Flores*, 997 F.3d at 729.

Consider *Sauers v. Borough of Nesquehoning*, where an officer had the time to "call the neighboring police department as he was contemplating his actions" related to pursuing a driver who committed "a simple traffic violation." 905 F.3d 711, 718 (3d Cir. 2018). The Third Circuit held the officer had sufficient time to consider his actions. *Id.* This case has an even clearer showing that Officer Gorny — who, unlike the officers in *Steen*, *Lewis*, *Flynn*, and even *Sauers*, was not the primary officer pursuing the driver — had time to deliberate.

14

Officer Gorny was not a member of the Hot Spot Team and was patrolling an entirely different district of the city that night. Recall that Gorny was chatting with a fellow officer miles away when he heard on Channel 7 that the Hot Spot Team observed the white minivan commit traffic violations. He then asked them if they needed help. Officer Alfrey explained the situation, and when Officer Gorny announced that he was on his way, Officer Alfrey told him he would stay behind him. Officer Gorny then proceeded to travel from the Southwest District of the city towards the white minivan's location. During this time, he checked in with the Hot Spot Team. He had time to consider whether the Hot Spot Team could handle the situation themselves. He had time to consider whether a closer officer could help. He had time to consider whether he needed to travel so fast to catch up to a vehicle that was being actively monitored by other police.  He had time to consider whether a white minivan who had committed some minor traffic violations justified his high-speed driving. He even had time to deliberate whether his emergency lights should be on or off, as he switched between the two repeatedly during his race to get to the white minivan. This is far from the "split-second judgments" talked about in other cases. *Lewis*, 523 U.S. at 853.

Where, as here, "there is no compelling justification for an officer to engage in a high-speed pursuit and an officer has time to consider whether to engage in such inherently risky behavior," the deliberate indifference standard applies. *Sauers*, 905 F.3d at 723. Deliberate indifference occurs when an "officer proceeds to operate his vehicle in a manner that demonstrates a conscious disregard of a great risk of serious harm." *Id.* In

15

other words, the inquiry is whether "the officer acted recklessly." *Flynn*, 148 F.4th at 568.

A jury could reasonably find that Officer Gorny's actions constituted deliberate indifference. The Seventh Circuit stated that, based on the allegations that Officer Gorny was "with no justification," racing through a residential area at "two-to-three times the limit" and sped through a red light at an intersection "despite the obstructed view," a jury could find that he displayed "deliberate indifference to the known risk." *Flores*, 997 F.3d at 730 (parentheses omitted).

When the case was previously before Circuit, the court was considering allegations. We're now armed with facts. Officer Gorny was indeed going over three times the speed limit as he approached an intersection on a mixed commercial and residential street and ran through a red light with no siren and intermittent use of his emergency lights. Officer Gorny testified that he knew Western and Kaley was a "blind" intersection, and yet he was still accelerating shortly before passing through the intersection, still had his siren off, and only turned his emergency lights back on two to three seconds prior to impact. [DE 166, ¶¶ 133, 145, 169-170]. There is no evidence that Erica Flores' conduct contributed to this crash, nor is it disputed that she had the right of way. In short, there is a plenty of evidence for a reasonable jury to conclude that Officer Gorny acted recklessly.

Nothing in *Lisby v. Henderson*, 74 F.4th 470, 474 (7th Cir. 2023), a case relied on by Gorny, mandates a different result. In *Lisby*, a police officer who struck and killed a pedestrian in a nonemergency scenario was found to not be acting with deliberate

indifference. 74 F.4th 470, 474 (7th Cir. 2023). While tragic, *Lisby* involved an act of simple negligence on the officer's part. The case involved two pedestrians walking on the shoulder of a highway at night. The officer in that case was speeding while merging onto the highway and inadvertently crossed the fog line partially onto the shoulder of the road, striking and killing one of the pedestrians. *Id.* at 472. Those facts are far from the ones at play here. Indeed, it is telling that, in arriving at their decision, the Circuit distinguished our very case noting that "[u]nlike the officer in *Flores*, Officer Henderson was not racing through a residential area at speeds tripling the posted speed limit, but was merging onto an on-ramp of a major highway." *Id.* at 474.

Defendants also rely on *Hill v. Shobe* for its statement that conduct by a police officer that merely shows a "generic risk to the public at large" is insufficient to show a constitutional violation. 93 F.3d 418, 421-22 (7th Cir. 1996). Defendants argue that the risk posed to Erica Flores "was not a risk to a specific individual, it was a risk to the public at large." [DE 140, 12]. The Seventh Circuit has already disposed of this argument. The Circuit noted that the allegations in *Hill* were only "superficially similar" to this case, constituted "bare factual allegations," and that "the facts alleged here go well beyond those in *Hill*, and the difference matters." *Flores*, 997 F.3d at 729.

In sum, given the totality of the evidence, a reasonable jury could find that Officer Gorny was reckless in the manner in which he operated his car and that his recklessness led to a violation of Erica Flores' constitutional rights.

### b. Qualified Immunity

The next question is whether Officer Gorny is protected by the judge-made doctrine of qualified immunity. Under the doctrine of qualified immunity, even if a constitutional violation is found, government officials are protected from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640 (internal citations omitted).

A plaintiff can demonstrate that a right is clearly established in two ways: (1) "by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional" or (2) "by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010). The first avenue is dispositive in this case.

In determining whether there is controlling precedent, I first look to cases decided by the Supreme Court or the Seventh Circuit. *Abbott v. Sangamon*, 705 F.3d 706, 731 (7th Cir. 2013). If there is no controlling precedent, I need to cast "a wider net to

18

examine all relevant case law to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* (internal quotation marks omitted).

While the precedent should be "closely analogous," it need not be a twin. *Escobedo*, 600 F.3d at 781. Stated differently, although "earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Instead, the central inquiry is whether a defendant has fair warning that his conduct was unconstitutional. *Escobedo*, 600 F.3d at 781. Further, "the more obviously egregious the conduct… the less specificity is required from prior case law to clearly establish the violation." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1083 (10th Cir. 2015). To give the state official fair warning, the precedent must obviously pre-date the conduct involved in the instant case. *See Sauers*, 905 F.3d at 723.

In 1996, the Seventh Circuit stated in *Hill v. Shobe* that "criminal recklessness— which is the same as 'deliberate indifference' is a proxy for intent" and it is enough to show "that the defendant had actual knowledge of impending harm which he consciously refused to prevent." 93 F.3d at 421-22.  Two years later in *County of Sacramento v. Lewis*, the Supreme Court specifically noted the lesser standard in a non-emergency situation compared to one where the police must make decisions "in haste, under pressure." 523 U.S. at 853-54.

Well before 2018, multiple courts have cited *Hill v. Shobe* and *County of Sacramento v. Lewis* as clearly establishing that the deliberate indifference standard applies to nonemergency police vehicle operations such as this one.

> *Hill* established that, in the context of non-emergency police motor vehicle accidents, a criminal recklessness-deliberate indifference standard would apply. While articulating a higher standard for police motor vehicle accidents in which a police officer must make the split-second decision whether to give chase, *Lewis* bolstered the holding in *Hill* by specifically contemplating that situations not marked by such urgency be measured by the lesser, deliberate indifference standard.

*Wells v. Bisard*, 2011 WL 5827213, at *3 (S.D. Ind. Nov. 18, 2011) (denying qualified immunity to a police officer who hit someone in a nonemergency scenario); *see also Mellenthin v. County of McDonough*, 2025 WL 3559097, at *7 (C.D. Ill. Aug. 25, 2025) (denying qualified immunity to a police officer who hit someone in a nonemergency scenario and favorably quoting *Wells*' analysis of *Hill* and *Lewis* for the same proposition); *see also Flores*, 997 F.3d at 730 (finding that the allegations supported that through "his course of action, Gorny was 'willing to let a fatal action occur'" and citing *Hill*).

In 2015, the Tenth Circuit found that a police officer who hit someone in a nonemergency scenario did not benefit from qualified immunity. Then-Judge Neil Gorsuch, writing for the panel, held that:

> The Supreme Court and this court have spoken unmistakably to this situation. In *Lewis,* the officer was using his police car to respond to an emergency and the Court held he didn't violate the Constitution. But the Court also expressly noted when a private person suffers a serious physical injury "'due to a police officer's *intentional misuse* of his vehicle'" a viable due process claim can arise.

*Browder*, 787 F.3d at 1083 (quoting *Lewis*, 523 U.S. at 854 n. 13). What's more, although not directly relevant for the qualified immunity analysis, it's worth noting that the law has continued to trend toward this approach. A few months after the crash in this case, the Third Circuit, in finding that a police officer committed a constitutional violation, "agree[d] with the Tenth Circuit's applications of a culpability standard below that of 'intent to harm' in a non-emergency police pursuit." *Sauers*, 905 5.3d 711.

In sum, these cases demonstrate that a person's rights in the context of a nonemergency police situation were well-established by *Hill* and *Lewis* prior to Officer Gorny's conduct in this case.

With this considerable backdrop, it is unsurprising, then, that Officer Gorny's colleagues were uniformly aware of the fact that reckless driving could constitute a constitutional violation.  Sergeant Corey Calvert, the city's designated 30(b)(6) witness and an Indiana police officer who graduated from the academy in 2011, testified that he was taught about constitutional violations of the Fourteenth Amendment, and that he knew in 2018 that recklessness could be considered a constitutional violation. [DE 159-2, 31:15-22]. Sergeant Hippaka, a member of the Hot Spot Team, also testified that he was taught that reckless driving could be a Fourteenth Amendment violation; and South Bend Assistant Chief Skibins said the same thing. [DE 159-11, 47:15-23; DE 159-14, 57:5-10].

By 2018, it was clearly established that police officers who operate their vehicles with deliberate indifference or criminal recklessness in a nonemergency scenario can be held constitutionally liable for injuries they cause. Multiple courts from both within this

circuit and elsewhere have recognized this, as have many of Officer Gorny's former peers in the South Bend Police Department. Because the state of the law gave Officer Gorny fair warning that his conduct was unconstitutional, he is not entitled to qualified immunity.

### 2. Section 1983 Failure to Train Claim Against the City

There is no general *respondeat superior* liability against municipalities under section 1983. Municipalities are only liable for their own misdeeds. *Flores*, 997 F.3d at 731. One way of putting a municipality on the hook is by proving it did not properly train its officers, and that poor training caused a constitutional violation. So held the Supreme Court in *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). When the Seventh Circuit reviewed this case, a failure to train was the sole theory that was allowed to go forward against South Bend. *Flores*, 997 F.3d at 733-34. While "stressing that we are still at the pleading stage," and that the "parties would have the chance to develop the factual record further," the Circuit found that Plaintiff sufficiently alleged that South Bend knew that its officers, including Officer Gorny, routinely drove too fast, but "took no steps to prevent this behavior—no training, no discipline, no reprimands." *Flores*, 997 F.3d at 733. Now, that we are armed with evidence—not simply allegations—I can assess whether South Bend's training regimen passes constitutional muster.

Before diving in, it has to be recognized that failure to train is a very difficult theory for plaintiffs to prevail on. Indeed, the Supreme Court has issued a word of caution when considering such claims: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v.*

*Thompson*, 563 U.S. 51, 61 (2011). The Seventh Circuit acknowledged as much in this case when it noted that, although the theory remains valid, "failure-to-train liability is rare[.]" *Flores*, 997 F.3d at 731.

Traditionally, to prevail on a failure to train claim, a plaintiff must show a "pattern of similar constitutional violations by untrained employees" and "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Connick*, 563 U.S. at 62. In a circumstance where a constitutional violation is a plainly obvious consequence of failing to adequately train state actors, liability can also attach even after just a single instance of violative conduct. *Flores*, 997 F.3d at 731-32.

There is a key gating issue for any failure to train case: was the relevant training adequate? *City of Canton,* 489 U.S. at 391. ("In resolving the issue of a city's liability, the focus must be on whether the program is adequate to the tasks the particular officer must perform."). To avoid an "endless exercise of second-guessing municipal employee-training programs" that the "federal courts are ill suited to undertake," showing that a training program is inadequate is a heavy burden for plaintiffs pursuing a claim against a municipality. *Id.* at 392. Indeed, in "virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident." *Id.* (internal quotations omitted). So, a permissive burden to show a failure to train would "open up municipalities to unprecedented liability under § 1983." *Id.* at 391.

To establish that a training program is inadequate, it's not enough to show that an otherwise sound program was negligently administered. *Id.* "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training sufficient to equip him to avoid the particular injury-causing conduct." *Id.* In *Canton*, the Supreme Court provided an example of a situation that would clearly constitute a failure to train: a municipality that arms its police officers but fails to train them on constitutional limitations on the use of deadly force. *Id.* at 390 n. 10. Plaintiff tells me that this hypothetical "perfectly describes this case[.]" [DE 150, 23]. It does not.

As the Supreme Court clarified in *Connick*, the "*Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limitations of deadly force." *Connick*, U.S. at 67. In *Connick*, the plaintiff was alleging that prosecutors were not adequately trained about the *Brady* rule in the context of certain evidentiary disclosures. *Id.* The Court found that it was undisputed that the prosecutors were "familiar with the general *Brady* rule" and that arguing that they were not trained on a specific facet of it is "a nuance [that] simply cannot support an inference of deliberate indifference" by the municipality. *Id.*

The undisputed evidence in this case shows that South Bend does train its officers on how to operate their vehicles and how reckless operation may constitute constitutional violations. For starters, every South Bend Police Officer must graduate from the Indiana Law Enforcement Academy, where recruits are taught how to operate emergency vehicles safely. The academy also teaches recruits that driving recklessly can be a violation of the Fourteenth Amendment. Officer Alfrey testified that the academy

24

teaches how officers should clear intersections. South Bend has an emergency vehicle policy that has guidelines for how to appropriately operate a vehicle when responding to an emergency. The emergency vehicle policy provides guidelines for when officers should use their lights and sirens. New officers at the South Bend police department complete a field training officer program that has additional emergency vehicle training for officers after they have graduated from the academy. After this, officers receive annual training on emergency vehicle operations, including on the need to operate vehicles with due regard. And then there's hands on training: twice a year South Bend police officers are provided training at a racetrack on how to operate their emergency vehicles at high speeds. This does not strike me as the actions of a municipality acting with deliberate indifference.

What's more, the South Bend Police Department, through a dedicated Pursuit Review Committee and a procedure for reviewing all instances of damage to police vehicles, investigates instances of its officers speeding and being involved in crashes. Officers found to have engaged in unjustified speeding or to be at-fault for crashes have received warnings, written reprimands, and additional training.

In this case, the Seventh Circuit allowed a claim against South Bend to proceed past the pleading stage on a failure to train theory because the allegations included that, while South Bend was aware of its officers engaging in high-speed driving, it "took no steps to prevent this behavior — no training, no discipline, no reprimands." *Flores*, 997 F.3d at 733. Discovery, however, has shown that South Bend does take various steps to

ensure its officers drive safely and that it often reviews instances of high-speed pursuits and crashes.

Plaintiff does not dispute that many of these training measures exist but repeatedly question their adequacy and the seriousness with which the trainings were conducted, especially in light of the frequency with which South Bend police engage in pursuits. But pointing at existing training regimens and simply alleging that "better or more training" could have avoided the conduct at issue "will not suffice." *Connick*, 563 U.S. at 1363-64. To hold otherwise would be to engage the courts in exactly the "endless exercise of second-guessing municipal training programs" which the Supreme Court aimed to avoid in *Canton*. *Canton*, 489 U.S. at 392.

Plaintiff also points to Captain Schweizer's complaints that the Pursuit Review Committee was too lenient, but his complaints do not change this analysis. It is undisputed that Captain Schweizer considered the Committee members to be experienced, prepared, and knowledgeable of U.S. and Indiana Supreme Court rulings on the relevant issues. Further, it is undisputed that the Committee *did* change its membership after his complaints. The fact that Captain Schweizer thought that the Committee was not stringent enough does not show that the totality of the South Bend Police Department's emergency vehicle operations training was inadequate, much less that the municipality was deliberately indifferent to the dangers that can arise from police pursuits.

Additionally, Plaintiff's counsel forcefully argued in the qualified immunity portion of its brief that the training of South Bend police officers showed that the

26

constitutional right at issue here was well-known by officers. Plaintiff pointed out that Sergeant Calvert, Sergeant Hippaka, and Assistant Chief Skibins all testified that they were taught about constitutional violations, including those caused by recklessness. [DE 150, 19-20.] Plaintiff noted how the "South Bend Police Department was kept well-informed of recent Supreme Court holdings and opinions on an annual basis, and EVO [emergency vehicle operations] instructors would relay legal updates to each officer." *Id.* at 20. As Plaintiff summed it up: "consistent testimony from multiple witnesses at different ranks and across different academy graduation years establishes that South Bend police officers were affirmatively taught that reckless high-speed driving operations violating the 'shocks the conscience' standard constituted a 14th Amendment violation." *Id.* at 21. I agree. The evidence indeed shows a robust training program. But as I see it, that evidence undercuts Plaintiff's failure to train argument for the very same reason it supports their position on qualified immunity.

It is true there were some inappropriate and callous statements made by a South Bend training instructor during training. These statements were made after an emergency vehicle operations training video was played for South Bend police officers. *Id.* at 28. Plaintiff argues that certain statements encouraged the officers to engage in high-speed pursuits, and did not take the consequences of not doing so seriously. Notably, after showing the officers a statement by a mother who lost two children during a police pursuit, the instructor commented that the video was "sombering" [*sic*] but also that he had "bored" the officers "into oblivion" during the training. [DE 166, ¶ 218.] Some witnesses, including South Bend's 30(b)(6) witness, agreed that calling the

27

video "boring" was not the right message to send to officers, and that some statements were improper and reckless. *Id.* at ¶¶ 212, 219. By contrast, the City points to all of the positive training in the video, including training on clearing intersections, how legal liability may arise from improper driving, and that high-speed pursuits are dangerous. [DE 167, 13-14.] The instructor also discussed what constitutes an emergency under state law and the need to operate their vehicles with due regard. *Id.* Plaintiff's own police practices expert, Dr. Scott Mourtgos, agreed that these portions of the video constituted good police training. [DE 160-40: 219:24-225:5.]

I fully agree that some of the comments made by the instructor were inappropriate. But a stray comment does not make the whole of South Bend's training regimen for emergency vehicle operations constitutionally inadequate. Moreover, evidence that an "otherwise sound program has occasionally been negligently administered" is insufficient to show a failure to train. *Canton*, 489 U.S. at 391.

The standard for a failure to train claim also includes that "the identified deficiency in the training program must be closely related to the ultimate injury" and that this Court ask: "would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Canton*, U.S. at 391. In a brief section in their response, Plaintiff argues that if "Gorny had received adequate and proper training on speed management, risk assessment, intersection clearing, and decision-making he would not have driven 98 mph toward a blind intersection… This should be obvious." [DE 150, 31-32.] This ignores the possibility that Officer Gorny engaged in this misconduct *despite* his training. Officers "who are well

trained are not free from error[.]" *Canton* U.S. at 391. So, the fact that the officer engaged in misconduct is not itself evidence that he was inadequately trained. Even the emergency vehicle operations training video which Plaintiff heavily relies on taught about the need to properly clear intersections, and Plaintiff has not sufficiently pointed to a specific facet of the training that is responsible for the actions taken by Officer Gorny on July 20, 2018.

The evidence shows that South Bend police were engaging in high-speed pursuits, and that Captain Schweizer was of the opinion that some of those pursuits were unjustified. But it also shows that the South Bend Police Department was doing what you would expect of a department that knew its officers were engaging in high-speed pursuits. It was taking many steps, from the time officers are in the academy through every year of their duty, to make sure that they are trained to operate their emergency vehicles safely. The evidence does not show inadequate emergency vehicle training, or, more broadly, a department or municipality that is indifferent to such training.

All of which brings me back to where we began. "A municipality's culpability for deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.  The evidence in this case shows that South Bend was well aware of the perils of high-speed police pursuits. And the City addresses those concerns by having a vigorous training program for police officers relating to the high-speed operation of police cars. No reasonable juror could find that South Bend was being deliberately indifferent to a "known risk" to the motoring public in the manner in

which it trained its officers. *Flores*, 997 F.3d at 731. Summary judgment must therefore be granted in favor of South Bend.

### 3. State Law Claims Against Officer Gorny

Plaintiff has brought two state law wrongful death claims against Officer Gorny, one based upon willful and wanton conduct (Count IV) and one based upon negligence (Count V). Officer Gorny argues that he is immune from Plaintiff's state law claims under the Indiana Tort Claims Act because he was acting within the scope of his employment with South Bend. Officer Gorny claims this immunity applies equally to Plaintiff's negligence claim and to her willful and wanton claim. [DE 140, 34.]

"The ITCA limits when a plaintiff may sue a governmental employee personally." *Wilson v. Isaacs*, 917 N.E.2d 1251,1257 (Ind. Ct. App. 2009). The ITCA states in Indiana Code § 34-13-3-5(b) ("Subsection B") that a "lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally" unless "the governmental entity answers that the employee acted outside the scope of the employee's employment[.]" *Id.* In this case, Plaintiff alleged that Officer Gorny was acting within the scope of his employment, and the Defendants have not disputed that. [DE 1, ¶ 10.] However, in the very next subsection of the ITCA (Subsection C), it states that a lawsuit against an employee must show one of five factors to proceed. Ind. Code § 34-13-3-5(c). Those factors are that the conduct was "(1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." *Id.* On a plain reading of this statute, what it suggests

to me is that claims against public employees acting within the scope of their employment can still proceed if the allegations involve malicious, willful or wanton conduct. That's our case.

But for reasons that are not clear to me, Courts have disagreed as to whether the factors in Subsection C serve as an exception to the scope of employment immunity granted in Subsection B, or if they delineate an additional requirement for plaintiffs. This disagreement appears to stem primarily from the Indiana Supreme Court's 2003 decision in *Bushong v. Williamson*. 790 N.E.2d 467, 471 (Ind. 2003). In *Bushong*, the Indiana Supreme Court held that the defendant, a government employee, was immune under the ITCA because the evidence established that he had acted within the scope of his employment, regardless of the fact that defendant had alleged his actions were criminal, one of the five listed factors. *Id.* at 472-74. The Court held that the fact that the defendant was operating within the scope of his employment was dispositive. *Id.*

Based on this decision, some judges have found that a finding that the employee was operating within the scope of his employment entitles them to immunity under the ITCA even if the action would fall into one of the factors in the next subsection. *See, e.g.,* *Estate of Spates by Spates v. Crizer*, 2019 WL 3935347, at *3 (N.D. Ind. Aug. 20, 2019) ("Indiana Supreme Court's holding in *Bushong* supports the notion that a plaintiff may not sue a governmental employee should the complaint allege that the employee's acts occurred within the scope of employment, even if those acts were criminal, malicious, or willful and wanton[.]"); *Richardson v. Thompson*, 2025 WL 3466874, at *4 (N.D. Ind. Dec. 2, 2025) ("Accordingly, although the act or omission may be alleged to fall under

one of the categories delineated in IND. CODE § 34-13-3-5(c), that fact 'standing alone is not dispositive of whether the employee was acting outside the scope of employment.'" (quoting *Bushong*, 790 N.E.2d at 473)).

However, in 2020, the Indiana Supreme Court seems to have taken the air out of *Bushong* when it clarified the standard for ITCA cases in *Burton v. Benner*. In that case, the Court emphasized that the ITCA provides "substantial immunity for conduct within the scope of the employee's employment," but states that Subsection C "also authorizes a suit to be filed against an employee personally if the plaintiff alleges the employee's act or omission is criminal, malicious, willful and wanton, or calculated to benefit the employee personally." *Burton*, 140 N.E.2d at 852 n.3. Moreover, in recent years, multiple rulings have allowed police or correctional officers to be sued for torts where the conduct at issue was willful and wanton even when their actions were within the scope of their employment. *Biddle v. Cushingberry*, 2024 WL 1050434, at *2 (S.D. Ind. Mar. 11, 2024); *Johnson v. Galipeau*, 2022 WL 504539, at *7 (N.D. Ind. Feb. 18, 2022); *Mitchum v. City of Indianapolis*, 2021 WL 2915025, at *15 (S.D. Ind. July 12, 2021); *see also Thomas v. Brinker*, 2011 WL 1157622 (N.D. Ind. Mar. 28, 2011) ("The ITCA does not require that a plaintiff allege that a defendant was acting 'clearly outside the scope of employee's employment' *and* that the conduct was willful and/or malicious; rather it is sufficient that a plaintiff alleges one of the five factors in his complaint in order to take the action outside of the purview of ITCA immunity.").

In analyzing this issue, I note that, because "the Indiana Tort Claims Act is in derogation of the common law," it must "be strictly construed against limitations on the

32

claimant's right to bring suit." *Greater Hammond Comty. Servs., Inc. v. Mutka*, 735 N.E.2d 780, 782 (Ind. 2000). Moreover, "the party seeking immunity bears the burden of establishing its conduct comes within the Act." *King v. Northeast Security, Inc.*, 790 N.E.2d 474, 480 (Ind. 2003) (citation omitted).

Undoubtedly, "judicial interpretations of the scope-of-employment immunity are not uniform." *Biddle*, 2024 WL 1050434, at *3. However, under Indiana law, I'm obliged to interpret the statute as strictly as possible. And after reviewing the text of the statute and the relevant case law, I find that if a plaintiff sufficiently shows a factor satisfying Subsection C, then a government employee operating within the scope of his employment is not immune from suit under the ITCA.

In this case, Plaintiff alleges that Officer Gorny's conduct was willful and wanton. Willful and wanton conduct under the ITCA includes an act done with reckless disregard of the natural and probable consequence of injury. *See Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1204-05 (Ind. Ct. App. 2011). It's noteworthy that the "federal deliberate indifference standard and Indiana willful and wanton standard are remarkably similar." *Galipeau*, 2022 WL 504539, at *7. Having found above that Officer Gorny's actions could possibly constitute deliberate indifference, the Court relatedly finds that a reasonable jury could conclude that Officer Gorny's conduct was willful and wanton. *See Mitchum*, 2021 WL 2915025, at *15 (allowing both a § 1983 claim and a tort claim against a police officer to proceed past summary judgment). So, these wrongful death claims may proceed.

33

### 4. Motion to Exclude Dr. Mourtgos

South Bend has also moved to exclude the opinions of Plaintiff's expert, Dr. Scott Mourtgos. [DE 141.]  Dr. Mourtgos has provided a mammoth expert report, 173 pages in all including the supplemental report. Dr. Mourtgos' opinions cover accepted police practices related to emergency vehicle operations, training policies related to emergency vehicle operations, and an appraisal of Officer Gorny's actions on July 20, 2018.

As an initial matter, allowing an expert to testify to what constitutes, supports, or satisfies a specific legal standard, is impermissible. *Arrington v. City of Chicago*, 2022 WL 2105871, at *5-6 (N.D. Ill. June 10, 2022); *Davis v. Duran*, 277 F.R.D. 362, 373 (N.D. Ill. 2011). Dr. Mourtgos' report makes such assertions repeatedly. For example, Dr. Mourtgos asserts frequently in his report that certain evidence constitutes or supports a finding of deliberate indifference or that certain conduct shocks the conscience. This "abridges the jury's role of applying the law to the facts," and "usurps the judge's role of instructing the jury as to the applicable law." *Arrington*, 2022 WL 2105871, at *5. All of Dr. Mourtgos' conclusions that apply the facts to the law or that attempt to explain what facts support or do not support a specific legal finding are inadmissible.

Additionally, certain of Dr. Mourtgos' opinions relate primarily to the *Monell* claims, notably his opinions relating to whether the training of South Bend police officers was adequate, which includes his opinions on South Bend police training materials, procedures, and videos. As the Court is granting South Bend's motion for summary judgment on the *Monell* claims, these opinions are now much less relevant, and any remaining relevance is likely substantially outweighed by the risk of undue

34

prejudice and confusion. *See Andersen v. City of Chicago*, 454 F.Supp.3d 808, 819 (N.D. Ill. 2020) (finding that, where a *Monell* claim was bifurcated, references to department practices and procedures "beyond the evidence of what was actually done in this case are unnecessary, confusing, and unduly prejudicial" under FRE 403). Any definitive ruling on this issue can await trial.

But not all of Dr. Mourtgos' opinions are excludable. "When an expert offers an opinion *relevant to applying* a legal standard," testimony "describing sound professional standards and identifying departures from them" may be admitted. *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (emphasis added). Much of Dr. Mourtgos' testimony falls within this rule. Dr. Mourtgos has substantial experience with police practices, including how officers generally act in scenarios like the one Officer Gorny found himself in on July 20, 2018. Police practices during patrols and traffic stops are not subjects the average juror would have experience with, and thus, Dr. Mourtgos' testimony regarding general police practices and how Officer Gorny's actions compare to those could help the jury determine whether Officer Gorny was deliberately indifferent and whether his actions "shock the conscience."

In sum, given the broad outline discussed above of permissible and impermissible testimony, Dr. Mourtgos will be permitted to testify at trial. But given the scope and breadth of his report (it is, after all, 173 pages in length), any further specificity in this ruling is simply not feasible at this time. All objections to particular testimony will need to be made contemporaneous with his testimony at trial, or perhaps in a targeted motion in limine, and will be ruled on at that time.

35

## Conclusion

For the reasons stated above, Defendants' motion for summary judgment [DE 137] is GRANTED IN PART and DENIED IN PART. It is GRANTED as to the claim against the City of South Bend, and it is DENIED as to the claims against Officer Gorny. The federal § 1983 claim and the state wrongful death claims against Officer Gorny shall proceed to trial in accordance with this order.

The City of South Bend's motion to exclude Dr. Mourtgos [DE 141] is GRANTED IN PART and DENIED IN PART. Dr. Mourtgos will be allowed to testify to certain expert opinions subject to the limitations above. Further, any specific challenges to his testimony will be addressed during pretrial proceedings and submissions or contemporaneously during trial.

**SO ORDERED**.

ENTERED:  March 23, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT